**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 06-cv-7010 |
| v. | ) | |
| | ) | Honorable Amy J. St. Eve |
| ST. ANTHONY'S SPINE & JOINT INSTITUTE, | ) | |
| P.C., MELVIN D'SOUZA, D.C., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendants Melvin D'Souza, D.C. ("Dr. D'Souza") and St. Anthony's Spine and Joint Institute, P.C.'s ("St. Anthony's") (collectively "Defendants") Motion for Summary Judgment. In their Complaint, Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Company (collectively "Allstate") allege that Dr. D'Souza, a chiropractic physician and the sole shareholder of St. Anthony's, defrauded Allstate by submitting false and misleading medical reports, records, and billing statements for chiropractic and diagnostic services. (R. 1-1, Compl. ¶ 1.) Specifically, Allstate claims that Dr. D'Souza routinely ordered "unnecessary and unwarranted diagnostic testing" such as video fluoroscopy in the form of dynamic motion x-rays ("DMX"). According to Allstate, it suffered harm when it "made direct payments to defendants on first party claims submitted by its own insureds pursuing medical payments claims, and uninsured and underinsured motorist claims" based on Defendants' alleged fraudulent bills. *Id.* at ¶ 2. In other instances, Allstate made "substantial payments based upon settlements and verdicts obtained against plaintiffs' insureds in third party personal injury claims and lawsuits" in which

Defendants "submitted physicians liens through the U.S. mail to Plaintiffs purporting to assert their alleged right to attach towards any potential settlement and/or resolution reached in each particular case." *Id.* Dr. D'Souza denies that his statements are false and unsubstantiated and further denies that his DMX testing was unnecessary or that his billing was fraudulent.

There are six remaining claims in Allstate's Complaint. Count I alleges a civil Racketeer Influenced and Corrupt Organizations Act ("RICO") claim, pursuant to 18 U.S.C. § 1964. In addition to the RICO claim, the remaining counts allege insurance fraud in violation of 720 ILCS 5/46-5 (Count II), common law fraud and misrepresentation (Count IV), unjust enrichment (Count V), and two counts of negligent spoliation of DMX studies (Counts VI and VII). Defendants have raised nineteen affirmative defenses, including unclean hands, and have counterclaimed for bad faith insurer conduct pursuant to 720 ILCS 5/46-5(b). For the following reasons, the Court grants in part and denies in part Defendants' Motion for Summary Judgment. The Court further denies Defendants' Motion to Strike Affidavit Testimony of Catia Monforton, and grants in part and denies in part Defendants' Motion to Strike Affidavit Testimony of Jim Ryan.

## BACKGROUND

### I.     Northern District of Illinois Local Rule 56.1

When determining summary judgment motions, the Court derives the background facts from the parties' Local Rule 56.1 statements. Specifically, Local Rule 56.1 assists the Court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). Local Rule 56.1(a)(3) requires the

moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)). In addition, Local Rule 56.1(b)(3)(C) requires the nonmoving party to present a separate statement of additional facts that require the denial of summary judgment. *See Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008). Pursuant to the Local Rules, the Court will not consider any additional facts proposed in the nonmoving party's Local Rule 56.1(b)(3)(B) Response, but instead must rely on the nonmovant's Local Rule 56.1(b)(3)(C) Statement of Additional Facts when making factual determinations. *See id.* at 643; *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809 (7th Cir. 2005) ("Local Rule 56.1 requires specifically that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate 'statement … of any additional facts that require the denial of summary judgment.'") (emphasis in original).

Moreover, the purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments, *see Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006), and thus the Court will not address the parties' arguments made in their Rule 56.1 statements and responses. Also, the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon*, 233 F.3d at 528. Further, the Court may disregard statements and responses that do not properly cite to the record. *See Cichon*, 401 F.3d at 809-10. Finally,

"hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). With these standards in mind, the Court turns to the relevant facts of the case.

## II.    Relevant Facts

Allstate Insurance Company is an Illinois professional corporation with its principal place of business in Northbrook, Illinois. (R. 183-1, Def.'s Rule 56.1 Stmt. Facts, p. 1.)[1] Allstate Indemnity Company is an Illinois corporation with its principal place of business in Northbrook, Illinois. *Id.* Allstate Property and Casualty Company is also an Illinois corporation with its principal place of business in Northbrook, Illinois. *Id.* This case involves a series of claims submitted to Allstate by claimants who were treated by Dr. D'Souza and other physicians and assistants employed by chiropractic clinics operated by Dr. D'Souza. In 2000, Dr. D'Souza opened a chiropractic clinic in Chicago, Illinois. (R. 198-1, Pl.'s Rule 56.1(b)(3)(C) Stmt. Facts, ¶ 1.) Between 2000 and January 2005, Dr. D'Souza opened at least five additional chiropractic clinics at locations in and around Chicago, Illinois. *Id.* Dr. D'Souza hired chiropractic physicians and assistants to staff the clinics. *Id.* at ¶ 4. Prior to January 28, 2005, Dr. D'Souza operated the clinics as sole proprietorships. *Id.* at ¶ 2. On January 18, 2005, Dr. D'Souza incorporated the clinics as one corporate entity, St. Anthony's, an Illinois professional corporation. *Id.* at p. 1.

---

[1]    Both parties include legal arguments in their responses to the respective statements of facts. *See* R. 183-1, ¶¶ 25, 26; R. 198-1, ¶¶ 76-8. It is inappropriate to make legal arguments in Rule 56.1 statements and responses, and thus the Court will not consider these arguments. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n. 2 (7th Cir. 2008); *see also Raymond v. Ameritech Corp.*, 442 F.3d 600, 604 (7th Cir. 2006) ("district courts are entitled to expect strict compliance with Local Rule 56.1").

## A.    Allstate's Investigation

Allstate's Special Investigation Unit ("SIU") investigates insurance claims that Allstate suspects of being fraudulent.  (R. 183-1, ¶ 1.)  SIU employees include (i) investigators who investigate and resolve suspected fraud claims not in litigation, (ii) litigation specialists who are responsible for investigating and resolving suspected fraud claims in litigation, and (iii) analysts who have the ability to review data from all claims involving a particular medical provider to escalate an investigation into a "project."  (*Id.* at ¶ 2; R. 183-1, Ex. 3, Monforton Dep., pp. 17-21; R. 198-1, ¶ 14.)  Projects look at a providers' activities on a more global perspective rather than on a file-by file basis.  (R. 198-1, ¶ 21; R. 183-1, Ex. 3, Monforton Dep., pp. 17-21.)  Analysts do not handle individual investigations, but "assist and oversee[]" the overall project. *Id.*  Specifically, an analyst's role is to analyze patterns of fraud, and then put together a team of investigators to develop evidence.  (Pl. Ex. 8, Crespo Dep., p. 16.)  Analysts also have the authority to recommend to their supervisors that a project be presented to senior management at Allstate for the purposes of pursuing legal action against any provider that it determines to be engaging in a clear pattern and practice of fraud.  (R. 198-1, ¶ 23.)

Numerous Allstate employees were involved in the investigation of Dr. D'Souza.  From November 2001 until March 2005, Danielle Crespo worked an investigator, and for a brief time as a litigation specialist, in the SIU, and in March 2005 she became an analyst.  (R. 183-1, ¶ 3.)  Barbara Johnston (2000 to the inception of the lawsuit), Williams Watts (2000 to the inception of the lawsuit), Raymond Summins (2001 to the inception of the lawsuit), Jesus Ortiz (2001-2002, and 2003 to the inception of the lawsuit), and Larry Arbetman (2002 to 2005) also worked as investigators in the SIU.  *Id.* at ¶ 3.  From 2000 to the inception of the lawsuit, James Ryan was a

litigation specialist in the SIU. *Id.* Catia Monforton was the initial analyst Allstate assigned to the Dr. D'Souza investigation and remained the analyst on the project until March 2005. (R. 198-1, ¶ 29.) At that time, Danielle Crespo took over the analyst responsibilities for the project. *Id.* After Crespo left Allstate at the end of 2007, Monforton again took over the project regarding Dr. D'Souza. *Id.* Monforton remains the analyst on the case. *Id.* at ¶ 18.

As the initial step in an investigation, Allstate sends a claim to the SIU if there is an unusual circumstance or pattern of circumstances that are not typical and indicate that there might be dishonesty or misrepresentation on the part of a party involved in the claim. (Pls.' Ex. 7, Summins Dep., pp. 24-25.) During the pendency of an investigation, SIU personnel work together and share information regarding medical providers, as they did with information relating to Dr. D'Souza. (R. 183-1, ¶ 7.) While investigators do not review claim files other than those to which they are assigned, analysts have the ability to review all claims relating to a particular provider in order to detect a pattern of fraud. (Defs' Ex. 4, Monforton Dep., p. 87.) To conduct their investigations, SIU investigators employ medical bill review software, MBRS or Mitchell Decision Point, for individual claims. (Def. Ex. 7, Ryan Dep., pp. 31-33.) Analysts employ BRIO, a computerized system that permits an analyst to review all inputted claims in the claim file system relating to a provider for patterns and practices. *Id.*

Between 2000 and 2001, Allstate transferred insurance claims regarding Dr. D'Souza's clinics to Allstate's Chicago-area SIU to investigate suspected allegations of fraud. (R. 198-1, ¶ 7; R. 183-1, ¶ 8.) In the early stages of the investigation, SIU personnel reviewed statements on insurance claims that revealed discrepancies in Defendants' medical records and billing statements, suspected billing for higher levels of services than were rendered, suspected billing

6

for treatments that had not been rendered, and suspected potential treatment by lay persons rather than licensed medical professionals.  (R. 198-1, ¶ 12.)  Some of the claims Allstate transferred to the SIU involved the use of DMX (*id.* at ¶ 13), or video fluoroscopy in the form of dynamic motion x-rays, which Dr. D'Souza began using in 2000 or 2001.  (R. 183-1, ¶ 23; Def. Ex. 28, p. 19.)

During the time period when Defendants were submitting claims for DMX studies on patients to Allstate, SIU investigators and litigation specialists had not encountered diagnostic studies using DMX from any other medical providers in the Chicago area.  (R. 198-1, ¶ 14.) Indeed, Allstate employees may have transferred claims to the SIU, at least in part, to investigate Dr. D'Souza's use of DMX.  (R. 183-1, ¶ 16; Def. Ex. 4, Crespo Dep., pp. 53-58.)  Sometime in late 2001 or early 2002, after the initial transfer of some of Dr. D'Souza's claims to the SIU, Allstate designated Dr. D'Souza a "provider on hold," meaning the SIU would closely scrutinize any files concerning claims involving Dr. D'Souza's patients or clinics.  (R. 183-1, ¶ 9.)  After being placed "on hold," Allstate required Dr. D'Souza to submit his entire medical records, including narrative reports, to the SIU which SIU employees then reviewed.  *Id.* at ¶ 9.  The fact that a provider's bills are placed "on hold" does not necessarily mean that a provider is defrauding the company, but that Allstate requires SIU personnel to more closely review the provider's files in order to verify that the provider actually provided the treatments being billed before Allstate takes steps to resolve a claim.  (R. 198-1, ¶ 10.)

During the investigation of Dr. D'Souza and after conducting research on the use of DMX in soft-tissue injury cases, various SIU employees began to question the medical necessity of providing DMX tests.  (R. 198-1, ¶ 16.)  Allstate's SIU personnel premised their beliefs that

Dr. D'Souza's use of DMX was fraudulent on a range of evidence. (R. 183-1, ¶ 28.) Most of the patients whom Defendants treated and whose claims are the subject of this litigation purportedly sustained "soft-tissue" injuries, such as sprains or strains, in car accidents. (R. 183-1, ¶ 27.) SIU employees Arbetman, Ryan, Summins and Crespo all believed that soft-tissue injuries typically resolved within a few days and did not pose risks of serious complications or permanent injuries. *Id.* at ¶ 47. Allstate personnel also viewed soft-tissue injuries, including the stains and sprains diagnosed by Dr. D'Souza, as "subjective injuries." *Id.* at 49-50.

In addition, various SIU personnel believed that Dr. D'Souza's use of DMX was medically unnecessary. (R. 183-1, ¶ 16; Def. Ex. 8, Summins Dep., pp. 56-57; Def. Ex. 4, Crespo Dep., pp. 74-76; Def. Ex. 10, Johnston Dep., pp. 26-27; Def. Ex. 7, Ryan Dep. pp. 73-74.) Indeed, SIU personnel, including Johnston and Crespo, formed these beliefs as early as 2001 and early 2002. *Id.* at ¶¶ 42-43. Crespo and Ryan also testified that it was their understanding that videofluoroscopic (DMX) x-rays could only be used in surgical procedures and that they do not have utility to chiropractic physicians. (R. 183-1, Def.'s Rule 56.1 Stmt., ¶ 29.) Crespo and Ortiz believed that videofluoroscopic x-rays had no usefulness to chiropractic physicians. *Id.* at ¶ 33. In fact, Crespo communicated with employees of other insurance companies who shared the view that use of DMX was inappropriate to evaluate soft-tissue injuries. *Id.* at ¶ 30. Ortiz, Ryan and Arbetman also believed that every time Dr. D'Souza employed DMX studies for his patients, he was doing so only to increase the patient's bill. *Id.* at ¶ 34. In addition, Ryan believed that Dr. D'Souza took unnecessary conventional x-rays. (Def. Ex. 7, Ryan Dep., pp. 83-88.) Ryan and Arbetman believed that Dr. D'Souza's use of computerized range of motion and muscle strength (ROM-MS) tests were medically

unnecessary.  (R. 183-1, ¶ 38.)

Some of the investigators premised their beliefs on information contained on Dr. D'Souza's website.  Dr. D'Souza's website claimed that DMX had the ability to find injuries that were never seen before, and that it could provide objective information that could not be disputed.  (R. 198-1, ¶ 17.)  The website targeted potential personal injury claimants and attorneys by purporting to represent that DMX could assist in settling and/or resolving claims for more money.  *Id.* at ¶ 18.  Crespo was aware that Dr. D'Souza promoted the use of DMX on his website and Crespo believed that his advertisements were inappropriate.  (R. 183-1, ¶ 35; Def. Ex. 4, Crespo Dep., pp. 228-229.)

Throughout the pendency of the investigation of Dr. D'Souza, from 2002 to 2004, the SIU investigators, litigation specialists, and analysts reviewed Dr. D'Souza's claim files on a case-by-case basis, visited Defendants' clinics, conducted surveillance of Defendants' clinics, researched DMX generally and as a diagnostic tool, attended SIU meetings where Defendants and other suspected fraudulent providers were discussed, and obtained statements from insured and claimants in personal injury claims at issue.  (R. 198-1, ¶ 20.)  By 2004, the SIU investigators and litigation specialists began to notice that they were being bombarded with insurance claims from multiple clinics that Defendants operated in the Chicago area.  *Id.* at ¶ 25. After seeing increasing numbers of claims, the SIU employees began to see other issues of potential misconduct.  *Id.* at ¶ 26.  The other areas of misconduct included inappropriate use of form medical reporting, deceptive use of letterhead and other records, unnecessary use of computerized range of motion testing, unnecessary x-rays, and exaggeration of the nature and extent of the diagnosed injuries.  *Id.* at ¶ 27.

As a result of the increasing patterns of misconduct, in mid-2004, Monforton, the assigned SIU analyst, approved the escalation of the SIU investigation into a "project" to look at Defendants' practices on a global level rather than on an individual level. (Pl. Ex. 9(a), Ryan Aff., ¶ 17.) The project allowed for a more focused investigation into Defendants' operations and practices on a global level. (R. 198-1, ¶ 31.) Although the date Allstate first communicated with Allstate in-house counsel regarding Dr. D'Souza is unclear, (Def.'s Ex. 4, Crespo Dep., pp. 73-75; 315-316), in June 2004, Allstate retained legal counsel, LaRose & Bosco, as defense counsel in various personal injury cases being pursued by patients treated by Defendants. (R. 198-1, ¶ 33.) Allstate's counsel then secured depositions of Dr. D'Souza and his employees, as well as statements of the personal injury plaintiffs who allegedly received the treatments and diagnostic testing billed by Defendants. *Id.* at ¶ 34.

In 2005, Allstate also retained chiropractic experts, including Dr. Tara Reinke, to conduct peer reviews of cases involving Defendants' clinics. *Id.* at ¶¶ 35-36. Allstate used Dr. Reinke's opinions when making the decision to go forward with the filing of a lawsuit against Defendants in December 2006. (Pl. Ex. 8, Crespo Dep., p. 127.) In May of 2006, Allstate again retained Dr. Reinke to determine whether she could verify that patterns and practices of misconduct existed in all of the personal injury related insurance claims submitted by Defendants to Allstate. (R. 198-1, ¶ 38.) Ultimately, Dr. Reinke opined that Dr. D'Souza routinely misrepresented the nature and extent of patients' injuries, provided excessive and unnecessary treatment and diagnostic testing, and billed for examinations, treatments and diagnostic testing that he never

actually rendered.  *Id.* at ¶ 39.[2]

Due to the patterns of fraud revealed by Allstate's investigation, Crespo ultimately recommended to her superiors that Allstate file a lawsuit against Dr. D'Souza.  Specifically, based on her review of the evidence obtained during the investigation of the project and on her own independent review of "hundreds" of claims involving Defendants' clinics, Crespo ultimately presented the project to her manager, Kevin Meritt.  (*Id.* at ¶ 40; Def.'s Ex. 4, Crespo Dep., pp. 127-128.)  After Meritt reviewed the investigation, he presented it to Edward Moran, head of the SIU Claims Department, for authority to pursue the insurance fraud action against Defendants that Allstate ultimately filed on December 19, 2006.  *Id.* at ¶ 41.

### B.    Allstate's Settlement of Dr. D'Souza's Claims

During the pendency of the investigation, Allstate settled cases brought by Dr. D'Souza's patients on the basis of such factors as liability factors, litigation costs, and the possibility of adverse settlements.  (R. 183-1, ¶¶ 54-56.)  Crespo testified that, on occasion, Allstate would convey to these plaintiffs' attorneys that it believed that Dr. D'Souza was engaged in a fraud scheme, but that Allstate evaluated each case on its merits and "never completely denied every one of [Dr. D'Souza's] bills."  (Def. Ex. 4, Crespo Dep., ¶¶ 143-148.)  Allstate also settled third party claims on a lump sum basis without separating out payments for Dr. D'Souza.  (R. 183-1, ¶ 58.)  Summins testified that every time Allstate investigated a case, "we had to evaluate a case

---

[2] Defendants assert that the Court should not rely on Dr. Reinke's report because it is unsworn and unverified.  While one district court in this Circuit has stated that an "unsworn and unverified expert report is not Rule 56 evidence," *Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 482 F. Supp. 2d 1045, 1057 (N.D. Ind. 2007), Rule 56 does not impose such a requirement for expert reports.  Moreover, Dr. Reinke's report is signed and, in response to a *Daubert* motion, the Court has previously addressed at length and confirmed Dr. Reinke's qualifications to give testimony in this case.  (R. 153-1, 5/4/2009 Minute Entry.)

on its own merits. Certainly there are many aspects of an insurance claim involving any specific injury party . . . which would sometimes necessitate us to -- in order to protect our policy holders and to protect Allstate [--] make sure that they settled the case instead of denying the case." (Pl. Ex. 7, Summins Dep, pp. 192-193.) Similarly, Ryan testified that while he thought that Dr. D'Souza might be engaging in fraud, that he still settled cases involving Dr. D'Souza due to other factors that Allstate considers in settling claims. (Pl. Ex. 9, Ryan Dep., pp. 156-157.) Ryan testified that, "frequently I have cases where I suspected we had evidence of billing for services not rendered or something inappropriate that took place, up-coding, late treatment, but my first obligation is to protect my policyholder and resolve the claim." *Id.*

### C. Damages

Allstate initially provided Defendants with a spreadsheet prepared by SIU analyst Crespo that listed the names of all claimants, amounts Defendants billed for alleged chiropractic treatment, amounts Allstate paid to resolve those claims, and expenses Allstate incurred in resolving the claims. (R. 198-1, ¶ 46.) Crespo personally reviewed hundreds of claims at issue involving Defendants' clinics and had the ability to conduct global reviews of the claims. *Id.* at ¶ 68. Later in discovery, and subsequent to the Court granting Defendants' request for Allstate to identify for each bill at issue the "specific charges that Plaintiffs claim are fraudulent, evidence of racketeering, or otherwise actionable," Allstate responded by identifying hundreds of bills at issue in this litigation. (R. 183-1, ¶¶ 61-62.) Magistrate Judge Denlow entered an order stating that Allstate would be "bound by the disclosure made in discovery for purposes of trial and motions." *Id.* at ¶ 62. Thereafter, in response to Defendants' request to state the specific charge in each bill that is "fraudulent, evidence of racketeering, or otherwise

actionable," Allstate ultimately stated that "each and every one of the [claims in Exhibit A] were based in whole or part upon the fraud, racketeering, or otherwise actionable activities of the defendants." (Def. Ex. 15, Plaintiffs' Answers to First Set of Interrogatories, p. 3.)

In an interrogatory, Defendants also requested that Allstate identify "each and every alleged false, misleading, deceptive, or fraudulent representation by the Defendants upon which you base the claims of your Complaint and/or upon which you intend to rely upon to support your claims at trial," as well as detailed information regarding, *inter alia*, the content, date and person responsible for the misrepresentations. (R. 183-1, ¶ 63.) In response, Allstate identified depositions of various witnesses who testified in civil actions relating to personal injury claims, as well as information contained in Defendants' patient files and billing statements. Allstate also referred Defendants to the list of all claims at issue in the litigation and statements and depositions of various claimants previously provided to Defendants. In accordance with Magistrate Judge Denlow's November 19, 2007 order, Allstate also provided Defendants with 10 exemplar claims that contained specific and detailed examples of fraudulent billing, and other improper practices. (Def. Ex. 21, Allstate's Answers to Defendants' Third Set of Interrogatories, p. 5.)

On January 23, 2008, in response to Defendants' interrogatory regarding Allstate's employee witnesses, Allstate identified both Crespo and Monforton and explained that Monforton took over the position of analyst on the investigation of Dr. D'Souza when Crespo left Allstate at the end of 2007. *Id.* at p. 6. In their supplemental Rule 26(a) disclosures, Allstate identified Crespo as having knowledge regarding Allstate's damages. Defendants have deposed both Crespo and Monforton. (Def. Exs. 3-4, Crespo Dep., Monforton Dep.)

Prior to Monforton's deposition, Allstate produced a second chart to Defendants containing Allstate's computation of its damages related to this case. (R. 198-1, ¶ 69; R. 183-1, ¶ 67.) Monforton testified that she first heard of Dr. D'Souza in 2004, and that initially, her work related to Dr. D'Souza involved reviewing computerized data regarding Dr. D'Souza's claims and billing. (R. 183-1, ¶ 68.) While Monforton testified that she had a "limited role" in Dr. D'Souza's case and was not familiar with the specific details of the investigations of the individual cases, she also testified that she performed data mining activity, retained legal counsel, and reviewed the claims provided by Crespo in the original damages compilations that Crespo provided to Allstate's counsel. (Def. Ex. 3, Monforton Dep., pp. 31-44.) Monforton calculated damages paid by Allstate by reviewing the information compiled by Crespo and performing independent calculations of those claims. *Id.* at pp. 45-47. Monforton also employed Allstate's medical bill review software to gather information including the claim diaries of investigators and litigation specialists working on Dr. D'Souza's cases. *Id.* at 48. Allstate did not provide manuals regarding those medical bill review systems to Defendants during discovery. (R. 183-1, ¶¶ 71-72.) To determine the damages associated with each claim, if Defendants were the only providers on a particular claim, the amount Monforton calculated as payment for damages was the total amount paid in settlement for that claim. (Def. Ex. 3, Monforton Dep., p. 47.) If a claim representative had only considered a portion of the bill towards settlement of a claim, Monforton would also consider that same amount as payment for damages. *Id.* at pp. 47-48. With respect to bills that reflected no payments issued, Monforton would identify zero compensatory damages, but twice the amount billed as damages pursuant to RICO. *Id.* at p. 48. In calculating RICO damages, Monforton also included expenses Allstate

had incurred during its investigation of Defendants. *Id.*

Allstate paid for at least one DMX study performed on patient Nancy Limpar that Dr. D'Souza submitted to Allstate. (R. 198-1, ¶ 15; Pl. Ex. 9(a), Ryan Aff., ¶ 9(a).) Dr. D'Souza charged Limpar $875 for the DMX study, which was the typical price he charged patients for that type of study. (R. 198-1, ¶ 15; R. 183-1, ¶ 22.)

In addition to the damages calculations performed by Allstate, Defendants provided Allstate with a spreadsheet purporting to account for all payments it received from Allstate for resolution of insurance claims in the underlying lawsuits related to this litigation. (R. 198-1, ¶ 72.)

### D.     Spoliation

A portion of the evidence related to Dr. D'Souza's x-rays is unavailable. Dr. D'Souza testified that he cannot locate any original DMX videotapes from 2000-2001 relevant to the claims in this case. (Def. Ex. 35, D'Souza Dep., p. 755.) Dr. D'Souza also testified that he cannot produce any of the electronically stored digital x-ray or DMX studies due to various hard drive crashes on his computer. *Id.* at pp. 754-757. In addition, Crespo also testified that Dr. D'Souza was unable to produce certain DMX studies and as well as data from conventional x-rays stored on computers. (Def. Ex. 4, Crespo Dep., pp. 236-242.) She further testified that she was aware that Dr. D'Souza claimed that he lost the computer data in a hard drive crash. *Id.* at pp. 238-239. In some of the underlying cases, Allstate took the position that Dr. D'Souza could not use the x-rays as evidence if he could not produce them. *Id.* at p. 240.

Further, Dr. D'Souza printed radiology reports by physicians not licensed in Illinois on the letterhead of his clinics. Dr. D'Souza testified that he received radiologist reports

electronically from radiologists retained to read or report findings of Dr. D'Souza's digital x-rays and DMX studies, but that he did not alter the reports' content when he printed them out on his office stationary.  (Def. Ex. 3, D'Souza Dep., pp. 819-820.)  With respect to radiology reports that Dr. Duane Marquart sent to Dr. D'Souza electronically, Dr. Marquart testified that he believed the reports he viewed that Dr. D'Souza had printed out on his own stationary had been held intact, but that he had no way of verifying whether they were in fact altered.  (Def. Ex. 36, Marquart Dep., pp. 218-220, 229-231.)

Allstate's expert, Dr. Reinke, asserts in her expert report that physicians "have a legal duty and an ethical responsibility to maintain their patient's medical records as a 'permanent record.'  This includes radiographic studies if they are performed by a physician."  (Def. Ex. 28, Reinke Report, p. 28.)  Dr. Reinke opines in her report that Dr. D'Souza "failed to secure [diagnostic] images consistent with the known professional standards (outlined by the American College of Radiology)."  *Id.*  Dr. Reinke provided an exhibit identifying all cases at issue in the litigation and specifically identified each case in which she maintains that Dr. D'Souza negligently maintained or destroyed radiographic studies and/or other medical records.  *Id.* at pp. 30-31.  Dr. Reinke also offered opinions regarding Defendants' attempts to conceal fraudulent activities subsequent to the initiation of Allstate's investigation.  Dr. Reinke opined that: (i) Defendants concealed that lay assistants were performing treatments billed as provided by medical professionals by altering SOAP forms, (ii) Defendants concealed that they were billing for treatments never rendered, (iii) Defendants issued medical records and bills identifying licensed physicians as attendees when they were not located at Defendants' clinics, (iv) Defendants used form reporting to conceal the extent and nature of patients' injuries, (v)

Dependants fraudulently concealed on x-ray and DMX reports that certain radiologists were licensed to practice in Illinois and working at Defendants' clinics when they were not and that Defendants were using out of state radiologists to read and report their x-ray and DMX studies, and (vi) Dr. D'Souza attempted to fraudulently conceal the fact that he took radiology reports from out of state physicians and inserted them onto his own letterhead. *Id.*

## LEGAL STANDARD

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Knight v. Wiseman*, 590 F.3d 458 (7th Cir. 2009). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "Thus, to survive summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on all essential elements of its case." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009); *see Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005) (the nonmoving party must present "evidence on which the jury could reasonably find for the nonmoving party.").

# ANALYSIS

## I.      Motions to Strike

Defendants seek to strike portions of the affidavits of Jim Ryan and Catia Monforton.

Rule 56(e)(1) of the Federal Rules of Civil Procedure sets forth requirements for affidavits

submitted at the summary judgment stage:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts
> that would be admissible in evidence, and show that the affiant is competent to testify on
> the matters stated.  If a paper or part of a paper is referred to in an affidavit, a sworn or
> certified copy must be attached to or served with the affidavit.  The court may permit an
> affidavit to be supplemented or opposed by depositions, answers to interrogatories, or
> additional affidavits.

Fed.R.Civ.P. 56(e)(1).  "While personal knowledge may include inferences and opinions, those

inferences must be substantiated by specific facts."  *Vakharia v. Little Co. of Mary Hosp. &*

*Health Care Ctrs.*, 62 Fed. Appx. 122, 125 (7th Cir. 2003); *Drake v. 3M*, 134 F.3d 878, 887 (7th

Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general

truth of a particular matter, rather it requires affidavits that cite specific concrete facts

establishing the existence of the truth of the matter asserted.")  For the following reasons the

Court grants in part and denies in part Defendants' Motion to Strike Affidavit Testimony of Jim

Ryan, and denies Defendants' Motion to Strike Affidavit Testimony of Catia Monforton.

### A.      Jim Ryan

Defendants first seek to strike paragraph 15 and a portion of paragraph 18 of Ryan's

affidavit because the statements contradict the testimony given by Ryan during his deposition.

Ryan is a litigation specialist in Allstate's SIU.

In paragraph 15 of his affidavit, Ryan states that "[o]ne of the main problems that SIU

adjusters such as myself encountered early on in investigating claims involving defendants'

clinics was attempting to put together the whole picture of what was truly going on, as adjusters did not have open access to search and review the individual claims files being handled by other adjusters, due to privacy and/or conflict issues."  (R. 198-1, Ex. 9(a), Ryan Aff., ¶ 15.)  In paragraph 18, Ryan states that "[u]nlike individual claims adjusters, SIU Analysts had the authority and ability to look at all of the information obtained on all claims submitted by a particular provider suspected of engaging in improper conduct, in order to determine if there were certain patterns of practices of insurance fraud."  *Id.* at ¶ 18.  During his deposition, Ryan testified that, time permitting, as part of his role in the SIU, he could look at all files that involved Dr. D'Souza.  *Id.* at Ex. 9, 127: 15 - 182: 7.  "Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy."  *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995) (citing *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1297 (7th Cir. 1993)).  Because Ryan's deposition testimony that only time constraints prohibited him reviewing other investigators' files conflicts with his statements in paragraphs 15 and 18 of his affidavit, the Court strikes those paragraphs of his affidavit.

Defendants also seek to strike paragraph 16 of Ryan's affidavit in which Ryan states that, "[t]he initial investigation on individual claims was often difficult and time consuming as defendants' acts were often self-concealing by their very nature, as medical bills and records submitted appeared to be legitimate on their face."  (R. 198-1, Ex. 9(a), Ryan Aff., ¶ 16.)  Defendants' contention that this statement is conclusory and devoid of specific facts, however, is incorrect.  Defendants contend that the term "self-concealing" is conclusory because "[i]t is hard

to understand . . . how . . . a medical bill . . . would be concealing of an improper act." (R. 203-1, Motion to Strike Affidavit Testimony of Jim Ryan, ¶ 23.) Ryan specifically explains in his affidavit that he means "self-concealing" to mean to the medical bills and records that Dr. D'Souza submitted to Allstate "appeared to be legitimate on their face." As an investigator who reviewed Dr. D'Souza's claims, Ryan based his non-conclusory assertion on specific facts and thus the Court will not strike paragraph 16.

Defendants next ask the Court to strike paragraph 22 in which Ryan states, in part, "defendants attempted to conceal their fraudulent activity by repeatedly altering their practices, procedures and record keeping, as well as even changing their sworn deposition testimony. . . ." (R. 198-1, Ex. 9(a), Ryan Aff., ¶ 22.) Defendants are correct that the testimony contained in paragraph 22 is conclusory and without factual support. Ryan does not explain how Defendants allegedly altered their practices, or how their deposition testimony changed from case to case. *See Deloach v. Infinity Broad.*, 164 F.3d 39, 402 (7th Cir. 1999) (non-moving party not permitted to rely on conclusory allegations). Accordingly, paragraph 22 of Ryan's affidavit is stricken.

Finally, Defendants seek to strike paragraph 20 in which Ryan asserts, in part, "Allstate's contractual and legal obligations as an insurer prevented me and other SIU adjusters from simply denying and/or refusing to pay on insurance claims just because the claims involved defendants' clinics." (R. 198-1, Ex. 9(a), Ryan Aff., ¶ 20.) Defendants are correct that this statement is conclusory. It does not identify the legal or contractual obligations upon which Ryan relies. *See Deloach*, 164 F.3d at 402; *see also Shank v. William R. Hague, Inc.*, 192 F.3d 675, 682 (7th Cir. 1999) (self-serving affidavit not sufficient to identify alleged oral agreements without further

evidence). Accordingly, the Court strikes paragraph 20 of Ryan's affidavit.

Defendants' Motion to Strike Affidavit Testimony of Jim Ryan is accordingly granted in part and denied in part.

### B. Catia Monforton

Defendants have moved to strike two paragraphs of Monforton's affidavit. Monforton was the initial analyst Allstate assigned to Dr. D'Souza's case and, after stopping work on the case in 2005, took over again as the assigned analyst when Danielle Crespo ended her employment with Allstate. Monforton prepared Allstate's damages chart in this litigation.

Defendants first seek to strike paragraph 11 of Monforton's affidavit in which Monforton states that claims adjusters did not have "the ability to look at information contained on other adjusters' claims files, due to a variety of privacy and potential conflict issues . . . ." (R. 198-1, Ex. 15, Monforton Aff., ¶ 11.) While this statement does not identify the alleged "privacy" or "conflict" issues that prevent adjusters from viewing other adjusters' claims files, Monforton's deposition testimony reveals that she has personal knowledge of the roles and responsibilities of SIU employees. (R. 198-1, Ex. 14, Monforton Dep., pp. 17-21.) Based on her personal knowledge of these issues, the Court declines to strike paragraph 11 of Monforton's affidavit.

Defendants next seek to strike paragraph 30 in which Monforton states "[b]y reviewing the electronic records of each of the cases I only included as recoverable damages those payments for resolution and expenses that I believed to be to be directly attributable to defending against defendants' improper activities." (R. 198-1, Ex. 15, Monforton Aff., ¶ 30.) Defendants argue that this assertion is based on hearsay, that Monforton failed to attach the records to which she refers to her affidavit, and that the testimony is not based on personal knowledge. Each of

these arguments is without merit.  As described in detail above, Monforton's deposition testimony makes clear that she personally reviewed Allstate's computer records in compiling Allstate's damages spreadsheet.  (Def. Ex. 3, Monforton Dep., pp. 45-102.)  Indeed she details her methods in doing so in both her deposition and affidavit.  She gave testimony specifically explaining the basis for her belief that the charges she included were damages paid by Allstate by (i) reviewing the information compiled by Crespo, who is no longer employed by Allstate, and (ii) performing independent calculations of those claims.  Accordingly, Allstate has presented sufficient factual basis in both Monforton's affidavit and her deposition testimony to support the assertions in paragraph 30.  Defendants' Motion to Strike Affidavit Testimony of Catia Monforton is therfore denied.

## II.     Defendants' Motion for Summary Judgment

Defendants seek summary judgment on the six remaining counts in the Complaint.  For the following reasons, the Court grants in part and denies in part Defendants' Motion for Summary Judgment.

### A.     Count I - RICO - Mail Fraud Racketeering Activity

Section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") "makes it unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389 (7th Cir. 2009); 18 U.S.C. § 1692(c).  "A claim under section 1962(c) therefore requires a plaintiff to demonstrate (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Id.*  Count I of

the Complaint alleges that Defendants violated RICO, 18 U.S.C. § 1962(a), (b), and (c), by:

> operating various chiropractic clinics in the Chicagoland area for the purpose of illicitly
> and illegally enriching themselves at the expense of Plaintiffs, by systematically and
> deliberately submitting through the U.S. Mail, false, misleading and deceptive medical
> reports, records, billing statements, and physicians liens, for services allegedly rendered
> to patients pursuing personal injury insurance claims against Plaintiffs.

(R. 1-1, Compl. at ¶ 145.)  Defendants challenge Allstate's RICO claims on several grounds.

### 1.      Person-Enterprise Distinction

Defendants first argue that Allstate's RICO claims must fail because Allstate cannot

prove a distinct RICO enterprise solely through the alleged pattern of racketeering activity

undertaken by Dr. D'Souza.  Defendants premise this argument on their contention that there "is

no evidence in this case that a group of people who shared an illicit purpose functioned as a

continuing unit to achieve a common goal of committing insurance fraud" and that the alleged

"enterprise" consists only of a single person, Dr. D'Souza.  (R. 182-1, Defendants'

Memorandum in Support of Motion for Summary Judgment ("Defendants' Memorandum"), pp.

7-8.)  As Defendants correctly recognize, a series of predicate offenses does not alone constitute

a distinct enterprise.  *See Brown v. County of Cook*, 549 F.Supp.2d 1026, 1030 (N.D. Ill. 2008).

Defendants' argument, however, misinterprets case law governing RICO cases in the Seventh

Circuit.

RICO defines an "enterprise" to include "any individual, partnership, corporation,

association, or other legal entity, and any union or group of individuals associated in fact

although not a legal entity."  18 U.S.C. § 1961(4).  While Allstate's Complaint is somewhat

unclear in identifying the RICO "person"and the RICO "enterprise," in their response to the

Motion for Summary Judgment, Allstate makes clear that Dr. D'Souza is the "person" and the

clinics, both before and after their incorporation as St. Anthony's, constitute the "enterprise."[3] (R. 199-1, Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment ("Plaintiffs' Opposition"), pp. 14-15.)  It is well established that the RICO "person" and "enterprise" must be separate and distinct entities.  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 121 S. Ct. 2087, 2089, 150 L. Ed. 2d 198 (2001); *see also Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 643 (7th Cir. 1995) (referring to the "separateness" test established in *Haroco, Inc. v. American Nat'l Bank & Trust Co.*, 747 F.2d 384, 400 (7th Cir. 1984)).  In fact, in *Cedric,* the Supreme Court explained that while the legislative history of the statute "refers frequently to the importance of undermining organized crime's influence upon legitimate businesses," it also "refers to the need to protect the public from those who would run 'organizations in a manner detrimental to the public interest.'"  *Cedric,* 533 U.S. at 165 (citing legislative history).  "This latter purpose, as we have said, invites the legal principle we endorse, namely, that in present circumstances the statute requires no more than the formal legal distinction between 'person' and 'enterprise' (namely, incorporation) that is present here."  *Id.*

The Seventh Circuit has also made clear that as long as an entity has employees in addition to the individual(s) accused of being the RICO "persons," a RICO claim will survive. In *Ashland Oil v. Arnett*, 875 F.2d 1271, 1280 (7th Cir. 1989), for example, defendants claimed

---

[3] Defendants correctly assert that a section 1962(c) claim also requires that there be a "pattern" of racketeering activity, which is an element distinct from the enterprise requirement. *Boyle*, 129 S. Ct. at 2245.  Contrary to Defendants' argument that Allstate is relying on a series of bills sent through the mail to assert an enterprise, the Complaint does not advance a theory that the enterprise is merely a string of predicate acts.  (R. 1-1, Complaint, ¶ 145.)  Indeed, while the language of the Complaint is somewhat unclear due to Allstate's use of the collective term "Defendants,"  Allstate makes clear that the alleged enterprise is the St. Anthony's clinics, both before and after their incorporation.

that the RICO "persons," the Arnett brothers, were not sufficiently distinct from the defendant

corporation and alleged "enterprise," the Arnett Oil corporation.  The Seventh Circuit, however,

found that because RICO defines "enterprise" to include corporations, "[w]hile the enterprise

under RICO cannot simply be the person who allegedly conducted his own affairs through a

pattern of racketeering activity, there need be shown 'only some separate and distinct existence

for the person and the enterprise.'"  *Id.* (internal citation omitted).  The Court therefore held that

the "evidence show[ing] that Arnett Oil was an incorporated business which employed several

people besides the Arnett brothers" was "sufficient to support the conclusion that Arnett Oil and

the Arnett brothers were not one and the same."  *Id.* (sole proprietorship with several employees

is a sufficiently distinct enterprise).  The Seventh Circuit has also held that sole proprietorships

can be considered an enterprise as long as they have employees to distinguish them from the

RICO "person."  *See McCullogh v. Suter*, 757 F.2d 142, 144 (7th Cir. 1985) ("if [an individual or

sole proprietorship] has employees or associates, the enterprise is distinct from him, and it then

makes no difference, so far as we can  see, what legal form the enterprise takes.  The only

important thing is that it be either formally (as when there is incorporation) or practically (as

when there are other people besides the proprietor working in the organization) separable from

the individual.")  Here, Allstate has established that Defendants' clinics, both prior to and after

incorporation as St. Anthony's, employed individual physicians and lay assistants other than Dr.

D'Souza.  Accordingly, Allstate has sufficiently alleged a distinct "enterprise" through which

Dr. D'Souza engaged in the alleged pattern of racketeering activity.

　　In their reply in support of their Motion for Summary Judgment, Defendants do not

attempt to distinguish the controlling Seventh Circuit case law cited by Allstate.  Instead,

Defendants misconstrue Supreme Court precedent and state that *Boyle* and *Turkette* require evidence that Dr. D'Souza's professional colleagues represented a group of persons who joined together for a certain criminal or illicit purpose. In fact, in *United States v. Turkette*, 452 U.S. 576 (1981), the Supreme Court held that the language and structure of RICO did not limit its application to legitimate enterprises and that the legislative history indicated that Congress intended the term "enterprise" to include legitimate and well as illegitimate enterprises. *Id.* In *Boyle v. United States*, 129 S. Ct. 2237 (2009), the defendant was charged in connection with a series of bank thefts that were allegedly conducted by a group that was loosely organized and did not appear to have had a leader or hierarchy. The Supreme Court held that an "association-in-fact" enterprise, while not limited to business enterprises, required some sort of structure including a purpose, relationships among those associated with the enterprise, and sufficient longevity to permit pursuit of the purpose. *Id.* Indeed, most of the case law cited by Defendants involves non-business structures and association-in-fact enterprises.

Viewing all of the facts in the light most favorable to Plaintiffs, Allstate has established a distinct RICO person and enterprise.

## 2. Injury

Section 1962(c) claims also require Allstate to demonstrate that it suffered injury. *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389 (7th Cir. 2009); 18 U.S.C. § 1692(c). "The compensable harm in a cause of action under section 1962(c) 'necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.'" *Rao*, 589 F.3d 389 (7th Cir. 2009) (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457, 126 S. Ct. 1991, 164 L. Ed. 2d 720

(2006)).  A party making a RICO claim must demonstrate that the fraudulent representation was not only a "but for" but also proximate cause of the injury.  *Anza*, 547 U.S. at 457.  The Supreme Court has held that although plaintiffs asserting RICO claims based on mail fraud need not show as an element of their claim that they relied on the defendant's alleged misrepresentations, "[i]n most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation."  *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2144 (2008).  Here, Defendants argue that Allstate cannot establish that it sustained injuries that were caused by Defendants and that Allstate never relied on the bills, tests or treatment information that Defendants submitted to Allstate.  As a result, Defendants contend that Allstate has not demonstrated "but for" or proximate causation.

Defendants premise their first argument regarding injury on Allstate's alleged lack of evidence regarding damages.  Defendants highlight what they perceive to be deficiencies in the timing and content of Allstate's disclosures and written discovery responses.  The record shows, however, that Allstate first disclosed Crespo as an Allstate employee with knowledge of its damages in its supplemental 26(a)(1) disclosures.  Moreover, in response to Defendants' interrogatories, Allstate provided a detailed spreadsheet prepared by SIU analyst Crespo including the names of the relevant claimants, amounts Defendants billed for each chiropractic treatment, amounts Allstate paid to resolve each claim, and additional expenses incurred by Allstate in resolving the claim.  (R. 198-1, ¶ 46.)  Allstate also submitted a damages spreadsheet prepared by Monforton, the analyst currently assigned to the litigation (Crespo is no longer employed by Allstate).  Monforton premises her damages calculations on her personal review of Allstate's computer-generated claim diary system, medical review bill system and loss report

system, and her spreadsheet similarly reflects the amounts billed by Defendants for each claim, Allstate payments and Allstate expenses.

As to proximate causation, "the central question . . . [the court] must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006). The question of whether conduct is a proximate cause of the alleged injuries is typically a question of fact for the jury. *Chambers v. Ingram*, 858 F.2d 351, 358-359 (7th Cir. 1988); *see also Knight v. Schneider Nat'l Carriers, Inc.*, 350 F. Supp. 2d 775, 784 (N.D. Ill. 2004). Defendants claim that Allstate never "paid monies out" due to wrongful conduct by Dr. D'Souza. Conversely, Allstate contends that Defendants' fraudulent bills caused Allstate to make payments to Defendants and incur expenses investigating the nature of Defendants' medical bills and records, and that Allstate has provided detailed information regarding each of these claims to Defendants. The evidence shows that there is at least a material issue of fact as to whether "but for" the submission of Defendants' bills, Allstate would not have made payments to Defendants.

In particular, Allstate's damages spreadsheets indicate a series of payments made to Dr. D'Souza,[4] Allstate has introduced at least one example of a direct payment to Dr. D'Souza in the case of patient Limpar, and Defendants identified in their own spreadsheet payments made to them by Allstate. Indeed, Allstate has informed Defendants that it takes the position that each

---

[4] Indeed, Defendants recognize "[t]he best proof for the fact that Allstate's position on 'but for' and proximate cause is . . . the testimony of Ms. Monforton." Defendants question the admissibility of portions of Monforton's testimony but, as the Court has noted, the record demonstrates that Monforton based her calculations on her personal review of Allstate records and, as the analyst assigned to the case after the departure of Crespo, she is qualified to testify regarding damages. Any questions regarding the validity of her review of Allstate documents and methods for computing damages are for a jury to resolve.

and every one of the claims it identifies in its damages spreadsheet was based in whole or part upon the fraud, racketeering, or otherwise actionable activities of Defendants. (Def. Ex. 15, Plaintiffs' Answers to First Set of Interrogatories, p. 3.) In addition, Allstate paid for a DMX study performed on patient Nancy Limpar that was submitted to Allstate by Dr. D'Souza. (R. 198-1, ¶ 15; Pl. Ex. 9(a), Ryan Aff., ¶ 9(a).) Allstate's only response to this undisputed fact is that a claim based on that payment is time-barred which, as detailed below, is incorrect. Finally, in addition to the damages calculations performed by Allstate, Defendants provided Allstate with a spreadsheet purporting to account for all payments it received from Allstate for resolution of insurance claims in the underlying lawsuits related to this litigation. (R. 198-1, ¶ 72.) The evidence accordingly shows that there is at least a material issue of fact as to whether "but for" the submission of Defendants' bills, Allstate would not have made payments to Defendants and as to whether Dr. D'Souza's fraudulent representations caused Allstate's damages. Accordingly, material questions of fact exist regarding whether Defendants' fraudulent actions caused injury to Allstate.[5]

### 3. Statute of Limitations

Defendants further argue that Allstate did not file its RICO claims within the requisite statute of limitations. "The statute of limitations for a civil RICO cause of action is a fairly generous four years." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674

---

[5] The parties dispute whether Allstate is required to show reasonable reliance as a means of demonstrating proximate causation with respect to its RICO claim premised on mail fraud in order to survive summary judgment. As discussed below with respect to Allstate's common law fraud claim, however, the Court finds that Allstate has established a genuine issue of material fact with regard to Allstate's reliance, and therefore the Court need not resolve this issue in order to resolve the Motion for Summary Judgment.

(7th Cir. 2009). The limitation period "begins to run when the plaintiffs discover, or should, if diligent, have discovered, that they had been injured by the defendants."[6] *Id.* A plaintiff "does not need to know that his injury is actionable to trigger the statute of limitations--the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim." *Id.* "'There must, of course, be a pattern of racketeering before the plaintiff's RICO claim accrues, and this requirement might delay accrual until after the plaintiff discovers her injury.'" *Limestone Dev. Corp. v. Vill. of Lemont*, 473 F. Supp. 2d 858, 869 (N.D. Ill. 2007) (citing *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1465 (7th Cir. 1992)).

The parties agree that the statute of limitations argument turns on the time at which Allstate, the corporate entity, had knowledge of its injury. "Where a corporate agent obtains knowledge while acting in the scope of his agency, he presumably reports that knowledge to his corporate principal so the court imputes such knowledge to a corporation." *United States v. One Parcel of Land*, 965 F.2d 311, 316 (7th Cir. 1992); *see also Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 603 (7th Cir. 2006) (citing same). "However, where an agent obtains knowledge while acting outside the scope of his agency, the standard presumption is unfounded, and the court will not impute the agent's knowledge to the corporation." *Id.* at 316. Defendants contend that because some Allstate SIU employees testified that in 2001 they believed that Defendants' use of DMX was fraudulent and more than two of Defendants' actions in billing Allstate occurred by February 26, 2001, that February 26, 2001 is the relevant accrual date. Accordingly, Defendants argue, any actions that occurred more than four years before the

---

[6] The Court declines to adopt the injury rule applied pursuant to the Clayton Act as requested by Defendants. That rule has not been adopted by the Supreme Court or the Seventh Circuit in RICO cases. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 185 (1997).

complaint was filed, or before December 19, 2002, are time-barred. Allstate contends that the earliest date of accrual is June of 2004 when SIU analyst Monforton obtained and acted on knowledge regarding Defendants' suspected fraudulent conduct by authorizing the escalation of the investigation into a project.

While at least two SIU employees, Crespo and Johnston, believed that Dr. D'Souza was fraudulently employing DMX as early as July 25, 2001 (Def. Ex. 4, Crespo Dep., pp. 71-72; Def. Ex. 10, Johnston Dep., p 26), there are questions of material fact as to when the corporate entity knew of the injury. Pursuant to the Seventh Circuit's ruling in *One Parcel of Land*, the relevant issue is whether the knowledge obtained by SIU employees was accrued while acting in the scope of their agency. *See, e.g., Monotype Imaging, Inc. v. Bitstream Inc.*, 2005 WL 936882, 2005 U.S. Dist. LEXIS 7410 (N.D. Ill. Apr. 21, 2005) (where undisputed facts showed that relevant email was accessible to employees charged with the duty of investigating infringement issues, corporation was held to have knowledge of the content of the email). While there is conflicting testimony regarding the issue of whether SIU investigators had the ability to view information regarding all of a providers' claims, the evidence submitted by both parties makes clear that the role of an Allstate investigator is to review specifically assigned claims. Viewing the facts in the light most favorable to Plaintiff, acting in the scope of their agency, Crespo and Johnson had knowledge that the claims that they personally reviewed involving Dr. D'Souza and his clinics indicated a likelihood of fraud. Even if one were to impute that knowledge regarding limited numbers of Defendants' claims to Allstate, however, Plaintiffs cannot establish that the knowledge possessed by these two SIU employees is sufficient to establish fraud on the part of Dr. D'Souza.

Defendants make broad assertions that "all of the medical records collected from a physician by the SIU employees and all of the information gathered or written by the SIU employees concerning a physician could be examined by anyone else working in the SIU." (R. 183-1, Def.'s Rule 56.1 Stmt. Facts, ¶ 6.) These statements, however, are controverted by the deposition testimony of several Allstate employees. While Ryan, an investigator, testified during his deposition that only time permitted him from looking at other investigators' files, other investigators explained that it was not their role to review files other than those to which they were assigned, and further that privacy, conflict, and HIPPA regulations prevented them from accessing other claims. (Pls. Ex. 7, Summins Dep., pp. 277-278; Def. Ex. 10, Crespo. Dep. pp. 85-88; R. 198-1, Ex. 15, Monforton Aff., ¶ 11.) Indeed, the critical issue is not whether the investigators had the ability to review claims not assigned to them, but whether investigators did in fact review those files. Defendants present no evidence in that regard. Accordingly, the information possessed by Crespo and Johnston only related to a limited number of Defendants' claims.

Additionally, the evidence shows that analysts, not investigators, have the authority to consolidate claims regarding a provider into a "project" so that Allstate can review claims on a global level for patterns of fraud. In the present case, the SIU analyst responsible for the Chicago region did not obtain knowledge regarding Defendants' activities until June 2004 when Brendan Hannan met with her and recommended escalating the investigation into a project. Only at that time did Allstate begin to take steps to further the investigation on a global level.

There is accordingly a material question of fact as to the date that Allstate knew of its injury. A jury could conclude that the suspicions of two investigators relating to a portion of Dr.

D'Souza's claims at the outset of the investigation are sufficient to impute knowledge to Allstate, or that Allstate's knowledge did not accrue until some later date.  *See, e.g., Installation Serve. v. Elec. Research, Inc.*, 2005 WL 3180129, 2005 U.S. Dist. LEXIS 29832, 13-23 (N.D. Ill. Nov. 23, 2005) (summary judgment denied despite evidence that entity had suspicious regarding relevant conduct where court could not determine as a matter of law when corporate entity should have known that its injury was wrongfully caused)[7]; *Abrams*, 2000 WL 574466, 2000 U.S. Dist. LEXIS 6837 (N.D. Ill. May 11, 2000) (whether insurance company had sufficient information to file fraud claims against a provider and was justified in continuing to pay out claims is an issue of fact for a jury).  Based on the evidence presented, the Court cannot determine as a matter of law when Allstate should have known that its injury was wrongfully caused.  For the foregoing reasons, the Court denies Defendants' Motion for Summary Judgment with respect to Plaintiffs' § 1962(c) claim.

### 4.      18 U.S.C. § 1692(a) and 18 U.S.C § 1692(b) Claims

Finally, Defendants contend that the Court should enter judgment on Allstate's § 1962(a) and (b) claims because Allstate never pled those claims and there is no proof to support them.  A section 1962(a) claim requires a showing that a defendant: "(1) received income from a pattern of racketeering activity; (2) used or invested that income in the operation of an enterprise; and (3) caused the injury complained of by the use or investment of racketeering income in an enterprise."  *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389 (7th Cir. 2009); 18 U.S.C. § 1962(a). In addition, 18 U.S.C. § 1962(b) "prohibits acquiring or maintaining directly or indirectly,

---

[7]  For the same reasons, Allstate's state law claims are also not time-barred because they are each subject to a five-year statute of limitations by their respective statutes of limitations, 735 ILCS 5/13-205.

through a pattern of racketeering activity, any interest in an enterprise engaged in interstate or foreign commerce." *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 672 (7th Cir. 1998); 18 U.S.C. § 1962(b).

While Allstate alleges claims pursuant to §§ 1962(a) and (b) in its Complaint, Allstate has not presented any evidence that Defendants used or invested any income to acquire any interest in, establish or operate the relevant enterprise or that Defendants maintained an interest in the enterprise through a pattern of racketeering. Indeed, in its opposition to the Motion for Summary Judgment, Allstate cursorily addresses Defendants' arguments with respect to §§ 1962(a) and (b) and contends that the undisputed facts that Dr. D'Souza opened a series of chiropractic clinics establishes that a jury could "easily find that the proceeds of defendants' illegitimate enterprise were reinvested in the enterprise." (R. 199-1, Plaintiffs' Opposition, p. 21.) The record is devoid of any evidence to support a claim pursuant to §§ 1962(a) or (b) and the Court accordingly grants Defendants' Motion for Summary Judgment with respect to the portions of Count I premised on 18 U.S.C. §§ 1962(a) and (b).

## B.  Count IV - Common Law Fraud

Under Illinois law, to prove common law fraud, Allstate must prove: "(1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance." *D.S.A Fin. Corp. v. County of Cook*, 345 Ill. App. 3d 554, 560, 280 Ill. Dec. 130, 135, 801 N.E.2d 1075, 1080 (Ill. Ct. App. 2003) (quoting *Bd. of Educ. of City of Chicago v. A, C, and S, Inc.*, 131 Ill. 2d 428, 452, 137 Ill. Dec. 635, 546 N.E.2d 580 (Ill. 1989)). In addition, "[t]he party alleging fraudulent

misrepresentation must show it justifiably relied on another's statements." *Id.* (quoting *Soules v. Gen. Motors Corp.*, 79 Ill.2d 282, 286, 37 Ill. Dec. 597, 402 N.E.2d 599 (Ill. 1980)). "[A] party is not justified in relying on representations made when he has ample opportunity to ascertain the truth of the representations before he acts." *Smith v. Ethell*, 144 Ill. App.3d 171, 174, 98 Ill. Dec. 742, 743–44, 494 N.E.2d 864, 865–66 (Ill. Ct. App. 1986) (quoting *Schmidt v. Landfield*, 20 Ill.2d 89, 94, 169 N.E.2d 229, 232 (Ill. 1960)). Whether a party's reliance is justified is a question of fact viewed in light of the surrounding circumstances, taking into account "both what the plaintiff knew and what he could have learned through the exercise of ordinary prudence." *Johnson v. Waterfront Servs. Co.*, 909 N.E.2d 342, 350, 330 Ill. Dec. 629, 637 (Ill. Ct. App. 2009) (collecting cases). Allstate premises its common law fraud claim on Defendants' submission of false and misleading medical reports, records, billing statements, physicians' liens, and other medical documents to Allstate. Allstate contends that it relied on these misrepresentations when paying bills for medical expenses generated by Defendants on behalf of their patients and settlements or verdicts arising out of claims brought by those patients.

Defendants first argue that Allstate cannot prove the reliance prong of its common law fraud claim because Allstate's employees admitted that they believed that Dr. D'Souza was engaged in fraudulent activity, and it is therefore impossible for Allstate to prove that it justifiably relied on anything that Dr. D'Souza represented or did. Specifically, Defendants posit that Allstate's employees never credited any of Dr. D'Souza's bills as legitimate and that Allstate has not presented any evidence of payments that were made by Allstate to Dr. D'Souza in reliance on fraudulent misrepresentations. Allstate's reliance, however, again turns on the fact of *when* it knew or should have known that Dr. D'Souza was engaging in fraud. As discussed

above, this fact remains in dispute.

Moreover, another court in this district has analyzed a similar question at the motion for summary judgment stage.[8] In *State Farm Mut. Auto. Ins. Co. v. Abrams*, 2000 WL 574466, 2000 U.S. Dist. LEXIS 6837 (N.D. Ill. May 11, 2000), a plaintiff automobile insurance company sued defendant attorneys and health care providers, alleging RICO violations and, *inter alia,* a pendant common law fraud claim. The defendants contended that the insurance company "cannot show justifiable reliance on the alleged misrepresentations because it knew as early as 1993 that certain claims were not valid, which therefore put it on notice to investigate" and given the company's "size and resources it should have been aware and suspicious of the allegedly invalid claims." *Id.* at *61-*63. Similar to the facts in this case, the defendants argued that the plaintiffs' employees had knowledge regarding the alleged fraud and indeed undertook an investigation of the allegations. *Id.* The court found that although the company did undertake an investigation into the alleged fraud in 1993, a material issue of fact remained as to when it discovered the "truth" that the claims were fraudulent. The court therefore held that "[w]hether or not State Farm had enough information to actually file its fraud claims until 1996, and was justified in continuing to pay out on facially valid claims, is an issue of fact that ought to be reserved for a jury." *Id.* at *64.

Similarly, the issue presented by the present litigation is whether Allstate justifiably

---

[8] The analysis presented in *Abrams* is more persuasive than that presented in *Allstate Ins. Co. v. Receivable Fin. Co., LLC*, 501 F.3d 398 (5th Cir. 2007), a case on which Defendants rely. As the Court has previously recognized (*see* R.179-1, 8/11/09 Minute Entry), the Fifth Circuit case "is inapposite" because the case involves review of a jury verdict and a failure to prove reliance under Texas state law where there was no evidence that Allstate relied on allegedly fraudulent medical bills or that Allstate made any payment to any of the defendants.

relied on Defendants' medical bills from 2001 to 2004 even though some of its SIU employees believed that Dr. D'Souza was engaging in fraud at that time. As in *Abrams*, a material question of fact remains as when to Allstate discovered the "truth" that the claims submitted by Defendants were fraudulent. Despite evidence in the record that a number of Allstate employees asserted that Dr. D'Souza's actions were fraudulent as early as 2001 or 2002, Defendants have not presented uncontroverted evidence that Allstate corporation knew that the claims submitted by Dr. D'Souza were necessarily fraudulent as of those dates.

Finally, Defendants also argue that Allstate's fraud claim fails because Allstate cannot establish proximate causation. As discussed above, however, Allstate has established a material issue of fact as to whether Defendants' actions proximately caused its injury. There are disputes over genuine issues of material fact relating to the elements of Allstate's fraud claim and, accordingly, the Court denies Defendants' Motion for Summary Judgment with respect to Count IV.

### C. Count II - Insurance Fraud Pursuant to 720 ILCS 5/46-5

Pursuant to 720 ILCS 5/46-5, an insurance company can seek damages against: "[a] person who knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of any insurance company by the making of a false claim or by causing a false claim to be made on a policy of insurance issued by an insurance company, or by the making of a false claim or by causing a false claim to be made to a self-insured entity intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property. . . ." 720 ILCS 4/46-5; *see also Adelman v. Trustmark Ins. Co. (Mutual)*, 2008 WL 1995041, 2008 U.S. Dist. LEXIS 37250 (N.D. Ill. May 7, 2008). Defendants argue that

Allstate's insurance fraud claim fails for the same reasons its common law fraud claims fail, failure to prove reliance and proximate cause. As discussed in Sections II.A.2 and II.C, above, however, Allstate has established that material questions of fact exist with respect to these issues. The Court accordingly denies Defendants' Motion for Summary Judgment with respect to Count IV.

### D. Count V - Unjust Enrichment

"Illinois law recognizes a claim for unjust enrichment where a benefit was transferred to the defendant by a third party in three situations: where (1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant." *Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 854 (7th Cir. 2007). Where fraud forms the basis of a claim for unjust enrichment as Allstate argues in the present case, Defendants must prove wrongful conduct by the same standards applied to a common law fraud claim. *Id.* at 854-55. Because the Court finds that Allstate's common law fraud claim survives summary judgment, Allstate's claim for unjust enrichment survives as well.

Defendants also contend that Allstate never specified the basis for its unjust enrichment claim during discovery. While a party may not rely on evidence it failed to disclose during discovery, *Commonwealth Ins. Co. v. Titan Tire Corp.*, 398 F.3d 879, 888 (7th Cir. 2004), Defendants have not identified any such evidence. In fact, contrary to Defendants' assertions, Allstate responded to Defendants' interrogatory: "State by reference to each and every person whose claims and/or medical care and/or medical bills Plaintiffs seek to put at issue in this

lawsuit, the dollar amount by which Plaintiffs maintain Defendants have been unjustly enriched and the method used to calculate those dollar amounts." (Def. Ex. 17, Plaintiffs' Responses to Defendants' Second Set of Interrogatories, pp. 11-12.) Allstate responded that it had provided Defendants with a spreadsheet that included the following information relevant to this litigation: "the names of all claimants, the Allstate claim file number, the dollar amounts of all the bills generated by defendants on each of said claims, the amounts that Allstate has paid out in resolution of each of said claims, and other expenses incurred in resolution of such claims." *Id.* Allstate further disclosed its contention that, "[D]efendants have been unjustly enriched if they have received payment upon resolution of any and all of the above-mentioned claims." *Id.* Finally, Allstate provided Defendants the dollar amounts of billing statements submitted to Allstate on closed files, insurance claim payments, Allstate's costs and expenses relating to its investigation, and open billing statements provided to Allstate by Defendants. While Defendants make clear in their reply brief that they take issue with the extent of Allstate's disclosures, the evidence presented by Allstate is sufficient to create material issues of fact with respect to many, if not all, of its claims. The sufficiency of the evidence is therefore best weighed by a jury.

### E. Counts VI and VII - Negligent Spoliation of Evidence

"Illinois does not recognize a separate tort for spoliation of evidence. Rather, a claim for negligent spoliation falls under negligence law." *Perez-Garcia v. Village of Mundelein*, 396 F. Supp. 2d 907, 912 (N.D. Ill. 2005) (citing *Boyd v. Travelers Ins. Co.*, 166 Ill.2d 188, 194, 652 N.E.2d 267, 270, 209 Ill. Dec. 727 (Ill. 1995)). "A plaintiff must plead the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, an injury proximately caused by the breach, and damages." *Id.*

Allstate bases its spoilation claim on two sets of facts: (i) Dr. D'Souza failed to maintain the integrity of radiology reports by discharging original reports and altering reports from other physicians, and (ii) Dr. D'Souza failed to maintain the x-ray records which form the basis of many of the underlying claims in this lawsuit when his computer system crashed on three occasions and he failed to produce VHS tape recordings of DMX studies or hard copies of conventional x-rays. Defendants do not dispute that Dr. D'Souza altered radiologist reports sent to him by printing them on his own letterhead, or that he has failed to produce records, either VHS, hard copy, or electronic, of the various forms of x-rays at issue in the underlying claims. (Def. Ex. 3, D'Souza Dep., pp. 755-757, 819-820.) Instead, Defendants contend that the fact that Dr. D'Souza "lost" x-rays is not evidence of unreasonable conduct and he did not alter radiologist reports when he printed them on his own stationary.

Allstate, however, has presented evidence that contradicts these statements. Allstate's expert, Dr. Reinke, has opined that medical professionals have an absolute duty to store and maintain all patient medical records and to maintain the integrity of medical records. Defendants do not question this duty, and instead solely object to the statement based on the validity of Dr. Reinke's unsworn report. As discussed above, the Court already has determined that Dr. Reinke is well qualified to opine on these matters and confirmed the admissibility of Dr. Reinke's opinions. Dr. Reinke has also opined that Dr. D'Souza failed to maintain the integrity of patients' radiology reports by discarding the originals report and altering the text of the reports by printing them on his own stationary. Dr. Reinke further opines that Dr. D'Souza breached his duty to maintain records when he failed to maintain and/or preserve digital x-rays and DMX studies taken of patients. While Defendants object to Dr. Reinke's findings, Allstate has

sufficiently alleged a material fact at to whether Defendants breached their duty to properly maintain medical records. *See, e.g., China Ocean Shipping Co. v. Simone Metals*, 1999 WL 966477, 1999 U.S. Dist. LEXIS 16229 (N.D. Ill. Oct. 1, 1999) (negligent spoilation claim not capable of resolution at summary judgment stage where questions of material fact existed regarding party's failure to maintain and preserve evidence). The Court accordingly denies Defendants' Motion for Summary Judgment with respect to Count VI.

**CONCLUSION**

For the foregoing reasons, the Court grants in part Defendants' Motion for Summary Judgment with respect to the claims in Count I premised on 18 U.S.C. 1962(a) and (b), and denies the remainder of the motion.

DATED: February 10, 2010

ENTERED

_____
AMY J. ST. EVE
United States District Court Judge