**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 06-cv-7010 |
| v. | ) | |
| | ) | Honorable Amy J. St. Eve |
| ST. ANTHONY'S SPINE & JOINT INSTITUTE, | ) | |
| P.C., MELVIN D'SOUZA, D.C., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

## BACKGROUND

Before the Court is Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Company's (collectively "Allstate") Motion for Summary Judgment on Defendants Melvin D'Souza, D.C. ("Dr. D'Souza") and St. Anthony's Spine and Joint Institute, P.C.'s ("St. Anthony's") (collectively "Defendants") Counterclaim. Allstate's suit against Defendants includes a claim pursuant to 720 ILCS § 5/46-5(a) based on Defendants' submission of allegedly false and misleading medical reports, records, and billing statements for chiropractic and diagnostic services to Allstate. Defendants filed a counterclaim against Allstate alleging that Allstate brought its suit against Defendants in bad faith in contravention of 720 ILCS § 5/46-5(b) and seeking statutory damages and attorneys' fees. For the following reasons, the Court grants Plaintiffs' Motion for Summary Judgment.

## I. Northern District of Illinois Local Rule 56.1

When determining summary judgment motions, the Court derives the background facts from the parties' Local Rule 56.1 statements. Specifically, Local Rule 56.1 assists the Court by

"organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)). In addition, Local Rule 56.1(b)(3)(C) requires the nonmoving party to present a separate statement of additional facts that require the denial of summary judgment. *See Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008). Pursuant to the Local Rules, the Court will not consider any additional facts proposed in the nonmoving party's Local Rule 56.1(b)(3)(B) Response, but instead must rely on the nonmovant's Local Rule 56.1(b)(3)(C) Statement of Additional Facts when making factual determinations. *See id.* at 643; *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809 (7th Cir. 2005) ("Local Rule 56.1 requires specifically that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate 'statement … of any additional facts that require the denial of summary judgment.'") (emphasis in original).

Moreover, the purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments, *see Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006), and thus the Court will not address the parties' arguments made in their Rule 56.1 statements and responses. Also, the requirements for responses under Local

Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon*, 233 F.3d at 528. Further, the Court may disregard statements and responses that do not properly cite to the record. *See Cichon*, 401 F.3d at 809-10. Finally, "hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). With these standards in mind, the Court turns to the relevant facts of the case.

## II.      Dr. D'Souza's Affidavit

Prior to addressing the facts, the Court must address Dr. D'Souza's affidavit which contains numerous unsubstantiated statements and legal conclusions that are outside of his personal knowledge. Rule 56(e)(1) of the Federal Rules of Civil Procedure sets forth requirements for affidavits submitted at the summary judgment stage:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

Fed.R.Civ.P. 56(e)(1). "While personal knowledge may include inferences and opinions, those inferences must be substantiated by specific facts." *Vakharia v. Little Co. of Mary Hosp. & Health Care Ctrs.*, 62 Fed. Appx. 122, 125 (7th Cir. 2003); *Drake v. 3M*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.")

The Court recognizes that 720 ILCS § 5/46-5(b) on which Defendants premise their counterclaim provides that, "[i]n determining whether an insurance company . . . acted in bad

faith, the court shall relax the rules of evidence to allow for the introduction of any facts or other information on which the insurance company . . . may have relied in bringing an action under subsection (a) of this Section."  720 ILCS § 5/46-5(b).  Defendants contend that § 5/46-5(b) renders certain otherwise inadmissible evidence admissible as to the issue of Allstate's reliance.  The evidentiary portion of § 5/46-5(b), however, is a state rule of evidence and thus inapplicable here.  Indeed, the "Federal Rules of Evidence, not provisions of state law, govern the admissibility of evidence in federal court."  *Park v. City of Chicago*, 297 F.3d 606, 611 (7th Cir. 2002); *see also Barron v. Ford Motor Co. of Canada Ltd.*, 965 F.2d 195, 198 (7th Cir. 1992) ("Even in diversity cases the rules of evidence applied in federal courts are the federal rules of evidence rather than state rules . . .").  As the Seventh Circuit noted in *Barron*, "[a] pure rule of evidence, like a pure rule of procedure, is concerned solely with accuracy and economy in litigation . . . while a substantive rule is concerned with the channeling of behavior outside the courtroom."  *Id.* at 199.  Because the text of § 5/46-5(b) establishes an evidentiary rule, the provision does not apply to the admissibility of evidence in federal court.

Despite the inapplicability of this evidentiary rule, the Court views the facts in the light most favorable to Defendants.  The Court will consider evidence admissible in federal court, including deposition testimony from Allstate employees and Dr. D'Souza, as well as portions of Dr. D'Souza's affidavit that are based on his personal knowledge.  The Court, however, will not consider the many self-serving, conclusory allegations contained in Dr. D'Souza's affidavit that assert legal conclusions regarding issues at the center of this motion for summary judgment, or that are not supported by Dr. D'Souza's personal knowledge or any other form of evidence.  The Court, for example, will not assume the truth of the following statements contained in Dr.

D'Souza's affidavit:  Allstate's "refusal to pay for my patients' care was because [Allstate] does not credit as real and compensable musculigamentous injuries arising out of automobile accidents," Allstate's "refusal to pay for radiographic testing of my patients was because the insurance company falsely believes that x-rays can only be used to detect fractures of bone and are useless in diagnosing soft tissue injuries," "Allstate's continuing practice of declining any payment for the reasonable and necessary medical expenses of its insureds . . . who [were] treated at my clinic was in bad faith," "this is a vindictive suit" and "it has been brought against me as a means to punish me for caring for soft tissue injury patients," "[t]he suit is being used to harass, intimidate and burden me," "the suit has also been brought as a means of avenging [Allstate's] hostility toward me for my views [on] . . . injuries arising from automobile accidents," "the charges against me . . . are untrue," "I believe all of Allstate's accusations against me have been trumped up to try to mask the motive of this suit, which is to vindictively punish, harass, and intimidate me for treating and diagnosing patients whom Allstate does not want to pay its insurance out to," and "[t]his lawsuit has been brought to teach a lesson to chiropractors in this community that if they engage in caring treatment and thorough diagnostic work up of soft tissue injury cases and if they engage in public speech and actions that challenge the practices of [Allstate] . . . they can be targeted for a costly and burdensome suit as punishment."  (R. 184-1, Ex. 1, D'Souza Aff, ¶¶ 122, 124-125, 184-188, 204, 227.)

### III.    Relevant Facts

The facts underlying Allstate's claims against Defendants are detailed in the ruling on Defendants' Motion for Summary Judgment.  (R. 209-1, Memorandum Opinion and Order.)  The facts pertinent to the pending motion concern whether Defendants have a counterclaim that Allstate brought its statutory insurance fraud claim against Defendants in bad faith.

### A.    Defendants' Relationship with Allstate

Dr. D'Souza, a chiropractic physician, conducts business through a series of chiropractic centers located in and around Chicago, Illinois.  (R. 186-1, Plaintiffs' Local Rule 56.1 Statement of Undisputed Facts, ¶¶ 2-5.)  As a physician who treats patients who have been injured in automobile accidents, Dr. D'Souza routinely submits claims to insurance companies.  Allstate has contracted to pay all reasonable expenses actually incurred for the necessary medical treatments and services of insureds in an automobile accident.  *Id.* at ¶ 4.  At issue in this case are a series of insurance claims seeking payment of medical bills that Dr. D'Souza submitted to Allstate between 2000 and 2006.  (R. 196-1, Defendants' Local Rule 56.1 Statement of Additional Facts, ¶ 1.)  Most of the insurance claims Defendants submitted to Allstate involved patients who sustained soft-tissue injuries consisting of ligament and muscle sprains or strains of the cervical, thoracic, and/or lumbar spine in automobile accidents.  (R. 186-1, ¶¶ 1-2.)  From 2000 through the inception of this lawsuit, Allstate paid Defendants almost $80,000 in direct payments for treatments and diagnostic services, but declined to pay the majority of bills that Dr. D'Souza submitted to Allstate.  (R. 196-1, ¶ 9; R. 186-1, Pl. Ex. S.)  In the pending lawsuit, Allstate has put at issue every patient, approximately 450 individuals, who received treatment from Dr. D'Souza from 2000 forward.  (R. 186-1, ¶ 27.)

**B.**     **Allstate's Investigation and Dr. D'Souza's Response**

At the outset of the time frame in which Dr. D'Souza submitted claims to Allstate, sometime in 2001 or early 2002, Allstate's Special Investigations Unit ("SIU") began investigating Defendants on suspicion of fraudulent activities. Allstate began its investigation after discovering inconsistencies between information contained in Defendants' billing statements and patients' recollections of who performed treatments they received at Dr. D'Souza's clinics. (R. 186-1, Pl. Ex. E, Summins Dep., pp. 211, 295.) In addition to these inconsistencies, as early as 2001, some SIU personnel also discovered information that led them to believe that Dr. D'Souza was perpetrating a fraudulent scheme through the use of a videofluoroscopic x-ray machine, or DMX. (R. 186-1, Pl. Ex. G, Crespo Dep., pp. 61, 139.) Defendants used the DMX to take videofluoroscopic x-rays of patients beginning in late 2000. (R. 186-1, ¶ 17.) Based on these concerns, by 2001, Allstate had designated Dr. D'Souza as a "provider on hold," and thereafter Allstate sent all of the claims submitted by Dr. D'Souza to the SIU for further investigation. (R. 196-1, ¶ 3.)

Allstate employees and Dr. D'Souza hold conflicting views regarding the value of or necessity for his treatment of the patients whose claims are at issue in this lawsuit. Danielle Crespo was the SIU analyst assigned to the investigation of Dr. D'Souza. (R. 186-1, ¶ 63.) Crespo, and a number of SIU investigators, including Larry Arbetman, James Ryan, and Raymond Summins, for example, believe that soft-tissue injuries are typically "self-limiting," resolve in a few days, do not require long term treatment, and pose no risk of permanent injury. *Id.* at ¶ 4. SIU personnel also explained that Allstate considers injuries confirmed by diagnostic tests such as MRIs, CAT scans, or x-rays to be objective injuries. (R. 186-1, Pl. Ex. G, Crespo

Dep., pp. 26-29.) Conversely, Allstate considers injuries that are based only on complaints made by patients and not confirmed by diagnostic tests, even if those injuries are diagnosed by a physician, to be subjective injuries. *Id.* Specifically, SIU employees Crespo and Arbetman believe that physicians cannot use x-rays and videofluoroscopic motion x-rays to diagnose soft-tissue injuries to the cervical, thoracic or lumbar spine. (R. 196-1, ¶ 15.) Crespo and William Watts, also an SIU investigator, believe that x-rays do not show whether a soft-tissue injury is present in a patient. *Id.* In fact, Crespo testified that all the employees in the SIU unit believed that Dr. D'Souza "had no business" employing the DMX machine due to the nature of his patients' injuries. (R. 186-1, Pl. Ex. G, Crespo Dep., pp. 72-73.) Arbetman testified that he did not believe that any Allstate employees were present while Dr. D'Souza treated any of the patients whose claims are at issue in this lawsuit. (R. 196-1, ¶ 26.)

Crespo, who testified that she was the individual principally responsible for the analysis of the propriety of suing Dr. D'Souza, testified at length regarding Dr. D'Souza's fraudulent practices. In fact, she testified that she believed that Dr. D'Souza never provided medical care to anyone who was actually in need of that care, (R. 186-1, Pl. Ex. G, Crespo Dep., pp. 117-118, 236), a view also held by Arbetman who similarly testified that a "vast majority" of Dr. D'Souza's practice is fraudulent. (R. 205-1, Pl. Ex. Q, Arbetman Dep., pp 75-76.) Crespo, acting in her role as an Allstate employee, also told dozens of attorneys in Chicago who represented Dr. D'Souza's patients that Dr. D'Souza was providing medically unnecessary treatments and fraudulently padding bills, and that he was dishonest. (R. 196-1, ¶ 30.) She further testified that she told one attorney that Allstate was taking the position that Allstate would not treat Dr. D'Souza's bills in the same manner as other physicians' bills. According to

Crespo, a benefit of communicating with these attorneys was that they would not take cases involving Dr. D'Souza as the medical provider. (R. 186-1, Pl. Ex. G, Crespo Dep., pp. 153-154.) In addition, Crespo testified that one factor that attorneys might have considered in deciding to "walk away" from a case associated with Dr. D'Souza was whether they could settle the case with the insurance company. *Id.* at p. 156. Finally, Crespo testified that she communicated these same concerns regarding Dr. D'Souza to his patients. (R. 196-1, ¶ 133.)

Contrary to the beliefs held by Crespo and other SIU employees, Dr. D'Souza believes that physicians can diagnose soft-tissue injuries, that soft-tissue injuries are not self-limiting and can benefit from treatment, and that such injuries carry long-term risks. (R. 196-1, ¶ 7.) Dr. D'Souza also believes, based on his education and experience, that static x-rays and motion x-rays, or DMX, are useful tools for diagnosing muscoligamentous injuries caused by automobile accidents. *Id.* at ¶ 16. Indeed, Dr. D'Souza believes that Allstate's views regarding the allegedly subjective nature of soft-tissue injuries are contrary to both medical science and widely accepted views in the chiropractic profession. *Id.* at ¶ 8.

Allstate and Dr. D'Souza also hold conflicting beliefs regarding Dr. D'Souza's use of chiropractic assistants. Dr. D'Souza contends that he properly trained, educated, and supervised his assistants, and that all tasks performed by his assistants were proper. *Id.* at ¶ 42. Dr. D'Souza employed chiropractic treatments of soft-tissue massage, superficial heat therapy, ultrasound deep heat therapy, electromuscle stimulation therapy, and physician exercises to treat patients. (R. 196-1, Def. Ex. 1, D'Souza Aff., ¶¶ 64-69.) Although Dr. D'Souza alleges that the chiropractic profession recognizes these as standard treatments, and Dr. D'Souza's medical records demonstrated that his patients suffered injuries in automobile accidents, received

treatment and incurred expenses, Allstate did not pay many of the bills submitted by Dr. D'Souza. *Id.* at ¶¶ 70, 116-118.

The parties further dispute whether all of Dr. D'Souza's patients received the chiropractic treatments indicated on the medical bills submitted to Allstate. Dr. D'Souza asserts in his affidavit that the patients did receive those treatments, (*id.* at ¶ 121), but Allstate's expert, Dr. Reinke, has opined that some of the patients did not receive the treatments indicated on the medical bills submitted to Allstate by Defendants. (R. 186-1, Pl. Ex. L, Reinke Report, p. 18.) Dr. Reinke explains that some of Dr. D'Souza's patients have testified that they did not actually receive all of the treatments identified in Dr. D'Souza's billing statements, and that some billing statements reflect services that are not identified in the SOAP notes associated with the date of service. *Id.* at pp. 18-19. To support these contentions, Dr. Reinke prepared a detailed chart identifying each claim for which she concluded that Dr. D'Souza billed for services never rendered. *Id.*

### C.    Dr. D'Souza's Public Challenge of Allstate Practices

In 2001 and 2002, Dr. D'Souza became publicly active regarding his belief that the DMX motion x-ray was a useful tool physicians could employ to prove muscoligamentous injuries and his concerns regarding the behavior of insurance companies in denying claims based on those injuries. (R. 196-1, Def. Ex. 1, D'Souza Dep., ¶¶ 134-140, 144-146.) As part of his public campaign, Dr. D'Souza published information on his website and held conferences in the Chicago area for physicians who treated, and attorneys who represented, patients who had sustained automobile accident injuries. *Id.* SIU employees Crespo and Watts knew that Dr. D'Souza was promoting the use of DMX via his website, and that he held a conference

promoting the use of DMX. (R. 196-1, ¶ 20.) Crespo testified that she, other SIU investigators, and the assigned analyst on the Dr. D'Souza investigation viewed the actions of Dr. D'Souza in promoting the use of the DMX to be highly inappropriate, and that she did not "understand why he would solicit attorneys when his top priority should be the well-being of his patients." (R. 186-1, Pl. Ex. G, Crespo Dep., pp. 229-230.) Crespo also testified that she had never heard of a doctor or physician hosting a conference where lawyers were in attendance, and that she told employees of other insurance companies that Dr. D'Souza was employing a medically useless DMX motion x-ray in his cases. (R. 196-1, ¶¶ 22-23.)[1]

In addition to these public actions, Dr. D'Souza also expressed some of his concerns directly to Allstate. In 2003, Dr. D'Souza had a telephone call with SIU investigator Watts. (R. 186-1, Def. Ex 1, D'Souza Dep., ¶¶ 151-153.) Watts recalls Dr. D'Souza calling him to discuss a bill or payment regarding a particular patient's claim. (R. 205-1, Pl. Ex. R, Watts Dep., p. 122.) During the call, Dr. D'Souza and Watts discussed the licensing of Dr. D'Souza's chiropractic assistants. (R. 196-1, Def. Ex. 1, D'Souza Aff., ¶ 150.; R. 205-1, Pl. Ex. R, Watts Dep., pp. 90-97.) Watts also recalls a discussion of a discrepancy between Dr. D'Souza's recollection and a patient's recollection regarding whether Dr. D'Souza was present for certain treatment. (R. 205-1, Pl. Ex. R, Watts Dep., p. 104.) Prior to his call with Dr. D'Souza, Watts also recalled a series of phone calls with the Illinois Department of Professional Regulation in

_____

[1] To supplement the facts regarding Dr. D'Souza's public activities, in his affidavit, Dr. D'Souza also summarizes the opinions that Dr. Michael Freeman expressed at a conference. In addition to being inadmissible hearsay, the Court has previously ruled that Dr. Freeman's opinions are inadmissible in this case. (R. 179-1, 8/31/09 Minute Entry granting, in part, Plaintiff's Motion to Strike.) The Court will not permit Dr. D'Souza to introduce Dr. Freeman's opinions through his affidavit. Accordingly, the Court strikes paragraphs 141-143 of Dr. D'Souza's affidavit.

which he inquired as to whether there was a license for chiropractic assistants and vaguely recalls that there was no such license. *Id.* at pp. 100-101. In addition, Watts testified that after his call with Dr. D'Souza, Dr. D'Souza posted a statement relating to the specific claim that Dr. D'Souza called Allstate to discuss on a website called "Allstatesucks.com." In that posting, Dr. D'Souza characterized Watts' claims handling in a negative way and called him unfair. *Id.* at pp. 121-123, 137.

Dr. D'Souza was upset about the phone call with Watts and continued to believe that Allstate's refusal to pay his bills was wrong. (R. 196-1, ¶ 42.) Dr. D'Souza therefore contacted the Illinois Attorney General, a member of the Illinois Medical Licensing Board, and the Illinois Department of Professional Regulation about his dispute with Allstate regarding the use of chiropractic assistants. *Id.* at ¶ 44. In response, Dr. D'Souza received an informal advisory opinion from the Illinois Department of Professional Regulation that stated that neither the Illinois Medical Practice Act nor the rules for the administration of that Act set forth regulations regarding chiropractic assistants or requirements that such individuals be licensed. *Id.* at ¶ 45. The letter also referred to a provision of the Act which stated, in part: "Nothing in this Act shall be construed to limit the delegation of tasks or duties by a physician licensed to practice medicine in all its branches to a licensed practical nurse, a registered professional nurse, or other personnel." *Id.* After receiving this letter, in or around February - April 2004, Dr. D'Souza transmitted the letter via fax or mail to approximately 30 Allstate employees, including a number of SIU employees who worked on Dr. D'Souza's claims. A number of these employees subsequently reviewed the letter. *Id.* at ¶ 46-47.

After receiving the letter from Dr. D'Souza, Allstate contacted its outside counsel from the offices of Dale Sherman or Christine Tennon, and the offices of Condon and Cook, who held a meeting with Allstate SIU employees regarding the advisory opinion sent to Allstate by Dr. D'Souza. *Id.* at ¶ 49. Allstate's counsel informed Allstate's SIU personnel that the advisory opinion letter was not a binding legal opinion. *Id.* at ¶ 50. Indeed, SIU investigator Ryan continued to take the position that the treatment rendered by Dr. D'Souza's chiropractic assistants was inappropriate. *Id.* at ¶ 51. SIU investigator Summins also testified that Allstate did not change its position that Allstate should not pay for treatments done by Dr. D'Souza's assistants, and that there was "a lot of gray area" concerning the issue of direct supervision by a chiropractic physician of an assistant. *Id.* at ¶¶ 52, 55. Crespo similarly testified that whether a non-physician can assist a chiropractic physician is a "gray area," though she noted that an assistant could perform an ultrasound if the physician is in direct proximity to the assistant. *Id.* at ¶¶ 56-57. Arbetman also testified that a chiropractor had to be in the room with an assistant when an assistant was treating a patient, but was not sure if the physician needed to be present every minute. *Id.* at ¶ 58. Finally, Ryan believed that chiropractic assistants could perform massages without physician supervision. *Id.* at ¶ 59.

### D. Allstate's Continued Investigation and Institution of Legal Proceedings

Meanwhile, the SIU continued to investigate its suspicions of Defendants' fraudulent activities by securing recorded statements of Dr. D'Souza's patients and obtaining Defendants' medical records pertaining to Dr. D'Souza's patients' personal injury claims. (R. 186-1, ¶ 20.) In addition, Allstate inspected one of Dr. D'Souza's clinics and interviewed Dr. D'Souza. *Id.* at ¶ 21. After Allstate took these steps, in 2004, Brendan Hannan, an SIU manager, requested a

meeting with SIU analyst Catia Monforton to discuss the evidence obtained by Allstate during its investigation into Defendants' activities. *Id.* at ¶ 22. Hannan presented Monforton with evidence which raised a series of concerns including that Defendants billed for services not rendered, permitted treatment of patients by unlicensed physicians, and used the DMX to diagnose soft-tissue injuries. (R. 186-1, Pl. Ex. F, Monforton Dep., p. 33.) Subsequent to her meeting with Hannan, Monforton decided to consolidate and continue the various investigations into Dr. D'Souza, and, in June 2004, to retain outside legal counsel, LaRose & Boscoe, Ltd. ("LaRose"), to conduct an investigation into Defendants. (*Id.* at p. 24; R. 205-1, Pl. Ex. W, Monforton Aff., ¶ 19.) During its legal investigation, LaRose secured numerous depositions of Dr. D'Souza, the associate physicians and employees who worked at the St. Anthony's clinics, and Dr. D'Souza's patients. (R. 186-1, ¶ 25.) At the conclusion of its investigation, LaRose provided Allstate with an opinion concerning Defendants' fraudulent activities. *Id.*

In 2005, Allstate also retained Dr. Tara Reinke, a chiropractic expert, to conduct a peer review of three individual cases involving Defendants' clinics. *Id.* at ¶ 26. Allstate hired Dr. Reinke in order to assist it in its investigation and to make a determination as to whether or not to pursue litigation against Defendants. (R. 186-1, Pl. Ex. G, Crespo Dep., pp. 2-7.) Dr. Reinke found that Defendants' medical records failed to substantiate the medical necessity of medical services, treatments and diagnostic testing allegedly rendered by Defendants. Dr. Reinke also raised the same concerns that led Allstate to suspect additional improper activities on the part of Defendants regarding, *inter alia,* aspects of diagnostic imaging generally, the necessity of videofluoroscopic x-rays, and the establishment of medical necessity for services rendered. (R. 186-1, ¶ 27.) On May 10, 2006, Allstate decided to retain Dr. Reinke to review numerous other

14

claims involving Defendants' clinics and to opine on Defendants' pattern of misconduct by billing for services never rendered, providing treatment for non-existent injuries, using unlicensed assistants, providing inaccurate medical reporting, and misrepresenting medical staffing. *Id.* at ¶ 28.

On November 30, 2006, Dr. Reinke issued her opinions to Allstate that the medical records, sworn statements and other documentation that she reviewed demonstrated a "clear pattern of misconduct" by Dr. D'Souza. Based on Dr. Reinke's opinion and the evidence secured in its ongoing investigation into Defendants' fraudulent activities, Allstate filed the present lawsuit on December 19, 2006. (R. 186-1, Pl. Ex. G, Crespo Dep., pp. 2-7, 127, 318-322.) Crespo testified that she recommended the filing of a lawsuit against Dr. D'Souza, but that Ed Moran, head of Allstate's claims department, ultimately made the decision to file the lawsuit. *Id.* at pp. 127-128. The complaint filed by Allstate cited to specific deposition testimony and medical records. (R. 1-1, Complaint; R. 186-1, ¶ 12.)

Subsequent to the filing of the lawsuit, Dr. Reinke continued her review of Defendants' files and eventually reviewed all 450 case files at issue. (R. 186-1, ¶ 32.) She concluded that Defendants had engaged in a pattern of misconduct "designed to inflate the potential value of insurance claims and/or lawsuits involving insurance claims." *Id.* Dr. Reinke opined that Dr. D'Souza improperly billed for exams at the highest level, inappropriately used form medical reporting, misrepresented that licensed physicians were performing treatments, billed for treatment and services never rendered, billed for unnecessary diagnostic testing and chiropractic treatment, negligently maintained medical records and diagnostic studies, exaggerated the nature

and extent of injuries allegedly sustained, paid "kickbacks" to physicians that referred patients to him, and improperly solicited personal injury attorneys and patients.  *Id.*

## LEGAL STANDARD

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Knight v. Wiseman*, 590 F.3d 458 (7th Cir. 2009).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007).  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  "Thus, to survive summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on all essential elements of its case."  *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009); *see Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005) (the nonmoving party must present "evidence on which the jury could reasonably find for the nonmoving party.").

# ANALYSIS

In Count II of its Complaint, Allstate seeks damages pursuant to 720 ILCS § 5/46-5(a),
which states in pertinent part: "A person who knowingly obtains, attempts to obtain, or causes to
be obtained, by deception, control over the property of any insurance company by the making of
a false claim or by causing a false claim to be made on a policy of insurance issued by an
insurance company . . . shall be civilly liable to the insurance company . . . in an amount equal to
either 3 times the value of the property wrongfully obtained or, if no property was wrongfully
obtained, twice the value of the property attempted to be obtained, whichever amount is greater,
plus reasonable attorneys fees." 720 ILCS § 5/46-5(a). Section 46-5(b) conversely provides the
basis for Defendants' counterclaim against Allstate and states: "An insurance company . . . that
brings an action against a person under subsection (a) of this Section in bad faith shall be liable
to that person for twice the value of the property claimed, plus reasonable attorneys fees." 720
ILCS § 5/46-5(b). Under § 46-5(b), then, to survive summary judgment, Defendants must
establish a genuine issue of material fact regarding whether Allstate brought fraud claims against
them in bad faith.

As an initial matter, both parties rely heavily on *Steadfast Ins. Co. v. Automobile Mktg.
Network, Inc.*, 2001 WL 881324, 2001 U.S. Dist. LEXIS 11708 (N.D. Ill. July 31, 2001), the
only reported case addressing claims pursuant to § 46-5(b). In *Steadfast*, the court considered
whether a determination of bad faith in the insurance context requires a showing of improper
motive. In reaching its determination, the *Steadfast* court analyzed the language of § 46-5(b),
common law definitions of bad faith, and courts' interpretations of "unreasonable and vexatious"

17

delay or denial of a claim pursuant to 215 ILCS § 5/155.  *Id.* at \*21-\*28.  *Steadfast's* detailed

analysis of the issues is persuasive, and the court ultimately held:

> For § 46-5(b), however, the explicit use of the term bad faith leaves little room to doubt that liability must be predicated on proof of '. . . a state of mind affirmatively operating with furtive design or ill will.'  The notion that it is a mixture of motive and result suggests that motive can be inferred from other evidence.  For these reasons, the court adopts Steadfast's view that improper motive must be established to prevail under § 46-5(b).  Subjective intent is generally a jury question.  Thus, as indicated above, summary judgment is appropriate only if no reasonable jury could find in favor of the non-moving party.

*Id.* at \*27-\*28.  In order to prevail on its motion for summary judgment, Allstate must therefore

establish that no reasonable jury could find that Allstate brought its actions against Defendants

with improper motive.  Because this issue presents a subjective question, Allstate's burden is

high.  *See, e.g., Kilty v. Maple Grove Condo. Ass'n*, 101 F. Supp. 2d 1041, 1051 (N.D. Ill. 2000)

(holding that the defendant's subjective intent in a discriminatory housing case is a proper

question for the jury).

I.      **The Undisputed Facts Show that Allstate Had a Good Faith Basis for Filing Suit Against Defendants**

The undisputed facts demonstrate that Allstate had sufficient evidence on which to

premise its § 46-5(a) claim against Defendants.  This case is unlike *Steadfast* where the Court

declined to enter summary judgment on the plaintiffs' § 46-5(b) claim because despite a six-

month investigation into the defendants' activities, the plaintiffs' barren complaint raised a

genuine issue of fact as to whether plaintiffs had acted in bad faith by filing a complaint that did

not contain any substantive allegations.  2001 WL 881324, 2001 U.S. Dist. LEXIS 11708 at \*32-

\*33.  This case is more analogous to *Lummis v. State Farm Fire & Cas. Co.*, 469 F.3d 1098,

1100 (7th Cir. 2006) in which the Seventh Circuit upheld a district court's dismissal of the

plaintiff insured's bad faith claim against the defendant insurer at the summary judgment stage. *Lummis* involved a suit filed against State Farm as a result of State Farm's denial of payment of the plaintiff's claim subsequent to a fire that destroyed the plaintiff's home. The Plaintiff claimed that State Farm denied its claim in bad faith in contravention of state law. State Farm, however, presented evidence revealing that the cause of the fire was arson, State Farm informed the plaintiff that he had coverage under its policy despite the fact that his mortgagee was paying premiums on his home, the plaintiff was "nonchalant and cavalier" on the day of the fire, the plaintiff was struggling financially, the plaintiff purchased gasoline on the day of the fire, and the fire occurred the day of the foreclosure proceeding on the plaintiff's home. *Id.* Based on this evidence, the Court held that "State Farm's position [in denying plaintiff's claim], as a matter of law, simply can't be viewed as unreasonable or motivated by ill will." *Id.*

Similarly, Allstate has presented uncontested evidence that, prior to filing its complaint against Defendants, it thoroughly investigated Dr. D'Souza's activities for five years, obtained recorded statements from Dr. D'Souza's patients who testified that they did not receive all of the services for which Dr. D'Souza billed, reviewed Defendants' medical records, and inspected Defendants' clinics. Allstate also retained outside legal counsel to further its investigation, and secured the deposition of Dr. D'Souza and other clinic employees. Plaintiffs do not dispute these facts. The evidence also shows that Allstate's internal investigation revealed a series of fraudulent practices on the part of Dr. D'Souza and his clinics, including that Defendants billed for services not rendered, permitted treatment of patients by unlicensed physicians, and used DMX to diagnose soft-tissue injuries. Finally, Allstate retained a medical expert to assess the evidence collected by Allstate who issued an expert report in 2006 concluding that Defendants'

activities demonstrated a clear pattern and practice of billing for services never rendered, using unlicensed assistants to provide medical treatment, providing inaccurate medical reporting, and inappropriately soliciting personal injury plaintiffs and attorneys.  Allstate premised its complaint against Defendants on this evidence, and indeed cited to specific deposition testimony and other evidence throughout its detailed complaint.  (R. 1-1, Complaint.)  In short, Allstate conducted an extensive, thorough investigation before filing this lawsuit, and it has presented a wide array of evidence to demonstrate that it had a good faith basis for filing suit against Defendants.  Accordingly, summary judgment is appropriate with respect to Defendants' bad faith counterclaim.  *See Lummis*, 469 F.3d 1098 (holding that insurer's position, as a matter of law, was not unreasonable or motivated by ill will because thorough investigation into facts related to insurance claim at issue revealed evidence to support its denial of plaintiff's claim.)  Based on the undisputed facts, no jury could find bad faith on Allstate's part as a matter of law.

## II.     Defendants Cannot Establish Any Genuine Issues of Material Fact With Respect to Their Bad Faith Counterclaim

Defendants' attempts to establish a genuine issue of material fact with respect to their § 46-5(b) counterclaim fail.  They have failed to raise a question of fact regarding bad faith.

Defendants first argue that the fact that Dr. D'Souza holds a view regarding treatment of soft-tissue injuries that is contrary to the view taken by Allstate reveals bad faith on the part of Allstate.  Defendants have established that there is a divergence of opinion between Allstate and Defendants on this issue.  While Allstate employees testified that they believe soft-tissue injuries resolve in a few days and do not necessitate long-term treatment, and that such injuries are subjective, Dr. D'Souza, based on his education and experience, believes such injuries are objective, require extended treatment, and can result in permanent injury.  Dr. D'Souza and

20

Allstate also hold conflicting opinions regarding the use of DMX motion x-rays. Dr. D'Souza asserts that the DMX is a useful tool to diagnose muscoligamentous spinal injuries caused by automobile accidents, while Allstate questions the use of this form of x-ray.

The Court, however, need not resolve these questions to determine that Defendants' § 46-5(b) claim does not survive summary judgment. Dr. D'Souza's opinion alone that Allstate's views are "false views" that Allstate uses to "avoid paying claims in bad faith so as to keep its money" does not establish a genuine issue of fact regarding bad faith, especially where Allstate has retained a qualified expert who opines that Dr. D'Souza routinely provides and/or bills for excessive and unnecessary treatment and diagnostic testing. (R. 186-1, Ex. K, Reinke Report.) Dr. Reinke also opines that videofluoroscopy, or DMX, is not required or appropriate for the evaluation of spinal or extremity soft-tissue injuries. (R. 186-1, Ex. K. Reinke Report, p. 8.) While these questions need to be resolved to determine Allstate's § 46-5(a) claim against Defendants, the fact that Allstate holds opposing views supported by a qualified medical expert to those of Dr. D'Souza does not support any furtive design or ill will toward Dr. D'Souza. *See, e.g., Lummis v. State Farm Fire & Cas. Co.*, 2005 WL 1417053, 2005 U.S. Dist. LEXIS 12346, *24-*25 (S.D. Ind. June 16, 2005) ("evidence may be highly relevant in deciding whether State Farm was wrong in determining [insured's claim] . . . [b]ut the possibility that a jury could disagree with State Farm's determination will not defeat summary judgment on a bad faith claim.")

As noted in *Backwater, Inc. v. Penn-American Ins. Co.*, 448 F.3d 962 (7th Cir. 2006), a case in which the Seventh Circuit upheld a district court's dismissal of plaintiff insured's bad faith claim against defendant insurer on summary judgment, "the court, in deciding a motion for

summary judgment, is obliged to construe the facts as favorably as possible to the nonmoving party.  But [insurer], in deciding whether to grant or deny coverage, was under no such obligation."  *Id.* at 964.  Likewise, in the present case, Allstate "was free, within the constraints of reason and good faith, to evaluate the evidence and draw its own conclusion about [Dr. D'Souza's claims]."  *Id.*  Although "conflicting inferences may be drawn from the facts," "[t]hat's practically the definition of a good-faith dispute."  *Id.*  Such a dispute cannot provide the basis for a claim that an insurer breached a duty to deal in good faith.  *Id.*  (applying Indiana tort law).  *See also Sexson v. State Farm Fire & Cas. Co.*, 61 Fed. Appx. 267 (7th Cir. 2003) (upholding dismissal of bad faith claim against insurer at summary judgment stage where insurer demonstrated a genuine good faith dispute on the issue of whether a fire was the product of the insured's arson.)

Defendants further attempt to establish a factual dispute regarding their bad faith counterclaim by contending that Allstate filed its lawsuit against Dr. D'Souza in retaliation for his public actions regarding issues involving soft-tissue injuries in auto accidents.  Even viewing the relevant facts in the light most favorable to Defendants, however, there is no factual dispute bearing on Defendants' bad faith claim.  Defendants present evidence that Dr. D'Souza published information on his website and held widely publicized conferences in the Chicago area for physicians and attorneys in 2001 and 2002.  The evidence also shows that, in 2003, Allstate informed Dr. D'Souza that his use of chiropractic assistants was improper because they were unlicensed, despite that fact that no current regulation specifically governed delegation by a chiropractic physician to an unlicensed assistant.  Thereafter, Dr. D'Souza challenged Allstate's actions on a website called "AllstateSucks.com."  Moreover, because Dr. D'Souza thought that

Allstate was refusing payment of his bills on the basis of his use of unlicensed assistants, he contacted several Illinois regulatory agencies and ultimately received an informal advisory opinion from the Department of Professional Regulation in early 2004 which confirmed the lack of governing authority on the issue. Dr. D'Souza claims that this was the "final straw" prompting Allstate to pursue its suit against him because after Dr. D'Souza mailed and faxed his correspondence with the regulatory agencies to a total of 30 Allstate employees, including Crespo, Allstate hired lawyers to sue Dr. D'Souza.

Allstate, however, has presented undisputed evidence that belies Defendants' assertions that these actions led to Allstate's claim against Defendants. Based on these facts, no reasonable jury could find for Defendants. Indeed, Allstate admits that subsequent to receiving Dr. D'Souza's correspondence, Allstate retained outside legal counsel, Condon and Cook, to review the issues regarding chiropractic assistants raised by Dr. D'Souza. Allstate's outside legal counsel informed Allstate employees that the advisory opinion was not a legally binding document. Significantly, however, the uncontroverted evidence demonstrates that Allstate's retention of outside counsel to investigate Dr. D'Souza's practices as they related to the claims underlying this lawsuit was a step taken by Allstate apart from its retention of Condon and Cook. The undisputed evidence shows that, in 2004, Brendan Hannan, an SIU manager, requested a meeting with SIU analyst Catia Monforton to discuss the evidence obtained by Allstate during its investigation into Defendants' activities. Hannan presented Monforton evidence which raised concerns that Defendants were billing for services not rendered, permitting treatment of patients by unlicensed physicians, and using DMX to diagnose soft-tissue injuries. Subsequent to her meeting with Hannan, Monforton decided to consolidate and continue the various internal

investigations into Dr. D'Souza, and, in June 2004, to retain outside legal counsel, LaRose, to further investigate Dr. D'Souza.

Accordingly, while Defendants have established that Allstate retained counsel to review the issues raised by Dr. D'Souza in his communications with Allstate regarding chiropractic assistants, Defendants have presented no evidence to contradict Allstate's evidence that it hired LaRose as a result of the various indicators of fraud that SIU employees discerned in their separate and distinct review of Defendants' claim files from 2001 forward. Indeed, Defendants have presented no evidence linking Dr. D'Souza's public actions, or his communications with or about Allstate, to Allstate's investigation or lawsuit. Viewing all evidence in favor of Defendants, they have failed to establish a genuine issue of fact regarding bad faith. *See Fisher v. Transco Services-Milwaukee, Inc.*, 979 F.2d 1239, 1242 (7th Cir. 1992) ("While we view the facts in the light most favorable to the nonmoving party, there is an affirmative burden of production on the nonmoving party to defeat a proper summary judgment motion."); *see also Chmiel v. JC Penney Life Ins. Co.*, 158 F.3d 966, 968 (7th Cir. 1998) (noting that the court is not required to draw every conceivable inference from the record in favor of the non-movant, but only those inferences that are reasonable).

Indeed, given the lack of factual basis for their theory, Defendants rely solely on the timing of Allstate's retention of LaRose. Defendants argue that Allstate's timing is "no coincidence," and that Allstate was aware of the allegedly fraudulent activity as early as 2001, but did not hire LaRose until 2004, "the very same time that Dr. D'Souza sent his letter to about 30 Allstate employees." (R. 195-1, Defendants' Opposition, p. 14.) The Seventh Circuit has held, however, that timing alone is not sufficient to create a genuine issue of material fact.

*Bivens v. Trent*, 591 F.3d 555 (7th Cir. 2010) ("suspicious timing alone rarely is sufficient to create a triable issue") (citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006)). Defendants' argument in this regard is therefore not persuasive. Accordingly, Defendants have not established a genuine issue of material fact regarding bad faith on the part of Allstate in investigating Dr. D'Souza or retaining counsel to pursue a lawsuit against him and his clinics.

Finally, Defendants also attempt to create a triable issue of fact by mischaracterizing the testimony of Allstate employees. Defendants' Opposition memorandum is replete with exaggerated descriptions of the statements of Allstate employees. In particular, Defendants rely heavily on the testimony of SIU employee Crespo.

There is no indication in Crespo's deposition testimony that ill will or furtive design motivated any of Crespo's statements. Instead, the evidence merely reflects that, in line with her job responsibilities, Crespo disseminated information regarding the facts underlying Allstate's investigation to attorneys associated with patients treated by Dr. D'Souza.

Furthermore, while Crespo testified that she recommended the filing of a lawsuit against Dr. D'Souza, she ultimately did not make this determination. Allstate only moved forward with a lawsuit after consulting with outside counsel and reviewing Dr. Reinke's findings. The evidence presented by Defendants is therefore insufficient to create an issue of triable fact regarding Allstate's alleged bad faith. *See. e.g.*, *Nat'l Ath. Sportswear, Inc. v. Westfield Ins. Co.*, 2007 WL 3286858, 2007 U.S. Dist. LEXIS 82614, *42-*43 (N.D. Ind. Nov. 5, 2007) (granting summary judgment for defendant on plaintiff insured's bad faith claim and holding that allegations and evidence that defendant repeatedly requested plaintiff to undergo an examination

under oath, did not return plaintiff's phone calls, ignored correspondence from plaintiff, and delayed in responding to plaintiff did not rise to the level of bad faith).

Allstate's thorough investigation and factual support for its claim against Dr. D'Souza defeats Defendants' attempts to create a triable issue of fact with respect to their bad faith counterclaim. Defendants have not provided any evidence that would allow a jury to conclude that Allstate filed suit against Defendants under § 46-5(a) in bad faith.

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' Motion for Summary Judgment on Defendants' Counterclaim.


DATED:  March 9, 2010                           ENTERED

                                                _____
                                                AMY J. ST. EVE
                                                United States District Court Judge