## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ALLSTATE INSURANCE COMPANY,
ALLSTATE INDEMNITY COMPANY,
and ALLSTATE PROPERTY &
CASUALTY INSURANCE COMPANY.

    Plaintiffs,

vs.

ST. ANTHONY'S SPINE & JOINT
INSTITUTE, P.C., an Illinois Corporation;
AND MELVIN D'SOUZA, D.C.,
Individually, and doing business as ST.
ANTHONY'S SPINE & JOINT
INSTITUTE, P.C., BRIDGEPORT NECK
AND BACK WELLNESS CENTER,
SPORTS & SPINAL REHAB CENTERS,
LORRAINE'S SPORTS & SPINAL
REHAB CENTER, SPINE TRAUMA
RESEARCH INSTITUTE OF CHICAGO,
DMX DIAGNOSTIC LABS, Inc.
FIDENCIO CHAIDEZ, JOHN D'SOUZA
and BERNADINE D'SOUZA

    Defendants.

Case No: 2006 CV 7010

Judge Amy St. Eve

Magistrate Judge Morton Denlow

## FIRST AMENDED COMPLAINT FOR MONETARY DAMAGES AND EQUITABLE RELIEF

Now come the Plaintiffs, ALLSTATE INSURANCE COMPANY, ALLSTATE

INDEMNITY COMPANY, and ALLSTATE PROPERTY & CASUALTY INSURANCE

COMPANY (hereinafter "Plaintiffs") by and through their attorneys, LaRose & Bosco, Ltd., and

complaining against the defendants, ST. ANTHONY'S SPINE & JOINT INSTITUTE, P.C., an

Illinois Corporation; MELVIN D'SOUZA, D.C., Individually, and doing business as ST.

ANTHONY'S SPINE & JOINT INSTITUTE, P.C., BRIDGEPORT NECK AND BACK

WELLNESS CENTER, SPORTS & SPINAL REHAB CENTERS, LORRAINE'S SPORTS &

SPINAL REHAB CENTER, SPINE TRAUMA RESEARCH INSTITUTE OF CHICAGO,

DMX DIAGNOSTIC LABS, Inc. (hereinafter "defendants"), FIDENCIO CHAIDEZ, JOHN

D'SOUZA and BERNADINE D'SOUZA allege as follows:

## TABLE OF CONTENTS

I.    INTRODUCTION (p. 5)

II.   JURISDICTION AND VENUE (p. 7)

III.  PARTIES (p. 8)

IV.   GENERAL STATEMENT OF FACTS (p. 9)

      A. THE DEFENDANTS' CLINICS (p. 9)

V.    FACTUAL ALLEGATIONS RELATING TO DEFENDANTS' FRAUDULENT
      ACTIVITIES (p. 11)

      A. STAFFING AT DEFENDANTS' CLINICS (p. 12)
      B. SPECIFIC ALLEGATIONS RELATING TO BILLING BY DEFENDANTS' CLINICS
      (p. 15)
      C. SPECIFIC ALLEGATIONS RELATING TO "EXAMINATIONS" ALLEGEDLY
      RENDERED AT DEFENDANTS' CLINICS (p. 20)
      D. SPECIFIC ALLEGATIONS RELATING TO "TREATMENTS" ALLEGEDLY
      RENDERED AT DEFENDANTS' CLINICS (p. 25)
      E. SPECIFIC ALLEGATIONS RELATING TO "X-RAYS, DMX, AND
      COMPUTERIZED RANGE OF MOTION STUDIES" ALLEGEDLY CONDUCTED AT
      DEFENDANTS' CLINICS (p. 33)
      F. SPECIFIC ALLEGATIONS RELATING TO DEFENDANTS' WEB SITES (p. 43)
      G. BOGUS "FORM" REPORTING USED TO SUBSTANTIATE DEFENDANTS'
      FRAUDULENT BILLING SCHEME (p. 45)

VI.   CAUSES OF ACTION (p. 52)
      A. COUNT I. (p. 52)
         MAIL FRAUD RACKETEERING ACTIVITY (RICO) 18 U.S.C. section 1961 et seq.
      B. COUNT II. (p. 57)
         STATE INSURANCE FRAUD-(ILLINOIS) 720 ILCS 5/46-5
      C. COUNT III. (p. 59) [VOLUNTARILY DISMISSED ON JANUARY 31, 2007]
         INSURANCE CLAIMS FRAUD PREVENTION ACT-(ILLINOIS) 740 ILCS 92/5
      D. COUNT IV. (p. 62)
         COMMON LAW FRAUD & MISREPRESENTATION
      E. COUNT V. (p. 63)
         UNJUST ENRICHMENT
      F. COUNT VI. (p. 65)
         NEGLIGENT SPOLIATION OF EVIDENCE REGARDING "LOST" X-RAY AND
         DMX STUDIES
      G. COUNT VII. (p. 69)
         NEGLIGENT SPOLIATION OF EVIDENCE REGARDING DESTRUCTION OF
         "ORIGINAL" X-RAY AND DMX REPORTS

H.  COUNT VII (P. 72)
    UNIFORM FRAUDULENT TRANSFER ACT (ILLINOIS) 740 ILCS 160/1 et. seq.

## I. INTRODUCTION

1.     Plaintiffs seek to recover sums fraudulently procured by Defendants as a result of an elaborate scheme to defraud insurance companies, including Plaintiffs. Defendants created and submitted through the U.S. Mail, false, and misleading medical reports, records, and billing statements for chiropractic and diagnostic services allegedly rendered at defendants' various chiropractic clinics to patients purportedly injured in automobile and premises accidents.

2.     Defendants' insurance fraud scheme was designed to and did in fact result in substantial payments made by Plaintiffs upon insurance policies covering accidents at issue in the particular insurance claims set forth in this pleading.  In certain instances, Plaintiffs made direct payments to defendants on first party claims submitted by its own insureds pursuing medical payments claims, and uninsured and underinsured motorist claims.  In other instances Plaintiffs were caused to and did make substantial payments based upon settlements and verdicts obtained against Plaintiffs' insureds in third party personal injury claims and lawsuits, in which defendants were also able to receive payments on their fraudulent medical bills, as in virtually all of the claims at issue defendants submitted physicians liens through the U.S. mail to Plaintiffs purporting to assert their alleged right to attach towards any potential settlement and/or resolution reached in each particular case.

3.     In virtually all claims submitted to the Plaintiffs which are the subject of this lawsuit, the defendants' bills for services allegedly rendered remained unpaid up until the time of the eventual settlement, verdict, and/or other resolution of the particular claim.

4.     Defendants' fraudulent scheme to collect on said false, and misleading billing statements was accomplished by creating and submitting to Plaintiffs, through the U.S. Mail, bogus,

false, fraudulent, and misleading "form" medical reports and records mispresenting the nature and extent of the injuries allegedly sustained by the patient, providing inappropriate and/or inaccurate diagnoses and/or medical opinons to substantiate that the services billed were reasonable and/or necessary to treat the alleged injuries, and purporting to document that the treatments billed were in fact rendered, and/or that the services were actually performed by duly licensed medical providers.

5.      The false and misleading documents generated and disemminated by defendants to Plaintiffs through the U.S. Mail, include, but are not limited to: form narrative medical reports, daily treatment records (commonly referred to as "SOAP notes", purporting to document Subjective complaints, Objective findings, Assessment of the physician, and Plan of treatment); HCFA-1500 billing forms,  itemized medical bills, physicians liens, and various other medical records from the particular patient's chart.

6.      Defendants fraudulently concealed that their false and misleading billing statements were based in part on either non-existent, and/or unnecessary, and/or excessive treatments, examinations, and diagnostic testing, and that many of the alleged services were performed by either unlicensed, unqualified, and unsupervised chiropractic assistants, that were merely certified massage therapists (hereinafter "C.M.T.'s").

7.      Through defendants fraudulent misrepresentations regarding the nature and extent of the injuries allegedly sustained, and the medical necessity of the alleged treatments provided by the defendants, plaintiffs were fraudulently induced in to paying inflated settlements and/or were caused to pay inflated verdicts, by which the defendants were able to receive substanital payments on their fraudulent bills as a result of the physicians liens that they submitted to Plaintiffs through the U.S. Mail.

6

8.     All of the acts and omissions of the defendants described throughout this complaint were undertaken intentionally with the specific intent to defraud the Plaintiffs.

9.     Defendants have also engaged in a deliberate practice to fraudulently conceal their activities from being discovered by plaintiffs, which will also be further discussed with specificity in this pleading.

10.     Plaintiffs seek equitable relief for a determination that they are under no obligation to pay remaining unpaid submitted invoices for the fees associated with these purported medical services, and Plaintiffs seek monetary damages incurred in investigating, defending and/or resolving insurance claims based in whole or part on the submission of such fraudulent, false and misleading invoices generated and submitted by the defendants. Plaintiffs seek relief in accordance with Federal and State law causes of action pled with specificity in this matter. Plaintiffs further contend that they are legally entitled to reimbursement from defendants for any and all payments previously made, and other consequential and punitive damages sustained in defending said fraudulent insurance claims, in accordance with State and Federal laws.

11.     Plaintiffs assert causes of action against the defendants seeking equitable relief and monetary damages for: Violations of the Federal Racketeer Influenced and Corrupt Organizations Act (hereinafter "RICO"), 18 U.S.C. sections 1962 (a) – (c); violations of Illinois Insurance Claims Fraud Prevention Act, 740 ILCS, section 92/1, and the Illinois Criminal Code of 1961, 720 ILCS section 5/46-1; Common Law Fraud and Misrepresentation, Unjust Enrichment, and Negligent Spoliation of Evidence.

## II. JURISDICTION AND VENUE

12.     Jurisdiction over this action is conferred upon this Court by 28 U.S.C. section 1331, 18 U.S.C. sections 1962 (a-c), 18 U.S.C. section 1964. Supplemental jurisdiction over Illinois state

law claims is properly before this Court in accordance with 28 U.S.C. section 1367.

13.    A vast majority of the wrongful acts or omissions alleged herein with specificity were carried out by the defendants within this District, in the City of Chicago, State of Illinois; and therefore, venue is properly before this Honorable Court pursuant to 28 U.S.C. section 1391 (c).

## III. PARTIES

14.    At all times relevant, Plaintiff, **Allstate Insurance Company,** is a corporation incorporated under the laws of Illinois, with its principal place of business in Northbrook, Illinois, and is duly licensed and authorized to conduct business in the state of Illinois.

15.    At all times relevant, Plaintiff, **Allstate Indemnity Company,** is a corporation incorporated under the laws of Illinois, with its principal place of business in Northbrook, Illinois, and is duly licensed and authorized to conduct business in the state of Illinois.

16.    At all times relevant, Plaintiff, **Allstate Property & Casualty Insurance Company,** is a corporation incorporated under the laws of Illinois, with its principal place of business in Northbrook, Illinois, and is duly licensed and authorized to conduct business in the state of Illinois.

17.    At all times relevant, Defendant, **Melvin D'Souza,** (hereinafter "D'Souza") is a citizen and resident of the State of Illinois, and Melvin D'Souza currently practices as a Chiropractic Physician at his principal place of business at, 804 W. 31st Street, Chicago, Illinois.

18.    Defendant, **St. Anthony's Spine & Joint Institute, P.C.** (hereinafter "St. Anthony's") is a corporation, organized under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois and may be served through its Registered agent in the State of Illinois.

8

## IV. GENERAL STATEMENT OF FACTS

19.     Articles of Incorporation of St. Anthony's were filed with the Illinois Secretary of State on January 18, 2005. Defendant, D'Souza, is the sole shareholder (owner) and officer of St. Anthony's.

20.     D'Souza has represented, and the Office of the Secretary of State of Illinois has indicated, that St. Anthony's also conducts business under the following assumed names: Sports & Spinal Rehab Centers, and Lorraine's Sports & Spinal Rehab Centers.

21.     D'Souza and/or St. Anthony's have also conducted business under the following names: Bridgeport Neck & Back Wellness Center, and Spine Trauma Research Institute of Chicago, and DMX Diagnostic Labs, Inc.

## A.     THE DEFENDANTS' CLINICS

22.     Prior to January 18, 2005, D'Souza, as a sole proprietor, initially owned and operated various chiropractic clinics in the Chicagoland area, in the State of Illinois. (hereinafter referred to as "defendants' clinics"). Prior to January 18, 2005, D'Souza conducted business under various assumed business names, including, but not limited to: Bridgeport Neck & Back Wellness Center, Sports and Spinal Rehab Centers, and Spine Trauma Research Institute of Chicago. A number of D'Souza's clinics simply operated and did business under the name Melvin D'Souza, D.C.

23.     In January of 2005, D'Souza formed the Illinois corporation, St. Anthony's Spine & Joint Institute, P.C., which according to D'Souza, assumed ownership of all of the clinics previously owned individually by D'Souza as a sole proprietor. Upon information and belief, the following is a list of the defendants' clinics at issue in this case:

*804 W. 31st Street, Chicago, Illinois 60608;*
*1610 W. 63rd Street, Chicago, IL 60636;*

*3520 W. Fullerton Ave., Chicago, IL 60647;*
*1255 W. 127th Street, Calumet Park, IL 60827;*
*222 Vollmer Road, Chicago Heights, IL 60411;*
*157A N. Locust, Manteno, IL 60950;*
*370 W. Jefferson St., Joliet,, IL 60435;*
*215 E. 75th Street, Chicago, Illinois 60618.*

24. St. Anthony's is merely a "shell" corporation through which D'Souza continues to to engage in the above-mentioned fraudulent activities. D'Souza continues to exercise complete control over all aspects of the operations of St. Anthony's, and all aspects of the fraudulent enterprise of running the chiropractic clinics now allegedly owned by St. Anthony's. D'Souza continues to exercise exclusive control over all of the assets and profits of the corporation. In fact, in deposition testimony in an Illinois state court case, *Soto vs. Ramos, 05M1304199 (Allstate claim# 2705668909)* D'Souza admitted that other than the name change to St. Anthony's, he still operates his clinics the same way that he did in the past. For purposes of this pleading all of the clinics currently purportedly owned by St. Anthony's, and exclusively controlled by D'Souza, will continue to be hereinafter referred to as the "defendants' clinics".

25. Defendants' main chiropractic clinic, along with its general business office is currently located at the ***804 W. 31st Street, Chicago, Illinois*** address. This particular clinic is hereinafter referred to as the "Bridgeport clinic", while all of the other clinics at issue will hereinafter be referred to as "Satellite clinics".

26. D'Souza has also conducted business in the past as **DMX Diagnostic Labs, Inc.,** which D'Souza set up as a separate corporate entity to bill for diagnostic testing such as x-rays, which were allegedly performed by D'Souza at the Bridgeport facility. D'Souza was the sole shareholder, officer and director of this facility. Upon information and belief, D'Souza has dissolved the above-mentioned facility. DMX Diagnostic Labs, Inc., was also merely just a "shell" corporation that was

entirely owned and operated by D'Souza, and through which he perpetrated fraudulent activities upon the Plaintiffs relating to the billing for x-ray related services.

27.     Subsequent to the dissolution of DMX Diagnostic Labs, Inc., defendants have submitted bills to Plaintiffs for x-rays and other diagnostic testing from the Bridgeport clinic using various other assumed business names, including, but not limited to: Bridgeport Neck & Back Wellness Center, Melvin D'Souza, D.C., and St. Anthony's.

## V.     FACTUAL ALLEGATIONS RELATING TO DEFENDANTS' FRAUDULENT ACTIVITIES

28.     The vast majority of patients allegedly treating at the defendants' clinics are persons purportedly injured in automobile collisions and premises accidents, who then submit third party personal injury claims, and/or file personal injury lawsuits against Plaintiffs' insureds sounding in negligence. In addition, defendants' patients also include persons who have automobile insurance policies with Plaintiffs, who submit first party claims for medical payment benefits, and/or for uninsured or underinsured motorist benefits under their own insurance policies.

29.     The defendants' clinics "build up" the patients' prospective personal injury claims by issuing false, misleading, inaccurate, and/or excessive billing statements for: certain treatments that were never actually rendered; for unnecessary, unwarranted, and excessive courses of physical therapy treatments; for unnecessary, unwarranted and excessive referrals and alleged taking of various diagnostic tests, such as x-rays, DMX (digital "motion x-rays), and computerized range of motion studies; by producing and generating false, misleading, and inaccurate medical reports and records puporting to diagnose and opine severe, permanent, and chronic personal injuries that were not in fact sustained in the accident at issue; and by further providing false,

11

misleading, and inaccurate medical reports and opinions contending that the alleged injuries were proximately caused by the accidents at issue in the particular claim.

## A. STAFFING AT THE DEFENDANTS' CLINICS

30. To staff the various clinics, D'Souza hired various physicians, as well as lay persons. Some of the lay persons working at the various D'Souza clinics are certified and/or licensed massage therapists (C.M.T.'s).

31. D'Souza primarily practices as a Chiropractic Physician at the Bridgeport clinic, at 804 W. 31st Street, Chicago, Illinois, although on occasion he allegedly treats patients at the other above-mentioned Satellite clinics.

32. Defendants routinely misrepresent on medical reports, records, billing statements, invoices, physician's liens, and various other documentation that they submit to Plaintiffs through the U.S. Mail, that the defendants' clinics actually have licensed Medical Doctors (M.D.'s) on staff at these various clinics, by indicating on said documentation that various licensed Medical Doctors are *"Attending Physicians"* at the various clinics.

33. The defendants have materially misrepresented to Plaintiffs through documents regularly sent through the U.S. Mail, that the following Medical Doctors have been on staff at various D'Souza clinics as *"Attending Physicians"*, including, but not limited to: *Suresh Vade, M.D., Ramesh Kharwadkar, M.D., and Raheemunnisa Rawoof, M.D*.

34. During the period of time at issue, defendants' alleged *"Attending Physicians"* have recently provided sworn deposition testimony in civil personal injury cases filed in Illinois state court that they actually had very little, if any, connection with the defendants' clinics, and rarely, if ever, worked at some of the various physical locations of the particular clinics that they were misrepresented by the defendants to be on staff as *"Attending Physicans"*. For example, in

12

the Illinois state court case of *Allen vs. Morrow, 03M1303335 (Allstate claim# 2705102727)*, Dr. Vade (hereinafter "Vade") testified that he had no idea that D'Souza had even been listing his name on defendants' various medical forms as a so-called "Attending Physician", and further stated that he did not even know what defendants meant by such a designation. According to Vade, the only connection that he had with defendants' clinics was that on occasion he would randomly stop by the Bridgeport clinic on 31st Street to have lunch with his friend, Melvin D'Souza, who on occasion would ask Vade to examine a patient at that clinic.

35.     In a deliberate attempt to fraudulently conceal the nature and extent of defendants' fraudulent activities regarding its staffing with alleged "Attending Physicians", D'Souza has provided false, misleading, and deceptive sworn deposition testimony in Illinois state court cases, such as *Allen vs. Morrow, 03M1303335, (Allstate claim# 2705102727)* representing that Vade would examine patients at defendants' 31st Street clinic about one to two days per/week.

36.     Upon information and belief, while each D'Souza clinic might allegedly have a "full time" chiropractor, and perhaps a lay assistant on staff at a particular clinic, the clinics never have had a full time Medical Doctor on staff as an "Attending Physician", as misrepresented by defendants.

37.     On a very rare and limited occasion a Medical Doctor may allegedly examine a patient at one of defendants clinics, however, the vast majority of alleged examinations, referrals and treatments were either performed by chiropractors and/or lay persons assigned to the various clinics.

38.     In the Illinois state court case of *Zamarano v. Munoz, 05 M1301000 (Allstate claim# 2705827760) Dr. Raul Zavelata, D.C.,* testified that not only did he have no idea who **"Dr. R.**

13

*Rawoof, M.D., and/or Dr. Ramesh Kharwadkar, M.D."* were, but that he further had no idea why defendants would represent on various medical forms that these Medical Doctors were "Attending Physicians" at the West Fullerton clinic where *Zavelata* worked for the defendants, when neither *Rawoof and/or Kharwadkar* ever worked with *Zavelata* at that facility.

39. In the Illinois state court case of *Evans vs. Romano, 03M1303894 (Allstate claim #2704919527)* Dr. Julie Knell, D.C., testified that she had no idea why *"Dr. R. Rawoof, M.D. and/or Dr. Ramesh Kharwadkar, M.D."* would be listed on various medical records and forms by defendants as being "Attending Physicians" at the Chicago Heights clinic where *Knell* worked for the defendants, when neither *Rawoof and/or Kharwadkar* ever worked with *Knell* at that facility.

40. In the Illinois state court case of *Reynolds vs. Green, 05L2838 (Allstate claim# 2705729594),* Dr. Irene Ekpenyoung, D.C., testified that she she had no idea why *"Dr. R. Rawoof, M.D. and/or Dr. Ramesh Kharwadkar, M.D."* would be listed on various medical records and forms by defendants as being "Attending Physicians" at the 127th Street clinic in Calumet Park, where *Ekpenyoung* worked for the defendants, when neither *Rawoof and/or Kharwadkar* ever worked with *Ekpenyoung* at that facility.

41. In the Illinois case *of Taylor vs. Cook, 05M1304357 (Allstate claim# 2705678296),* Dr. Raheemunnisa Rawoof, M.D., testified that in the approximately 3 ½ years that she has worked for the defendants, she has practiced out of "her own" office at the 63rd Street. Dr. Rawoof testified that in all the time that she has worked for defendants, she has perhaps gone down to the main Bridgeport clinic to treat patients approximately six (6) times, in which she may have treated at total of ten (10) patients there. Dr. Rawoof has not treated patients at any of the defendants' other clinics.

**B.    SPECIFIC ALLEGATIONS RELATING TO BILLING BY DEFENDANTS'
CLINICS**

42.    All of the billing statements for examinations, treatments and diagnostic tests
allegedly rendered at defendants' clinics, and sent to the Plaintiffs through the U.S. Mail demanding
payment, employ the use of Current Procedural Terminology Codes (hereinafter "CPT codes").

43.    CPT codes are published anually by the American Medical Association (hereinafter
"AMA"), to facilitate the efficient processing of medical charges by insurance carriers, such as
Plaintiffs.

44.    Defendants regularly submitted HCFA forms and itemized billing statements to
Plaintiffs through the U.S. mail containing CPT codes purporting to correspond to specific medical
procedures, such as examinations, diagnostic testing, and modalities of physical therapy allegedly
rendered to patients at defendants' clinics.

45.    By using CPT codes the defendants represented to Plaintiffs that the services
specifically listed on defendants billing statements were in fact not only actually rendered, but were
performed in a manner set forth in accordance with accepted AMA guidelines.

46.    It is the custom and practice of the defendants to submit to Plaintiffs through the
U.S. Mail, copies of the patient's medical bills, records, reports, HCFA billing statements,
physician's liens, and various other medical documents from the patient's chart, after obtaining
knowledge that Plaintiffs could be potentially liable for the payment of any billing invoice
generated by the defendants. The information regarding Plaintiffs' potential "liability" for any
payment towards the defendants' billing invoice is routinely documented on patient initial history
and intake forms, which specifically request that the patient provide the defendants with all
applicable liability insurance information.

47.     In all of the claims submitted by the defendants that are at issue in this case, defendants possessed actual knowledge that their patient was either an insured of Plaintiffs making a first party claim, or that the patient was a third party claimant seeking compensation for alleged injuries against one of Plaintiffs' insureds.

48.     When defendants obtain information of Plaintiffs' potential involvement in the patient's case, it is defendants' custom and practice to send notice to Plaintiffs through the U.S. Mail of its purported physician's lien, to put Plaintiffs on notice of defendants' potential claim against any settlement and/or financial resolution obtained by the particular patient, for which Plaintiffs (or its insured) could be potentially liable.

49.     Under Illinois law, *The Health Care Services Lien Act*, 770 ILCS 23/10 provides that upon proper notice, every health care professional and health care provider, shall have a lien upon a settlement of the injured patient's cause of action, if that licensed medical provider actually rendered services in the treatment, care and maintenance of that injured patient.

50.     *The Health Care Services Lien Act*, 770 ILCS 23/10, further provides that any such lien shall be for reasonable charges for services actually rendered.

51.     Defendants service of their purported physicians lien upon the Plaintiffs further misrepresents and attempts to substantiate that defendants' clinics are billing for medical services that were in fact actually rendered to patients; that defendants' patients were in fact injured in the accident at issue; and that the defendants' medical bills were for reasonable and necessary medical services allegedly rendered to the patient by duly licensed medical providers as provided for in *The Health Care Services Lien Act*.

52.     The following are only a few specific examples of defendants' *billing for treatments never actually rendered,* and Plaintiffs will present evidence to prove many other

16

instances of defendants inappropriate and/or fraudulent billing practices:

- In the claim of *Ciara Hines & Alice Gray vs. Allstate Insurance (Allstate claim#2705997991)*, *Ciara Hines*, testified that she sustained a neck injury which resolved within 2 days of the alleged car accident, for which she *only* received Emergency Room care, and did not receive any treatments at defendant's clinic. However, defendants purported to bill *Ciara* for approximately two (2) months of physical therapy modalities, similar to what they billed out to *Ciara's* mother, *Alice Gray*. In addition defendants' supporting medical records and reports purportedly diagnosed and/or allegedly treated *Ciara* for injuries other than to her neck as well. In the same case, *Alice Gray* testified that she never received any examination by D'Souza, and only met with him for a about five minutes in which he asked her a few questions about the accident, yet she was billed by defendants for initial, follow up and final examinations allegedly conducted at defendants' clinic.

- In the case of *Soto vs. Ramos, 05M1304199 (Allstate claim# 2705668909)*, the patient expressly denied that he ever received any x-rays at defendants' clinic and further testified that it was his understanding the defendants were going to obtain copies of the x-rays that were previously taken of him at the Emergency Room on the date of the accident, yet defendants billed $700 for cervical, thoracic and lumbar spine x-rays. In addition, *Mr. Soto* further testified that the only injuries he even sustained in the accident at issue were his right low back and a scrape to his right elbow. *Mr. Soto* was also billed for four (4) physical therapy modalities for each visit, when he testified to only receiving two (2); and he was further billed $675 for computerized range of motion and strength tests that he testified that he never received.

- In the case of *Chiu vs. Wheeler, 04L1844 (Allstate claim# 101624467)* the patient denied receiving an examination on her first visit at defendants' clinic for which she was billed, and she also failed to provide any testimony to substantiate that she ever received a DMX motion x-ray for which defendants also billed, and defendants apparently continued to bill *Ms. Chiu* for five (5) additional physical therapy visits after the date that *Ms. Chiu* testified that she already stopped treating at defendants' clinic.

- In the case of *Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130)*, the patients testified to receiving two (2) physical therapy modalities each visit, yet they were billed for four (4) modalities for each visit, not to mention that the treatments were allegedly being performed to different parts of the bodies that the patients testified to injuring in the accident at issue. In fact in the *Fenton* case, *Ms. Fenton* allegedly was given, and billed for an x-ray to her *left* shoulder, when her deposition testimony was that she in fact injured the *right* shoulder.

- In *Vera West vs. Allstate (Allstate claim# 2705823447)*, *Ms. West* was billed by defendants for cervical and thoracic x-rays that she testified to never receiving, as the only injury she sustained in the accident at issue was to her low back.

- In *Engram vs. Raj, 04 M1303919 (Allstate claim# 1016331678)*, one of defendants' patients was billed for a DMX motion x-ray to her *left hand*, that not only did the patient deny ever receiving, but further denied even injuring her left hand in the accident at issue.

- In the claim of *Lillie Sims vs. Allstate Insurance Company (Allstate claim#2705658447)*, the patient testified to only receiving ultrasound treatments and electric muscle stimulations on *alternating* visits, yet she was billed for both modalities on *every* visit by the defendants.

- In *Moss vs. Oparka, 04M1302263, (Allstate claim# 2705593891)*, the patient testified to only receiving hot packs and massages, but was also billed for four (4) modalities for each visit, including ultrasound and electrical muscle stimulation.

- In *Davenport vs. Lewis, 05L7770 (Allstate claim# 1237932972)*, the patient was billed for a massages on each visit that she denied receiving. Defendants also produced numerous documents purporting to be for multiple computerized range of motion studies allegedly conducted on Ms. Davenport, that she denied ever receiving.

- In *Santiago vs. Diaz, 04M1302947 (Allstate claim# 1376180681)* the patient was billed for DMX to both the cervical spine and TMJ areas, yet the patient never testified to receiving any type of "motion" x-ray, that would have been taken outside defendants' clinic in a mobile van. In

fact the patient testifed that all of the x-rays taken of her were conducted "inside" the office of the defendants'clinic. *Ms. Santiago* further <u>denied</u> complaining about any TMJ related symptoms, yet the defendants' TMJ-DMX report even purported to find and diagnose abnormalities in *Ms. Santiago's* TMJ. In addition, the patient was apparently billed by defendants for physical therapy allegedly performed to her *knee*, yet the patient testified that by the time she began treating at defendants' clinic two (2) weeks after the accident, she no longer had any knee pains or discomfort, and further denied receiving any such therapy to her knee.

- In *Jones vs. Allstate Insurance, (Allstate claim# 2704781117)*, Mr. Jones testified that the only part of his body that was injured in the accident at issue was his low back, and that he only received an x-ray to his low back at defendants' clinic, yet he was also billed for cervical and thoracic spine x-rays by defendants as well.

- *In Saldivar vs. Tomecki, 03M1303552 (Allstate claim# 2705011019)*, Ms. Saldivar testified that the only injuries she sustained in the accident at issue were to the low back, neck, upper back and right shoulder. Ms. Saldivar was billed by defendants for x-rays to the left shoulder that she denied ever receiving. In addition, defendants allegedly diagnosed, and billed *Ms. Saldivar* for treatments to her right triceps, right forearm, right thigh, right hip, right knee and right ankle, all of which *Ms. Salidivar* specifically denied injuring. In addition, her final office visit report submitted by defendants continued to represent that *Ms. Saldivar* was still having complaints associated with an alleged right ankle injury, that *Ms. Saldivar* apparently never sustained.

53.     Defendants' engaged in a pattern and practice of using CPT codes that misrepresent the severity of the alleged injuries by exaggerating the complexity involved in treating the alleged condition, and the time spent by the medical providers in treating the alleged condition, as in many instances the injuries purportedly diagnosed by defendants did not exist, or were grossly exaggerated, and in certain instances the treatments and procedures billed either were never actually rendered, and/or were not medically necessary or reasonable to treat the patient.

54. Defendants also engaged in a pattern and practice of misrepresenting that they used a billing publication called "Fee Facts" to determine their reasonable and customary charges for examinations, treatments, and various diagnostic services. Defendants routinely submitted to Plaintiffs through the U.S. Mail a written statement prepared on defendants' letterhead, describing how Fee Facts compiled extensive data from a multitude of medical providers from various geographic areas to come up with reasonable and customary fees for like CPT coded medical procedures.

55. In addition, in a further deliberate attempt to fraudulently conceal the nature and extent of defendants' fraudulent activities regarding its billing operations, D'Souza has provided false, misleading, and deceptive sworn deposition testimony in Illinois state court cases, such as *Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130),* representing that defendants' fees for services allegedly rendered were reasonable and customary, and were "***always***" based upon the Fee Facts billing publication.

56. The billing for services allegedly performed by defendants and submitted through the U.S. Mail to the Plaintiffs not only regularly exceeded the reasonable and customary fees for like services in defendants' geographic area, but were in fact grossly in excess of the fees actually contained in the Fee Facts billing publication that defendants misrepresented to Plaintiffs' that it purportedly relied upon to set their alleged reasonable and customary fees.

## C. SPECIFIC ALLEGATIONS RELATING TO "EXAMINATIONS" ALLEGEDLY RENDERED AT DEFENDANTS' CLINICS

57. At various times Plaintiffs received though the U.S. Mail, HCFA claim forms, itemized billing statements, and various other medical records, submitted by defendants

representing that "examinations" were allegedly performed on defendants' patients.

58.     The billing statements submitted by defendants contain specific corresponding CPT codes purporting to represent the nature and extent of the examinations allegedly performed.

59.     Under existing CPT guidelines, examination codes range from a level 1 (CPT code 99201 for initial new patient examinations, and 99211 for follow up examinations) for the lowest level of medical complexity and physician time required, to a level 5 (CPT codes 99205 for initial new patient examinations, and 99215 for follow up examinations) for the highest level of medical complexity and physician time required.

60.     It is reasonable and customary medical billing protocol for providers to bill a higher amount for a higher level CPT coded examination due to the increase of the level of medical complexity involved in caring for the alleged medical condition, as well as the reasonable amount of time required to be spent by the physician in conducting the examination.

61.     Initial examinations, follow up examinations, and final examinations were often routinely billed by defendants on HCFA forms and billing statements using level 5 CPT Codes (99205 and 99215).

62.     Based upon information and belief, and in part on sworn patient testimony, sworn testimony of D'Souza, and of others associated and affiliated with defendants' operation, certain examinations billed to patients, either did not occur at all, and/or were not performed by the physician allegedly represented as conducting the examination, and/or were not performed to the extent represented by the use of the corresponding level of CPT code that was submitted on the patients' billing statements.

21

63.     In cases in which patients were billed for level 5 coded CPT examinations, such as *Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130)* D'Souza's own deposition testimony suggests that he either: fails to understand the AMA coding requirements for examination billing, and/or he simply fails to adhere to the AMA guidelines associated with billing for patient examinations.

64.     Defendants' billing statements and HCFA forms that were submitted to Plaintiffs through the U.S. Mail, contained improper and/or deceptive CPT codes, which were deliberately designed to allow for the defendants to submit "higher" bills for the examination services allegedly rendered.

65.     Most, if not all, of the patients that were allegedly treated at defendants' chiropractic clinics that are the subject of this pleading involved patients that purportedly sustained "soft tissue" type injuries such as sprains and strains in car accidents, and premises accidents.

66.     Under existing CPT coding quidelines, the use of level 5 examination coding purports to represent at least two of the following three key components: a comprehensive history, a comprehensive examination, and medical decision making of the highest level of medical complexity, where usually the presenting problems justifying such examinations are of such a high severity, that the physician typically spends upwards of sixty (60) minutes of "face to face" time with the patient or the patient's family.

67.     The billing operations for all of the defendants' various clinics are performed by D'Souza (and/or his office staff) at Bridgeport clinic, regardless of which clinic allegedly treated the patient.

68.     The physicians at the Satellite clinics are never involved in any aspect of the

defendants' billing operations, and these physicians never know what level of CPT code was actually assigned to their examination, and billed by defendants to the patient.

69.     D'Souza and/or his office staff at the Bridgeport clinic use complete speculation and conjecture in assigning a corresponding CPT code for the examinations allegedly performed by physicians from the Satellite clinics.

70.     In many instances there is also a complete lack of any corresponding medical documentation, and/or incomplete and/or insufficient medical documentation to substantiate that defendants' billed examinations were in fact performed and/or were performed to the extent represented by the use of the corresponding level of CPT code that was assigned to the alleged examination.

71.     The following cases are illustrative of defendants inappropriate billing practices as it relates to defendants' Satellite clinics:

- In *Evan vs. Romano, 03M1303894 (Allstate claim# 2704919527)*, **Julie Knell, D.C.**, admitted that she had no idea what amount, and/or what corresponding level CPT code was assigned by D'Souza in generating bills for her examinations conducted at defendants' Chicago Heights clinic. Defendants' billed out **Dr. Knell's** new patient examination and follow up examinations to the patient at CPT codes **99205** and **99215**. **Dr. Knell** further testified in the *Evans* case that she typically spends approximately 30 minutes with a new patient examination and about 15 minutes on follow up examinations;

- In the case of *Zamorano vs. Munoz, 05M1301000 (Allstate claim# 2705827760)*, **Dr. Raul Zaveleta, D.C.**, likewise testified that he has no idea what defendants' bill out for his patient examinations that he allegedly conducts at the clinics that he worked out of on West Fullerton, in Chicago;

- In *Reynolds vs. Green, 05L2838 (Allstate claim# 2705729594)*, D'Souza himself admitted that he had no idea how much time was spent by a **Dr. Irene Ekpenyoung, D.C.**, on her patient examinations that she allegedly conducted at defendants' 127th Street clinic in Calumet Park, for which defendants issued specific CPT coded

examination charges. D'Souza testified that he simply assumed that Ekpenyoung would be conducting examinations in accordance with what D'Souza would normally do during one of his patient examinations.

72.     The following cases illustrate specific examples of defendants' up-coding and/or inappropriately billing for examinations, as well as situtations in which patients have provided sworn testimony suggesting that they were not actually examined by the medical provider represented by defendants' in their medical records and billing statements:

- In *Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130)*, the patient's sworn testimony indicated that D'Souza spent five to ten minutes on the patient's initial examination which was billed out as a CPT coded 99205 examination;

- In *Ciara Hines & Alice Gray vs. Allstate Insurance Company (Allstate claim# 2705997991)*, defendants issued a bill for an examination to Ciara Hines, yet this person denied that she ever treated at defendants' clinic. In addition, Ciara's mother, Alice Gray, also denied ever receiving *any* "examinations" at defendants clinic, rather she was simply asked questions by D'Souza for approximately five minutes, yet she was billed for initial, follow up and final examinations containing corresponding AMA approved CPT examination codes.

- *Webb vs. Stoval, 03M1303552 (Allstate claim# 2704918008)* in which the patient testified to only receiving examinations from a *Hispanic woman* at defendants' clinic, yet D'Souza's records and D'Souza's own deposition testimony obtained in the case represented that *D'Souza* personally conducted the examinations that were billed, and D'Souza further admitted that he did *not* have any *Hispanic women doctors* working for him at the time of the examinations billed to the patient; and

- *Taylor vs. Cook, 05 M1304357 (Allstate claim# 2705678296)*, where the patient testified that she *never* received any examinations from a *woman doctor*, and further denied that she received any examinations at the defendants' *63rd Street clinic*, rather she claimed that any examinations conducted were performed by a *male* doctor at the defendants' *31st Street clinic*. The defendants submitted bills for examinations allegedly performed by *Dr. Rawoof, a female doctor*, that were purported to

be conducted at the defendants' *63rd Street clinic* according to the defendants' medical records.

## D. SPECIFIC ALLEGATIONS RELATING TO "TREATMENTS" ALLEGEDLY RENDERED AT DEFENDANTS' CLINICS

73. Regardless of the nature and/or extent of the alleged injuries, at the time of their initial office visit at defendants' clinics, virtually all patients are routinely prescribed a standard course of physical therapy consisting of a set "protocol" of four (4) physical therapy modalities: hot packs, electrial muscle stimulation, ultrasound, and massage, which generally take approximately 30-45 minutes to complete on a typical office visit at defendants' clinics.

74. At the time of the patient's initial office visit, defendants engage in a practice of providing the new patient with a "*calendar*" containing circled dates of future appointments that the patient is required to attend. It is also defendants' custom and practice to have the patient sign the calendar of scheduled future appointments, and to acknowledge that they will adhere to the office policy of keeping their scheduled appointments or they will be "*discharged*" from the clinic, and their "*attorney, rehabilitaion nurse, and insurance company will be notified*".

75. At the time of the patient's initial office visit, defendants also engage in a practice of generating typed written initial reports which are also routinely submitted to the Plaintiffs through the U.S. Mail, purporting to "grade" the patient's alleged complaints on a scale of "1 to 5", (with 5 being the most severe) according to a system purportedly taken from a book entitled "Whiplash Injuries: The Cervical Acceleration/Deceleration Syndrom", by a Dr. Croft.

76. Defendants engage in a practice of grossly exaggerating the "grade" assigned to the patient's alleged injuries in an attempt to further justify and/or substantiate the scheduling up front of excessive, unnecessary, and/or unwarranted chiropractic treatments for the patient.

According to the matrix provided by the defendants on their initial medical reports, a higher grade assigned to the patient's alleged injury purports to substantiate the medical necessity and/or justify an increase in the "frequency and duration" for the scheduling up front of future chiropractic visits.

77.     Regardless of the "grade" actually assigned by the defendants to the patient's alleged medical condition, and/or the purported diagnoses listed on the initial examination reports, all of the defendants' patients basically receive the same standard four modalities of physical therapy, and most, if not all, of the treatments rendered at defendants' clinics are performed by the C.M.T.'s and/or other lay assistants.

78.     Defendants' method of compensating the physicians at the Satellite clinics encourages over-treating, and/or providing unnecessary chiropractic care to patients, as the physicians are compensated in part based upon the *number of visits* that they treat the particular patient.  Defendants' manner of compensation regarding its Satellite clinic chiropractors has also been fraudulently concealed to the Plaintiffs.  Plaintiffs have obtained sworn deposition testimony of ***Julie Knell, D.C.*** in the Illinois state court case of *Evans vs. Romano, 03M1303894 (Allstate claim#2704919527)* in which **Dr. Knell** admitted to being compensated by the defendants at a rate of $25 for each office visit that she allegedly treated a patient at defendants' Chicago Heights clinic.

79.     Defendants compensate their C.M.T.'s at a rate of approximately *$10 an hour*. Defendants' method of compensation for its C.M.T.'s also encourages over-treating, and/or providing unnecessary and/or excessive treatments to defendants' patients, as it allows defendants to issue excessive and unwarranted bills for services rendered by the C.M.T.'s in an amount that grossly exceeds the amount that defendants pay the C.M.T.'s to provide the

30-45 minutes of physical therapy modalities to patients on a typical office visit.
Defendants' manner of compensation regarding its C.M.T's has also been fraudulently
concealed to the Plaintiffs. In *Saldivar vs. Tomecki, 03L12096 (Allstate claim#
2705011019)* D'Souza admitted to compensating C.M.T.'s at a rate of *$10 an hour*, and that
the defendants would typically bill $125 for a standard office visit of four physical therapy
modalities (and $170 if exercise is also billed to the patient on a particular office visit).

80.     D'Souza has admitted in sworn deposition testimony in Illinois state court cases
such as *Allen vs. Morrow, 03M1303335, (Allstate claim# 2705102727), Fenton vs. Breton,
03M1303838 (Allstate claim# 1016073130), and Smith vs. Barr, 03M1302281 (Allstate claim#
2704848833)*, that the fees for alleged services which are billed by defendants are based upon
AMA accepted CPT coding guidelines, and are based upon reasonable and customary fee
schedules, as if said services were in fact performed by duly licensed medical providers, and
*not* C.M.T.'s.

81.     The HCFA billing forms and itemized billing statements generated by defendants,
and submitted to Plaintiffs through the U.S. Mail, represent that D'Souza and/or some other duly
licensed medical provider, as being the patient's "treating physician", and contain CPT codes
misrepresenting that the billed services were actually performed by D'Souza, and/or a duly
licensed medical provider, when at times said treatments are in fact never rendered at all, and/or
are at other times rendered entirely by the unsupervised C.M.T.'s.

82.     In a deliberate attempt to fraudulently conceal the fact that treatments at
defendants' clinics are being entirely rendered by the C.M.T.'s, D'Souza has at times provided
false, misleading, deceptive, and extremely inconsistent testimony at depositions in Illinois
state court cases, including, but not limited to the following examples:

- In *Allen vs. Morrow, 03M1303335, (Allstate claim# 2705102727)*, D'Souza testified that treatments at defendants' clinic are <u>never</u> provided by just the C.M.T.'s, and that the assistants just bring supplies into the room and help "set up" for the physician, and it is the physician that actually administers the treatments;

- In *Moss vs. Oparka, 04M1302263, (Allstate claim# 2705593891)*, D'Souza testified that the C.M.T.'s who are trained in massage, would <u>only</u> perform "*massages*" that were billed to patients;

- Likewise, in *Soto vs. Ramos, 05M1304199 (Allstate claim# 2705668909)*, D'Souza testified that the C.M.T.'s would only do massage therapy upon his instruction, but nothing else;

- In *Smith vs. Barr, 03M1302281 (Allstate claim# 2704848833)*, D'Souza testified that other than massages, the C.M.T.'s merely "*assisted*" him, (and/or other licensed medical providers) in "*setting up*" the various physical therapy modalities that were billed by defendants to the particular patient, and D'Souza further claimed that "*he*" (and/or other physicians) actually performed <u>all</u> of the other modalities billed;

- In *Saldivar vs. Tomecki, 03M1303552 (Allstate claim# 2705011019)*, D'Souza testified that the C.M.T.'s did and can provide the various physical therapy modalities to the patients that were billed by the defendants, but claimed that the assistants <u>only</u> did so under the "direct supervision" of a duly licensed medical provider.

83. Many of the defendants' billing statements and HCFA forms that were submitted to Plaintiffs through the U.S. Mail, contain improper and/or deceptive CPT coding regarding the nature and extent of the physical therapy modalities that were allegedly performed on defendants' patients, and particularly conceal the identity, and medical specialty, if any, of the individuals that may have actually rendered the services being billed.

84. In many instances there is a lack of corresponding medical documentation, and/or incomplete, and/or insufficient medical documentation, to substantiate that said treatments were in fact performed and/or were performed to the extent represented by the corresponding level of

CPT codes that were being billed by the defendants for the alleged treaments.

85.     In many instances the patient's daily progress notes (SOAP notes) and various other medical records were regularly sent by the defendants to Plaintiffs through the U.S. Mail, along with the patient's billing statements, to deliberately and deceptively misrepresent that <u>all</u> of the physical therapy treatments that were being billed by the defendants were actually rendered, and/or that all services were actually performed by D'Souza, and/or some other duly licensed medical provider, when in fact the services were rendered by the C.M.T.'s.

86.     Initially it was the custom and practice of the defendants' clinics to <u>never</u> disclose the identity of any of the assistants that actually performed the billed modalities, as all of defendants' medical records expressly misrepresented that <u>all</u> of the billed treatments were performed entirely by D'Souza and/or another licensed medical provider.

87.     In a deliberate attempt to fraudulently conceal the nature and extent of their activities, defendants changed/altered their medical record keeping procedures to include the name of the C.M.T. that was allegedly involved in providing treatments to the patient. This change in record keeping was in direct response to testimony secured from various patients of the defendants indicating that various *women* "assistants", and not Melvin D'Souza, D.C. (a *male*), were actually providing the treatments billed. Specific examples of Illinois state court cases and first party insurance claims in which patients have testified that <u>all</u> of the therapy rendered was entirely performed by various women assistants, mostly Hispanic, yet all of the defendants' daily SOAP note records, and billing statements misrepresented that Melvin D'Souza, D.C., and/or another chiropractor or medical doctor, was actually the provider of the billed services rendered, include, but are not limited to:

- *Alice Gray vs. Allstate Insurance (Allstate claim# 2705997991);*
- *Allen vs. Morrow, 03M1303335 (Allstate claim# 2705102727);*

29

- *Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130);*
- *Wilson vs. Pickens, 03L192 (Allstate claim# 2214125338);*
- *Santiago vs. Diaz, 04M1302947 (Allstate claim# 1376180681);*
- *Moss vs. Oparka, 04M1302263 (Allstate claim #2705593891);*
- *Chui vs. Wheeler, 04L1844 (Allstate claim# 1016244467) and;*
- *Taylor vs. Cook,* 05M1304357 (Allstate claim# 2705678296).

88.     In a deliberate attempt to fraudulently conceal the identity of the actual provider

of the treatments billed, defendants changed/altered their medical record keeping procedures

purporting to indicate the name/identity of the particular C.M.T. that was involved in the particular

patient visit by utilizing a form that allows a check mark to be placed next to the name of a C.M.T.

from a list on the SOAP note form. However, this changed SOAP note form expressly indicates

that the designated C.M.T. only *"assisted"* a physician in the performance of the various modalites

that are checked off from a list on the form, as the name of a purported treating physician is also

checked off on the same SOAP note representing that the patient was *"seen by"* that designated

physician.

89.     Based upon information and belief, and from deposition testimony from defendants'

patients in Illinois state court cases, there continue to be instances in which defendants' patients

never meet with and/or never treat with any duly licensed medical provider, and only meet with,

and/or receive treatments from unsupervised C.M.T's, yet the patient's medical records and billing

statements submitted to the Plaintiffs' through the U.S. Mail continue to fraudulently conceal this

information from the Plaintiffs.

90.     The following cases contain specific examples of defendants continued deceptive

practices of concealing the true idenity of the actual provider of alleged billed services rendered:

- In *Soto vs. Ramos, 05M1304199 (Allstate claim #2705668909)* the
  patient testified that **all** of the physical therapy rendered were
  performed by the *Hispanic women* assistants, as this particular
  patient only spoke Spanish. Mr. Soto specifically denied ever
  treating with any chiropractor that appeared to look "Asian", yet

various SOAP notes in his file indicated that *Lehoa Huynh*, a female chiropractor of Asian decent and appearance was the chiropractor that he was allegedly treated him on various dates. *Dr. Huynh* in her deposition, also testified that patients medical records indicated that she actually treated *Mr. Soto* on those various dates as well. In addition, many of the records in Mr. Soto's file also misrepresented that Melvin D'Souza (a male) provided various treatments to Mr. Soto. All of the daily SOAP note forms in Mr. Soto's file misrepresented that the Hispanic woman C.M.T.'s merely "assisted" the physicians (D'Souza and Huynh) that were also designated on the SOAP note forms. In addition, the defendants in the *Soto* case misrepresented that only *Melvin D'Souza, D.C.,* was the patient's "treating physician" for all of the dates of treatments indicated on the patient's billing statements.

- In the case of *Taylor vs. Cook*, 05M1304357 (Allstate claim# 2705678296) *Dr. R. Rawoof*, admitted in deposition testimony that she has never rendered any of the physical therapy modalities to patients at defendants' 63<sup>rd</sup>Street clinic, yet all of the defendants' daily SOAP notes and billing statements from that clinic continue to designate Dr. Rawoof as being the treating doctor that the patient was "*seen by*" on each of the visits, and the C.M.T.'s name was merely selected to represent that they "assisted" Rawoof in providing the modalities billed.

91.     As a result of defendants' continued false, misleading and deceptive records keeping pertaining to their daily SOAP note forms, the information pertaining to the identity of the person actually providing the billed treatments to the patient is often not able to be reasonably discovered by the Plaintiffs' until the time that the particular patient provides sworn testimony in support of their personal injury and/or insurance claim.

92.     In many instances there is also a complete lack of any corresponding medical documentation, and/or incomplete, and/or insufficient medical documentation, to substantiate that all of defendants' bills for treatments allegedly rendered were in fact actually performed and/or were performed to the extent represented by the use of the corresponding level of CPT code that was assigned to the alleged treatments, and/or that the treatments billed were reasonable and/or necessary to treat injuries allegedly sustained in the accidents at issue.

93.     In addition, even after defendants changed/altered their daily SOAP note forms to disclose the name of the lay assistant, defendants continued to submit billing statements and HCFA forms to the Plaintiffs through the U.S. Mail, containing AMA approved CPT codes, and misrepresenting that the services billed were in fact only performed by a duly licensed medical as the physician's name is still the only name that appears on the HCFA forms and/or billing statements.

94.     In a deliberate attempt to continue to fraudulently conceal the nature and extent of defendants' fraudulent activities concerning the identity of the actual provider of the treatments being billed, defendants continue to purport to rely upon the use of the Fee Facts billing publication to set their fees for services allegedly rendered. As Fee Facts only provides billing information concerning reasonable and customary fees charged by duly licensed medical providers, defendants' purported reliance on Fee Facts continues to fraudulently misrepresent to Plaintiffs that defendants are billing for physical therapy modalities that were in fact performed by licensed medical providers, and not C.M.T's.

95.     The billing for physical therapy modalities allegedly performed at defendants' clinics not only regularly exceed the reasonable and customary fees for like services in defendants' geographic area, said fees regularly exceed the average fees for like services contained in the Fee Facts publication that defendants purport to rely upon to set their alleged reasonable and customary fees, even assuming that all of said services were performed by licensed medical providers.

32

**E.**     **SPECIFIC ALLEGATIONS RELATING TO "X-RAYS, DMX, AND**
**COMPUTERIZED RANGE OF MOTION AND STRENGTH STUDIES" ALLEGEDLY**
**CONDUCTED AT DEFENDANTS' CLINICS**

96.     On the initial office visit at defendants' chiropractic clinics there is a near

universal pattern of "self referral" of patients to the defendants' Bridgeport clinic for various

unnecessary and unwarranted diagnostic testing, such as plain x-rays, digital "motion" x-rays

("DMX"), and computerized range of motion and strength tests.

97.     It is the common practice and protocol of the defendants' clinics to have their

patients referred to the Bridgeport clinic for the taking of plain x-ray films, even in situations in

which the particular patient may have had the exact same set of plain x-ray films taken at an

Emergency Room, and/or another medical facility immediatley before coming to defendants'

clinics.

98.     The Bridgeport clinic is the only facility owned and operated by the defendants

that has standard x-ray equipment.   Defendants' standard (non-motion) x-ray equipment is

located *inside* the Bridgeport Clinic at 804 W. 31st Street, in Chicago.

99.     Defendants maintain the DMX (*motion* x-ray) equipment in a mobile van that is

parked *outside* at the Bridgeport clinic.  However, D'Souza himself allegedly drives the DMX

mobile van to various other clinics to conduct motion DMX studies on patients.

100.     Defendants typically bill $875 for the taking of a DMX of the cervical spine,

which takes approximately three minutes to complete. DMX studies to other parts of the body

such as the TMJ, are typically billed out at an additional $575.

101.     According to the defendants' stated protocols set forth in their form medical

reports and records, (which are also regularly submitted to the plaintiffs through the U.S. Mail),

DMX studies are conducted by defendants only *after* the patient initially received standard (non-motion) x-rays at defendants' clinics. Defendants typically bill approximately $200-$250 for standard plain x-rays to each part of the body allegedly x-rayed on a patient.

102. In many instances there is a lack of supporting medical documentation, and/or incomplete, and/or insufficient medical documentation, to substantiate that x-rays and/or DMX motion x-rays were in fact performed on patients, and/or that such x-rays and DMX were reasonable and/or necessary, and/or warranted for the diagnoses and/or treatment of the patient. In fact, in response to numerous subpoenas issued upon defendants to produce actual reproductions of x-rays and DMX studies allegedly taken on various patients, defendants have indicated that the actual studies were allegedly ***destroyed*** in two separate computer hard drive crash(es) that allegedly occurred at the Bridgeport clinic where the studies were allegedly stored.

103. In addition, D'Souza has provided sworn deposition testimony in the Illinois state court case of *Soto vs. Ramos, 05M1304199 (Allstate claim #2705668909)* admitting that defendants are <u>not</u> able to produce any of defendants' digital x-rays and DMX studies that were allegedly taken of defendants' patients on or before ***November of 2005,*** as such studies were ***permanently destroyed*** in two separate hard drive crashes at the Bridgeport clinic, in which defendants had no viable back up system in place.

104. The defendants custom and practice of re-taking plain x-rays to the exact same parts of the body previously x-rayed, taking of x-rays to parts of the patient's body that were not even injured, and/or otherwise unnecessarily taking x-rays on patients, is not medically appropriate and/or warranted for the necessary care and treatment of the defendants' patients, and if such studies are actually being rendered, they are solely done for the purpose of "building up" and/or "inflating" the amount of the defendants' billing statements, and the particular

patient's personal injury claim.

105.    Defendants continue to fraudulently conceal the unnecessary taking of x-rays to parts of the body that the patient denied even injuring by simply misrepresenting in form medical reports and records that the patient did in fact complain of injuries to the parts of the body allegedly x-rayed by the defendants. The fraudulent x-ray related information is often not able to be reasonably discovered by the Plaintiffs until the time that the particular patient provides contrary sworn testimony regarding regarding what parts of their body were actually injured in the accident at issue, and what parts of their body, if any, were actually x-rayed by D'Souza.

106.    Defendants continue to fraudulently misrepresent the medical necessity of re-taking x-rays to parts of the body previously x-rayed. In attempt to justify and/or substantiate the unnecessary and/or unreasonable billing for re-taking of plain x-rays on patients, D'Souza has provided deposition testimony in Illinois state court cases, such as *Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130), and Soto vs. Ramos, 05M1304199 (Allstate claim #2705668909)*, that defendants' x-rays are somehow different and/or better, and/or can somehow allow D'Souza to see different things than the Radiologist could have seen when the Radiologist originally took and reported the original studies at an Emergency Room.

107.    At the time of a patient's initial office visit, in addition to prescribing that the patient immediately receive and/or re-take standard x-rays, it is often documented in "form" initial medical reports that as a result of the patient's alleged initial complaints it will be necessary to have the patient undergo a subsequent "motion" x-ray, "DMX" a few weeks later.

108.    At least one chiropractic physician working at one of defendants' Satellite clinics, **Julie Knell, D.C.**, has tesfied to receiving what amounts to a "kick back" and/or a "referral fee" for sending patients down to the Bridgeport clinic for x-ray related services. **Julie Knell** testified

in the case of *Evans vs. Romano, 03 M1303894 (Allstate claim# 2704919527)* to receiving a *"referral fee"* of **$25** for every patient that she referred down to D'Souza at Bridgeport for the taking of an x-ray, and an additional **$25** if the patient was also later referred for a subsequent DMX study.

109. Defendants fraudulently submit billing statements, physicians liens, and other medical related documentation to the Plaintiffs through the U.S. Mail, seeking payment for x-rays, DMX studies that were on occasion never actually rendered, and/or were allegedly peformed to parts of the patient's body that were not even injured in the accident at issue, and/or were not medically necessary and/or warranted to further diagnose and/or treat the injuries allegedly sustained by the particular patient. Specific examples of defendants inappropriate conduct relating to x-ray and DMX services allegedly rendered, include, but are not limited to:

- *Soto vs. Ramos*, 05M1304199 (Allstate claim# 2705668909), where the patient denied that he ever received <u>any</u> x-rays at defendants' clinic, yet defendants billed $700 for a cervical, thoracic and lumbar x-rays allegedly taken;

- *Chiu vs. Wheeler, 04L1844 (Allstate claim# 101624467)* in which the patient's testimony indicated that she was instructed to remain "still" during the only "x-rays" she received, yet she was billed for DMX, "motion" x-rays;

- *Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130)* in which Ms. Fenton was allegedly given, and billed for an x-ray to her *left* shoulder, when her deposition testimony stated that she in fact injured her *right* shoulder;

- *Engram vs. Raj, 04 M1303919 (Allstate claim# 1016331678)*, where defendants' billed for a DMX motion x-ray to the patient's left hand, that not only did the patient deny ever receiving, but the patient further denied even injuring her left hand in the accident at issue;

- *Smith vs. Barr, 03M1302281 (Allstate claim# 2704848833)*, the patient was billed for a DMX to his TMJ which he never received;

- *Santiago vs. Diaz, 04M1302947 (Allstate claim# 1376180681)* the patient was billed for DMX to both the Cervical and TMJ that the patient never testified to receiving, and again, the patient further *denied* complaining about any TMJ related symptoms to defendants.

110.    Defendants engaged in a practice of allegedly taking DMX studies on patients even when the defendants' own medical records indicate that by the time the patient allegedly receives the DMX motion x-ray a few weeks after the alleged accident, the patient is either no longer complaining about discomfort to that particular part of the body, and/or the patient's medical records indicate that the patient had been making substantial progress and their alleged initial complaints had greatly improved. Specific examples of defendants' practice of unnecessarily and/or unreasonably taking subsequent DMX studies on patients include, but are not limited to:

- *Rush vs. Halverson, 03M2466 (Allstate claim# 2214109759); and Santiago vs. Diaz, 04M1302947 (Allstate claim# 1376180681),* in which DMX studies were allegedly given to the patient's cervical spine when the medical records and testimony suggest that the patients were progressively getting better with each visit. In both cases, DMX studies were also allegedly taken to the patient's TMJ when no such injuries to that particular part of the patient's body were ever complained about by the patient.

- *Huynh vs. Vandiver, 04L9925 (Allstate claim# 1016302975),* where the defendants billed the patient for a DMX motion x-ray allegedly performed on the patient's last visit at the clinic, when not only did the patient deny ever receiving such a motion x-ray study, but further testified that he felt much better at the time of his last visit at the defendants' clinic.

111.    In certain instances in which patients were billed by defendants for DMX "motion" x-ray studies, they have testified in Illinois state court depositions that they never received any sort of (DMX) x-ray study conducted in a "*mobile van*", nor were they ever given any x-ray in which they were asked to "*move*"; rather patients have testified that they were in fact told of the importance of remaining "*still*" during all of the x-ray procedures that they allegedly had at

37

defendants clinics. Specific examples in which patients have testified in Illinois state court cases to being instructed to remain "still" during their x-ray procedures in which defendants billed for the taking of DMX "motion x-rays" include, but are not limited to *Engram vs. Raj, 04M1303919 (Allstate claim# 1016331678), and Chui vs. Wheeler, 04L1844 (Allstate claim# 1016244467).*

112.     To allegedly review and report their x-rays and DMX studies, defendants apparently hire out of state chiropractic radiologists as independent contractors. The x-ray bills submitted by defendants to the Plaintiffs through the U.S. Mail, contain one global amount, and on the face of the billing statement purports to indicate that the bill could include both the technical component of taking the studies, as well as the professional fee associated with the reading and reporting of the studies.

113.     According to varying and inconsistent sworn deposition testimony obtained from D'Souza in Illinois state court cases, defendants allegedly pay the out of state chiropractic radiologists anywhere from *$40 to $100* to read and report their findings of x-ray and DMX studies provided to them by the defendants. Examples of D'Souza's inconsistent testimony include:

- *William Jones vs. Allstate Insurance (Allstate claim# 2704781117)* in which D'Souza testified to paying the chiropractic radiologists **$100** to review his x-ray related studies;

- *Engram vs. Raj, 04M1303919 (Allstate claim# 1016331678)* in which D'Souza testified to paying the chiropractic radiologists *$50* to review the studies.)

- *Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130)* in which D'Souza testified to paying the chiropractic radiologists *$40* to review the studies;

- In addition, in *Webb vs. Stoval, 03M1303552 (Allstate claim# 2704918008)l,* D'Souza further testified that before he started using a "digital" x-ray machine, for which he now allegedly sends the studies out via the internet, defendants would also allegedly incur

additional postage related expenses of approximately *$25* to mail the x-rays to the various out of state chriopractic radiologists.

114. The defendants fraudulently conceal in their billing statements for x-rays and DMX studies, the part of the fee that is being charged by defendants for having the studies read and reported by these out of state chiropractic radiologists, including any and all associated mailing/postage related expenses.

115. The amount that the out of state chiropractic radiologist bills for their alleged professional service in reading and reporting the studies is never disclosed to the patient, and/or to Plaintiffs.

116. In certain circumstances defendants have in fact issued bills for *$200* for the alleged reading and/or reporting of DMX studies, while in certain other instances, D'Souza has testified in Illinois state court cases that defendants never bill the patient for any fee associated with the reading/reporting of the x-ray and DMX studies, rather D'Souza claims that defendants are only billing for the technical component of taking the studies. Specific examples of D'Souza's testimony contending that defendants do not bill for the reading and reporting of such x-ray and DMX related studies include: *Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130)*; *Soto vs. Ramos*, 05M1304199 (Allstate claim# 2705668909); *Smith vs. Barr, 03M1302281 (Allstate claim# 2704848833); William Jones vs. Allstate Insurance (Allstate claim# 2704781117); Allen vs. Morrow, 03M1303335 (Allstate claim# 2705102727);* and *Chui vs. Wheeler, 04L1844 (Allstate claim# 1016244467).*

117. The bills and reports that defendants submit for x-ray and DMX related services contain the Bridgeport clinic's address, thus representing that all of the x-ray related services were performed at that location. D'Souza has repeatedly admitted in Illinois state court depositions that none of the chiropractic radiologists that he has ever retained to review and

39

report defendants' x-ray and DMX studies have ever actually worked at the Bridgeport clinic address of 804 W. 31st Street, Chicago, Illinois, that appears on the x-ray and DMX reports and billing statements submitted by defendants.

118.    To fraudulently conceal the fact that defendants are using out of state chiropractic radiologists to read and report the studies, defendants manufacture reports on defendants' own letterhead containing the Bridgeport clinic's address of 804 W. 31st Street in Chicago, Illinois, by "cutting and pasting" the out of state chiropractic radiologists findings on to the defendants' Bridgeport clinic stationary, and electronically affixing the signature of the chiropractor who allegedly reported the study.

119.    The x-ray and DMX reports produced and generated by defendants and submitted through the U.S. Mail to the Plaintiffs misrepresent that the reporting chiropractic radiologists is not only duly licensed in Illinois, but that they are either actually working at and/or affiliated with the Bridgeport clinic at the 804 W. 31st Street, Chicago, Illinois, address that appears on the x-ray and DMX reports.

120.    In many instances the x-ray and DMX reports allegedly generated by these out of state chiropractic radiologists are dated many days after the date of the studies allegedly conducted by D'Souza, and in some instances the reports from the out of state chiropractic radiologists are even dated *after* the patient had already been discharged from defendants' clinics; a few specific examples of this conduct include, but are not limited to:

- *Allen vs. Morrow, 03M1303335 (Allstate claim# 2705102727)* in which the defendants billed for a DMX study that was allegedly taken on 6/3/02, reported on 7/25/02, and the patient was discharged from defendants'clinic on 6/25/02;

- *Huynh vs. Vandiver, 04L9915 (Allstate claim# 1016302975)*, in which defendants billed for a DMX that was reported 4 days after the patient was discharged;

40

- *Chui vs. Wheeler, 04L1844 (Allstate claim# 1016244467)* in which defendants billed for standard x-rays which were reported six weeks after they were allegedly taken, and for DMX motion x-rays allegedly taken even before the standard x-rays were reported by the chiropractic radiologist;

- *Smith vs. Barr, 03M1302281 (Allstate claim# 2704848833)*, in which defendants billed for standard x-rays which were reported over 5 weeks after they were allegedly taken, and for DMX motion x-rays that were allegedly taken even before the standard x-rays were reported by the chiropractic radiologist.

121. Any and all bills for x-rays and DMX studies allegedly taken on defendants' patients for which reports are generated weeks, if not months, after the studies are allegedly taken, and in some instances, even after the patient is discharged from defendants clinics, are not reasonable and necessary medical expenses incurred for the alleged care and/or treatment of the patient, and any bills for such alleged services are solely generated to increase and/or inflate the defendants' overall billing statements, and/or to increase the potential settlement value of the claim to the particular patient. In addition, said x-rays and DMX studies are in no way utilized for the care of the patient, and/or the establishment of any legitimate course of medical treatment at defendants' clinics.

122. The fees that defendants bill for x-rays and DMX allegedly taken, not only regularly exceed the reasonable and customary fees for like services in defendants' geographic area, but said fees are grossly in excess of the fees actually contained in the Fee Facts publication that defendants misrepresent that they relied upon in setting their alleged reasonable and customary fees for like services. In fact in some instances, defendants' bills for x-ray related services were almost twice the average fees listed in the Fee Facts billing publication.

123. At the time of the patient's initial office visit, defendants also engage in a pattern

of unnecessarily prescribing and taking various *computerized range of motion and strength test studies.*

124.     Defendants typically bill **$100 to $150** for range of motion studies allegedly performed to each part of the body allegedly tested, and additional **$75 to $100** for muscle strength tests allegedly rendered. Defendants often prescribe, and/or allegedly render such unnecessary and/or unwarranted computerized tests on multiple office visits.

125.     The fees charged by the defendants for allegedly conducting computerized range of motion studies are not reasonable and customary medical services, and are not medically necessary to care for and/or treat any of the injuries allegedly sustained by the defendants' patients in the accidents at issue, and are simply utilized to increase the overall billing generated by defendants' clinics, and increase the overall potential settlement value of the patient's personal injury claim. In fact, any fees associated with "measuring" a patient's "range of motion" should be reasonably and customarily included as part of the physician's fee for conducting a standard examination on the patient. The computerized tests allegedly rendered by defendants have no legitimate added medical diagnostic value in the care and treatment of defendants' patients.

126.     Any computerized range of motion and/or strength study allegedly conducted by defendants is not utilized for the establishment of any purported treatment plan prescribed for the particular patient.

127.     The computerized tests are often used by defendants to misrepresent and/or exaggerate the existence of alleged severe, permanent, and/or chronic injuries that do not exisit, and to further provide a fraudulent basis upon which the defendants attempt to substantiate extended, excessive, and unwarranted chiropractic care on patients, and to increase defendants' overall billing statements, and to potentially increase the value of the patient's

personal injury claim.

128.    In certain instances there is a lack of supporting medical documentation, and/or incomplete, and/or insufficient medical documentation, to substantiate that computerized range of motion and strength studies that were being billed by the defendants were in fact performed on the patients, and/or were medically necessary and/or appropriate for the diagnoses, care and treatment of the patient. In certain instances defendants have billed for the alleged rendering of computerized range of motion and strength studies that individual patients denied ever receiving. Specific examples of defendants' inappropriate conduct relating to computerized range of motion studies, include, but are not limited to:

- *Soto vs. Ramos, 05M1304199 (Allstate claim# 2705668909)*, in which the defendants billed Mr. Soto $675 for a total of three (3) separate computerized range of motion and strenght tests, that *Mr. Soto* simply denied ever receiving;

- *Alice Gray vs. Allstate Insurance (Allstate claim# 2705997991)*, in which Ms. Gray testified that any such studies took 5 minutes to complete, and she further testified that any such studies were not conducted by Dr. D'Souza, yet defendants billed her $300 each for three separate alleged computerized studies ($900), and defendants further submitted numerous pages of reports and documents contending that the computerized studies were allegedly rendered by *D'Souza*. In addition, accompanying their billing statements in the Alice Gray case, defendants submitted, on their own letterhead, a "Statement of Medical Necessity" purporting to justify the conducting of the alleged computerized studies on Ms. Gray.

- *Davenport vs. Lewis, 05L7770 (Allstate claim# 1237932972)*, the defendants produced numerous pages of graphs, charts, and reports for multiple computerized range of motion studies allegedly conducted on Ms. Davenport, that she simply denied ever receiving.

## F.    SPECIFIC ALLEGATIONS RELATING TO DEFENDANTS' WEB SITES

129.    In many of the documents submitted by the defendants to the Plaintiffs through the

U.S. Mail, defendants make reference to, and otherwise disclose their various *web site* addresses,

including, but not limited to: *whiplash100.com, whiplash102.com, DMX.tv, DMX-lab.com, back-doc.com, i-got-hurt.com, drdsouza.net.* In addition to the information submitted to Plaintiffs in the various written literature which often accompanies defendants billing statements and physicians liens, defendants' further misrepresent the medical necessity and/or their billing for DMX, by making unsubstantiated, inaccurate, false, deceptive, and/or otherwise misleading statements on their *web sites* that DMX can be utilized to diagnose, among other things, "*ligamentous instability*" of the cervical spine, that DMX can be used can "*find injuries that could never be seen before*", that DMX can provide "*objective information that cannot be disputed*", and that "*DMX can provide demonstrable evidence of permanent soft tissue damage resulting from automobile accidents*".

130.     Defendants' website (www.dmx.tv) specifically targets potential personal injury patients and lawyers. Under the website's "attorneys" section defendants represent that the use of DMX can help increase the *settlement value* of cases by containing such statements as: *"Why settle for less!; "Stop letting 80% of your practice potential go out the door"; "Since we have been in practice many attorneys have come up to me and told me that before utilizing DMX for their clients, typically they would have settled for a much lesser amount, as soft tissue injuries were hard to show proof. Now they send them (insurance companies) a copy of the VHS tape with their proposal and they are seeing surprising results, some policy limits"*.

131.     Defendants' website also targets other physicians under the "doctors" section, by misrepresenting that by using DMX it can "*increase attorney referrals*" and that DMX can "*diagnose soft tissue injuries objectively, provide proof of injury, and substantiate patient care*".

132.     The DMX tests allegedly conducted by defendants have no legitimate medical

diagnostic value, and the reported findings and alleged diagnoses made from reviewing DMX studies are not capable of being medically supported by the tests.

133.    DMX reports are often used by defendants to misrepresent the existence of ligamentous instability of the cervical spine of the patient, as well as other alleged severe, permanent, and/or chronic injuries that cannot be legitimately diagnosed by such a test.

134.    In addition to the excessive costs associated with taking and reporting the unnecessary and/or unwarranted DMX studies, defendants engage in a practice of using false, misleading, and otherwise unreliable DMX findings as a basis for providing additional unnecessary, unwarranted, and/or excessive chiropractic treatments to patients, thus further increasing the defendants overall bill for services and potentially increasing the value of the patient's personal injury claim.

## G.    BOGUS "FORM" REPORTING USED TO SUBSTANTIATE DEFENDANTS' FRAUDULENT BILLING SCHEME

135.    Narrative "form" medical reports routinely generated for patients allegedly treating at defendants' clinics are submitted to Plaintiffs through the U.S. Mail, purporting to represent that the patient sustained severe, permanent and chronic injuries in the accident at issue, and to justify the medical necessity, and substantiate the alleged care purportedly rendered and billed by the defendants. Defendants' form medical reports often contain one or more of the following false, misleading, deceptive and/or wholly inaccurate findings, including but not limited to:

a.    the actual name of the particular patient;
b.    the description of the facts and circumstances of the accident at issue;
c.    the parts of the body subjectively complained of by the patient;
d.    the objective injuries allegedly sustained by the patient;
e.    the permanency of any injuries allegedly sustained in the accident at issue;
f.    the results of radiological studies and diagnostic tests allegedly

45

performed;

g.    the patient's diagnoses;

h.    the patient's past medical history;

i.    a disability statement regarding the patient's inability to work;

j.    recommendations of future treatment, and diagnostic testing;

k.    the patient's prognosis and alleged need for future medical care;

l.    the identity of the actual provider of medical services;

m.    a statement alleging that all of the billed services rendered were medically necessary and reasonable.

n.    standard findings of causation alleging that the diagnosed injuries were proximately caused by the accident at issue in the particular claim, regardless of whether the patient had a significant pre-existing condition to the exact same part(s) of the body allegedly "injured" in the accident at issue.

136.    The following cases illustrate specific examples of defendants' use of "form"

medical reports containing false, misleading, deceptive and/or wholly inaccurate findings relating

to various aspects of the insurance claims at issue:

- In *Taylor vs. Cook, 05M1304357 (Allstate claim# 2705678296),* the patient's final report incorrectly referred to Ms. Taylor as a "***Mrs. Battie***". D'Souza admitted that the information was apparently not changed on the "form" medical report that is utilized by the defendants. In addition, the report in Ms. Taylor's case further mistakenly referred to her as the ***driver*** of the motor vehicle that was involved in an accident, when Ms. Taylor was actually the ***passenger***. Ms Taylor also testified that she only injured her low back, neck, and left knee, yet a number of defendants' records also alleged injuries to the left shoulder, with radiating complaints to the arms and legs, as well as a left ankle injury, all of which were specifically denied by the Ms. Taylor at her deposition. Defendants' "form" final report also contended that Ms. Taylor sustained *permanent* injuries in the accident at issue and was only 85% improved by the last visit, yet Ms. Taylor testified that she was fine at the time of her discharge.

- In *Reynolds vs. Green, 05L2838 (Allstate claim# 2705729594)* Defendants' "form" final report also incorrectly referred to Ms. Reynolds as a "***Mrs. Battie***". D'Souza admitted that the information was apparently not changed on the "form" medical report that is utilized by defendants. In addition, the report in Ms. Reynolds' case further mistakenly referred to her as a ***driver*** of the motor vehicle that was in a ***rear end*** accident, when Ms. Reynolds was actually the ***passenger*** in a car that was involved in

a *left turn* accident. The initial report also indicated that Ms. Reynolds did not receive any emergency medical care before coming to defendants' clinic, yet in reality, Ms. Reynolds received an extensive medical and diagnostic work up at Christ Hospital in which she received over $7,000 in medical and diagnostic care. Defendants also allegedly re-took various x-rays and diagnostic tests on Ms. Reynolds that had already been performed at the Hospital and reported as negative/normal, yet defendants alleged studies reported certain positive findings, when they were conducted weeks after the accident at issue. The reports in Ms. Reynolds case also contain inaccuracies regarding the parts of her body were allegedly injured in the accident, when compared to her deposition testimony.

- *In Ciara Hines and Alice Gray vs. Allstate (Allstate claim# 2705997997)*, not only did Ciara Hines deny ever treating at defendants' clinic, defendants' records even purported to diagnose her with injuries to parts of body that she denied even injuring. In addition, defendants' medical records "incorrectly" described Ciara as being six (6) foot, three (3) inches tall, when at her deposition, Ciara testified that she was actually five (5) foot, six (6) inches tall. Also, Ciara's mother, Alice Gray, who testified that she actually did treat with defendants' clinic, admitted that she was 100% better at the end of her treatment, yet the defendants' "form" final report noted that she sustained *permanent* and *chronic* soft tissue type injuries in the accident at issue and was only 85% better at the time of discharge.

- In a number of cases, including, but not limited to*: Smith vs. Barr 03M1302281 (Allstate claim# 2704848833), Saldivar vs. Tomecki, 03L12096 (Allstate claim# 2705011019), Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130), and Wilson vs. Pickens, 03L192 (Allstate claim# 2214125938)*, the same "*mistake*" appeared in the "form" reports that were generated in each patient's case, indicating that the patient was "***wearing airbags***" in the accident. D'Souza admitted in various discovery depositions that the reference to the patient "wearing airbags" was a "typo" that was contained in one of the standard paragraphs on defendants' "form" medical report that was used for all of defendants' patients. On this same issue, *Dr. Zaveleta, D.C.*, admitted in the case of *Zamorano vs. Munoz, 05M1301000 (Allstate claim# 2705827760)*, that D'Souza gave him software containing defendants "form" medical reports, and that there were in fact certain hardcoded paragraphs that *Zaveleta* could not alter, including the section mentioned above the that patient was "wearing airbags" in the accident. *Zaveleta* also admitted to

47

"form" paragraphs pertaining to causation, prognosis and need for future medical care, that he could not alter as well.

- In *Saldivar vs. Tomecki, 03L12096 (Allstate claim# 2705011019)*, the final "form" report noted that Ms. Saldivar was still allegedly complaining about a right ankle injury that Ms. Saldivar denied ever sustaining in the accident at issue. Defendants' records also diagnosed various other injuries allegedly sustained by Ms. Saldivar to her left shoulder, right triceps, right forearm, right hip, right thigh, and right knee, that Ms. Saldivar also denied injuring in the accident at issue.

- In *Santiago vs. Diaz, 04M1302947 (Allstate claim# 1376180681)*, Ms. Santiago admitted that she was better at the end of the treatments at defendants' clinic, yet defendants' "form" report indicated she sustained *permanent* and *chronic* injuries in the accident. Defendants' records failed to even note injuries that Ms. Santiago had sustained in a prior worker's compensation accident. Ms. Santiago testified to complaining about her back and neck, but defendants' records also noted that they allegedly treated injuries to her knees, shoulders and legs. Ms. Santiago actually testified that while she *did* injure her knees in the accident issue, that injury had resolved by the time she started treating with D'Souza approximately 2 weeks after the accident.

- In *Wilson vs. Pickens, 03L192 (Allstate claim# 2214125938)*, defendants' initial "form" report noted that the patient had "torn ligaments" even before a single diagnostic study had been performed. Defendants' "form" final report also contended that the patient's final diagnosis was *cervical disc displacement-herniation,* when the patient never even received a CT scan, MRI and/or any other diagnostic test to confirm such a diagnosis. Defendants' records and D'Souza's testimony in the case contended that the patient struck his *left* shoulder on the driver's door, yet the patient testified in his deposition that he was actually thrown to the *right* in the accident and injured his *right* shoulder.

- In *Smith vs. Barr 03M1302281 (Allstate claim# 2704848833)*, D'Souza admitted that he "*forgot*" to type in case specific information on the "form" final report which still contained the phrase: "***need verbiage***". D'Souza further admitted that the reports utilized by defendants contained "form" paragraphs noting the alleged injuries were *permanent* and *chronic* and *causally connected* to the accident at issue in the case.

- In *Soto vs. Ramos, 05M1304199 (Allstate claim# 2705668909)*, defendants' initial and final "form" reports noted that Mr. Soto sustained lumbar and thoracic spine injuries causing him to have *weakness* in both of his legs, and D'Souza suspected that Mr. Soto had sustained a *herniated disc*, yet Mr. Soto testified that he was fine on his last visit to defendants' clinic, and further *denied* that he ever complained about *any weakness* in his lower extremities at all.

- In *Webb vs. Stoval, 03M1303552 (Allstate claim# 2704918008)* the patient testified to <u>only</u> receiving a **low back** injury, yet defendants' records purported to diagnose and treat *cervical* and *thoracic* spine injuries, and even reported that the patient sustained *cervical disc displacement/herniation.* The "form" medical reports further noted that the patient's *cervical* spine injury was *permanent* and *chronic* and *casually related* to the accident at issue. Also the "disability" section of the "form" report noted that the patient related: "I can *drive* my car as long as I want with moderate *neck* pain". However, not only did this patient deny that he had a neck injury, the patient further testified that he did <u>not</u> even have a driver's license, and he was passenger in the car accident at issue.

- In *Jones vs. Allstate (Allstate claim# 2704781117)*, Mr. Jones testified that he sustained an injury to his **low back** as he was attempting to get into his parked car, when he was struck in the **low back** by the side mirror of another car that was backing out of an adjacent parking space. Mr. Jones repeatedly testified that the <u>only</u> injury he sustained was to his low back. Mr. Jones also admitted to at least a 7 year history of a prior low back injury in which he had been diagnosed with a herniated disc, for which surgery had actually been recommended. Mr. Jones also admitted to a prior history of knee surgery. On defendants "form" medical reports and records, D'Souza opined that Mr. Jones **low back** injury was solely caused by the car accident, and failed to even mention the patient's pre-existing low back condition. More importantly, other medical records obtained in the case from other doctors indicated that Mr. Jones had treated for his low back condition literally days before the alleged car accident. Defendants' "form" report also purported to diagnose and treat Mr. Jones for a *knee* injury and an *ankle* sprain, that Mr. Jones denied sustaining in the car accident. In D'Souza's deposition in the case he actually attempted to opine how Mr. Jones allegedly sustained a "*contusion*" to his **knee**, as well as *patellar tendonitis*, when Mr. Jones allegedly twisted his **knee** and apparently hit it against the side of the car in the accident.

- In *Goodwin vs. Martin, 05M1301867 (Allstate claim#
  2705860753)*, Mr. Goodwin was actually under the care of
  D'Souza for a *low back injury* that he had sustained in a work
  related accident, when he was involved in a subsequent car
  accident. Thereafter, Mr. Goodwin continued to treat with
  D'Souza for both accidents. Defendants maintained two separate
  and distinct files for the work accident and the car accident. The
  work accident file *only* reported complaints "*low back*", and the
  car accident file *only* reported complaints to the "*mid back* and
  *neck*". Each file also never mentioned the other accident/injuries.
  After the date of the car accident defendants issued two separate
  and distinct bills for services allegedly rendered to Mr. Goodwin
  for the ***exact same dates of treatments***. Mr. Goodwin testified at
  his deposition that the car accident allegedly caused him to injure
  and/or aggravate his "low back" injury, for which he continued to
  receive treatments at defendants' clinic. Mr. Goodwin even
  testified that D'Souza allegedly told him that the car accident
  "aggravated" his pre-existing low back condition, yet none of this
  was ever recorded in any of the patient's medical records, which
  purport to note completely different injuries being sustained in
  each accident.

137. In certain instances D'Souza generates and submits to the Plaintiffs through the
U.S. Mail, "form" narrative medical reports for patients that allegedly treat with other medical
providers at the defendants' Satellite clinics. In certain situations D'Souza electronically affixes
the other physician's name to the report, and prepares the report without ever consulting with this
other medical provider.

138. The physician from the Satellite clinic for whom D'Souza purportedly prepares
medical reports is not shown the final report to review for accuracy and/or representations made
therein, and these reports contain false, misleading, and exaggerated findings that were not
contained in the physician's medical records who actually treated the particular patient, and in some
instances said reports contain "errors" regarding medical opinions, conclusions, and alleged
diagnoses of injuries to parts of the body that the particular patient did not even complain about
injuring in the accident at issue.

139.    In the case of *Taylor vs. Cook, 05M1304357 (Allstate claim# 2705678296)*,
D'Souza admitted that he generated medical reports for ***Dr. R. Rawoof, M.D.***, who treated patients
at defendants' 63rd Street Clinic, because ***Rawoof*** was not too computer literate and/or that she did
not like to type. ***Rawoof*** admitted in her depostion in the *Taylor* case that when she treats patients
in her own private practice (in which she spends 80% of her time) she actually uses her own
computer to type up her own records and reports.

140.    In *Taylor vs. Cook*, ***Rawoof*** further admitted that she had no involvement in the
preparation of the "final report" generated by D'Souza regarding her alleged care and treatment of
Ms. Taylor, and therefore, had no idea how the reported findings that the patient was "85% better"
and/or how D'Souza determined the that patient's condition was "permanent and chronic", when
none of this information was contained anywhere in Rawoof's medical chart for that patient.
Rawoof could also not explain how and/or why in a certain paragraph Ms. Taylor was mistakenly
referred to as "***Mrs. Battie***", as again, Rawoof testified that she had nothing to do with the
generation of the report and never reviewed the report for accuracy.

141.    Defendants have actual knowledge that all of the false, misleading, and deceptive
form medical reports that are submitted to Plaintiffs through the U.S. Mail will also be utilized by
personal injury attorneys and/or will be otherwise relied upon in support of the patient's claims
for injuries made to insurance companies, such as the Plaintiffs.

142.    In a deliberate and calculated attempt to collect on their false and/otherwise
fraudulent billing statements, defendants intend for Plaintiffs to rely on the above-mentioned
material misrepresentations contained in the false, misleading and deceptive documents submitted
by defendants, and for Plaintiffs to accordingly pay large sums of money in settlement of personal
injury and/or insurance claims based in whole or part upon defendants' submitted documentation.

## VI.    CAUSES OF ACTION

### A.    COUNT I.

### MAIL FRAUD RACKETEERING ACTIVITY, 18 U.S.C. section 1961 et seq. (RICO)

143.    Plaintiffs incorporate, as though fully set forth herein, each and every allegation

contained in the preceding paragraphs 1 through 142, as if fully set forth herein.

144.    The acts and conduct of the defendants as fully alleged above were in violation

of Federal law, namely, *18 U.S.C. section 1962*, which provides in pertinent part as follows:

> *(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce; (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce; (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity or collection of unlawful debt.*

145.    Defendants were and are engaged in the affairs of an ongoing enterprise, as defined in

18 U.S.C. section 1961, by operating various chiropractic clinics in the Chicagoland area for the

purpose of illicitly and illegally enriching themselves at the expense of the Plaintiffs, by systematically

and deliberately submitting through the U.S. Mail, false, misleading and deceptive medical reports,

records, billing statements, and physicians liens, for services allegedly rendered to patients pursuing

personal injury insurance claims against Plaintiffs.

146.    Defendants' enterprise engages in and its activities affect and involve interstate commerce, as defendants' pattern of racketeering activity has consistently and repeatedly relied upon the regular use of the U.S. Mail to accomplish and achieve its purpose of defrauding the Plaintiffs in to paying out substantial sums of money based upon the above-mentioned racketeering activities of the defendants.

147.    Defendants have made false, misleading, deceptive, and fraudulent representations of fact by submitting to the Plaintiffs through the U.S. Mail, various documents containing the following material misrepresentations, including, but not limited to:

a.      false and misleading statements in regard to the rendition, reasonableness and necessity of chiropractic examinations, treatments and diagnostic testing.

b.      false and misleading statements in regard to the necessity, duration, and nature of chiropractic examinations, treatments, and diagnostic testing which are billed by defendants at specific CPT code levels.

c.      false and misleading statements in regard to the alleged existence of severe, permanent and/or chronic injuries allegedly sustained in the accidents at issue;

e.      false and misleading statements in regard to the qualifications and identity of the individuals actually performing the examinations, treatments and diagnostic studies allegedly rendered at defendants' clinics;

f.      false and misleading statements in regard to the reasonableness, necessity and medical value of DMX studies allegedly rendered on defendants' patients;

g.      false and misleading statements in regard to the reasonableness, necessity and medical value of computerized range of motion and strength studies allegedly rendered on defendants' patients;

h. false and misleading statements in regard to the reasonableness and necessity of re-taking x-rays to parts of the body previously x-rayed at medical facilities immediately before coming to defendants' facilities, and/or otherwise unnecessarily taking of x-rays on patients;

i. false and misleading statements that future medical care, diagnostic testing, or future medical care will be required to treat the alleged severe, permanent and chronic injuries allegedly sustained in the accidents at issue;

j. false and misleading statements submitted to substantiate that defendants bills for various examinations, treatments, and diagnostic tests were reasonable and customary and/or medically necessary to treat injuries proximately caused by the accident at issue.

148. As a direct and proximate result of, and in reasonable reliance upon defendants' false and misleading misrepresentations, at least since January 1, 2000, and continuing through the date of this complaint, Plaintiffs were caused to and did issue substantial payments in settlement and/or other resolution of the above mentioned claims that they would not have otherwise done if the defendants' insurance scheme had not been fraudulently concealed to them.

149. As described above, defendants engaged in a near universal pattern of self-referring various accident patients for various unnecessary, unwarranted, and costly, diagnostic testing, and treatments, regardless of the patients' symptoms or apparent injuries. The referrals for diagnostic testing such as x-rays, DMX, and computerized range of motion studies, were made among the various satellite clinics to be performed by D'Souza at the defendants' Bridgeport clinic.

150. Bogus "form" medical narrative reports often containing false, misleading,

deceptive, and unsupported findings of severe, permanent and chronic injuries, and need for future medical/chiropractic care, and opining that all of the diagnosed injuries listed, were proximately caused by the accidents at issue in the particular claim were regularly submitted to the Plaintiffs by the defendants through the U.S. Mail.

151.    The treatments, diagnostic testing, and other alleged services rendered were not based on reasonable medical necessity in caring for the patient, but were rendered and/or allegedly rendered as part of an elaborate insurance scheme designed to maximize defendants' profits, by providing false and bogus medical records and billing statements geared towards increasing the potential settlement value and/or potential verdict on the patient's claim, which in turn would allow the defendants to collect on their fraudulent medical bills through the physicians liens that they served upon the Plaintiffs through the U.S. Mail.

152.    The misrepresentations made by defendants to Plaintiffs were material in that Plaintiffs relied on such representations to determine the settlement value of claims made against them and their insureds.

153.    The misrepresentations made by the defendants were also material in that defendants knew that the such representations would be utilized by plaintiff personal injury attorneys, and considered by judges and/or juries in determining the compensable damages to be awarded to the patient in a third party action filed against Plaintiffs' insureds.

154.    When defendants made such false and fraudulent misrepresentations they were aware of the falsity of such misrepresentations.

155.    Defendants made the misrepresentations with the deliberate intent to deceive Plaintiffs into paying large sums of money in settlement of the fraudulent claims at issue.

156.    Defendants also intentionally concealed and failed to disclose material facts within their knowledge, knowing that Plaintiffs were ignorant of those facts; specifically, that chiropractic, and other medical bills and related records reflected services that were not reasonable or necessary, and/or were not rendered at all, and/or rendered to the extent misrepresented in defendants' medical records and billing statements.

157.    D'Souza has repeatedly made false and misleading statements in depositions in Illinois state court cases in a deliberate attempt to fraudulently conceal the defendants activities from being discovered by the Plaintiffs.

158.    The object of the fraud was to enrich the defendants at the expense of Plaintiffs and other insurers. D'Souza played a specific role in the overall fraudulent insurance scheme, and upon information and belief, D'Souza personally received all monies and profits from the alleged scheme, individually, and through the fraudulent operations of St. Anthony's.

159.    As a direct and proximate result of the defendants' pattern of racketeeing activity consisting of repeated violations of Federal mail fraud, Plaintiffs were injured in its business and property in that since at least January of 2000, and continuing through the date of this complaint, it has paid out in excess of *$1,800,000* (One Million, Eight Hundred Thousand Dollars) in connection with insurance claims submitted through defendants' fraudulent enterprise, and Plaintiffs have further incurred other substantial consequential damages such as investigative and litigation expenses, in responding to and otherwise defending such fraudulent claims.

160.    Because of the elaborate nature of the defendants' fraudulent enterprise, plaintiffs were precluded from discovering the defendants' fraudulent activities and the

resultant injuries to the Plaintiffs. Therefore, the matters raised in this complaint are timely based upon when the Plaintiffs actually discovered defendants' fraudulent activities and the resultant injuries to the Plaintiffs.

Wherefore, Plaintiffs respectfully pray that: (1) the court enter judgment in favor of the Plaintiffs and against the defendants on Count 1 of Plaintiffs' complaint; (2) Plaintiffs be awarded actual and consequential damages to be established at trial; (3) Plaintiffs be awarded treble damages pursuant to 18 U.S.C. section 1964, plus costs of this lawsuit, as well as reasonable attorneys fees; (4) Plaintiffs be granted such other relief that this Honorable Court deems appropriate under the circumstances.

## B.    COUNT II.

### STATE INSURANCE FRAUD (ILLINOIS) 720 ILCS 5/46-5

161.    Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the preceding paragraphs 1 through 160, as if fully set forth herein.

162.    The acts and conduct of the defendants as fully alleged above were in violation of Illinois law, namely, *720 ILCS 5/46-5*, which provides in pertinent part as follows:

> *A person who knowingly obtains, attempts to obtain, or causes to be obtained by deception, control over the property of any insurance company by the making of a false claim or by causing a false claim to be made on a policy of insurance issued by an insurance company, intending to deprive an insurance company permanently of the use and benefit of that property, shall be civilly liable to the insurance company that paid the claim or against whom the claim was made, in an amount equal to either three (3) times the value of the property wrongfully obtained, or if no property was wrongfully obtained, twice the value of the property attempted to be obtained, which ever amount is greater, plus reasonable attorney fees.*

163.    As a direct and proximate result of defendants' conduct in violation of Illinois law, namely, *720 ILCS 5/46-5*, the Plaintiffs have been fraudulently caused to incur damages by

having to permanently pay significant sums of money to settle and/or otherwise resolve

fraudulent insurance claims based in whole or part upon defendants' illicit and illegal insurance

fraud scheme, through which defendants have fraudulently obtained signifcant sums of money

from Plaintiffs as a result of proceeds paid in the resolution of such fraudulent insurance claims.

164.    As a direct and proximate result of the defendants' violation of Illinois law,

namely, *720 ILCS 5/46-5*, Plaintiffs were injured in its business and property in that since at

least January of 2000, and continuing through the date of this complaint, it has paid out in

excess of *$1,800,000* (One Million, Eight Hundred Thousand Dollars) in connection with

insurance claims submitted through defendants fraudulent enterprise, and Plaintiffs have

further incurred other substantial consequential damages such as investigative and

litigation expenses, in responding to such fraudulent claims, in an amount to be determined

at trial.

165.    Because of the elaborate nature of the defendants' fraudulent enterprise,

plaintiffs were precluded from discovering the defendants' fraudulent activities and the

resultant injuries to the Plaintiffs.  Therefore, the matters raised in this complaint are

timely based upon when the Plaintiffs actually discovered defendants' fraudulent activities

and the resultant injuries to the Plaintiffs.

Wherefore, Plaintiffs respectfully pray that: (1) the court enter judgment in favor of

the Plaintiffs and against the defendants on Count II of Plaintiffs' complaint; (2) Plaintiffs

be awarded actual and consequential damages to be established at trial; (3) Plaintiffs be

awarded treble damages pursuant to *720 ILCS 5/46-5*, for any and all amounts wrongfully

obtained by defendants, plus costs of this lawsuit, as well as reasonable attorneys fees; (4)

Plaintiffs be awarded twice the value of property attempted to be obtained by defendants,

plus costs of this lawsuit and reasonable attorney fees; (5) Plaintiffs be granted such other relief that this Honorable Court deems appropriate under the circumstances.

## C.    COUNT III.    *[VOLUNTARILY DISMISSED ON JANUARY 31, 2007]*

### INSURANCE CLAIMS FRAUD PREVENTION ACT (ILLINOIS) 740 ILCS 92/5

166.    Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the preceding paragraphs 1 through 165, as if fully set forth herein.

167.    The acts and conduct of the defendants as fully alleged above were in violation of Illinois law, namely, *740 ILCS 92/5*, which provides in pertinent part as follows:

> *it is unlawful to knowingly offer or pay any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer.*

168.    Through the conduct of the defendants, as fully set forth above, defendants have submitted to Plaintiffs, false, and misleading medical bills for services allegedly rendered, and/or were not medically necessary and/or warranted to treat the injuries allegedly sustained by their patients.

169.    Defendants also engaged in a practice to solicit potential patients, and personal injury attorneys by falsely advertising and misrepresenting in various literature, and on various web sites that they can use certain diagnostic tests, namely DMX, to "*find*" alleged severe and permanent injuries that "*could never be seen before*", and use DMX to "*provide demonstrable evidence of permanent soft tissue damage resulting from automobile accidents*".

170.    Defendants' websites further misrepresent to potential patients that by utilizing DMX they can "***settle***" their cases for a much higher amount, even "*policy limits*" in certain situations, because the DMX will be used to "*show proof to the doctor, **insurance company**, and attorney that your are not crazy like many accuse. This is objective information which cannot be disputed*".

171. Defendants' website further attempts to solicit and/or target plaintiff personal injury attorneys, under a section entitled "DMX and the Attorney" in which defendants further misrepresent that through the use of DMX the defendants can *increase potential settlement* values, by expressly stating: "*why settle for less!*"; "*stop letting 80% of your practice potential go out the door*"; "*since we have been in practice many attorneys have come up to me and have told me that before utilizing DMX for their clients, typically they would have settled for a much lesser amount, as soft tissue injury(sp) were hard to show proof*".

172. Through defendants various solicitations set forth above, defendants have knowingly offered to directly and/or indirectly assist potential claimants in attempting to obtain benefits under policies of insurance, in which defendants offer to assist the potential claimant, and/or their attorney, by misrepresenting that defendants can increase the potential value of their potential "settlements" by purporting to indicate that defendants can provide "*proof*" of injuries that "could never be seen before".

173. At the time that defendants made the above-mentioned solicitations, offers, and misrepresentations on their web sites, defendants knew that the DMX studies had no legitimate diagnostic value, that such tests were not reasonable and/or medically necessary to diagnose and/or treat soft tissue injuries that were allegedly sustained in the accidents at issue, and that the DMX studies could not be utilized to "*find injuries that could never be seen before*", and that DMX could not objectively show proof of "*permanent soft tissue injuries*".

174. In addition to purporting to represent to potential patients, and their attorneys that defendants would be able to increase the potential settlement values of their claims, the defendants, inappropriately paid "kick backs" and/or "referral fees" to independent contractor chiropractors working at their Satellite clinics, such as *Julie Knell, D.C.*, for the referral of patients to the defendants

60

for the taking of unnecessary, and unwarranted DMX studies by D'Souza at the main Bridgeport clinic. (*Evans vs. Romano, 03M1303894 (Allstate claim#2704919527)* addressed above).

175.    As a direct and proximate result of the defendants' violation of Illinois law, namely, *740 ILCS 92/5*, Plaintiffs were injured in its business and property in that since at least January of 2000 and continuing through the date of this complaint, it has paid out in excess of *$1,800,000* (One Million, Eight Hundred Thousand Dollars) in connection with insurance claims submitted through defendants fraudulent enterprise, and Plaintiffs have further incurred other substantial consequential damages such as investigative and litigation expenses, in responding to and otherwise defending such fraudulent claims, in an amount to be determined at trial.

176.    Because of the elaborate nature of the defendants' fraudulent enterprise, plaintiffs were precluded from discovering the defendants' fraudulent activities and the resultant injuries to the Plaintiffs. Therefore, the matters raised in this complaint are timely based upon when the Plaintiffs actually discovered defendants' fraudulent activities and the resultant injuries to the Plaintiffs.

Wherefore, Plaintiffs respectfully pray that: (1) the court enter judgment in favor of the Plaintiffs and against the defendants on Count III of Plaintiffs' complaint; (2) Plaintiffs be awarded actual and consequential damages to be established at trial; (3) Plaintiffs be awarded treble damages pursuant to *740 ILCS 92/5*, for any and all amounts wrongfully sought by defendants under Plaintiffs' contracts of insurance, plus costs of this lawsuit, as well as reasonable attorneys fees; (4) Plaintiffs be granted such other relief that this Honorable Court deems appropriate under the circumstances, including, but not limited to the granting of other equitable relief, including temporary injunctive relief, as this court deems

necessary to prevent the transfer, concealment, or dissipation of illegal proceeds, or to protect the public.

**D.    COUNT IV.**

### COMMON LAW FRAUD & MISREPRESENTATION

177.    Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the preceding paragraphs 1 through 176, as if fully set forth herein.

178.    The defendants' scheme to defraud the Plaintiffs was based upon material misrepresentations of fact made in submissions of various false, misleading, and deceptive medical reports, records, billing statements, and physicians liens, and other medical related documents sent to the Plaintiffs by the defendants, intentionally, and in furtherance of their scheme to defraud Plaintiffs into making payments on claims for insurance benefits.

179.    The defendants made representations which were false, and/or required disclosure of additional facts to render the submitted information not misleading to Plaintiffs. The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Plaintiffs by submitting false and misleading claims for medical services based upon bodily injury claims pursued by their patients, for which defendants asserted rights to attach to settlement proceeds through physicians liens submitted to the Plaintiffs through the U.S. Mail.

180.    The material misrepresentations were known to be false by the defendants and were made for the purpose of inducing Plaintiffs to make substantial payments on various fraudulent insurance claims.

181.    Plaintiffs reasonably relied upon such material misrepresentations to its detriment in paying numerous, unreasonable, unnecessary, inappropriate, bills for medical expenses generated by the defendants on behalf of their patients, and submitted to the Plaintiffs for payment, and Plaintiffs

were also caused to pay inflated settlements and verdicts which were based in whole or part on defendants' material misrepresentations.

182.    As a direct and proximate result of defendants' fraudulent conduct, Plaintiffs were injured in its business and property in that since at least January of 2000 and continuing through the date of this complaint, it has paid out in excess of *$1,800,000* (One Million, Eight Hundred Thousand Dollars) since at least January of 2000 and continuing through the date of this complaint, in connection with fraudulent insurance and/or personal injury claims submitted by patients of defendants' clinics, which have been based in whole or part on defendants' fraudulent conduct, and Plaintiffs have incurred other consequential damages such as investigative and litigation expenses, in an amount to be determined at trial.

183.    Because of the elaborate nature of the defendants' fraudulent enterprise, plaintiffs were precluded from discovering the defendants' fraudulent activities and the resultant injuries to the Plaintiffs. Therefore, the matters raised in this complaint are timely based upon when the Plaintiffs actually discovered defendants' fraudulent activities and the resultant injuries to the Plaintiffs.

Wherefore, Plaintiffs respectfully pray that: (1) the court enter judgment in favor of the Plaintiffs and against the defendants on Count IV of Plaintiffs' complaint; (2) Plaintiffs be awarded actual and consequential damages to be established at trial; (3) Plaintiffs be awarded Punitive damages; (4) Plaintiffs be granted such other relief that this Honorable Court deems appropriate under the circumstances.

**E.    COUNT V.**

**UNJUST ENRICHMENT**

184.    Plaintiffs reallege and incorporate, as though fully set forth herein, each and every

allegation contained in the preceding paragraphs 1 through 183, as if fully set forth herein.

185.    As described above, defendants have made false and fraudulent representations of fact to Plaintiffs in regard to the existence, nature, and severity of purported soft tissue injuries allegedly attributable to accidents at issue to defraud Plaintiffs, in violation of both Federal and State Statutes pertaining to their fraudulent insurance scheme.

186.    Defendants have obtained a benefit from Plaintiffs, namely the payment for chiropractic, diagnostic, and other alleged medical expenses that were non-existent, unreasonable and unnecessary, and designed to enrich defendants at Plaintiffs' detriment. Not only was the benefit gained by fraud, but it was gained through the willful violations of both Illinois and Federal laws. As a direct and proximate result of defendants' conduct, Plaintiffs have paid sums, and defendants have been benefited from those payments, in connection with their insurance fraud activities.

187.    By receiving payments in connection with said fraudulent insurance scheme the defendants have clearly unjustly received a benefit to the Plaintiffs' detriment, and that the defendants' retention of such benefit violates the fundamental principals of justice, equity and good conscience.

188.    As a direct and proximate result of defendants' fraudulent conduct, Plaintiffs were injured in its business and property in that since at least January of 2000 and continuing through the date of this complaint, it has paid out in excess of *$1,800,000* (One Million, Eight Hundred Thousand Dollars) since at least January of 2000 and continuing through the date of this complaint, in connection with fraudulent insurance and/or personal injury claims submitted by patients of defendants' clinics, which have been based in whole or part on defendants' fraudulent conduct, and Plaintiffs have incurred other consequential damages such as investigative and litigation

64

expenses, in an amount to be determined at trial.

189.     Because of the elaborate nature of the defendants' fraudulent enterprise, plaintiffs were precluded from discovering the defendants' fraudulent activities and the resultant injuries to the Plaintiffs. Therefore, the matters raised in this complaint are timely based upon when the Plaintiffs actually discovered defendants' fraudulent activities and the resultant injuries to the Plaintiffs.

Wherefore, Plaintiffs respectfully pray that: (1) the court enter judgment in favor of the Plaintiffs and against the defendants on Count V of Plaintiffs' complaint; (2) Plaintiffs be awarded actual and consequential damages to be established at trial; (3) Plaintiffs be awarded Punitive damages; (4) Plaintiffs be granted such other relief that this Honorable Court deems appropriate under the circumstances.

F.     COUNT VI.

NEGLIGENT SPOLIATION OF EVIDENCE REGARDING "LOST" X-RAY AND DMX STUDIES

190.     Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the preceding paragraphs 1 through 189, as if fully set forth herein.

191.     In response to numerous subpoenas issued in Illinois state court cases upon defendants to produce reproductions of x-rays and DMX studies allegedly taken on various patients, defendants have responded to subpoenas contending that the requested studies were ***permanently destroyed*** in two separate computer hard drive crashes that allegedly occurred at the Bridgeport clinic where the studies were allegedly stored.

192.     In addition, D'Souza has provided sworn deposition testimony in the Illinois state court case of *Soto vs. Ramos, 05M1304199 (Allstate claim #2705668909)* admitting that defendants

are not able to produce any of defendants' digital x-rays and DMX studies that were allegedly taken of defendants' patients on or before *November of 2005,* as such studies were *permanently destroyed* in two separate hard drive crashes in which defendants had no viable back up system in place.

193.    Defendants, as treating physicians of patients pursuing first party and third party insurance claims for alleged injuries, knew, or in the exercise of reasonable and ordinary care, should have known, that the actual x-ray and DMX studies allegedly conducted on their patients, were material to any potential civil actions and/or insurance claim, for alleged personal injuries sustained by their patients.

194.    After the x-rays and DMX studies were allegedly conducted by the defendants, the defendants allegedly maintained possession of the studies on a computer system located at the Bridgeport facility.

195.    Defendants, as the treating physicians at issue in each of the particular insurance claims submitted to the Plaintiffs, had a duty to exercise ordinary and reasonable care to ensure that any and all of the x-rays and DMX studies allegedly taken to diagnose and/or care for their patients, were reasonably stored and maintained in a manner that would allow for such studies to be capable of being subsequently retrieved for future reproduction, review, and/or inspection.

196.    Defendants breached their aforementioned duty to reasonably and properly maintain and store their x-rays and DMX studies, and were careless and negligent in one or more of the following acts and/or omissions:

> (a)    failed to have any back up system in place in the event of a computer hard drive crash;
>
> (b)    failed to have any guidelines and/or office policy and/or procedure in place regarding the storage and/or maintenance of the x-rays and DMX allegedly taken and kept at the

defendants' Bridgeport clinic;

(c)     failed to have a reliable system in place for the retrieval of data from any x-ray and DMX studies maintained on defendants' computer system at the Bridgeport facility;

(d)     failed to properly ensure that any personnel involved in the maintenance and/or storage of defendants' x-ray and DMX studies at the Bridgeport clinic had the proper qualifications and/or working knowledge of the procedures necessary to ensure said studies were properly stored and maintained;

(e)     failed to utilize proper and sufficient computer equipment necessary for the storing of the x-ray and DMX studies; and

(f)     failed to take any of the above-mentioned actions even after the defendants' allegedly sustained their first alleged computer hard drive crash.

197.    As a direct and proximate result of one or more of the defendants' negligent acts and/or omissions, the defendants allegedly lost the ability to retrieve and produce for inspection, any and all digital x-ray and DMX studies that were allegedly taken and stored on their computer systems at the Bridgeport facility for any such study allegedly conducted by defendants prior to *November of 2005.*

198.    As a direct and proximate result of defendants' negligent spoliation of the above mentioned evidence, the Plaintiffs have been extremely prejudiced and damaged in their abilities to investigate and/or otherwise defend personal injury claims submitted by patients of the defendants' clinics, in that Plaintiffs are simply precluded from having any such studies independently reviewed by any retained expert to analyze the content of the studies and to render legitimate medical opinions that could potentially be used in the defense of personal injury and insurance claims submitted by defendants' patients.

199.    Even though defendants continue to maintain that they cannot produce the actual x-ray and DMX studies for review, defendants continue to produce typed written reports that

were allegedly prepared by chiropractic radiologists regarding their review of the alleged studies, and such reports are now completely incapable of being confirmed, contradicted and/or otherwise refuted by any expert retained in defense of such personal injury or insurance claims.

200.    Plaintiffs are further prejudiced and damaged by defendants' negligent spoliation of evidence in that defendants still continue to issue billing statements and physicians liens to the Plaintiffs for the fees sought by the defendants' for the alleged of x-ray and DMX studies that can longer be reviewed and/or substantiated. In such instances the Plaintiffs have simply been deprived of the ability to compare the veracity of any written reports with the actual x-ray and DMX studies allegedly performed by defendants.

201.    As a direct and proximate result of the defendants' conduct set forth above, Plaintiffs were injured in its business and property in that since January of 2000 and continuing through the date of this complaint, it has paid out in excess of *$1,800,000* (One Million, Eight Hundred Thousand Dollars) in connection with insurance claims based in whole or part on x-ray and DMX studies that are now allegedly permanently destroyed due to defendants' negligent spoliation of evidence.

202.    Because of the elaborate nature of the defendants' fraudulent enterprise, plaintiffs were precluded from discovering the defendants' fraudulent activities and the resultant injuries to the Plaintiffs. Therefore, the matters raised in this complaint are timely based upon when the Plaintiffs actually discovered defendants' fraudulent activities and the resultant injuries to the Plaintiffs.

Wherefore, Plaintiffs respectfully pray that: (1) the court enter judgment in favor of the Plaintiffs and against the defendants on Count VI of Plaintiffs' complaint; (2) Plaintiffs be awarded actual and consequential damages to be established at trial; (3)

Plaintiffs be awarded Punitive damages; (4) Plaintiffs be granted such other relief that this Honorable Court deems appropriate under the circumstances.

**G.   COUNT VII.**

**NEGLIGENT SPOLIATION OF EVIDENCE REGARDING DESTRUCTION OF "ORIGINAL" X-RAY AND DMX REPORTS**

203.   Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the preceding paragraphs 1 through 202, as if fully set forth herein.

204.   Defendants engage in a practice of allegedly sending out their x-ray and DMX studies to out of state independent contractors to review and report their findings.

205.   After the out of state chiropractic radiologists allegedly review the x-ray and DMX studies they allegedly prepare and generate "original" reports which are sent to D'Souza at the defendants' Bridgeport clinic.

206.   The "original" report that is prepared by the chiropractic radiologist hired by the defendants is <u>not</u> generated on the defendants' clinics letterhead/stationary.

207.   Upon receipt of the "original" report from the chiropractic radiologist, D'Souza allegedly changes/alters the "original" report by thereafter "cutting and pasting" it onto defendants' letterhead/stationary containing the Bridgeport clinic address of 804 W. 31st Street, Chicago, Illinois.

208.   In addition to simply cutting/pasting the "original" report on to defendants' letterhead/stationary, D'Souza also adds additional language to the "original" report, that he allegedly personally "agrees" with the reported findings of the radiologist. D'Souza also affixes his electronic signature and the electronic signature of the alleged out of state chiropractic radiologist to the changed/altered report.

209.    The "original" report that was initially generated and submitted by the chiropractic radiologist is <u>never</u> kept in the defendants' patient's medical chart, and likewise, that "original" x-ray and DMX report is <u>never</u> submitted to the Plaintiffs for inspection/review in any of the insurance claims at issue in this case.  D'Souza has testified in Illinois state court cases, including, but not limited to, *Moss vs. Oparka, 04M1302263 (Allstate claim #2705593891)*, that the "original/unaltered" report generated by the chiropractic radiologist is <u>never</u> kept by the defendants.

210.    Defendants, as treating physicians of patients pursuing first party and third party insurance claims for alleged personal injuries, knew, or in the exercise of reasonable and ordinary care, should have known, that the "original" x-ray and DMX reports were material to potential civil actions for alleged personal injuries and insurance claims pursued by their patients.

211.    Defendants, as the treating physicians at issue in each of the particular insurance claims submitted to the Plaintiffs, had a duty to exercise ordinary and reasonable care to ensure that the "original" x-ray and DMX reports initially prepared and generated by the out of state chiropractic radiologists were reasonably preserved and maintained in a manner that allowed for such reports to be capable of being later produced for future reproduction, review, and/or inspection.

212.    Defendants breached their aforementioned duty to reasonably and properly preserve, maintain, and store the "original" x-rays and DMX reports, and defendants were careless and negligent in one or more of the following acts and/or omissions:

        (a)    failed to simply keep and maintain the "original" unaltered x-ray and DMX reports that were provided to them by the various radiologists in the particular patient's file;

        (b)    failed to have any guidelines and/or office policy and/or procedure in place regarding the storage and/or maintenance of the "original" x-rays and DMX reports at the Bridgeport clinic;

(c)    failed to properly ensure that any personnel involved in the maintenance and/or storage of the "original" x-ray and DMX reports at the Bridgeport clinic had the proper qualifications and/or working knowledge of the procedures necessary to ensure said "original" reports were properly stored and maintained and;

(d)    were otherwise careless and negligent in failing to preserve and maintain "original" patient medical records in their possession.

213.    As a direct and proximate result of the defendants' negligent acts and/or omissions, the defendants allegedly destroyed and/or otherwise discarded the "original" unaltered x-ray and DMX reports that were allegedly initially provided to them from the independent contractor chiropractic radiologists.

214.    As a direct and proximate result of defendants' negligent spoliation of the above mentioned evidence, the Plaintiffs have been extremely prejudiced and damaged in their abilities to investigate and/or otherwise defend personal injury and insurance claims submitted by patients of the defendants' clinics, in that Plaintiffs are simply precluded from having the ability to review the "original" unaltered radiological reports that were initially generated by the defendants' purported independent chiropractic radiologists, and therefore, Plaintiffs have been precluded from having such "original" reports independently reviewed by any retained expert to analyze the content of the "original" reports, and to render any necessary medical opinions that could have potentially been used in the defense of personal injury and insurance claims submitted by defendants' patients.

215.    As defendants continue to maintain that they do not keep and/or otherwise maintain the "original" unaltered x-ray and DMX reports, Plaintiffs are virtually precluded from being able to verify whether any of the "original" reported findings have been changed and/or altered by the defendants. Plaintiffs are further prejudiced and damaged by defendants' negligent spoliation of evidence in that defendants still continue to issue and generate changed/altered x-ray and DMX reports to the Plaintiffs, and said changed/altered reports are still being submitted by defendants to

substantiate the patient's alleged diagnoses and the medical necessity to continue with alleged courses of chiropractic treatments for patients, and said changed/altered x-ray and DMX reports are submitted by the defendants to the Plaintiffs to substantiate and/or support the billing statements and physicians liens generated regarding the alleged x-ray and DMX studies conducted on defendants' patients.

216.    As a direct and proximate result of the defendants' conduct set forth above, Plaintiffs were injured in its business and property in that it has paid out in excess of *$1,800,000* (One Million, Eight Hundred Thousand Dollars) since at least 2000 and continuing through the date of this complaint, in connection with insurance claims based in whole or part on x-ray and DMX reports, of which the "original/unaltered" reports are now allegedly permanently destroyed due to defendants' negligent spoliation of evidence.

217.    Because of the elaborate nature of the defendants' fraudulent enterprise, plaintiffs were precluded from discovering the defendants' fraudulent activities and the resultant injuries to the Plaintiffs. Therefore, the matters raised in this complaint are timely based upon when the Plaintiffs actually discovered defendants' fraudulent activities and the resultant injuries to the Plaintiffs.

Wherefore, Plaintiffs respectfully pray that: (1) the court enter judgment in favor of the Plaintiffs and against the defendants on Count VII of Plaintiffs' complaint; (2) Plaintiffs be awarded actual and consequential damages to be established at trial; (3) Plaintiffs be awarded Punitive damages; (4) Plaintiffs be granted such other relief that this Honorable Court deems appropriate under the circumstances.

## G.    COUNT VIII

### UNIFORM FRAUDULENT TRANSFER ACT (ILLINOIS) 740 ILCS 160/1 et. seq.

72

218.    Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the preceding paragraphs 1 through 217, as if fully set forth herein.

**JURISDICTION AND VENUE**

219.    Supplemental jurisdiction over this Illinois state law claim is properly before this Court in accordance with 28 U.S.C. section 1367.

220.    Upon information and belief, the wrongful acts and omissions alleged in Count VIII were carried our by the defendants with this District, in the City of Chicago, State of Illinois; and therefore, venue is properly before this Honorable Court pursuant to 28 U.S.C. section 1391(c).

**PARTIES TO FRAUDULENT TRANSFERS**

221.    At all times relevant, Defendant MELVIN D'SOUZA is a citizen and resident of the State of Illinois, and currently practices as a Chiropractic Physician at his principal place of business, 804 W. 31st Street, Chicago, Illinois.

222.    At all times relevant, Defendant FIDENCIO CHAIDEZ is a citizen and resident of the State of Illinois.  Based upon representations made by Defendant MELVIN D'SOUZA's counsel in this matter, Defendant FIDENCIO CHAIDEZ is the brother-in-law of Defendant MELVIN D'SOUZA.

223.    At all times relevant, Defendant JOHN D'SOUZA is a citizen and resident of the State of Illinois.  Upon information and belief, Defendant JOHN D'SOUZA is a relative of Defendant MELVIN D'SOUZA.

224.    At all times relevant, Defendant BERNADINE D'SOUZA is a citizen and resident of the State of Illinois.  Upon information and belief, Defendant BERNADINE D'SOUZA is a relative of Defendant MELVIN D'SOUZA.

**FACTUAL ALLEGATIONS RELATED TO DEFENDANTS' FRAUDULENT TRANSFERS**

225.     Upon information and belief, at the time of filing this lawsuit, Defendant MELVIN D'SOUZA owned valuable assets in the form of property deeds for the following properties in and around the Chicagoland area:

        a.   3055 South Poplar Avenue, Chicago, IL 60608

        b.   804 West 31st Street, Chicago, IL 60608

        c.   8400 West Roseview Drive, Niles, IL 60714

        d.   1255-57 West 127th Street, Calument Park, IL 60827

226.     On March 31, 2008, Defendant MELVIN D'SOUZA and Defendant FIDENCIO CHAIDEZ executed a warranty deed transferring ownership of the property located at 3055 South Poplar Avenue, Chicago, IL 60608 to Defendant CHAIDEZ for the reasonable equivalent value of the property.

227.     On October 22, 2008, Defendant MELVIN D'SOUZA and Defendant FIDENCIO CHAIDEZ executed a warranty deed transferring ownership of the property located at 804 West 31st Street, Chicago, IL 60608 to Defendant CHAIDEZ for the reasonable equivalent value of the property.

228.     On September 17, 2008, Defendant MELVIN D'SOUZA and Defendants JOHN and BERNADINE D'SOUZA executed a quit claim deed transferring ownership of the property located at 8400 West Roseview Drive, Niles, IL 60714 to Defendants JOHN and BERNADINE D'SOUZA for little or no consideration.

229.     On January 7, 2010, Defendant MELVIN D'SOUZA and Defendant FIDENCIO CHAIDEZ executed a quit claim deed transferring ownership of the property located at 1255-57 West 127th Street, Calumet Park, IL 60827 to Defendant CHAIDEZ for little or no consideration.

230.     On February 10, 2010, this Court denied the majority of the RICO defendants' Motion

of Summary Judgment stating that Plaintiffs had established a genuine issue of material fact as to all counts alleged in the preceding paragraphs 1 through 217.

231.     In response to an order by Magistrate Judge Morton Denlow, Defendant MELVIN D'SOUZA has indicated to Plaintiffs and the Court his inability to pay a substantial settlement in resolution of these allegations set forth in the preceding paragraphs 1 through 217.

232.     Upon information and belief, at all times relevant to Count VIII to this Amended Complaint, Defendant MELVIN D'SOUZA is generally not paying his debts as they become due.

## ACTS IN VIOLATION OF THE UNIFORM FRAUDULENT TRANSFER ACT

233.     At the time of filing this complaint, Plaintiffs became a "creditor" by acquiring a "claim" against Defendant MELVIN D'SOUZA as defined in the Uniform Fraudulent Transfer Act, namely, *740 ILCS 160/2(c) and (d),* which provides in pertinent part as follows:

> *(c) "Claim" means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured*

> *(d) "Creditor" means a person who has a claim, including a claim for past-due child support*

234.     At the time Defendant MELVIN D'SOUZA was served with this complaint, he became a "debtor" to the Plaintiffs as defined in the Uniform Fraudulent Transfer Act, namely, *740 ILCS 160/2(f)*, which provides in pertinent part as follows:

> *(f) "Debtor" means a person who is liable on a claim*

235.     The acts and conduct of Defendants MELVIN D'SOUZA and FIDENCIO CHAIDEZ with regard to the properties at 804 West 31st Street, Chicago, IL and 3055 South Poplar Avenue, Chicago, IL were in violation of Illinois state law, namely, *740 ILCS 160/5*, which provides in pertinent part as follows:

> *A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether*

*the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation*
*(1) with actual intent to hinder, delay, or defraud any creditor of the debtor*

236.    With regard the aforementioned properties, Defendant MELVIN D'SOUZA acted

with actual intent to hinder, delay or defraud the Plaintiffs' claim in violation of Illinois state law,

namely, 740 ILCS 160/5(b)(1-11), by transferring the properties to an insider, namely his brother-in-

law Defendant CHAIDEZ, for the reasonable equivalent value of the asset after Defendant MELVIN

D'SOUZA had been sued by the Plaintiffs. As a result of the fraudulent transactions, Defendant

D'SOUZA became or claims to have become insolvent.

237.    The acts and conduct of Defendants MELVIN D'SOUZA, FIDENCIO CHAIDEZ,

JOHN D'SOUZA and BERNADINE D'SOUZA with regard to the properties at 8400 West

Roseview Drive, Niles, IL and 1255-57 West 127th Street, Calumet Park, IL were in violation of

Illinois state law, namely, *740 ILCS 160/6(a)*, which provides in pertinent part as follows:

*A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the debtor the transfer was made or the obligation incurred if the debtor made the transfer or incurred the obligation without receiving reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or became insolvent as a result of the transfer or obligation*

238.    With regard to the property located at 8400 West Roseview, Niles, IL, Defendant

MELVIN D'SOUZA transferred ownership of the property to his relatives, Defendants JOHN and

BERNADINE D'SOUZA on September 17, 2008 for little or not consideration. As a result of the

transfer, Defendant MELVIN D'SOUZA became or claims to have become insolvent.

239.    With regard to the property located 1255-57 West 127th Street, Calumet Park, IL,

Defendant MELVIN D'SOUZA transferred ownership to his brother-in-law, Defendant CHAIDEZ

on January 7, 2010 for little or no consideration. As a result of the transfer, Defendant MELVIN

D'SOUZA became or claims to have become insolvent.

240.    As a result of the aforementioned fraudulent transfers, Defendant MELVIN D'SOUZA will not be able to satisfy any judgment entered against him regarding the allegations of insurance fraud alleged in the preceding paragraphs 1-217.

Wherefore, Plaintiffs respectfully pray that this Honorable Court enter an order in its favor and against Defendants MELVIN D'SOUZA, FIDENCIO CHAIDEZ, JOHN D'SOUZA, and BERNADINE D'SOUZA (1) avoiding the transfers of properties located at 3055 South Poplar Avenue, Chicago, IL 60608, 804 West 31st Street, Chicago, IL 60608, 8400 West Roseview Drive, Niles, IL 60714 and 1255-57 West 127th Street, Calumet Park, IL 60827 to the extent necessary to satisfy any future judgment obtained by Plaintiffs, (2) permitting an attachment or other provisional remedy, (3) granting temporary injunctive relief against Defendants MELVIN D'SOUZA, FIDENCIO CHAIDEZ, JOHN D'SOUZA and BERNADINE D'SOUZA preventing further disposition of the aforementioned properties and any other assets for which Plaintiffs may have a claim, (4) appointing a receiver to take charge of the aforementioned properties and (5) any other relief that this Honorable Court deems appropriate under the circumstances.

## JURY TRIAL DEMAND

The Plaintiffs, ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, and ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY demand a trial by jury on all issues pled in this matter.

Respectfully submitted,

/s/ David Koppelman
David Koppelman
One of the Attorneys for Plaintiffs

David Koppelman
Mark A. LaRose

77

Andrew Sperry
LaRose & Bosco, Ltd.
200 N. LaSalle Street, Suite 2810
Chicago, IL 60601
(312) 642-4414
Fax: (312) 642-0434
e-mail: dkoppelman@larosebosoclaw.com