## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **ALLSTATE INSURANCE COMPANY,** | ) | |
| **ALLSTATE INDEMNITY COMPANY, and** | ) | |
| **ALLSTATE PROPERTY & CASUALTY** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| vs. | ) | **Case No. 06 C 7010** |
| | ) | |
| **ST. ANTHONY'S SPINE & JOINT INSTITUTE,** | ) | |
| **P.C., an Illinois Corporation, and MELVIN** | ) | |
| **D'SOUZA, D.C., Individually and doing business** | ) | **Judge Amy J. St. Eve** |
| **as ST. ANTHONY'S SPINE & JOINT** | ) | |
| **INSTITUTE, P.C., BRIDGEPORT NECK AND** | ) | |
| **BACK WELLNESS CENTER, SPORTS &** | ) | |
| **SPINAL REHAB CENTERS, LORRAINE'S** | ) | |
| **SPORTS & SPINAL REHAB CENTER, SPINE** | ) | *JURY TRIAL DEMANDED* |
| **TRAUMA RESEARCH INSTITUTE OF** | ) | |
| **CHICAGO, DMX DIAGNOSTIC LABS, INC.,** | ) | |
| **FIDENCIO CHAIDEZ, JOHN D'SOUZA, and** | ) | |
| **BERNADINE D'SOUZA,** | ) | |
| | ) | |
| *Defendants.* | ) | |

## ANSWER TO PLAINTIFFS' FIRST AMENDED COMPLAINT
## FOR MONETARY DAMAGES AND EQUITABLE RELIEF

Defendants Melvin D'Souza, D.C., and St. Anthony's Spine & Joint Institute, P.C.

("Defendants"), by and through their attorney, Andrew P. Lamis, hereby answer Plaintiffs' First

Amended Complaint for Monetary Damages and Equitable Relief ("Complaint") as follows:

1.  Plaintiffs seek to recover sums fraudulently procured by Defendants as a result of an elaborate scheme to defraud insurance companies, including Plaintiffs. Defendants created and submitted through the U.S. Mail, false, and misleading medical reports, records, and billing statements for chiropractic and diagnostic services allegedly rendered at defendants' various chiropractic clinics to patients purportedly injured in automobile and premises accidents.

1

**ANSWER:**    Defendants deny the allegations in Paragraph 1.

2.    Defendants' insurance fraud scheme was designed to and did in fact result in substantial payments made by Plaintiffs upon insurance policies covering accidents at issue in the particular insurance claims set forth in this pleading. In certain instances, Plaintiffs made direct payments to defendants on first party claims submitted by its own insureds pursuing medical payments claims, and uninsured and underinsured motorist claims. In other instances Plaintiffs were caused to and did make substantial payments based upon settlements and verdicts obtained against Plaintiffs' insureds in third party personal injury claims and lawsuits, in which defendants were also able to receive payments on their fraudulent medical bills, as in virtually all of the claims at issue defendants submitted physicians liens through the U.S. mail to Plaintiffs purporting to assert their alleged right to attach towards any potential settlement and/or resolution reached in each particular case.

**ANSWER:**    Defendants deny the allegations in Paragraph 2.

3.    In virtually all claims submitted to the Plaintiffs which are the subject of this lawsuit, the defendants' bills for services allegedly rendered remained unpaid up until the time of the eventual settlement, verdict, and/or other resolution of the particular claim.

**ANSWER:**    Defendants admit that for third party claims, Defendants' bills typically remained

unpaid prior to the resolution of the claim through settlement or judgment, but Defendants deny

the remaining allegations in Paragraph 3.

4.    Defendants' fraudulent scheme to collect on said false, and misleading billing statements was accomplished by creating and submitting to Plaintiffs, through the US. Mail, bogus, false, fraudulent, and misleading "form" medical reports and records misrepresenting the nature and extent of the injuries allegedly sustained by the patient, providing inappropriate and/or inaccurate diagnoses and/or medical opinons to substantiate that the services billed were reasonable and/or necessary to treat the alleged injuries, and purporting to document that the treatments billed were in fact rendered, and/or that the services were actually performed by duly licensed medical providers.

**ANSWER:**    Defendants deny the allegations in Paragraph 4.

5.    The false and misleading documents generated and diseminated by defendants to Plaintiffs through the U.S. Mail, include, but are not limited to: form narrative medical reports, daily treatment records (commonly referred to as "SOAP notes", purporting to document Subjective complaints, Objective findings, Assessment of the physician, and plan of treatment); HCFA-1500 billing forms, itemized medical

bills, physicians liens, and various other medical records from the particular patient's chart.

**ANSWER:**     Defendants deny the allegations in Paragraph 5.

6.     Defendants fraudulently concealed that their false and misleading billing statements were based in part on either non-existent, and/or unnecessary, and/or excessive treatments, examinations, and diagnostic testing, and that many of the alleged services were performed by either unlicensed, unqualified, and unsupervised chiropractic assistants, that were merely certified massage therapists (hereinafter "C.M.T.'s").

**ANSWER:**     Defendants deny the allegations in Paragraph 6.

7.     Through defendants fraudulent misrepresentations regarding the nature and extent of the injuries allegedly sustained, and the medical necessity of the alleged treatments provided by the defendants, plaintiffs were fraudulently induced in to paying inflated settlements and/or were caused to pay inflated verdicts, by which the defendants were able to receive substantial payments on their fraudulent bills as a result of the physicians liens that they submitted to Plaintiffs through the US. Mail.

**ANSWER:**     Defendants deny the allegations in Paragraph 7.

8.     All of the acts and omissions of the defendants described throughout this complaint were undertaken intentionally with the specific intent to defraud the Plaintiffs.

**ANSWER:**     Defendants deny the allegations in Paragraph 8.

9.     Defendants have also engaged in a deliberate practice to fraudulently conceal their activities from being discovered by plaintiffs, which will also be further discussed with specificity in this pleading.

**ANSWER:**     Defendants deny the allegations in Paragraph 9.

10.     Plaintiffs seek equitable relief for a determination that they are under no obligation to pay remaining unpaid submitted invoices for the fees associated with these purported medical services, and Plaintiffs seek monetary damages incurred in investigating, defending and/or resolving insurance claims based in whole or part on the submission of such fraudulent, false and misleading invoices generated and submitted by the defendants. Plaintiffs seek relief in accordance with Federal and State law causes of action pled with specificity in this matter. Plaintiffs further contend that they are legally entitled to reimbursement from defendants for any and all payments previously made, and other consequential and punitive damages sustained in defending said fraudulent insurance claims, in accordance

with State and Federal laws.

**ANSWER:** Defendants acknowledge that Plaintiffs are attempting to assert various bases for

and legal conclusions concerning purportedly available forms of relief, but Defendants deny all

allegations of wrongdoing contained in Paragraph 10 and further deny that Plaintiffs are entitled

to any relief whatsoever.

11. Plaintiffs assert causes of action against the defendants seeking equitable relief and monetary damages for: Violations of the Federal Racketeer Influenced and Corrupt Organizations Act (hereinafter "RICO"), 18 U.S.C. sections 1962 (a) -(c); violations of Illinois Insurance Claims Fraud Prevention Act, 740 ILCS, section 92/1, and the Illinois Criminal Code of 1961, 720 ILCS section 5/46-1; Common Law Fraud and Misrepresentation, Unjust Enrichment, and Negligent Spoliation of Evidence.

**ANSWER:** Defendants acknowledge that Plaintiffs are attempting to assert several causes of

action in the Complaint, but Defendants deny that any such purported causes of action have been

sufficiently asserted, deny any and all allegations of wrongdoing contained in Paragraph 11, and

further deny that Plaintiffs are entitled to any relief whatsoever under any of the causes of action

Plaintiffs have purported to advance in their Complaint.

## JURISDICTION AND VENUE

12. Jurisdiction over this action is conferred upon this Court by 28 U.S.C. section 1331, 18 U.S.C. sections 1962 (a-c), 18 U.S.C. section 1964. Supplemental jurisdiction over Illinois state law claims is properly before this Court in accordance with 28 U.S.C. section 1367.

**ANSWER:** Defendants deny the allegations in Paragraph 12, and specifically deny Plaintiffs'

allegations as to jurisdiction under Title 18 of the United States Code.

13. A vast majority of the wrongful acts or omissions alleged herein with specificity were carried out by the defendants within this District, in the City of Chicago, State of Illinois; and therefore, venue is properly before this Honorable Court pursuant to 28 U.S.C. section 1391 (c).

**ANSWER:** Defendants admit that the majority of the alleged acts and purported omissions by

Defendants occurred in this District, but Defendants deny the remaining allegations in Paragraph 13, and specifically deny any and all allegations as to purported "wrongful acts or omissions." Defendants further state that, if were one to assume the existence of a viable RICO claim, which Defendants deny, then venue would be proper in this District under 18 U.S.C. § 1965(a) since Defendants reside and conduct their affairs in this District.

## PARTIES

14. At all times relevant, Plaintiff, **Allstate Insurance Company,** is a corporation incorporated under the laws of Illinois, with its principal place of business in Northbrook, Illinois, and is duly licensed and authorized to conduct business in the state of Illinois.

**ANSWER:** Admitted.

15. At all times relevant, Plaintiff, **Allstate Indemnity Company,** is a corporation incorporated under the laws of Illinois, with its principal place of business in Northbrook, Illinois, and is duly licensed and authorized to conduct business in the state of Illinois.

**ANSWER:** Admitted.

16. At all times relevant, Plaintiff, **Allstate Property & Casualty Insurance Company,** is a corporation incorporated under the laws of Illinois, with its principal place of business in Northbrook, Illinois, and is duly licensed and authorized to conduct business in the . state of Illinois.

**ANSWER:** Admitted.

17. At all times relevant, Defendant, **Melvin D'Souza,** (hereinafter "D'Souza") is a citizen and resident of the State of Illinois, and Melvin D'Souza currently practices as a Chiropractic Physician at his principal place of business at, 804 W. 31st Street, Chicago, Illinois.

**ANSWER:** Admitted.

18. Defendant, **St. Anthony's Spine & Joint Institute, P.C.** (hereinafter "St. Anthony's") is a corporation, organized under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois and may be served through its Registered agent in the State of Illinois.

**ANSWER:** Admitted.

5

19.    Articles of Incorporation of St. Anthony's were filed with the Illinois Secretary of State on January 18, 2005.  Defendant, D'Souza, is the sole shareholder (owner) and officer of St. Anthony's.

**ANSWER:**    Defendants admit that articles of incorporation for St. Anthony's were filed on or about January 18, 2005, and Defendants further admit that Defendant D'Souza is the sole shareholder and officer of St. Anthony's Spine & Joint Institute, P.C. (hereafter, "St. Anthony's"), but Defendants expressly deny any remaining allegation of Paragraph 19 that purports to be conveyed through the use of the word "owner."

20.    D'Souza has represented, and the Office of the Secretary of State of Illinois has indicated, that St. Anthony's also conducts business under the following assumed names: Sports & Spinal Rehab Centers, and Lorraine's Sports & Spinal Rehab Centers.

**ANSWER:**    Admitted.  Defendants further respond to Paragraph 20 by stating that the name "Lorraine's Sports & Spinal Rehab Centers" is not in current use  by St. Anthony's.

21.    D'Souza and/or St. Anthony's have also conducted business under the following names: Bridgeport Neck & Back Wellness Center, and Spine Trauma Research Institute of Chicago, and DMX Diagnostic Labs, Inc.

**ANSWER:**    Admitted.

22.    Prior to January 18, 2005, D'Souza, as a sole proprietor, initially owned and operated various chiropractic clinics in the Chicagoland area, in the State of Illinois. (hereinafter referred to as "defendants' clinics").  Prior to January 18, 2005, D'Souza conducted business under various assumed business names, including but not limited to: Bridgeport Neck & Back Wellness Center, Sports and Spinal Rehab Centers, and Spine Trauma Research Institute of Chicago.  A number of D'Souza's clinics simply operated and did business under the name Melvin D'Souza, D.C.

**ANSWER:**    Answering the first sentence of Paragraph 22, Defendants admit the allegations in the first sentence.  Answering the allegations in the second sentence of Paragraph 22, Defendants admit those allegations with the exception of the allegation that the name "Sports and Spinal Rehab Centers" was in use prior to the incorporation of St. Anthony's, which allegation is

6

denied, since said name went into use beginning only in or after mid-January 2005. Answering the third sentence of Paragraph 22, Defendants admit that clinics owned and operated by either D'Souza or St. Anthony's made use of the name "Melvin D'Souza, D.C.," but Defendants deny the remaining allegations of that sentence.

> 23.     In January of 2005, D'Souza formed the Illinois corporation, St. Anthony's Spine & Joint Institute, P.C., which according to D'Souza, assumed ownership of all of the clinics previously owned individually by D'Souza as a sole proprietor. Upon information and belief, the following is a list of the defendants' clinics at issue in this case: *804 W. 31st Street, Chicago, Illinois 60608; 1610 W. 63rd Street, Chicago,IL 60636; 3520 W. Fullerton Ave., Chicago,IL 60647; 1255 W. 127th Street, Calumet Park, IL 60827; 222 Vollmer Road, Chicago Heights, IL 60411; 157A N. Locust, Manteno, IL 60950; 370 W. Jefferson St., Joliet, IL 60435; 215 E. 75th Street, Chicago, Illinois 60618.*

**ANSWER:**     Answering the first sentence of Paragraph 23, Defendants admit the allegations of the first sentence. Answering the second sentence of Paragraph 23, Defendants acknowledge Plaintiffs have asserted what Plaintiffs believe are the "clinics at issue in this case," and Defendants further state in response to the second sentence of Paragraph 23 that the office addresses stated there are the correct addresses of clinics operated initially by D'Souza, and then operated later, commencing in or about January 2005, by St. Anthony's, with two exceptions: the clinics located at 370 W. Jefferson Street in Joliet, Illinois, and 215 E. 75th Street, Chicago, Illinois, began operations in or about January 2005 or thereafter and thus were operated only by St. Anthony's.

> 24.     St. Anthony's is merely a "shell" corporation through which D'Souza continues to to engage in the above-mentioned fraudulent activities. D'Souza continues to exercise complete control over all aspects of the operations of St. Anthony's, and all aspects of the fraudulent enterprise of running the chiropractic clinics now allegedly owned by St. Anthony's. D'Souza continues to exercise exclusive control over all of the assets and profits of the corporation. In fact, in deposition testimony in an Illinois state court case, *Soto vs. Ramos, 05M1304199 (Allstate claim# 2705668909)* D'Souza admitted that other than the name change to St. Anthony's, he still operates his clinics the same way that he did in the past. For purposes of this pleading all of the clinics currently purportedly owned by St.

Anthony's, and exclusively controlled by D'Souza, will continue to be hereinafter referred to as the "defendants' clinics".

**ANSWER:** Defendants deny the allegations in the first, second, and third sentences of Paragraph 24. Answering the fourth sentence of Paragraph 24, Defendants admit that in deposition testimony in the case of *Soto v. Ramos* Dr. D'Souza stated that following the incorporation of his professional practice in 2005 he continued to operate his chiropractic clinics in the same way as he had before, but to the extent any allegations of wrongdoing, by inference or otherwise, are directed toward Defendants in said fourth sentence of Paragraph 24, Defendants expressly deny any and all allegations of wrongdoing, and Defendants further state that the subject matter of the question and answer Plaintiffs are presumably referring to in the deposition in the *Soto v. Ramos* case had nothing whatsoever to do with the question of whether or not Dr. D'Souza was properly honoring corporate form. Answering the fifth sentence of Paragraph 24, to the extent that the fifth sentence may be construed as containing any allegations directed to Defendants and requiring a response, the allegations are hereby denied.

25. Defendants' main chiropractic clinic, along with its general business office is currently located at the *804 W. 31st Street, Chicago, Illinois* address. This particular clinic is hereinafter referred to as the "Bridgeport clinic", while all of the other clinics at issue will hereinafter be referred to as "Satellite clinics".

**ANSWER:** Defendants admit the allegations in the first sentence of Paragraph 25. To the extent that the second sentence thereof may be construed as containing any allegations directed to Defendants and requiring a response, the allegations are hereby denied.

26. D'Souza has also conducted business in the past as **DMX Diagnostic Labs, Inc.,** which D'Souza set up as a separate corporate entity to bill for diagnostic testing such as x-rays, which were allegedly performed by D'Souza at the Bridgeport facility. D'Souza was the sole shareholder, officer and director of this facility. Upon information and belief, D'Souza has dissolved the above-mentioned facility. DMX Diagnostic Labs, Inc., was also merely just a "shell" corporation that was entirely owned and operated by D'Souza, and through which he perpetrated fraudulent activities upon the Plaintiffs relating to the billing for x-ray

8

related services.

**ANSWER:** Answering the first sentence of Paragraph 26, Defendants deny the allegations in the first sentence of Paragraph 26. Further answering the first sentence of Paragraph 26, Defendants state that D'Souza formed the corporation DMX Diagnostic Labs, Inc., that DMX Diagnostic Labs, Inc. performed diagnostic testing, such as DMX motion x-rays, and that the radiological equipment used by DMX Diagnostic Labs, Inc. was housed in a truck used for that purpose that was parked in a covered garage attached to the clinic located at 804 W. 31st Street, Chicago, Illinois. Answering the allegations of the second and third sentences of Paragraph 26, to the extent the words "this facility" are intended to refer to DMX Diagnostic Labs, Inc., then Defendants admit that D'Souza was the sole officer, shareholder and director of DMX Diagnostic Labs, Inc., and that said corporation was dissolved, but Defendants deny any and all remaining allegations in the second and third sentences of Paragraph 26. Answering the fourth and final sentence of Paragraph 26, Defendants deny the allegations.

> 27. Subsequent to the dissolution of DMX Diagnostic Labs, Inc., defendants have submitted bills to Plaintiffs for x-rays and other diagnostic testing from the Bridgeport clinic using various other assumed business names, including, but not limited to: Bridgeport Neck & Back Wellness Center, Melvin D'Souza, D.C., and St. Anthony's.

**ANSWER:** Defendants admit that they have submitted bills to Plaintiffs for x-rays and other diagnostic testing performed at the clinic located at 804 W. 31st Street, Chicago, Illinois, or in the mobile facility located in the garage adjacent thereto, and that certain of said bills included the names St. Anthony's, Melvin D'Souza, D.C., or Bridgeport Neck & Back Wellness Center, but Defendants deny any and all remaining allegations of Paragraph 27.

> 28. The vast majority of patients allegedly treating at the defendants' clinics are persons purportedly injured in automobile collisions and premises accidents, who then submit third party personal injury claims, and/or file personal injury lawsuits against Plaintiffs' insureds sounding in negligence. In addition, defendants'

patients also include persons who have automobile insurance policies with Plaintiffs, who submit first party claims for medical payment benefits, and/or for uninsured or underinsured motorist benefits under their own insurance policies.

**ANSWER:** Defendants admit that many of the patients who received treatment at Defendants' clinics during the relevant period were persons injured in automobile accidents who then submitted or filed third party personal injury claims or lawsuits against Plaintiffs' insureds, but Defendants deny the remaining allegations in the first sentence of Paragraph 28. Defendants admit the allegations in the second sentence of Paragraph 28.

29. The defendants' clinics "build up" the patients' prospective personal injury claims by issuing false, misleading, inaccurate, and/or excessive billing statements for: certain treatments that were never actually rendered; for unnecessary, unwarranted, and excessive courses of physical therapy treatments; for unnecessary, unwarranted and excessive referrals and alleged taking of various diagnostic tests, such as x-rays, DMX (digital "motion x-rays), and computerized range of motion studies; by producing and generating false, misleading, and inaccurate medical reports and records purporting to diagnose and opine severe, permanent, and chronic personal injuries that were not in fact sustained in the accident at issue; and by further providing false, misleading, and inaccurate medical reports and opinions contending that the alleged injuries were proximately caused by the accidents at issue in the particular claim.

**ANSWER:** Defendants deny the allegations in Paragraph 29.

30. To staff the various clinics, D'Souza hired various physicians, as well as lay persons. Some of the lay persons working at the various D'Souza clinics are certified and/or licensed massage therapists (C.M.T.'s).

**ANSWER:** Answering Paragraph 30, Defendants state that they employed at their clinics both physicians and persons who were trained and appropriately supervised as chiropractic assistants, and Defendants further state that some of the chiropractic assistants were certified and licensed massage therapists (or "C.M.T.'s), but Defendants deny any and all remaining allegations of Paragraph 30.

31. D'Souza primarily practices as a Chiropractic Physician at the Bridgeport clinic, at 804 W. 31st Street, Chicago, Illinois, although on occasion he allegedly treats patients at the other above-mentioned Satellite clinics.

**ANSWER:**     Defendants admit that D'Souza practices as a chiropractic physician and treats patients at the clinic located at 804 W. 31st Street, Chicago, Illinois, and at the other locations identified in Paragraph 23, but Defendants deny the remaining allegations of Paragraph 31.

32.     Defendants routinely misrepresent on medical reports, records, billing statements, invoices, physician's liens, and various other documentation that they submit to Plaintiffs through the U.S. Mail, that the defendants' clinics actually have licensed Medical Doctors (M.D.'s) on staff at these various clinics, by indicating on said documentation that various licensed Medical Doctors are **"Attending Physicians"** at the various clinics.

**ANSWER:**     Defendants deny the allegations in Paragraph 32.

33.     The defendants have materially misrepresented to Plaintiffs through documents regularly sent through the U.S. Mail, that the following Medical Doctors have been on staff at various D'Souza clinics as **"Attending Physicians",** including, but not limited to: **Suresh Vade, MD., Ramesh Kharwadkar, MD., and Raheemunnisa RawooJ, MD.**

**ANSWER:**     Defendants deny the allegations in Paragraph 33.

34.     During the period of time at issue, defendants' alleged **"Attending Physicians"** have recently provided sworn deposition testimony in civil personal injury cases filed in Illinois state court that they actually had very little, if any, connection with the defendants' clinics, and rarely, if ever, worked at some of the various physical locations of the particular clinics that they were misrepresented by the defendants to be on staff as **"Attending Physicians".**  For example, in the Illinois state court case of *Allen vs. Morrow, 03M1303335 (Allstate claim# 2705102727),* Dr. Vade (hereinafter "Vade") testified that he had no idea that D'Souza had even been listing his name on defendants' various medical forms as a so-called "Attending Physician", and further stated that he did not even know what defendants meant by such a designation.  According to Vade, the only connection that he had with defendants' clinics was that on occasion he would randomly stop by the Bridgeport clinic on 31st Street to have lunch with his friend, Melvin D'Souza, who on occasion would ask Vade to examine a patient at that clinic.

**ANSWER:**     In answering Paragraph 34, which contains in part Plaintiffs' argumentative characterization of purported testimony allegedly secured in civil personal injury cases, Defendants state that by responding they do not waive their position that Plaintiffs' allegations rely on improper evidentiary material consisting of hearsay that is not properly admitted into

11

evidence in the instant action because, among other reasons, it is inadmissible under Rule 804(b)(1) of the Federal Rules of Evidence on the grounds that the Defendants in the instant action were not parties to the matters in which the prior testimony was taken, were not present at the questioning of the witnesses, and had no opportunity to develop the testimony through direct, cross, or redirect examination, it is inadmissible under Rule 32(a) of the Federal Rules of Civil Procedure because the prior actions did not involve both the same subject matter and the same parties or their representatives or successors in interest, and it cannot be introduced through the conduit of an expert witness because under Rule 703 of the Federal Rules of Evidence the alleged probative value of such inadmissible hearsay does not substantially outweigh the prejudicial effects of its introduction or the time and expense of its being made the subject of competing presentations at trial. Further answering the first sentence of Paragraph 34, Defendants expressly deny any and all allegations of wrongdoing, by inference or otherwise, that are directed toward Defendants in said first sentence, and Defendants further specifically deny that they engaged in any form of deceptive, misrepresentative, or otherwise inappropriate conduct associated with the listing of the names of physicians as "attending physicians" on medical forms or records. Answering the second and third sentences of Paragraph 34, and without waiving their position that the referenced purported testimony from other lawsuits is improper evidentiary material that is not admissible in this action, Defendants admit that in a deposition in the case of *Allen v. Morrow* Dr. Suresh Vade stated that he would on occasion come by Dr. D'Souza's clinic and perform physical examinations of patients at Dr. D'Souza's request, that he would write up reports on his physical examinations of patients on stationary that listed his name, that he did not know the exact frequency of his visits, that he did not have knowledge of what the term "attending physician" was meant to convey on the Defendants'

medical forms, and that he did not know why Dr. D'Souza included him among the persons listed as "attending physicians" on his medical forms, but Defendants deny any and all remaining allegations of the second and third sentences of Paragraph 34, and to the extent any allegations of wrongdoing, by inference or otherwise, are directed toward Defendants in said second and third sentences of Paragraph 34, Defendants expressly deny any and all allegations of wrongdoing, and Defendants further specifically deny that they engaged in any form of deceptive, misrepresentative, or otherwise inappropriate conduct associated with the listing of the name of Dr. Vade as an "attending physician" on medical forms or records.

35.     In a deliberate attempt to fraudulently conceal the nature and extent of defendants' fraudulent activities regarding its staffing with alleged "Attending Physicians", D'Souza has provided false, misleading, and deceptive sworn deposition testimony in Illinois state court cases, such as *Allen vs. Morrow, 03M1303335 (Allstate claim# 2705102727)* representing that Vade would examine patients at defendants' 31st Street clinic about one to two days per/week.

**ANSWER:**     Defendants deny the allegations in Paragraph 35.

36.     Upon information and belief, while each D'Souza clinic might allegedly have a "full time" chiropractor, and perhaps a lay assistant on staff at a particular clinic, the clinics never have had a full time Medical Doctor on staff as an "Attending Physician", as misrepresented by defendants.

**ANSWER:**     Defendants deny the allegations in Paragraph 36.

37.     On a very rare and limited occasion a Medical Doctor may allegedly examine a patient at one of defendants clinics, however, the vast majority of alleged examinations, referrals and treatments were either performed by chiropractors and/or lay persons assigned to the various clinics.

**ANSWER:**     Defendants deny the allegations in Paragraph 37. Defendants further respond to the allegations of Paragraph 37 by stating that examinations of patients who sought medical care at a clinic operated by Defendants were either performed by a chiropractic physician, a naprapathic physician, or a medical doctor, and that treatments were either performed by them or a properly trained chiropractic assistant acting under the supervision of them.

38.    In the Illinois state court case of *Zamarano v. Munoz, 05 M1301 000 (Allstate claim# 2705827760) Dr. Raul Zavelata, D.C.,* testified that not only did he have no idea who **"Dr. R. Rawoof, M.D., and/or Dr. Ramesh Kharwadkar, M.D."** were, but that he further had no idea why defendants would represent on various medical forms that these Medical Doctors were "Attending Physicians" at the West Fullerton clinic where *Zavelata* worked for the defendants, when neither *Rawoof and/or Kharwadkar* ever worked with *Zavelata* at that facility.

**ANSWER:** In answering Paragraph 38, which contains Plaintiffs' argumentative characterization of purported testimony allegedly secured in a state court case, Defendants state that by responding they do not waive their position that Plaintiffs' allegations rely on improper evidentiary material consisting of hearsay that is not properly admitted into evidence in the instant action for the reasons stated hereinabove in Defendants' response to Paragraph 34. Further answering Paragraph 38, Defendants admit that in a deposition in the case of *Zamarano v. Munoz*, Dr. Zavaleta stated that he did not know Dr. Rawoof or Dr. Kharwadkar and that he did not know what it meant to be an "attending physician," but Defendants deny the remaining allegations in said paragraph, and to the extent any allegations of wrongdoing, by inference or otherwise, are directed toward Defendants in said paragraph, Defendants expressly deny any and all allegations of wrongdoing, and Defendants specifically deny that they misrepresented anything about the precise clinic or office locations where Dr. Rawoof and/or Dr. Kharwadkar worked, and further deny that they engaged in any form of deceptive, misrepresentative, or otherwise inappropriate conduct associated with the listing of the names of Dr. Rawoof and Dr. Kharwadkar as "attending physicians" on medical forms or records.

39.    In the Illinois state court case of *Evans vs. Romano, 03M1303894 (Allstate claim #2704919527) Dr. Julie Knell, D.C.,* testified that she had no idea why **"Dr. R. Rawoof, M.D. and/or Dr. Ramesh Kharwadkar, M.D."** would be listed on various medical records and forms by defendants as being "Attending Physicians" at the Chicago Heights clinic where *Knell* worked for the defendants, when neither *Rawoof and/or Kharwadkar* ever worked with *Knell* at that facility.

**ANSWER:** In answering Paragraph 39, which contains Plaintiffs' argumentative

characterization of purported testimony allegedly secured in a state court case, Defendants state that by responding they do not waive their position that Plaintiffs' allegations rely on improper evidentiary material consisting of hearsay that is not properly admitted into evidence in the instant action for the reasons stated hereinabove in Defendants' response to Paragraph 34. Further answering Paragraph 39, Defendants admit that in a deposition in the case of *Evans v. Romano*, Dr. Knell stated that she did not know why Dr. Rawoof or Dr. Kharwadkar were listed as "attending physicians," but Defendants deny the remaining allegations in said paragraph, and to the extent any allegations of wrongdoing, by inference or otherwise, are directed toward Defendants in said paragraph, Defendants expressly deny any and all allegations of wrongdoing, and Defendants specifically deny that they misrepresented anything about the precise clinic or office locations where Dr. Rawoof and/or Dr. Kharwadkar worked, and further deny that they engaged in any form of deceptive, misrepresentative, or otherwise inappropriate conduct associated with the listing of the names of Dr. Rawoof and Dr. Kharwadkar as "attending physicians" on medical forms or records.

40.     In the Illinois state court case of *Reynolds vs. Green, 05L2838 (Allstate claim# 2705729594), Dr. Irene Ekpenyoung, D.C.,* testified that she she had no idea why **"Dr. R. Rawoof, M.D. and/or Dr. Ramesh Kharwadkar, M.D."** would be listed on various medical records and forms by defendants as being "Attending Physicians" at the l27th Street clinic in Calumet Park, where *Ekpenyoung* worked for the defendants, when neither *Rawoof and/or Kharwadkar* ever worked with *Ekpenyoung* at that facility.

**ANSWER:**     In answering Paragraph 40, which contains Plaintiffs' argumentative characterization of purported testimony allegedly secured in a state court case, Defendants state that by responding they do not waive their position that Plaintiffs' allegations rely on improper evidentiary material consisting of hearsay that is not properly admitted into evidence in the instant action for the reasons stated hereinabove in Defendants' response to Paragraph 34.

Further answering Paragraph 40, Defendants admit that in a deposition in the case of *Reynolds v. Green*, Dr. Ekpenyoung stated that she did not know Dr. Rawoof or Dr. Kharwadkar, though she had heard of Dr. Rawoof through her employment in Dr. D'Souza's practice, but Defendants deny the remaining allegations in said paragraph, and to the extent any allegations of wrongdoing, by inference or otherwise, are directed toward Defendants in said paragraph, Defendants expressly deny any and all allegations of wrongdoing, and Defendants specifically deny that they misrepresented anything about the precise clinic or office locations where Dr. Rawoof and/or Dr. Kharwadkar worked, and further deny that they engaged in any form of deceptive, misrepresentative, or otherwise inappropriate conduct associated with the listing of the names of Dr. Rawoof and Dr. Kharwadkar as "attending physicians" on medical forms or records.

> 41. In the Illinois case of *Taylor vs. Cook, 05M1304357 (Allstate claim# 2705678296), Dr. Raheemunnisa Rawoof M.D.,* testified that in the approximately 3 ½ years that she has worked for the defendants, she has practiced out of "her own" office at the 63rd Street. Dr. Rawoof testified that in all the time that she has worked for defendants, she has perhaps gone down to the main Bridgeport clinic to treat patients approximately six (6) times, in which she may have treated at total often (10) patients there. Dr. Rawoof has not treated patients at any of the defendants' other clinics.

**ANSWER:** In answering Paragraph 40, which contains Plaintiffs' argumentative characterization of purported testimony allegedly secured in a state court case, Defendants state that by responding they do not waive their position that Plaintiffs' allegations rely on improper evidentiary material consisting of hearsay that is not properly admitted into evidence in the instant action for the reasons stated hereinabove in Defendants' response to Paragraph 34. Answering the first and second sentences of Paragraph 40, Defendants admit only that in a deposition in the case of *Taylor v. Cook*, Dr. Rawoof stated that as of the time of her July 2006 deposition she had worked for Dr. D'Souza since December 2002, while simultaneously

maintaining her own family medical practice officed at 63rd Street, that she spent 80 percent of her time since 2002 working at her own practice and 20 percent of her time working for Dr. D'Souza, that from 2002 to 2006 she spent two to three days a week doing part-time work for Dr. D'Souza's practice, that she normally treated the patients from Dr. D'Souza's practice at her 63rd Street location, but would on rare occasions, taking place approximately once every six months, come to the Bridgeport clinic in the afternoons to treat patients who could not make the trip up to her office, and that from 2002 to 2006 physical therapists from Dr. D'Souza's practice would come to her office on 63rd Street on Mondays, Wednesdays, and Fridays to assist in the treatment of the patients of Dr. D'Souza's practice whom Dr. Rawoof was treating at that location. Defendants deny the remaining allegations in the first two sentences of said paragraph, and to the extent any allegations of wrongdoing, by inference or otherwise, are directed toward Defendants in said sentences, Defendants expressly deny any and all allegations of wrongdoing, and Defendants specifically deny the characterization of Dr. Rawoof's testimony as establishing that she was a stranger to, or barely involved in, Dr. D'Souza's practice. Answering the third sentence of Paragraph 41, Defendants admit that Dr. Rawoof treated the patients of Dr. D'Souza's practice only at the 63rd Street location and the Bridgeport clinic, and Defendants deny any remaining allegations in said sentence.

> 42. All of the billing statements for examinations, treatments and diagnostic tests allegedly rendered at defendants' clinics, and sent to the Plaintiffs through the U.S. Mail demanding payment, employ the use of Current Procedural Terminology Codes (hereinafter "CPT codes").

**ANSWER:** Admitted.

> 43. CPT codes are published anually by the American Medical Association (hereinafter "AMA"), to facilitate the efficient processing of medical charges by insurance carriers, such as Plaintiffs.

**ANSWER:** Defendants admit that "CPT Codes" are published annually by the American

17

Medical Association, but they deny the remaining allegations aimed at characterizing the purpose of their publication.

    44.    Defendants regularly submitted HCFA forms and itemized billing statements to Plaintiffs through the U.S. mail containing CPT codes purporting to correspond to specific medical procedures, such as examinations, diagnostic testing, and modalities of physical therapy allegedly rendered to patients at defendants' clinics.

**ANSWER:**    Defendants admit that they have regularly submitted insurance claims forms and itemized billing statements to Plaintiffs through the U.S. Mail containing CPT codes describing specific medical procedures, such as examinations, diagnostic testing, and modalities of physical therapy rendered to patients at Defendants' clinics, but deny the remaining allegations of Paragraph 44.

    45.    By using CPT codes the defendants represented to Plaintiffs that the services specifically listed on defendants billing statements were in fact not only actually rendered, but were performed in a manner set forth in accordance with accepted AMA guidelines.

**ANSWER:**    Defendants deny the allegations in Paragraph 45.

    46.    It is the custom and practice of the defendants to submit to Plaintiffs through the U.S. Mail, copies of the patient's medical bills, records, reports, HCFA billing statements, physician's liens, and various other medical documents from the patient's chart, after obtaining knowledge that Plaintiffs could be potentially liable for the payment of any billing invoice generated by the defendants. The information regarding Plaintiffs' potential "liability" for any payment towards the defendants' billing invoice is routinely documented on patient initial history and intake forms, which specifically request that the patient provide the defendants with all applicable liability insurance information.

**ANSWER:**    Defendants admit the allegations in the first sentence of Paragraph 46, with the exception of the allegation as to "HCFA billing statements" which is denied. Defendants deny the allegations in the second sentence of Paragraph 46. Further answering the second sentence of paragraph 46, Defendants state that their patient registration forms inquire of patients as to health insurance, automobile insurance, or worker's compensation insurance information, and there are

spaces on the forms to put in the name of the relevant insurance company and the policy number or claim number.

47. In all of the claims submitted by the defendants that are at issue in this case, defendants possessed actual knowledge that their patient was either an insured of Plaintiffs making a first party claim, or that the patient was a third party claimant seeking compensation for alleged injuries against one of Plaintiffs' insureds.

**ANSWER:** Given the fact that the Complaint does not define with precision "all of the claims" that "are at issue in this case," Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 47, and Defendants therefore deny the allegations in Paragraph 47.

48. When defendants obtain information of Plaintiffs' potential involvement in the patient's case, it is defendants' custom and practice to send notice to Plaintiffs through the U.S. Mail of its purported physician's lien, to put Plaintiffs on notice of defendants' potential claim against any settlement and/or financial resolution obtained by the particular patient, for which Plaintiffs (or its insured) could be potentially liable.

**ANSWER:** Admitted. Defendants further state that notice of the physician's lien is sent to the Plaintiffs and/or the patient's attorney.

49. Under Illinois law, *The Health Care Services Lien Act,* 770 ILCS 23/10 provides that upon proper notice, every health care professional and health care provider, shall have a lien upon a settlement of the injured patient's cause of action, if that licensed medical provider actually rendered services in the treatment, care and maintenance of that injured patient.

**ANSWER:** Defendants admit only that the *Health Care Services Lien Act,* 770 ILCS 23/1 *et seq.* provides as the language of said statute states and as said language has been interpreted by the courts reviewing same, and Defendants deny Plaintiffs' allegations which endeavor to restate the provisions of the statute.

50. *The Health Care Services Lien Act,* 770 ILCS 23/10, further provides that any such lien shall be for reasonable charges for services actually rendered.

**ANSWER:** Defendants admit only that the *Health Care Services Lien Act,* 770 ILCS 23/1 *et*

*seq.* provides as the language of said statute states and as said language has been interpreted by the courts reviewing same, and Defendants deny Plaintiffs' allegations which endeavor to restate the provisions of the statute.

51.    Defendants service of their purported physicians lien upon the Plaintiffs further misrepresents and attempts to substantiate that defendants' clinics are billing for medical services that were in fact actually rendered to patients; that defendants' patients were in fact injured in the accident at issue; and that the defendants' medical bills were for reasonable and necessary medical services allegedly rendered to the patient by duly licensed medical providers as provided for in *The Health Care Services Lien Act.*

**ANSWER:**    Defendants deny the allegations in Paragraph 51.

52.    The following are only a few specific examples of defendants' *billing for treatments never actually rendered,* and Plaintiffs will present evidence to prove many other instances of defendants inappropriate and/or fraudulent billing practices:

In the claim of *Ciara Hines* & *Alice Gray vs. Allstate Insurance (Allstate claim# 2705997991), Ciara Hines,* testified that she sustained a neck injury which resolved within 2 days of the alleged car accident, for which she *only* received Emergency Room care, and did not receive any treatments at defendant's clinic. However, defendants purported to bill *Ciara* for approximately two (2) months of physical therapy modalities, similar to what they billed out to *Ciara's* mother, *Alice Gray.* In addition defendants' supporting medical records and reports purportedly diagnosed and/or allegedly treated *Ciara* for injuries other than to her neck as well. In the same case, *Alice Gray* testified that she never received any examination by D'Souza, and only met with him for a about five minutes in which he asked her a few questions about the accident, yet she was billed by defendants for initial, follow up and final examinations allegedly conducted at defendants' clinic.

In the case of *Soto vs. Ramos, 05M1304199 (Allstate claim# 2705668909),* the patient expressly denied that he ever received any x-rays at defendants' clinic and further testified that it was his understanding the defendants were going to obtain copies of the x-rays that were previously taken of him at the Emergency Room on the date of the accident, yet defendants billed $700 for cervical, thoracic and lumbar spine x-rays. In addition, *Mr. Soto* further testified that the only injuries he even sustained in the accident at issue were his right low back and a scrape to his right elbow. *Mr. Soto* was also billed for four (4) physical therapy modalities for each visit, when he testified to only receiving two (2); and he was

20

further billed $675 for computerized range of motion and strength tests that he testified that he never received.

In the case of *Chiu vs. Wheeler, 04L1844 (Allstate claim# 101624467)* the patient denied receiving an examination on her first visit at defendants' clinic for which she was billed, and she also failed to provide any testimony to substantiate that she ever received a DMX motion x-ray for which defendants also billed, and defendants apparently continued to bill *Ms. Chiu* for five (5) additional physical therapy visits after the date that *Ms. Chiu* testified that she already stopped treating at defendants' clinic.

In the case of *Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130),* the patients testified to receiving two (2) physical therapy modalities each visit, yet they were billed for four (4) modalities for each visit, not to mention that the treatments were allegedly being performed to different parts of the bodies that the patients testified to injuring in the accident at issue.  In fact in the *Fenton* case, *Ms. Fenton* allegedly was given, and billed for an x-ray to her *left* shoulder, when her deposition testimony was that she in fact injured the *right* shoulder.

In *Vera West vs. Allstate (Allstate claim# 2705823447), Ms. West* was billed by defendants for cervical and thoracic x-rays that she testified to never receiving, as the only injury she sustained in the accident at issue was to her low back.

In *Engram vs. Raj, 04 M1303919 (Allstate claim# 1016331678),* one of defendants' patients was billed for a DMX motion x-ray to her *left hand,* that not only did the patient deny ever receiving, but further denied even injuring her left hand in the accident at issue.

In the claim of *Lillie Sims vs. Allstate Insurance Company (Allstate claim#2705658447),* the patient testified to only receiving ultrasound treatments and electric muscle stimulations on *alternating* visits, yet she was billed for both modalities on *every* visit by the defendants.

In *Moss vs. Oparka, 04M1302263, (Allstate claim# 2705593891),* the patient testified to only receiving hot packs and massages, but was also billed for four (4) modalities for each visit, including ultrasound and electrical muscle stimulation.

In *Davenport vs. Lewis, 05L7770 (Allstate claim# 1237932972),* the patient was billed for a massages on each visit that she denied receiving. Defendants also produced numerous documents purporting to be for multiple computerized range of motion studies allegedly conducted on Ms. Davenport, that she denied ever receiving.

In *Santiago vs. Diaz, 04M1302947 (Allstate claim# 1376180681)* the patient was billed for DMX to both the cervical spine and TMJ areas, yet the patient never testified to receiving any type of "motion" x-ray, that would have been taken outside defendants' clinic in a mobile van. In fact the patient testifed that all of the x-rays taken of her were conducted "inside" the office of the defendants' clinic. *Ms. Santiago* further denied complaining about any TMJ related symptoms, yet the defendants' TMJ-DMX report even purported to find and diagnose abnormalities in *Ms. Santiago's* TMJ. In addition, the patient was apparently billed by defendants for physical therapy allegedly performed to her *knee,* yet the patient testified that by the time she began treating at defendants' clinic two (2) weeks after the accident, she no longer had any knee pains or discomfort, and further denied receiving any such therapy to her knee.

In *Jones vs. Allstate Insurance, (Allstate claim# 2704781117),* Mr. Jones testified that the only part of his body that was injured in the accident at issue was his low back, and that he only received an x-ray to his low back at defendants' clinic, yet he was also billed for cervical and thoracic spine x-rays by defendants as well.

In *Saldivar vs. Tomecki, 03M1303552 (Allstate claim# 2705011019), Ms. Saldivar* testified that the only injuries she sustained in the accident at issue were to the low back, neck, upper back and right shoulder. Ms. Saldivar was billed by defendants for x-rays to the left shoulder that she denied ever receiving. In addition, defendants allegedly diagnosed, and billed *Ms. Saldivar* for treatments to her right triceps, right forearm, right thigh, right hip, right knee and right ankle, all of which *Ms. Saldivar* specifically denied injuring. In addition, her final office visit report submitted by defendants continued to represent that *Ms. Saldivar* was still having complaints associated with an alleged right ankle injury, that *Ms. Saldivar* apparently never sustained.

**ANSWER:**   Answering the language in the first sentence of Paragraph 52, beginning with the start of the sentence and ending with the colon, Defendants expressly deny any and all allegations contained therein, including but not limited to the allegations that Defendants have billed "for treatments never actually rendered," that they have engaged in "inappropriate" billing or billing practices, or that they have engaged in "fraudulent" billing or billing practices, and Defendants further expressly deny that Plaintiffs will ever prove any instances of nonexistent, inappropriate or fraudulent treatments, diagnoses, or billings whatsoever.

Answering the balance of Paragraph 52, consisting of the indented subparagraphs following the colon and setting forth averments as to purported testimony and other alleged evidential matter from a series of other lawsuits, Defendants state that the inclusion of said subparagraphs in the pleading is improper and in violation of Rules 8(a)(2) and 8(d) of the Federal Rules of Civil Procedure which require pleadings to consist of "short and plain" statements of claims where the allegations advanced are "simple, concise, and direct." Further answering the indented subparagraphs of Paragraph 52, Defendants state as to the indented subparagraphs that because they consist of unnecessary and excessive evidentiary detail as well as unnecessarily complicated, prolix, and argumentative alleged facts, the Plaintiffs have interfered with and obstructed the ability of Defendants to answer the pleading. Further answering the indented subparagraphs of Paragraph 52, Defendants state that because they chiefly consist of assertions about what "testimony" purportedly shows while in every instance failing to quote the testimony in full or to cite specifically a part of a transcript, and while in most instances failing to explain whether the allegation concerns testimony given during discovery or testimony given at the arbitration hearing or the trial of a given case, Plaintiffs have placed Defendants in the position of having to speculate as to what testimony might be the basis for the Plaintiffs' assertions, and thus Plaintiffs have interfered with and obstructed the ability of Defendants to answer the pleading and placed the Defendants in the position of having to guess about what exactly is being asserted in order to attempt to frame a proper response to same. Further answering the indented subparagraphs of Paragraph 52, Defendants state that because they sometimes contain assertions about what unspecified documents from voluminous records, such as medical records, purportedly prove or show, Plaintiffs have placed Defendants in the position of having to speculate as to what document or part of a document from voluminous

23

records might be the basis for the Plaintiffs' assertions, and thus Plaintiffs have interfered with and obstructed the ability of Defendants to answer the pleading and placed the Defendants in the position of having to guess about what exactly is being asserted in order to attempt to frame a proper response to same.

Further answering the indented subparagraphs of Paragraph 52, Defendants state that it is their position that Plaintiffs' allegations rely on improper evidentiary material consisting of hearsay that is not properly admitted into evidence in the instant action because, among other reasons, it is inadmissible under Rule 804(b)(1) of the Federal Rules of Evidence on the grounds that the Defendants in the instant action were not parties to the matters in which the prior testimony was taken, were not present at the questioning of the witnesses, and had no opportunity to develop the testimony through direct, cross, or redirect examination, it is inadmissible under Rule 32(a) of the Federal Rules of Civil Procedure because the prior actions did not involve both the same subject matter and the same parties or their representatives or successors in interest, and it cannot be introduced through the conduit of an expert witness because under Rule 703 of the Federal Rules of Evidence the alleged probative value of such inadmissible hearsay does not substantially outweigh the prejudicial effects of its introduction or the time and expense of its being made the subject of competing presentations at trial. Further answering the indented subparagraphs of Paragraph 52, and with specific reference to any "testimony" being made the subject of allegations that comes from sworn statements or recorded statements, Defendants state that it is their position that sworn statement or recorded statement material cannot be permissibly introduced into evidence for the reasons just stated and for the additional reason that such material is inadmissible under Rule 801(d)(1)(A) of the Federal Rules of Evidence.

Further answering the indented subparagraphs of Paragraph 52, and without waiving their position that the referenced purported testimony from other lawsuits is improper evidentiary material that is not admissible in this action, Defendants state as follows:

Answering the first subparagraph of Paragraph 52 regarding *Ciara Hines & Alice Gray v. Allstate*, Defendants expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that there are instances in said case of the Defendants having billed "for treatments never actually rendered," having engaged in "inappropriate" billing or billing practices, having engaged in "fraudulent" billing or billing practices, or having engaged in any impropriety in connection with treatments, diagnoses, billings or other actions regarding the patients involved in the cited case. Further answering the subparagraph, and specifically in response to the first three sentences of the subparagraph, Defendants expressly deny the Plaintiffs' characterization of the testimony of Ciara Hines in the cited case in that Ms. Hines, a fourteen year-old girl, testified at the arbitration hearing in that case that she had in fact received treatment at the clinic operated by Defendants and further testified that at her previously taken sworn statement she did not understand the word "clinic," thinking it referred to a hospital, and thus was confused by and mistakenly answered the single question upon which we presume Plaintiffs' mischaracterization of the testimonial record is based. Further answering the first three sentences of the subparagraph, Defendants deny that Ms. Hines did not receive care and treatment at Defendants' clinic and instead aver that she did in fact receive the care and treatment reflected in her medical records, which

25

treatment was reasonable and necessary given the nature of her injuries. Further answering the first three sentences of the subparagraph, Defendants deny any and all remaining allegations in the first three sentences. Further answering the subparagraph, and specifically in response to the fourth sentence of the subparagraph, Defendants admit that Alice Gray was billed for an initial, follow up and final examination, and Defendants state that Ms. Gray in fact received said examinations. Further answering the fourth sentence, Defendants expressly deny Plaintiffs' characterization of the testimony of Alice Gray in the cited case in that Ms. Gray testified at the arbitration hearing in that case that she had in fact been given the examinations by Dr. D'Souza that are reflected in her medical record, and that she met with him repeatedly. Further answering the fourth sentence of the subparagraph, Defendants deny any and all remaining allegations in the fourth sentence.

Answering the second subparagraph of Paragraph 52 regarding *Soto v. Ramos*, Defendants expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that there are instances in said case of the Defendants having billed "for treatments never actually rendered," having engaged in "inappropriate" billing or billing practices, having engaged in "fraudulent" billing or billing practices, or having engaged in any impropriety in connection with treatments, diagnoses, billings or other actions regarding the patients involved in the cited case. Further answering the second subparagraph, and specifically in response to the first sentence of the subparagraph, Defendants deny the allegations in the first sentence, and Defendants further state that Juvenal

Soto did not expressly deny receiving x-rays, but instead stated in a deposition in the cited case "I don't remember" in response to the questions about whether or not x-rays had been taken of him at Defendants' clinic, and Defendants aver that Mr. Soto did in fact receive the x-rays indicated on his medical bill. Further answering the first sentence of the subparagraph, Defendants deny any and all remaining allegations in the first sentence. Further answering the second subparagraph, and specifically in response to the second sentence of the subparagraph, Defendants admit that Mr. Soto stated in a deposition that at the time of his treatment by Defendants he was suffering from low back pain, but Defendants deny any and all remaining allegations in the second sentence, and Defendants further state that the "History Questionaire" in the patient's file states that Mr. Soto also had pain in his "upper back." Further answering the second subparagraph, and specifically in response to the language in the third sentence of the subparagraph before the semicolon, Defendants admit that Mr. Soto was billed for four modalities, but deny the Plaintiffs' characterization of Mr. Soto's testimony in that he testified at his deposition in the cited case to receiving a "lot of therapy" including the use on his body of massage, "a device" he described as a "soft piece," and "[s]ome machines," and Defendants further state that Mr. Soto received each and every therapy his medical records and bills indicated. Further answering the second subparagraph, and specifically in response to the language in the third sentence of the subparagraph following the semicolon, Defendants admit only that Mr. Soto stated in a deposition that he could not remember being "hooked up" to "some type of computer" or "any type of like machine" when

receiving his care at Defendants' clinic, and Defendants deny any and all remaining allegations of said third sentence, and further state that being given a computerized range of motion test does not involve "hooking up" a patient to anything, as said test involves the physician holding the measuring device in his own hand.

Answering the third subparagraph of Paragraph 52 regarding *Chiu v. Wheeler*, Defendants expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that there are instances in said case of the Defendants having billed "for treatments never actually rendered," having engaged in "inappropriate" billing or billing practices, having engaged in "fraudulent" billing or billing practices, or having engaged in any impropriety in connection with treatments, diagnoses, billings or other actions regarding the patients involved in the cited case. Further answering the third subparagraph, Defendants admit that Elaine Chiu was billed for an initial examination and a DMX motion x-ray, but Defendants deny the remaining allegations contained in said subparagraph. Further answering the third subparagraph, Defendants state that Plaintiffs have mischaracterized the testimony of Ms. Chiu in that (1) at a deposition in the cited case she did not expressly deny having received an examination, but instead simply answered "I really don't remember" when initially asked if she was examined by a doctor on her first visit to Defendants' clinic, which question and answer presumably forms the basis for Plaintiffs' mischaracterization of the record in that case, and (2) made clear in later testimony at that same deposition that in her first appointment with Defendants'

clinic she was in fact examined by a "male doctor" who inquired as to the nature of her pain in her neck and back and who then proceeded to physically examine those areas of her body and later took x-rays of her in two different sessions.

Answering the fourth subparagraph of Paragraph 52 regarding *Fenton v. Breton*, Defendants expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that there are instances in said case of the Defendants having billed "for treatments never actually rendered," having engaged in "inappropriate" billing or billing practices, having engaged in "fraudulent" billing or billing practices, or having engaged in any impropriety in connection with treatments, diagnoses, billings or other actions regarding the patients involved in the cited case. Further answering the fourth subparagraph, Defendants, Defendants admit that Ammie Fenton and Vanisa Crayton were billed for four therapy modalities and that Ms. Fenton was billed for an x-ray, but Defendants deny the remaining allegations contained in said subparagraph. Further answering the fourth subparagraph, Defendants state that Plaintiffs have mischaracterized the purported testimony from the cited case in that Ammie Fenton at a deposition in that case stated that she was "not really sure" which shoulder she injured, whether right or left, and that she could not remember having pain in one shoulder but not the other, and both patients at their depositions in the cited case refrained from precision in describing their treatments, using general terms like "massaging," which could reasonably be understood to encompass all four modalities, i.e., use of deep tissue massage, use of ultrasound on the body, application of hot packs to the body, and application of

electric muscle stimulation to the body.

Answering the fifth subparagraph of Paragraph 52 regarding *West v. Allstate*, Defendants expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that there are instances in said case of the Defendants having billed "for treatments never actually rendered," having engaged in "inappropriate" billing or billing practices, having engaged in "fraudulent" billing or billing practices, or having engaged in any impropriety in connection with treatments, diagnoses, billings or other actions regarding the patient involved in the cited case. Further answering the fifth subparagraph, Defendants, Defendants admit that Vera West was billed for cervical and thoracic x-rays, but Defendants deny the remaining allegations contained in said subparagraph. Further answering the fifth subparagraph, Defendants state that all billings for x-rays were appropriately given for services rendered, and Defendants also state that Plaintiffs have mischaracterized the purported testimony from the cited case in that Ms. West did not maintain at her deposition that her injury was exclusively confined to her lower back, but instead she repeatedly stated that she injured "my back and my neck" in the accident and she expressly stated that she sought the x-rays she received from Defendants' clinic because she "wanted to have my back checked out and have my neck checked out."

Answering the sixth subparagraph of Paragraph 52 regarding *Engram v. Raj*, Defendants expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that there are instances in said case of the

Defendants having billed "for treatments never actually rendered," having engaged in "inappropriate" billing or billing practices, having engaged in "fraudulent" billing or billing practices, or having engaged in any impropriety in connection with treatments, diagnoses, billings or other actions regarding the patients involved in the cited case. Further answering the sixth subparagraph, Defendants admit that they billed one of the patients, Lolita Engram, for a DMX motion x-ray to her left hand, but Defendants deny the remaining allegations contained in said subparagraph. Further answering the sixth subparagraph, Defendants state that Plaintiffs have mischaracterized the purported testimony from the cited case in that Lolita Engram did not categorically deny ever receiving an x-ray to her left hand, but instead explicitly stated that she had x-rays performed on parts of her body other than her neck but could not recall which parts of her body, and in that Lolita Engram did not deny ever having injured her hand, but instead testified that she complained at the clinic by "saying something" which prompted the personnel at the clinic to advise her to "massage my hands in and out," indicating the patient was complaining about injuries to her hands. Further answering this subparagraph Defendants also state that they have produced to Plaintiffs the actual videotape on CD-ROM showing Lolita Engram receiving a DMX motion x-ray to her left hand.

Answering the seventh subparagraph of Paragraph 52 regarding *Sims v. Allstate*, Defendants expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that there are instances in said case of the Defendants having billed "for treatments never actually rendered," having

engaged in "inappropriate" billing or billing practices, having engaged in "fraudulent" billing or billing practices, or having engaged in any impropriety in connection with treatments, diagnoses, billings or other actions regarding the patient involved in the cited case.

Answering the eighth subparagraph of Paragraph 52 regarding *Moss v. Oparka*, Defendants expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that there are instances in said case of the Defendants having billed "for treatments never actually rendered," having engaged in "inappropriate" billing or billing practices, having engaged in "fraudulent" billing or billing practices, or having engaged in any impropriety in connection with treatments, diagnoses, billings or other actions regarding the patient involved in the cited case. Further answering the eighth subparagraph, Defendants admit that they billed for four modalities, including not only hot packs and massages but also ultrasound and electric muscle stimulation, but Defendants deny the remaining allegations contained in said subparagraph. Further answering the eighth subparagraph, Defendants state that Plaintiffs have mischaracterized the purported testimony from the cited case in that Aaron Moss in a deposition specifically testified to having been treated at Defendants clinic with what he called a "heavy treating pad" that "vibrates," clearly indicating his understanding that he received treatments that went beyond only hot packs and massages.

Answering the ninth subparagraph of Paragraph 52 regarding *Davenport v. Lewis*,

Defendants expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that there are instances in said case of the Defendants having billed "for treatments never actually rendered," having engaged in "inappropriate" billing or billing practices, having engaged in "fraudulent" billing or billing practices, or having engaged in any impropriety in connection with treatments, diagnoses, billings or other actions regarding the patient involved in the cited case. Further answering the ninth subparagraph, Defendants admit only that Rochelle Davenport was billed for massages, which bills were properly issued for services rendered to that patient, and that her medical file shows she received computerized range of motion studies, but Defendants deny the remaining allegations contained in said subparagraph. Further answering the ninth subparagraph, Defendants state that Plaintiffs have mischaracterized the purported testimony from the cited case in that in a deposition in that case (1) Ms. Davenport did not categorically deny that she ever received computerized range of motion studies, but instead answered a question on that subject matter by stating in part that she could "not recall," and (2) Ms. Davenport explicitly stated that she received "massage" at Defendants' clinic "two to three times a week," which is not inconsistent with the treatment schedule reflected in her billings.

Answering the tenth subparagraph of Paragraph 52 regarding *Santiago v. Diaz*, Defendants expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that there are instances in said case of the Defendants having billed "for treatments never actually rendered," having

engaged in "inappropriate" billing or billing practices, having engaged in "fraudulent" billing or billing practices, or having engaged in any impropriety in connection with treatments, diagnoses, billings or other actions regarding the patient involved in the cited case. Further answering the tenth subparagraph, Defendants admit only that Dawn Santiago was billed for DMX studies on the cervical spine and TMJ areas. Further answering the tenth subparagraph, Defendants deny the remaining allegations contained in said subparagraph, and Defendants state that the services for which Ms. Santiago was billed, including her x-ray services, were in fact provided to her, and Defendants further state that Plaintiffs have mischaracterized the purported testimony from the cited case in that, among other things, Plaintiffs omitted to take account of the fact that the patient repeatedly stated at a deposition in that case that she could not remember what exactly she said or what exactly had occurred during her treatment at Dr. D'Souza's office that took place four years before the date that her deposition was taken, such as her comment: "I'm very short on remembering stuff." Finally, Defendants further state in answering this subparagraph that the DMX x-ray was in a mobile van that was normally parked in a fully enclosed garage attached to the Defendants' clinic, such that a patient could easily assume it was "inside" said location.

Answering the eleventh subparagraph of Paragraph 52 regarding *Jones v. Allstate*, Defendants expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that there are instances in said case of the Defendants having billed "for treatments never actually rendered," having

34

engaged in "inappropriate" billing or billing practices, having engaged in "fraudulent" billing or billing practices, or having engaged in any impropriety in connection with treatments, diagnoses, billings or other actions regarding the patients involved in the cited case. Further answering the eleventh subparagraph, Defendants admit that William Jones was billed for cervical and thoracic spine x-rays and Defendants aver that he did receive said x-rays and that they were medically necessary and reasonable diagnostic procedures for this patient.

Answering the twelfth subparagraph of Paragraph 52 regarding *Saldivar v. Tomecki*, Defendants expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that there are instances in said case of the Defendants having billed "for treatments never actually rendered," having engaged in "inappropriate" billing or billing practices, having engaged in "fraudulent" billing or billing practices, or having engaged in any impropriety in connection with treatments, diagnoses, billings or other actions regarding the patients involved in the cited case. Further answering the twelfth subparagraph, Defendants admit that they diagnosed Adela Saldivar as having the injuries specified in her medical records, and that they billed her for diagnostic services and treatments associated with those injuries, but Defendants deny the remaining allegations in said subparagraph, and Defendants further answer by stating that Plaintiffs have mischaracterized the purported testimony from the cited case in that Ms. Saldivar in a deposition taken in that case did not testify that the only injuries she sustained were to her low back, upper back, neck, and right shoulder, but instead described her injuries as also including *inter alia* weakness in "all" of

35

her body, pain throughout all her arm and shoulder, pain throughout her waist area, pain and bruises in her chest which had hit the steering wheel in the subject accident, and pain going from her back down both her legs, which became more noticeable when she walked or did certain movements.

53.     Defendants' engaged in a pattern and practice of using CPT codes that misrepresent the severity of the alleged injuries by exaggerating the complexity involved in treating the alleged condition, and the time spent by the medical providers in treating the alleged condition, as in many instances the injuries purportedly diagnosed by defendants did not exist, or were grossly exaggerated, and in certain instances the treatments and procedures billed either were never actually rendered, and/or were not medically necessary or reasonable to treat the patient.

**ANSWER:**     Defendants deny the allegations in Paragraph 53.

54.     Defendants also engaged in a pattern and practice of misrepresenting that they used a billing publication called "Fee Facts" to determine their reasonable and customary charges for examinations, treatments, and various diagnostic services. Defendants routinely submitted to Plaintiffs through the U.S. Mail a written statement prepared on defendants' letterhead, describing how Fee Facts compiled extensive data from a multitude of medical providers from various geographic areas to come up with reasonable and customary fees for like CPT coded medical procedures.

**ANSWER:**     Answering the first sentence of Paragraph 54, Defendants deny the allegations in the first sentence.  Answering the second sentence of Paragraph 54, Defendants admit that they often included a description in their statements sent through the U.S. Mail of the publication entitled *Fee Facts, Prevailing Fees for Rehabilitative Medicine, A Reference Guide*, Defendants further admit that they noted the method whereby the data in said publication was compiled from surveys of practitioners in the rehabilitative medical field, and Defendants further admit that they noted that the data in said publication was aimed at helping to establish the usual, customary, and reasonable fee level for types of medical care service, but Defendants deny the remaining allegations in the second sentence of Paragraph 54.  Defendants further state as regards the

36

second sentence of Paragraph 54 that they also routinely listed the name, address and telephone number of the publisher of the aforementioned *Fee Facts* publication.

55. In addition, in a further deliberate attempt to fraudulently conceal the nature and extent of defendants' fraudulent activities regarding its billing operations, D'Souza has provided false, misleading, and deceptive sworn deposition testimony in Illinois state court cases, such as *Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130),* representing that defendants' fees for services allegedly rendered were reasonable and customary, and were **"always"** based upon the Fee Facts billing publication.

**ANSWER:** Defendants deny the allegations in Paragraph 55.

56. The billing for services allegedly performed by defendants and submitted through the U.S. Mail to the Plaintiffs not only regularly exceeded the reasonable and customary fees for like services in defendants' geographic area, but were in fact grossly in excess of the fees actually contained in the Fee Facts billing publication that defendants misrepresented to Plaintiffs' that it purportedly relied upon to set their alleged reasonable and customary fees.

**ANSWER:** Defendants deny the allegations in Paragraph 56.

57. At various times Plaintiffs received though the U.S. Mail, HCFA claim forms, itemized billing statements, and various other medical records, submitted by defendants representing that "examinations" were allegedly performed on defendants' patients.

**ANSWER:** Defendants admit the allegations in Paragraph 57, with the exception of the allegation as to "HCFA claim forms" which is denied. Defendants further state that Plaintiffs received insurance claim forms through the U.S. Mail stating that examinations had been performed on patients of the Defendants.

58. The billing statements submitted by defendants contain specific corresponding CPT codes purporting to represent the nature and extent of the examinations allegedly performed.

**ANSWER:** Defendants admit that their billing statements submitted to Plaintiffs include CPT codes that describe the nature of the medical procedures, including examinations, performed on patients, but Defendants deny the remaining allegations of Paragraph 58.

59.     Under existing CPT guidelines, examination codes range from a level 1 (CPT code 99201 for initial new patient examinations, and 99211 for follow up examinations) for the lowest level of medical complexity and physician time required, to a level 5 (CPT codes 99205 for initial new patient examinations, and 99215 for follow up examinations) for the highest level of medical complexity and physician time required.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 59, and Defendants therefore deny the allegations in Paragraph 59.

60.     It is reasonable and customary medical billing protocol for providers to bill a higher amount for a higher level CPT coded examination due to the increase of the level of medical complexity involved in caring for the alleged medical condition, as well as the reasonable amount of time required to be spent by the physician in conducting the examination.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 60, and Defendants therefore deny the allegations in Paragraph 60.

61.     Initial examinations, follow up examinations, and final examinations were often routinely billed by defendants on HCFA forms and billing statements using level 5 CPT Codes (99205 and 99215).

**ANSWER:**     Defendants deny the allegations of Paragraph 61. Further answering paragraph 61, Defendants state that that initial, follow up, and final examinations of patients were described with a level 5 CPT code where it was appropriate to do so.

62.     Based upon information and belief, and in part on sworn patient testimony, sworn testimony of D'Souza, and of others associated and affiliated with defendants' operation, certain examinations billed to patients, either did not occur at all, and/or were not performed by the physician allegedly represented as conducting the examination, and/or were not performed to the extent represented by the use of the corresponding level of CPT code that was submitted on the patients' billing statements.

**ANSWER:**     Defendants deny the allegations in Paragraph 62.

63.     In cases in which patients were billed for level 5 coded CPT examinations, such

as *Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130)* D'Souza's own deposition testimony suggests that he either: fails to understand the AMA coding requirements for examination billing, and/or he simply fails to adhere to the AMA guidelines associated with billing for patient examinations.

**ANSWER:** Defendants deny the allegations in Paragraph 63.

64. Defendants' billing statements and HCFA forms that were submitted to Plaintiffs through the U.S. Mail, contained improper and/or deceptive CPT codes, which were deliberately designed to allow for the defendants to submit "higher" bills for the examination services allegedly rendered.

**ANSWER:** Defendants deny the allegations in Paragraph 64.

65. Most, if not all, of the patients that were allegedly treated at defendants' chiropractic clinics that are the subject of this pleading involved patients that purportedly sustained "soft tissue" type injuries such as sprains and strains in car accidents, and premises accidents.

**ANSWER:** Given the fact that the Complaint does not define with precision "all" "of the patients" that "are the subject of this pleading," Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 65, and therefore deny the allegations. Further answering Paragraph 65, Defendants state that the great majority of the patients whose treatment appears to be called into question in the Complaint suffered musculo-skeletal injuries that are sometimes referred to as "soft tissue injuries."

66. Under existing CPT coding guidelines, the use of level 5 examination coding purports to represent at least two of the following three key components: a comprehensive history, a comprehensive examination, and medical decision making of the highest level of medical complexity, where usually the presenting problems justifying such examinations are of such a high severity, that the physician typically spends upwards of sixty (60) minutes of "face to face" time with the patient or the patient's family.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 66, and Defendants therefore deny the allegations in Paragraph 66.

67. The billing operations for all of the defendants' various clinics are performed by

D'Souza (and/or his office staff) at Bridgeport clinic, regardless of which clinic allegedly treated the patient.

**ANSWER:**     Admitted.

68.     The physicians at the Satellite clinics are never involved in any aspect of the defendants' billing operations, and these physicians never know what level of CPT code was actually assigned to their examination, and billed to the patient.

**ANSWER:**     Defendants deny the allegations in Paragraph 68.

69.     D'Souza and/or his office staff at the Bridgeport clinic use complete speculation and conjecture in assigning a corresponding CPT code for the examinations allegedly performed by physicians from the Satellite clinics.

**ANSWER:**     Defendants deny the allegations in Paragraph 71.

70.     In many instances there is also a complete lack of any corresponding medical documentation, and/or incomplete and/or insufficient medical documentation to substantiate that defendants' billed examinations were in fact performed and/or were performed to the extent represented by the use of the corresponding level of CPT code that was assigned to the alleged examination.

**ANSWER:**     Defendants deny the allegations in Paragraph 70.

71.     The following cases are illustrative of defendants inappropriate billing practices as it relates to defendants' Satellite clinics:

> In *Evan vs. Romano, 03M1303894 (Allstate claim# 2704919527),Julie Knell, D.C.,* admitted that she had no idea what amount, and/or what corresponding level CPT code was assigned by D'Souza in generating bills for her examinations conducted at defendants' Chicago Heights clinic. Defendants' billed out *Dr. Knell's* new patient examination and follow up examinations to the patient at CPT codes *99205* and 99215. *Dr. Knell* further testified in the *Evans* case that she typically spends approximately 30 minutes with a new patient examination and about 15 minutes on follow up examinations;

> In the case of *Zamorano vs. Munoz, 05M1301000 (Allstate claim# 2705827760), Dr. Raul Zaveleta, D.C.,* likewise testified that he has no idea what defendants' bill out for his patient examinations that he allegedly conducts at the clinics that he worked out of on West Fullerton, in Chicago;

> In *Reynolds vs. Green, 05L2838 (Allstate claim# 2705729594),* D'Souza himself admitted that he had no idea how much time was spent by a *Dr. Irene Ekpenyoung, D.C.,* on her patient examinations that she allegedly

> conducted at defendants' l27th Street clinic in Calumet Park, for which defendants issued specific CPT coded examination charges. D'Souza testified that he simply assumed that Ekpenyoung would be conducting examinations in accordance with what D'Souza would normally do during one of his patient examinations.

**ANSWER:**    Answering the language in the first sentence of Paragraph 71, beginning with the start of the sentence and ending with the colon, Defendants expressly deny any and all allegations contained therein, including but not limited to the allegations that Defendants have engaged in "inappropriate billing" or "inappropriate billing practices" in connection with Defendants' clinics.    Answering the balance of Paragraph 71, consisting of the indented subparagraphs following the colon and setting forth averments as to purported testimony and other alleged evidential matter from several other lawsuits, Defendants state that by responding they do not waive their position that such matter is improper and in violation of Fed.R.Civ.P. 8(a)(2) and 8(d) and interferes with and obstructs the ability of Defendants to answer for the reasons stated hereinabove on pages 23 and 24 in Defendants' response to Paragraph 52, and their position that Plaintiffs' allegations rely on improper evidentiary material consisting of hearsay that is not properly admitted into evidence in the instant action for the reasons stated hereinabove on page 24 in Defendants' response to Paragraph 52, and Defendants further state that they expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that there are any cases in which Defendants having engaged in any form of "fraudulent" or otherwise "inappropriate" billing or billing practices in connection with any of Defendants' satellite clinics.

> 72.    The following cases illustrate specific examples of defendants' up-coding and/or inappropriately billing for examinations, as well as situations in which patients have provided sworn testimony suggesting that they were not actually examined by the medical provider represented by defendants' in their medical records and billing statements:

In *Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130),* the patient's sworn testimony indicated that D'Souza spent five to ten minutes on the patient's initial examination which was billed out as a CPT coded 99205 examination;

In *Ciara Hines* & *Alice Gray vs. Allstate Insurance Company (Allstate claim# 2705997991),* defendants issued a bill for an examination to Ciara Hines, yet this person denied that she ever treated at defendants' clinic. In addition, Ciara's mother, Alice Gray, also denied ever receiving *any* "examinations" at defendants clinic, rather she was simply asked questions by D'Souza for approximately five minutes, yet she was billed for initial, follow up and final examinations containing corresponding AMA approved CPT examination codes.

*Webb vs. Stoval, 03M1303552 (Allstate claim# 2704918008)* in which the patient testified to only receiving examinations from a *Hispanic woman* at defendants' clinic, yet D'Souza's records and D'Souza's own deposition testimony obtained in the case represented that *D'Souza* personally conducted the examinations that were billed, and D'Souza further admitted that he did *not* have any *Hispanic women doctors* working for him at the time of the examinations billed to the patient; and

*Taylor vs. Cook,* 05 *M1304357 (Allstate claim# 2705678296),* where the patient testified that she *never* received any examinations from a *woman doctor,* and further denied that she received any examinations at the defendants' *63rd Street clinic,* rather she claimed that any examinations conducted were performed by a *male* doctor at the defendants' *31st Street clinic.* The defendants submitted bills for examinations allegedly performed by *Dr. Rawoof, a female doctor,* that were purported to be conducted at the defendants' *63rd Street clinic* according to the defendants' medical records.

**ANSWER:**    Answering the language in the first sentence of Paragraph 72, beginning with the start of the sentence and ending with the colon, Defendants expressly deny any and all allegations contained therein, including but not limited to the allegations that Defendants have engaged in "upcoding," that Defendants have "inappropriately" billed for examinations, and that they have billed or recorded in medical records the names of medical providers as having performed examinations on patients when those medical providers had not in fact done so. With respect to the balance of Paragraph 72, consisting of the indented subparagraphs following the

colon and setting forth averments as to purported testimony and other alleged evidential matter from a series of other lawsuits, Defendants state that by answering they do not waive their position that such matter is improper and in violation of Fed.R.Civ.P. 8(a)(2) and 8(d) and interferes with and obstructs the ability of Defendants to answer for the reasons stated hereinabove on pages 23 and 24 in Defendants' response to Paragraph 52, and Defendants also state that by answering they do not waive their position that Plaintiffs' allegations rely on improper evidentiary material consisting of hearsay that is not properly admitted into evidence in the instant action for the reasons stated hereinabove on page 24 in Defendants' response to Paragraph 52. Further answering the balance of Paragraph 72, Defendants expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that there are any cases in which Defendants have engaged in "upcoding" for medical examinations, have "inappropriately" billed for examinations, or have billed or recorded in medical records the names of medical providers as having performed examinations on patients when those medical providers had not in fact done so, and Defendants also deny that Plaintiffs have presented an accurate portrayal of the alleged facts in the cited personal injury cases, and further deny that any purported materials from said cases in any way prove, illustrate, or exemplify any up-coding, inappropriate billing, or billing for treatment or diagnostic services not rendered.

73.     Regardless of the nature and/or extent of the alleged injuries, at the time of their initial office visit at defendants' clinics, virtually all patients are routinely prescribed a standard course of physical therapy consisting of a set "protocol" of four (4) physical therapy modalities: hot packs, electrial muscle stimulation, ultrasound, and massage, which generally take approximately 30-45 minutes to complete on a typical office visit at defendants' clinics.

**ANSWER:**     Defendants deny the allegations of Paragraph 73.

74.     At the time of the patient's initial office visit, defendants engage in a practice of providing the new patient with a "*calendar*" containing circled dates of future appointments that the patient is required to attend. It is also defendants' custom

and practice to have the patient sign the calendar of scheduled future appointments, and to acknowledge that they will adhere to the office policy of keeping their scheduled appointments or they will be "*discharged*" from the clinic, and their "*attorney, rehabilitaion nurse, and insurance company will be notified*".

**ANSWER:**     Defendants admit that patients, at the time of their initial office visit, are provided with a calendar, called a "Treatment Appointments Planer," that sets forth the schedule of their medical treatment appointments, Defendants further admit that the patients are asked to sign the "Treatment Appointments Planer," and Defendants further admit that patients are asked to acknowledge that they have been informed as to the appointment policy of the practice, but Defendants deny the remaining allegations in Paragraph 74.  In further answering Paragraph 74, Defendants state that the appointment policy of the practice, which is explained to the patients, is that if the patient misses three consecutive appointments without a medical reason, he or she shall be discharged from the Defendants' treatment program and that the insurance company, rehabilitation nurse and attorney of the patient will be notified of that fact.

75.     At the time of the patient's initial office visit, defendants also engage in a practice of generating typed written initial reports which are also routinely submitted to the Plaintiffs through the U.S. Mail, purporting to "grade" the patient's alleged complaints on a scale of "1 to 5", (with 5 being the most severe) according to a system purportedly taken from a book entitled "Whiplash Injuries: The Cervical Acceleration/Deceleration Syndrom", by a Dr. Croft.

**ANSWER:**     Defendants admit the allegations of Paragraph 75, except that Defendants deny that the grading is exclusively based on the work entitled *Whiplash Injuries: The Cervical Acceleration/Deceleration Syndrome* (3d Ed. 2002) and written by Arthur C. Croft and Stephen M. Foreman.

76.     Defendants engage in a practice of grossly exaggerating the "grade" assigned to the patient's alleged injuries in an attempt to further justify and/or substantiate the scheduling up front of excessive, unnecessary, and/or unwarranted chiropractic treatments for the patient. According to the matrix provided by the defendants on their initial medical reports, a higher grade assigned to the patient's alleged injury

44

purports to substantiate the medical necessity and/or justify an increase in the "frequency and duration" for the scheduling up front of future chiropractic visits.

**ANSWER:** Defendants deny the allegations in Paragraph 76.

77.   Regardless of the "grade" actually assigned by the defendants to the patient's alleged medical condition, and/or the purported diagnoses listed on the initial examination reports, all of the defendants' patients basically receive the same standard four modalities of physical therapy, and most, if not all, of the treatments rendered at defendants' clinics are performed by the C.M.T.'s and/or other lay assistants.

**ANSWER:** Defendants deny the allegations in Paragraph 77.

78.   Defendants' method of compensating the physicians at the Satellite clinics encourages over-treating, and/or providing unnecessary chiropractic care to patients, as the physicians are compensated in part based upon the *number of visits* that they treat the particular patient. Defendants' manner of compensation regarding its Satellite clinic chiropractors has also been fraudulently concealed to the Plaintiffs. Plaintiffs have obtained sworn deposition testimony of *Julie Knell, D. C.* in the Illinois state court case of *Evans vs. Romano, 03M1303894 (Allstate claim#2704919527)* in which *Dr. Knell* admitted to being compensated by the defendants at a rate of $25 for each office visit that she allegedly treated a patient at defendants' Chicago Heights clinic.

**ANSWER:** Answering the first and second sentences of Paragraph 78, Defendants deny the allegations in those sentences. In regards to the third sentence of Paragraph 78, which contains averments aimed at characterizing alleged testimony in a case called *Evans v. Romano*, Defendants state that by answering they do not waive their position that such matter is improper and in violation of Fed.R.Civ.P. 8(a)(2) and 8(d) and interferes with and obstructs the ability of Defendants to answer for the reasons stated hereinabove on pages 23 and 24 in Defendants' response to Paragraph 52, and Defendants also state that by answering they do not waive their position that Plaintiffs' allegations rely on improper evidentiary material consisting of hearsay that is not properly admitted into evidence in the instant action for the reasons stated hereinabove on page 24 in Defendants' response to Paragraph 52. Further answering the third sentence of Paragraph 78, Defendants expressly deny any and all allegations of wrongdoing, including but

not limited to any and all allegations that there are any cases in which Defendants have engaged in using methods of compensating physicians that encourage over-treating or the provision of unnecessary chiropractic care, and any and all allegations that Defendants' have fraudulently concealed anything in regards to their manner of compensating their physicians, and Defendants further deny that there is any purported material from the cited case that in any way proves or establishes any form of impropriety or wrongdoing by Dr. Knell or any form of impropriety or wrongdoing in Defendants' compensation of Dr. Knell or any other physician.

79. Defendants compensate their C.M.T.'s at a rate of approximately *$10 an hour.* Defendants' method of compensation for its C.M.T.'s also encourages over-treating, and/or providing unnecessary and/or excessive treatments to defendants' patients, as it allows defendants to issue excessive and unwarranted bills for services rendered by the C.M.T.'s in an amount that grossly exceeds the amount that defendants pay the C.M.T.'s to provide the 30-45 minutes of physical therapy modalities to patients on a typical office visit. Defendants' manner of compensation regarding its C.M.T's has also been fraudulently concealed to the Plaintiffs. In *Saldivar vs. Tomecki, 03L12096 (Allstate claim# 2705011019)* D'Souza admitted to compensating C.M.T.'s at a rate of *$10 an hour,* and that the defendants would typically bill $125 for a standard office visit of four physical therapy modalities (and $170 if exercise is also billed to the patient on a particular office visit).

**ANSWER:** Answering the first sentence of Paragraph 79, Defendants admit the allegations in the first sentence. Answering the second and third sentences of Paragraph 79, Defendants deny the allegations in those sentences. Answering the fourth sentence of Paragraph 79, which contains averments aimed at characterizing alleged testimony or other evidentiary matter in a case called *Saldivar v. Tomecki*, Defendants state that by answering they do not waive their position that such matter is improper and in violation of Fed.R.Civ.P. 8(a)(2) and 8(d) and interferes with and obstructs the ability of Defendants to answer for the reasons stated hereinabove on pages 23 and 24 in Defendants' response to Paragraph 52. Further answering the fourth sentence, Defendants admit that Dr. D'Souza stated at a deposition in the cited case that

chiropractic assistants were paid $10 per hour, but Defendants deny the remaining allegations of the fourth sentence, and Defendants expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that Defendants engage in over-treating or the provision of unnecessary or excessive treatments to their patients, that Defendants encourage, or use methods of compensation that encourage, over-treating or the provision of unnecessary or excessive treatments to their patients, that Defendants improperly compensate their chiropractic assistants (or "C.M.T.'s") or improperly bill for services in which they provide assistance, that Defendants fraudulently conceal anything regarding their manner of compensating chiropractic assistants, or that Defendants issue excessive or unwarranted bills.

80.     D'Souza has admitted in sworn deposition testimony in Illinois state court cases such as *Allen vs. Morrow, 03M1303335, (Allstate claim# 2705102727), Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130), and Smith vs. Barr, 03M1302281 (Allstate claim# 2704848833)*, that the fees for alleged services which are billed by defendants are based upon AMA accepted CPT coding guidelines, and are based upon reasonable and customary fee schedules, as if said services were in fact performed by duly licensed medical providers, and not C.M.T.'s.

**ANSWER:**     Answering Paragraph 80, Defendants admit that Defendants' fees are based upon and consistent with reasonable and customary fees for diagnostic and treatment services and that Dr. D'Souza has used several sources for purposes of ensuring the reasonable and customary nature of Defendants' fees, some of which he has described at depositions in Illinois state cases, but Defendants deny the remaining allegations in Paragraph 80.

81.     The HCFA billing forms and itemized billing statements generated by defendants, and submitted to Plaintiffs through the U.S. Mail, represent that D'Souza and/or some other duly licensed medical provider, as being the patient's "treating physician", and contain CPT codes misrepresenting that the billed services were actually performed by D'Souza, and/or a duly licensed medical provider, when at times said treatments are in fact never rendered at all, and/or are at other times rendered entirely by the unsupervised CM.T.'s.

**ANSWER:**     Defendants deny the allegations in Paragraph 81.

82. In a deliberate attempt to fraudulently conceal the fact that treatments at defendants' clinics are being entirely rendered by the C.M.T.'s, D'Souza has at times provided false, misleading, deceptive, and extremely inconsistent testimony at depositions in Illinois state court cases, including, but not limited to the following examples:

In *Allen vs. Morrow, 03M13 03335, (Allstate claim# 2705102727),* D'Souza testified that treatments at defendants' clinic are never provided by just the C.M.T.'s, and that the assistants just bring supplies into the room and help "set up" for the physician, and it is the physician that actually administers the treatments;

In *Moss vs. Oparka, 04M1302263, (Allstate claim# 2705593891),* D'Souza testified that the C.M.T.'s who are trained in massage, would only perform "*massages*" that were billed to patients;

Likewise, in *Soto vs. Ramos, 05M1304199 (Allstate claim# 2705668909),* D'Souza testified that the C.M.T.'s would only do massage therapy upon his instruction, but nothing else;

In *Smith vs. Barr, 03M1302281 (Allstate claim# 2704848833),* D'Souza testified that other than massages, the C.M.T.'s merely "*assisted*" *him,* (and/or other licensed medical providers) in "*setting up*" the various physical therapy modalities that were billed by defendants to the particular patient, and D'Souza further claimed that "*he*" (and/or other physicians) actually performed all of the other modalities billed;

In *Saldivar vs. Tomecki, 03M1303552 (Allstate claim# 2705011019),* D'Souza testified that the C.M.T.'s did and can provide the various physical therapy modalities to the patients that were billed by the defendants, but claimed that the assistants only did so under the "direct supervision" of a duly licensed medical provider.

**ANSWER:** Answering Paragraph 82, Defendants deny the allegations that treatments at Defendants' clinics are entirely rendered by C.M.T.'s, that either of the Defendants have ever attempted to deliberately or fraudulently conceal any facts regarding the nature of treatments provided at the clinics, that Dr. D'Souza has ever provided false, misleading, or deceptive testimony in Illinois state court cases, or that Dr. D'Souza has ever provided testimony in a deliberate attempt to fraudulently conceal, or conceal in any way, any facts about the treatments

48

being provided at Defendants' clinics, including but not limited to any facts relating to the role of C.M.T.'s.

83.     Many of the defendants' billing statements and HCFA forms that were submitted to Plaintiffs through the. U.S. Mail, contain improper and/or deceptive CPT coding regarding the nature and extent of the physical therapy modalities that were allegedly performed on defendants' patients, and particularly conceal the identity, and medical specialty, if any, of the individuals that may have actually rendered the services being billed.

**ANSWER:**     Defendants deny the allegations in Paragraph 83.

84.     In many instances there is a lack of corresponding medical documentation, and/or incomplete, and/or insufficient medical documentation, to substantiate that said treatments were in fact performed and/or were performed to the extent represented by the corresponding level of CPT codes that were being billed by the defendants for the alleged treaments.

**ANSWER:**     Defendants deny the allegations in Paragraph 84.

85.     In many instances the patient's daily progress notes (SOAP notes) and various other medical records were regularly sent by the defendants to Plaintiffs through the U.S. Mail, along with the patient's billing statements, to deliberately and deceptively misrepresent that all of the physical therapy treatments that were being billed by the defendants were actually rendered, and/or that all services were actually performed by D'Souza, and/or some other duly licensed medical provider, when in fact the services were rendered by the C.M.T.'s.

**ANSWER:**     Defendants deny the allegations in Paragraph 85.

86.     Initially it was the custom and practice of the defendants' clinics to never disclose the identity of any of the assistants that actually performed the billed modalities, as all of defendants' medical records expressly misrepresented that all of the billed treatments were performed entirely by D'Souza and/or another licensed medical provider.

**ANSWER:**     Defendants deny the allegations in Paragraph 86.

87.     In a deliberate attempt to fraudulently conceal the nature and extent of their activities, defendants changed/altered their medical record keeping procedures to include the name of the C.M.T. that was allegedly involved in providing treatments to the patient. This change in record keeping was in direct response to testimony secured from various patients of the defendants indicating that various *women* "assistants", and not Melvin D'Souza, D.C. (a *male),* were actually providing the treatments billed. Specific examples of Illinois state court cases and

49

first party insurance claims in which patients have testified that all of the therapy rendered was entirely performed by various women assistants, mostly Hispanic, yet all of the defendants' daily SOAP note records, and billing statements misrepresented that Melvin D'Souza, D.C., and/or another chiropractor or medical doctor, was actually the provider of the billed services rendered, include, but are not limited to:

*Alice Gray vs. Allstate Insurance (Allstate claim# 2705997991);*
*Allen vs. Morrow, 03M1303335 (Allstate claim # 2705102727);*
*Fenton vs. Breton, 03A11303838 (Allstate claim#1016073130);*
*Wilson vs. Pickens, 03L192 (Allstate claim# 2214125338);*
*Santiago vs. Diaz, 04M1302947 (Allstate claim# 1376180681);*
*Moss vs. Oparka, 04M1302263 (Allstate claim #2705593891);*
*Chui vs. Wheeler, 04L1844 (Allstate claim# 1016244467) and;*
*Taylor vs. Cook, 05M1304357 (Allstate claim# 2705678296).*

**ANSWER:** Defendants deny the allegations in Paragraph 87. Further answering Paragraph 87 Defendants state that by responding to averments as to purported testimony in a series of Illinois state court cases, Defendants do not waive their position that such matter is improper and in violation of Fed.R.Civ.P. 8(a)(2) and 8(d) and interferes with and obstructs the ability of Defendants to answer for the reasons stated hereinabove on pages 23 and 24 in Defendants' response to Paragraph 52, and Defendants also do not waive their position that Plaintiffs' allegations rely on improper evidentiary material consisting of hearsay that is not properly admitted into evidence in the instant action for the reasons stated hereinabove on page 24 in Defendants' response to Paragraph 52.

88. In a deliberate attempt to fraudulently conceal the identity of the actual provider of the treatments billed, defendants changed/altered their medical record keeping procedures purporting to indicate the name/identity of the particular C.M.T. that was involved in the particular patient visit by utilizing a form that allows a check mark to be placed next to the name of a C.M.T. from a list on the SOAP note form. However, this changed SOAP note form expressly indicates that the designated C.M.T. only "*assisted*" a physician in the performance of the various modalites that are checked off from a list on the form, as the name of a purported treating physician is also checked off on the same SOAP note representing that the patient was "*seen by*" that designated physician.

**ANSWER:** Defendants deny the allegations in Paragraph 88.

50

89. Based upon information and belief, and from deposition testimony from defendants' patients in Illinois state court cases, there continue to be instances in which defendants' patients never meet with and/or never treat with any duly licensed medical provider, and only meet with, and/or receive treatments from unsupervised C.M.T's, yet the patient's medical records and billing statements submitted to the Plaintiffs' through the U.S. Mail continue to fraudulently conceal this information from the Plaintiffs.

**ANSWER:** Defendants deny the allegations in Paragraph 89.

90. The following cases contain specific examples of defendants continued deceptive practices of concealing the true idenity of the actual provider of alleged billed services rendered:

In *Soto vs. Ramos, 05M1304199 (Allstate claim #2705668909)* the patient testified that **all** of the physical therapy rendered were performed by the *Hispanic women* assistants, as this particular patient only spoke Spanish. Mr. Soto specifically denied ever treating with any chiropractor that appeared to look "Asian", yet various SOAP notes in *his* file indicated that *Lehoa Huynh,* a female chiropractor of Asian decent and appearance was the chiropractor that he was allegedly treated him on various dates. *Dr. Huynh* in her deposition, also testified that patients medical records indicated that she actually treated *Mr. Soto* on those various dates as well. In addition, many of the records in Mr. Soto's file also misrepresented that Melvin D'Souza (a male) provided various treatments to Mr. Soto. All of the daily SOAP note forms in Mr. Soto's file misrepresented that the Hispanic woman C.M.T.'s merely "assisted" the physicians (D'Souza and Huynh) that were also designated on the SOAP note forms. In addition, the defendants in the *Soto* case misrepresented that only *Melvin D'Souza, D.C.,* was the patient's "treating physician" for all of the dates of treatments indicated on the patient's billing statements.

In the case of *Taylor vs. Cook,* 05M1304357 (Allstate claim# 2705678296) *Dr. R. Rawoof,* admitted in deposition testimony that she has never rendered any of the physical therapy modalities to patients at defendants' 63rd Street clinic, yet all of the defendants' daily SOAP notes and billing statements from that clinic continue to designate Dr. Rawoof as being the treating doctor that the patient was "*seen by*" on each of the visits, and the C.M.T.'s name was merely selected to represent that they "assisted" Rawoof in providing the modalities billed.

**ANSWER:** Answering the language in the first sentence of Paragraph 90, beginning with the start of the sentence and ending with the colon, Defendants expressly deny any and all allegations contained therein, including but not limited to the allegations that Defendants have

engaged in "deceptive practices," that their medical records were misleading or inaccurate, that they have concealed the "true identity" of the "actual provider" of services that were billed, or that they have in any way misrepresented the nature of medical treatment provided to patients or the persons providing the treatment. Answering the balance of Paragraph 90, consisting of the indented subparagraphs following the colon and setting forth averments as to purported testimony and other alleged evidential matter from other lawsuits, Defendants state that by responding they do not waive their position that such matter is improper and in violation of Fed.R.Civ.P. 8(a)(2) and 8(d) and interferes with and obstructs the ability of Defendants to answer for the reasons stated hereinabove on pages 23 and 24 in Defendants' response to Paragraph 52, and Defendants also state that by answering they do not waive their position that Plaintiffs' allegations rely on improper evidentiary material consisting of hearsay that is not properly admitted into evidence in the instant action for the reasons stated hereinabove on page 24 in Defendants' response to Paragraph 52. Further answering the balance of Paragraph 90, Defendants expressly deny all allegations contained therein that Defendants have engaged in "deceptive practices," that their medical records were misleading or inaccurate, that they have concealed the "true identity" of the "actual provider" of services that were billed, or that they have in any way misrepresented the nature of medical treatment provided to patients or the persons providing the treatment, and Defendants further deny that the purported evidential material cited from the stated cases proves or establishes the misconduct Plaintiffs allege.

91.     As a result of defendants' continued false, misleading and deceptive records keeping pertaining to their daily SOAP note forms, the information pertaining to the identity of the person actually providing the billed treatments to the patient is often not able to be reasonably discovered by the Plaintiffs' until the time that the particular patient provides sworn testimony in support of their personal injury and/or insurance claim.

**ANSWER:**     Defendants deny the allegations in Paragraph 91.

92.     In many instances there is also a complete lack of any corresponding medical documentation, and/or incomplete, and/or insufficient medical documentation, to substantiate that all of defendants' bills for treatments allegedly rendered were in fact actually performed and/or were performed to the extent represented by the use of the corresponding level of CPT code that was assigned to the alleged treatments, and/or that the treatments billed were reasonable and/or necessary to treat injuries allegedly sustained in the accidents at issue.

**ANSWER:**     Defendants deny the allegations in Paragraph 92.

93.     In addition, even after defendants changed/altered their daily SOAP note forms to disclose the name of the lay assistant, defendants continued to submit billing statements and HCFA forms to the Plaintiffs through the U.S. Mail, containing AMA approved CPT codes, and misrepresenting that the services billed were in fact only performed by a duly licensed medical as the physician's name is still the only name that appears on the HCFA forms and/or billing statements.

**ANSWER:**     Defendants deny the allegations in Paragraph 93.

94.     In a deliberate attempt to continue to fraudulently conceal the nature and extent of defendants' fraudulent activities concerning the identity of the actual provider of the treatments being billed, defendants continue to purport to rely upon the use of the Fee Facts billing publication to set their fees for services allegedly rendered. As Fee Facts only provides billing information concerning reasonable and customary fees charged by duly licensed medical providers, defendants' purported reliance on Fee Facts continues to fraudulently misrepresent to Plaintiffs that defendants are billing for physical therapy modalities that were in fact performed by licensed medical providers, and not C.M.T's.

**ANSWER:**     Defendants deny the allegations in Paragraph 94.

95.     The billing for physical therapy modalities allegedly performed at defendants' clinics not only regularly exceed the reasonable and customary fees for like services in defendants' geographic area, said fees regularly exceed the average fees for like services contained in the Fee Facts publication that defendants purport to rely upon to set their alleged reasonable and customary fees, even assuming that all of said services were performed by licensed medical providers.

**ANSWER:**     Defendants deny the allegations in Paragraph 95.

96.     On the initial office visit at defendants' chiropractic clinics there is a near universal pattern of "self referral" of patients to the defendants' Bridgeport clinic for various unnecessary and unwarranted diagnostic testing, such as plain x-rays, digital "motion" x-rays ("DMX"), and computerized range of motion and strength tests.

**ANSWER:**     Defendants deny the allegations in Paragraph 96.

97.     It is the common practice and protocol of the defendants' clinics to have their patients referred to the Bridgeport clinic for the taking of plain x-ray films, even in situations in which the particular patient may have had the exact same set of plain x-ray films taken at an Emergency Room, and/or another medical facility immediatley before coming to defendants' clinics.

**ANSWER:**     Defendants deny the allegations in Paragraph 97.

98.     The Bridgeport clinic is the only facility owned and operated by the defendants that has standard x-ray equipment. Defendants' standard (non-motion) x-ray equipment is located *inside* the Bridgeport Clinic at 804 W. 31st Street, in Chicago.

**ANSWER:**     Defendants admit the allegations in Paragraph 98.

99.     Defendants maintain the DMX *(motion* x-ray) equipment in a mobile van that is parked *outside* at the Bridgeport clinic. However, D'Souza himself allegedly drives the DMX mobile van to various other clinics to conduct motion DMX studies on patients.

**ANSWER:**     Answering the first sentence of Paragraph 99, Defendants admit that the DMX x-ray equipment is housed in a mobile van, and further state that said mobile van is parked in a covered garage attached to the clinic, where patients need only step out of a door from the clinic and take a few steps to go into the van for a DMX motion x-ray, but Defendants deny the remaining allegations in the first sentence of Paragraph 99. Answering the second sentence of Paragraph 99, Defendants admit only that D'Souza sometimes drives the mobile van to other locations, including other clinics, to see patients, but deny the remaining allegations of the second sentence.

100.     Defendants typically bill $875 for the taking of a DMX of the cervical spine, which takes approximately three minutes to complete. DMX studies to other parts of the body such as the TMJ, are typically billed out at an additional $575.

**ANSWER:**     Answering the first sentence of Paragraph 100, Defendants admit only that they typically bill $875.00 for a DMX diagnostic workup as to the cervical spine of a patient, but

expressly deny the remaining allegations in that first sentence. Answering the second sentence of Paragraph 100, Defendants admit that DMX studies that study other parts of the body, such as TMJ, are billed in a number of cases at $575.00, but deny the remaining allegations in Paragraph 100.

101.  According to the defendants' stated protocols set forth in their form medical reports and records, (which are also regularly submitted to the plaintiffs through the U.S. Mail), DMX studies are conducted by defendants only *after* the patient initially received standard (nonmotion) x-rays at defendants' *clinics.* Defendants typically bill approximately $200-$250 for standard plain x-rays to each part of the body allegedly x-rayed on a patient.

**ANSWER:**  Defendants deny the allegations in Paragraph 101.

102.  In many instances there is a lack of supporting medical documentation, and/or incomplete, and/or insufficient medical documentation, to substantiate that x-rays and/or DMX motion x-rays were in fact performed on patients, and/or that such x-rays and DMX were reasonable and/or necessary, and/or warranted for the diagnoses and/or treatment of the patient. In fact, in response to numerous subpoenas issued upon defendants to produce actual reproductions of x-rays and DMX studies allegedly taken on various patients, defendants have indicated that the actual studies were allegedly ***destroyed*** in two separate computer hard drive crash(es) that allegedly occurred at the Bridgeport clinic where the studies were allegedly stored.

**ANSWER:**  Answering the first sentence of Paragraph 102, Defendants deny the allegations in that sentence. Answering the second sentence of Paragraph 102, Defendants admit only that in some Illinois state court cases they have been unable to respond to Plaintiffs' requests for information, including subpoenas, aimed at securing reproductions of digital x-rays and DMX studies because, as Defendants have truthfully reported, said computerized data was not subject to retrieval due to computer hard drive crashes, and that the computers in which such hard drive crashes occurred were located in the clinic at 804 West 31st Street, Chicago, Illinois, but Defendants deny all remaining allegations contained in the second sentence of Paragraph 102.

103.  In addition, D'Souza has provided sworn deposition testimony in the Illinois state court case of *Soto vs. Ramos, 05M1304199 (Allstate claim #2705668909)*

55

admitting that defendants are not able to produce any of defendants' digital x-rays and DMX studies that were allegedly taken of defendants' patients on or before **November of 2005,** as such studies were **permanently destroyed** in two separate hard drive crashes at the Bridgeport clinic, in which defendants had no viable back up system in place.

**ANSWER:**    Defendants admit only that computer hard drive crashes at the Bridgeport clinic, some digital x-rays and DMX studies have been permanently lost, but Defendants deny the remaining allegations of Paragraph 103.

104.    The defendants custom and practice of re-taking plain x-rays to the exact same parts of the body previously x-rayed, taking of x-rays to parts of the patient's body that were not even injured, and/or otherwise unnecessarily taking x-rays on patients, is not medically appropriate and/or warranted for the necessary care and treatment of the defendants' patients, and if such studies are actually being rendered, they are solely done for the purpose of "building up" and/or "inflating" the amount of the defendants' billing statements, and the particular patient's personal injury claim.

**ANSWER:**    Defendants deny the allegations in Paragraph 104.

105.    Defendants continue to fraudulently conceal the unnecessary taking of x-rays to parts of the body that the patient denied even injuring by simply misrepresenting in form medical reports and records that the patient did in fact complain of injuries to the parts of the body allegedly x-rayed by the defendants. The fraudulent x-ray related information is often not able to be reasonably discovered by the Plaintiffs until the time that the particular patient provides contrary sworn testimony regarding regarding what parts of their body were actually injured in the accident at issue, and what parts of their body, if any, were actually x-rayed by D'Souza.

**ANSWER:**    Defendants deny the allegations in Paragraph 105.

106.    Defendants continue to fraudulently misrepresent the medical necessity of re-taking x-rays to parts of the body previously x-rayed. In attempt to justify and/or substantiate the unnecessary and/or unreasonable billing for re-taking of plain x-rays on patients, D'Souza has provided deposition testimony in Illinois state court cases, such as *Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130), and Soto vs. Ramos, 05M1304199 (Allstate claim #2705668909),* that defendants' x-rays are somehow different and/or better, and/or can somehow allow D'Souza to see different things than the Radiologist could have seen when the Radiologist originally took and reported the original studies at an Emergency Room.

**ANSWER:**    Defendants deny the allegations in Paragraph 106.

107.  At the time of a patient's initial office visit, in addition to prescribing that the patient immediately receive and/or re-take standard x-rays, it is often documented in "form" initial medical reports that as a result of the patient's alleged initial complaints it will be necessary to have the patient undergo a subsequent "motion" x-ray, "DMX" a few weeks later.

**ANSWER:**  Defendants deny the allegations in Paragraph 107.

108.  At least one chiropractic physician working at one of defendants' Satellite clinics, *Julie Knell, D.C.,* has tesfied to receiving what amounts to a "kick back" and/or a "referral fee" for sending patients down to the Bridgeport clinic for x-ray related services. *Julie Knell* testified in the case of *Evans vs. Romano, 03 M1303894 (Allstate claim # 2704919527)* to receiving a *"referral fee"* of **$25** for every patient that she referred down to D'Souza at Bridgeport for the taking of an x-ray, and an additional **$25** if the patient was also later referred for a subsequent DMX study.

**ANSWER:**  With respect to Paragraph 108, which contains averments aimed at characterizing alleged testimony in a case called *Evans v. Romano*, Defendants state that by responding they do not waive their position that such matter is improper and in violation of Fed.R.Civ.P. 8(a)(2) and 8(d) and interferes with and obstructs the ability of Defendants to answer for the reasons stated hereinabove on pages 23 and 24 in Defendants' response to Paragraph 52, and Defendants also state that by answering they do not waive their position that Plaintiffs' allegations rely on improper evidentiary material consisting of hearsay that is not properly admitted into evidence in the instant action for the reasons stated hereinabove on page 24 in Defendants' response to Paragraph 52.  Further answering the balance of Paragraph 108, Defendants admit only that Dr. Knell in the cited case stated she received a $25 fee for her work in diagnosing patients as needing x-rays, but Defendants deny the remaining allegations of said paragraph, and expressly deny any and all allegations of wrongdoing, including any allegations that Defendants paid Dr. Knell or any other physician a "kick back," that Dr. Knell ever received a "kick back," or that there was anything improper with the payment of the $25 fee.

109.  Defendants fraudulently submit billing statements, physicians liens, and other

medical related documentation to the Plaintiffs through the U.S. Mail, seeking payment for x-rays, DMX studies that were on occasion never actually rendered, and/or were allegedly peformed to parts of the patient's body that were not even injuried in the accident at issue, and/or were not medically necessary and/or warranted to further diagnose and/or treat the injuries allegedly sustained by the particular patient. Specific examples of defendants inappropriate conduct relating to x-ray and DMX services allegedly rendered, include, but are not limited to:

*Soto vs. Ramos,* 05M1304l99 (Allstate c1aim# 2705668909), where the patient denied that he ever received any x-rays at defendants' clinic, yet defendants billed $700 for a cervical, thoracic and lumbar x-rays allegedly taken;

*Chiu vs. Wheeler, 04L1844 (Allstate claim# 101624467)* in which the patient's testimony indicated that she was instructed to remain "still" during the only "x –rays" she received, yet she was billed for DMX, "motion" x-rays;

*Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130)* in which Ms. Fenton was allegedly given, and billed for an x-ray to her *left* shoulder, when her deposition testimony stated that she in fact injured her *right* shoulder;

*Engram vs. Raj, 04 M1303919 (Allstate claim# 1016331678),* where defendants' billed for a DMX motion x-ray to the patient's left hand, that not only did the patient deny ever receiving, but the patient further denied even injuring her left hand in the accident at issue;

*Smith vs. Barr, 03M1302281 (Allstate claim# 2704848833),* the patient was billed for a DMX to his TMJ which he never received;

*Santiago vs. Diaz, 04M1302947 (Allstate claim# 1376180681)* the patient was billed for DMX to both the Cervical and TMJ that the patient never testified to receiving, and again, the patient further *denied* complaining about any TMJ related symptoms to defendants.

**ANSWER:**   Answering the first sentence in Paragraph 109, Defendants deny the allegations in

the first sentence.  Answering the language in the second sentence of Paragraph 109, beginning

with the start of the sentence and ending with the colon, Defendants expressly deny any and all

allegations contained therein, including but not limited to the allegations that Defendants have

"fraudulently" submitted to the Plaintiffs through the U.S. Mail billing statements, physician's

liens, or any other medical related documentation, "fraudulently" or otherwise inappropriately sought payment from Plaintiffs, "fraudulently" or otherwise inappropriately sought payment from Plaintiffs for x-rays, DMX studies, or any other medical diagnostic or treatment services which were rendered to parts of a patient's body that were not medically necessary or warranted or proper. With respect to the balance of Paragraph 109, consisting of the indented subparagraphs following the colon and setting forth averments as to purported testimony and other alleged evidential matter from a series of other lawsuits, Defendants state that by answering they do not waive their position that such matter is improper and in violation of Fed.R.Civ.P. 8(a)(2) and 8(d) and interferes with and obstructs the ability of Defendants to answer for the reasons stated hereinabove on pages 23 and 24 in Defendants' response to Paragraph 52, and Defendants also state that by answering they do not waive their position that Plaintiffs' allegations rely on improper evidentiary material consisting of hearsay that is not properly admitted into evidence in the instant action for the reasons stated hereinabove on page 24 in Defendants' response to Paragraph 52. Further answering the balance of Paragraph 109, including subparagraphs, Defendants expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that Defendants have "fraudulently" submitted to the Plaintiffs through the U.S. Mail billing statements, physician's liens, or any other medical related documentation, "fraudulently" or otherwise inappropriately sought payment from Plaintiffs, "fraudulently" or otherwise inappropriately sought payment from Plaintiffs for x-rays, DMX studies, or any other medical diagnostic or treatment services which were rendered to parts of a patient's body that were not medically necessary or warranted or proper. Further answering the balance of Paragraph 109, including subparagraphs, Defendants deny the Plaintiffs' characterizations of the purported testimony and other matter from the cases

of *Soto v. Ramos*, *Chiu v. Wheeler*, *Fenton v. Breton*, *Engram v. Raj*, *Smith v. Barr*, or *Santiago v. Diaz*, as previously stated hereinabove at pages 26-31, 33-34 in Defendants' answer to Paragraph 52.

      110.    Defendants engaged in a practice of allegedly taking DMX studies on patients even when the defendants' own medical records indicate that by the time the patient allegedly receives the DMX motion x-ray a few weeks after the alleged accident, the patient is either no longer complaining about discomfort to that particular part of the body, and/or the patient's medical records indicate that the patient had been making substantial progress and their alleged initial complaints had greatly improved. Specific examples of defendants' practice of unnecessarily and/or unreasonably taking subsequent DMX studies on patients include, but are not limited to:

> *Rush vs. Halverson, 03M2466 (Allstate claim# 2214109759); and Santiago vs. Diaz, 04M1302947 (4llstate claim# 1376180681),* in which DMX studies were allegedly given to the patient's cervical spine when the medical records and testimony suggest that the patients were progressively getting better with each visit. In both cases, DMX studies were also allegedly taken to the patient's TMJ when no such injuries to that particular part of the patient's body were ever complained about by the patient.

> *Huynh vs. Vandiver, 04L9925 (Allstate claim# 1016302975),* where the defendants billed the patient for a DMX motion x-ray allegedly performed on the patient's last visit at the clinic, when not only did the patient deny ever receiving such a motion x-ray study, but further testified that he felt much better at the time of his last visit at the defendants' clinic.

**ANSWER:**    Answering the first sentence in Paragraph 110, Defendants deny the allegations in the first sentence. Answering the language in the second sentence of Paragraph 110, beginning with the start of the sentence and ending with the colon, Defendants expressly deny any and all allegations contained therein, including but not limited to the allegations that Defendants have engaged in the unnecessary or unreasonable taking of DMX studies on their patients. With respect to the balance of Paragraph 110, consisting of the indented subparagraphs following the colon and setting forth averments as to purported testimony and other alleged evidential matter from other lawsuits, Defendants state that by answering they do not waive their position that

such matter is improper and in violation of Fed.R.Civ.P. 8(a)(2) and 8(d) and interferes with and obstructs the ability of Defendants to answer for the reasons stated hereinabove on pages 23 and 24 in Defendants' response to Paragraph 52, and Defendants also state that by answering they do not waive their position that Plaintiffs' allegations rely on improper evidentiary material consisting of hearsay that is not properly admitted into evidence in the instant action for the reasons stated hereinabove on page 24 in Defendants' response to Paragraph 52. Further answering the balance of Paragraph 110, including subparagraphs, Defendants admit that the patients in the two cited cases improved and felt better over the course of their treatment at Defendants' clinic and that they received DMX studies, for which they were billed, but Defendants deny the remaining allegations in the balance of the paragraph, and Defendants expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that Defendants have engaged in the unnecessary or unreasonable taking of DMX studies on their patients.

> 111. In certain instances in which patients were billed by defendants for DMX "motion" x-ray studies, they have testified in Illinois state court depositions that they never received any sort of (DMX) x-ray study conducted in a "*mobile van*", nor were they ever given any x-ray in which they were asked to "*move*"; rather patients have testified that they were in fact told of the importance of remaining "*still*" during all of the x-ray procedures that they allegedly had at defendants clinics. Specific examples in which patients have testified in Illinois state court cases to being *instructed* to remain "still" during their x-ray procedures *in* which defendants billed for the taking of DMX "motion x-rays" include, but are not limited to *Engram vs. Raj, 04M1303919 (Allstate claim# 1016331678), and Chui vs. Wheeler, 04L1844 (Allstate claim# 1016244467).*

**ANSWER:** With respect to Paragraph 111, consisting of averments as to purported testimony and other alleged evidential matter from other lawsuits, Defendants state that by answering they do not waive their position that such matter is improper and in violation of Fed.R.Civ.P. 8(a)(2) and 8(d) and interferes with and obstructs the ability of Defendants to answer for the reasons

stated hereinabove on pages 23 and 24 in Defendants' response to Paragraph 52, and Defendants also state that by answering they do not waive their position that Plaintiffs' allegations rely on improper evidentiary material consisting of hearsay that is not properly admitted into evidence in the instant action for the reasons stated hereinabove on page 24 in Defendants' response to Paragraph 52.  Further answering Paragraph 111, Defendants admit that they billed for DMX motion x-rays in the two cited cases, but Defendants deny the accuracy of the characterizations of the purported evidence in the two cited cases, and Defendants further expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that Defendants have billed for DMX studies on their patients that were not actually performed.

112.  To allegedly review and report their x-rays and DMX studies, defendants apparently hire out of state chiropractic radiologists as independent contractors. The x -ray bills submitted by defendants to the Plaintiffs through the U.S. Mail, contain one global amount, and on the face of the billing statement purports to indicate that the bill could include both the technical component of taking the studies, as well as the professional fee associated with the reading and reporting of the studies.

**ANSWER:**    Defendants admit the allegations of the first sentence of Paragraph 112.  In further answering the first sentence of paragraph 112, Defendants state that they have not exclusively used out of state chiropractic radiologists to review and report on their x-rays and DMX studies, and further state that chiropractic radiologists are not the only persons who review and report on x-rays and DMX studies since physicians in the Defendants' practice also review and report on them.  Defendants deny the allegations of the second sentence of Paragraph 112.

113.  According to varying and inconsistent sworn deposition testimony obtained from D'Souza in Illinois state court cases, defendants allegedly pay the out of state chiropractic radiologists anywhere from *$40 to $100* to read and report their findings of x-ray and DMX studies provided to them by the defendants. Examples of D'Souza's inconsistent testimony include:

*William Jones vs. Allstate Insurance (Allstate claim# 2704781117)* in which D'Souza testified to paying the chiropractic radiologists **$100** to

review his x-ray related studies;

*Engram vs. Raj, 04M1303919 (Allstate claim# 1016331678)* in which D'Souza testified to paying the chiropractic radiologists **$50** to review the studies.)

*Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130)* in which D'Souza testified to paying the chiropractic radiologists **$40** to review the studies;

In addition, in *Webb vs. Stoval, 03M1303552 (Allstate claim# 2704918008)l,* D'Souza further testified that before he started using a "digital" x-ray machine, for which he now allegedly sends the studies out via the internet, defendants would also allegedly incur additional postage related expenses of approximately **$25** to mail the x-rays to the various out of state chriopractic radiologists.

**ANSWER:**    With respect to Paragraph 113, which contains averments aimed at characterizing alleged testimony in a series of other cases, by responding Defendants do not waive their position that such matter is improper and in violation of Fed.R.Civ.P. 8(a)(2) and 8(d) and interferes with and obstructs the ability of Defendants to answer for the reasons stated hereinabove on pages 23 and 24 in Defendants' response to Paragraph 52, and Defendants also state that by answering they do not waive their position that Plaintiffs' allegations rely on improper evidentiary material consisting of hearsay that is not properly admitted into evidence in the instant action for the reasons stated hereinabove on page 24 in Defendants' response to Paragraph 52.   Further answering Paragraph 111, Defendants admit that Dr. D'Souza has paid chiropractic and medical radiologists different fees over time for radiology reports, that Dr. D'Souza has sometimes mailed x-rays to radiologists who reside out of state, that Dr. D'Souza has incurred expenses in doing so, that the fees paid to chiropractic and medical radiologists to review x-rays and prepare a radiology report with their findings have generally ranged from $40 to $100, and that Dr. D'Souza has so testified in some state court cases, but Defendants deny all remaining allegations in Paragraph 113.

114.     The defendants fraudulently conceal in their billing statements for x-rays and DMX studies, the part of the fee that is being charged by defendants for having the studies read and reported by these out of state chiropractic radiologists, including any and all associated mailing/postage related expenses.

**ANSWER:**     Defendants deny the allegations in Paragraph 114.

115.     The amount that the out of state chiropractic radiologist bills for their alleged professional service in reading and reporting the studies is never disclosed to the patient, and/or to Plaintiffs.

**ANSWER:**     Defendants deny the allegations in Paragraph 115.

116.     In certain circumstances defendants have in fact issued bills for ***$200*** for the alleged reading and/or reporting of DMX studies, while in certain other instances, D'Souza has testified in Illinois state court cases that defendants never bill the patient for any fee associated with the reading/reporting of the x-ray and DMX studies, rather D'Souza claims that defendants are only billing for the technical component of taking the studies.   Specific examples of D'Souza's testimony contending that defendants do not bill for the reading and reporting of such x-ray and DMX related studies include: *Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130); Soto vs. Ramos,* 05M1304l99 (Allstate c1aim# 2705668909); *Smith vs. Barr, 03M1302281 (Allstate claim# 2704848833); William Jones vs. Allstate Insurance (Allstate claim# 2704781117); Allen vs. Morrow, 03M1303335 (Allstate claim# 2705102727);* and *Chui vs. Wheeler, 04L1844 (Allstate claim# 1016244467).*

**ANSWER:**     Answering the first sentence of Paragraph 116, Defendants are without

knowledge or information sufficient to form a belief as to the truth or falsity of those allegations

and therefore deny the allegations in the first sentence of Paragraph 116.  With respect to the

second sentence of Paragraph 116, Defendants admit only that fees associated with having a

chiropractic or medical radiologist read and prepare a report on a set of x-rays are not in fact

passed on to the patients or their insurers, and that Defendant D'Souza has so testified in a series

of cases, but Defendants deny any and all remaining allegations in Paragraph 116, and to the

extent any allegations of wrongdoing, by inference or otherwise, are directed toward Defendants

in said paragraph, Defendants expressly deny any and all allegations of wrongdoing.

117.     The bills and reports that defendants submit for x-ray and DMX related services

contain the Bridgeport clinic's address, thus representing that all of the x-ray related services were performed at that location. D'Souza has repeatedly admitted in Illinois state court depositions that none of the chiropractic radiologists that he has ever retained to review and report defendants' x-ray and DMX studies have ever actually worked at the Bridgeport clinic address of 804 W. 31st Street, Chicago, Illinois, that appears on the x-ray and DMX reports and billing statements submitted by defendants.

**ANSWER:** Answering Paragraph 117, Defendants admit only that some of the bills and reports contain the address of the Bridgeport clinic that is noted because they were printed on the Bridgeport clinic stationary and that the chiropractic radiologists Dr. D'Souza has retained to prepare radiology reports are not officed at the Bridgeport clinic, but Defendants deny the remaining allegations of the paragraph.

118. To fraudulently conceal the fact that defendants are using out of state chiropractic radiologists to read and report the studies, defendants manufacture reports on defendants' own letterhead containing the Bridgeport clinic's address of 804 W. 31st Street in, Chicago, Illinois, by "cutting and pasting" the out of state chiropractic radiologists findings on to the defendants' Bridgeport clinic stationary, and electronically affixing the signature of the chiropractor who allegedly reported the study.

**ANSWER:** Defendants deny the allegations in Paragraph 118.

119. The x-ray and DMX reports produced and generated by defendants and submitted through the U.S. Mail to the Plaintiffs misrepresent that the reporting chiropractic radiologists is not only duly licensed in Illinois, but that they are either actually working at and/or affiliated with the Bridgeport clinic at the 804 W. 31st Street, Chicago, Illinois, address that appears on the x-ray and DMX reports.

**ANSWER:** Defendants deny the allegations in Paragraph 119.

120. In many instances the x-ray and DMX reports allegedly generated by these out of state chiropractic radiologists are dated many days after the date of the studies allegedly conducted by D'Souza, and in some instances the reports from the out of state chiropractic radiologists are even dated *after* the patient had already been discharged from defendants' clinics; a few specific examples of this conduct include, but are not limited to:

*Allen vs. Morrow, 03M1303335 (Allstate claim# 2705102727)* in which the defendants billed for a DMX study that was allegedly taken on 6/3/02, reported on 7/25/02, and the patient was discharged from defendants'

clinic on 6/25/02;

*Huynh vs. Vandiver, 04L9915 (Allstate claim# 1016302975),* in which defendants billed for a DMX that was reported 4 days after the patient was discharged;

*Chui vs. Wheeler, 04L1844 (Allstate claim# 1016244467)* in which defendants billed for standard x-rays which were reported six weeks after they were allegedly taken, and for DMX motion x-rays allegedly taken even before the standard x-rays were reported by the chiropractic radiologist;

*Smith vs. Barr, 03M1302281 (Allstate claim# 2704848833),* in which defendants billed for standard x-rays which were reported over 5 weeks after they were allegedly taken, and for DMX motion x-rays that were allegedly taken even before the standard x-rays were reported by the chiropractic radiologist.

**ANSWER:** Answering Paragraph 120, Defendants admit that the reports of chiropractic radiologists, whether they are officed in state or out of state, are dated after, and in many instances, including those cases cited, many days after, the x-rays are actually taken, and Defendants further state that this is because the x-rays must be sent to the radiologists, who must then read and analyze them, and prepare their reports setting forth their findings and return same to Defendants. To the extent any allegations of wrongdoing, by inference or otherwise, are directed toward Defendants in said paragraph, Defendants expressly deny any and all allegations of wrongdoing.

121. Any and all bills for x-rays and DMX studies allegedly taken on defendants' patients for which reports are generated weeks, if not months, after the studies are allegedly taken, and in some instances, even after the patient is discharged from defendants clinics, are not reasonable and necessary medical expenses incurred for the alleged care and/or treatment of the patient, and any bills for such alleged services are solely generated to increase and/or inflate the defendants' overall billing statements, and/or to increase the potential settlement value of the claim to the particular patient. In addition, said x-rays and DMX studies are in no way utilized for the care of the patient, and/or the establishment of any legitimate course of medical treatment at defendants' clinics.

**ANSWER:** Defendants deny the allegations in Paragraph 121.

122. The fees that defendants bill for x-rays and DMX allegedly taken, not only regularly exceed the reasonable and customary fees for like services, in defendants' geographic area, but said fees are grossly in excess of the fees actually contained in the Fee Facts publication that defendants misrepresent that they relied upon in setting their alleged reasonable and customary fees for like services.  In fact in some instances, defendants' bills for x-ray related services were almost twice the average fees listed in the Fee Facts billing publication.

**ANSWER:**  Defendants deny the allegations in Paragraph 122.

123. At the time of the patient's initial office visit, defendants also engage in a pattern of unnecessarily prescribing and taking various *computerized range of motion and strength test studies.*

**ANSWER:**  Defendants deny the allegations in Paragraph 123.

124. Defendants typically bill **$100 to $150** for range of motion studies allegedly performed to each part of the body allegedly tested, and additional **$75 to $100** for muscle strength tests allegedly rendered.  Defendants often prescribe, and/or allegedly render such unnecessary and/or unwarranted computerized tests on multiple office visits.

**ANSWER:**  Defendants admit that range of motion studies and muscle strength tests are usually billed within the ranges stated in the paragraph, but Defendants deny the remaining allegations in Paragraph 124.

125. The fees charged by the defendants for allegedly conducting computerized range of motion studies are not reasonable and customary medical services, and are not medically necessary to care for and/or treat any of the injuries allegedly sustained by the defendants' patients in the accidents at issue, and are simply utilized to increase the overall billing generated by defendants' clinics, and increase the overall potential settlement value of the patient's personal injury claim. In fact, any fees associated with "measuring" a patient' "range of motion" should be reasonably and customarily included as part of the physician' fee for conducting a standard examination on the patient. The computerized tests allegedly rendered by defendants have no legitimate added medical diagnostic value in the care and treatment of defendants' patients.

**ANSWER:**  Defendants deny the allegations in Paragraph 125.

126. Any computerized range of motion and/or strength study allegedly conducted by defendants is not utilized for the establishment of any purported treatment plan prescribed for the particular patient.

**ANSWER:**     Defendants deny the allegations in Paragraph 126.

127.   The computerized tests are often used by defendants to misrepresent and/or exaggerate the existence of alleged severe, permanent, and/or chronic injuries that do not exisit, and to further provide a fraudulent basis upon which the defendants attempt to substantiate extended, excessive, and unwarranted chiropractic care on patients, and to increase defendants' overall billing statements, and to potentially increase the value of the patient's personal injury claim.

**ANSWER:**     Defendants deny the allegations in Paragraph 127.

128.   In certain instances there is a lack of supporting medical documentation, and/or incomplete, and/or insufficient medical documentation, to substantiate that computerized range of motion and strength studies that were being billed by the defendants were in fact performed on the patients, and/or were medically necessary and/or appropriate for the diagnoses, care and treatment of the patient. In certain instances defendants have billed for the alleged rendering of computerized range of motion and strength studies that individual patients denied ever receiving.  Specific examples of defendants' inappropriate conduct relating to computerized range of motion studies, include, but are not limited to:

> *Soto vs. Ramos, 05M1304199 (Allstate claim# 2705668909),* in which the defendants billed Mr. Soto $675 for a total of three (3) separate computerized range of motion and strenght tests, that *Mr. Soto* simply denied ever receiving;

> *Alice Gray vs. Allstate Insurance (Allstate claim# 2705997991),* in which Ms. Gray testified that any such studies took 5 minutes to complete, and she further testified that any such studies were not conducted by Dr. D'Souza, yet defendants billed her $300 each for three separate alleged computerized studies ($900), and defendants further submitted numerous pages of reports and documents contending that the computerized studies were allegedly rendered by *D'Souza.* In addition, accompanying their billing statements in the Alice Gray case, defendants submitted, on their own letterhead, a "Statement of Medical Necessity" purporting to justify the conducting of the alleged computerized studies on Ms. Gray.

> *Davenport vs. Lewis, 05L7770 (Allstate claim#* 1237932972), the defendants produced numerous pages of graphs, charts, and reports for multiple computerized range of motion studies allegedly conducted on Ms. Davenport, that she simply denied ever receiving.

**ANSWER:**     Answering the first sentence in Paragraph 128, Defendants deny the allegations in the first sentence.   Answering the second sentence in Paragraph 128, Defendants deny the

allegations in the second sentence.  Answering the language in the third sentence of Paragraph 128, beginning with the start of the sentence and ending with the colon, Defendants expressly deny any and all allegations contained therein, including but not limited to the allegations that Defendants have engaged in "inappropriate conduct relating to computerized range of motion studies."  As to the balance of the third sentence of Paragraph 128, consisting of the indented subparagraphs following the colon and setting forth averments as to purported testimony and other alleged evidential matter from a series of other lawsuits, Defendants state that by answering they do not waive their position that such matter is improper and in violation of Fed.R.Civ.P. 8(a)(2) and 8(d) and interferes with and obstructs the ability of Defendants to answer for the reasons stated hereinabove on pages 23 and 24 in Defendants' response to Paragraph 52, and Defendants also state that by answering they do not waive their position that Plaintiffs' allegations rely on improper evidentiary material consisting of hearsay that is not properly admitted into evidence in the instant action for the reasons stated hereinabove on page 24 in Defendants' response to Paragraph 52.  Further answering the balance of the third sentence of Paragraph 128, including subparagraphs, Defendants expressly deny any and all allegations of wrongdoing, including but not limited to any and all allegations that Defendants have engaged in inappropriate conduct as to the taking of computerized range of motion studies. Further answering the balance of the third sentence of Paragraph 128, including subparagraphs, Defendants deny the accuracy of the characterizations of the purported evidence in the three cited cases, and (1) Defendants further state with respect to the *Soto* case, that Juvenal Soto did not deny that he had ever received computerized range of motion or strength tests, but instead stated he could not remember being subjected to what Allstate's attorney questioning him described as being "hooked up" to "some type of computer" or "any type of like machine,"

69

which has nothing to do with a computerized range of motion or strength test, where the test is done by a physician holding a device in his own hand; (2) Defendants further state that with respect to the *Gray* case, that Ms. Gray did state she received three separate tests "to test the muscles or something" and stated they were done by a Caucasian male at Dr. D'Souza's clinic; and (3) Defendants further state with respect to the *Davenport* case, that Ms. Davenport did not categorically deny that she ever received computerized range of motion studies, but instead answered a question on that subject matter by stating in part that she could "not recall."

> 129. In many of the documents submitted by the defendants to the Plaintiffs through the U.S. Mail, defendants make reference to, and otherwise disclose their various *web site* addresses, including, but not limited to: *whiplash100.com, whiplash102.com, DMX.tv, DMX-lab.com, back-doc.com, i-got-hurt.com, drdsouza.net.* In addition to the information submitted to Plaintiffs in the various written literature which often accompanies defendants billing statements and physicians liens, defendants' further misrepresent the medical necessity and/or their billing for DMX, by making unsubstantiated, inaccurate, false, deceptive, and/or otherwise misleading statements on their *web sites* that DMX can be utilized to diagnose, among other things, "*ligamentous instability*" of the cervical spine, that DMX can be used can "*find injuries that could never be seen before*", that DMX can provide "*objective information that cannot be disputed*", and that "*DMX can provide demonstrable evidence of permanent soft tissue damage resulting from automobile accidents*".

**ANSWER:** Answering the first sentence of Paragraph 129, Defendants admit the allegations therein, except that the web address *DMX.tv* has not been renewed, and is thus not a web site now in use by Defendants. Defendants deny the allegations in the second sentence of paragraph 129, except that Defendants admit the quotations, which came from the manufacturer, appeared on some of the web sites.

> 130. Defendants' website (www.dmx.tv) specifically targets potential personal injury patients and lawyers. Under the website's "attorneys" section defendants represent that the use of DMX can help increase the *settlement value* of cases by containing such statements as: "*Why settle for less!*; "*Stop letting 80% of your practice potential go out the door*"; "*Since we have been in practice many attorneys have come up to me and told me that before utilizing DMX for their clients, typically they would have settled for a much lesser amount, as soft tissue*

*injuries were hard to show proof. Now they send them (insurance companies) a copy of the VHS tape with their proposal and they are seeing surprising results, some policy limits".*

**ANSWER:** Defendants deny the allegations in the first sentence of Paragraph 130. Defendants deny the allegations in the second sentence of the paragraph, except that Defendants admit the quotations, which came from the manufacturer, appeared on some of the web sites.

131. Defendants' website also targets other physicians under the "doctors" section, by misrepresenting that by using DMX it can "*increase attorney referrals*" and that DMX can "*diagnose soft tissue injuries objectively, provide proof of injury, and substantiate patient care*".

**ANSWER:** Defendants deny the allegations in Paragraph 131.

132. The DMX tests allegedly conducted by defendants have no legitimate medical diagnostic value, and the reported findings and alleged diagnoses made from reviewing DMX studies are not capable of being medically supported by the tests.

**ANSWER:** Defendants deny the allegations in Paragraph 132.

133. DMX reports are often used by defendants to misrepresent the existence of ligamentous instability of the cervical spine of the patient, as well as other alleged severe, permanent, and/or chronic injuries that cannot be legitimately diagnosed by such a test.

**ANSWER:** Defendants deny the allegations in Paragraph 133.

134. In addition to the excessive costs associated with taking and reporting the unnecessary and/or unwarranted DMX studies, defendants engage in a practice of using false, misleading, and otherwise unreliable DMX findings as a basis for providing additional unnecessary, unwarranted, and/or excessive chiropractic treatments to patients, thus further increasing the defendants overall bill for services and potentially increasing the value of the patient's personal injury claim.

**ANSWER:** Defendants deny the allegations in Paragraph 134.

135. Narrative "form" medical reports routinely generated for patients allegedly treating at defendants' clinics are submitted to Plaintiffs through the U.S. Mail, purporting to represent that the patient sustained severe, permanent and chronic injuries in the accident at issue, and to justify the medical necessity, and substantiate the alleged care purportedly rendered and billed by the defendants. Defendants' form medical reports often contain one or more of the following false, misleading, deceptive and/or wholly inaccurate findings, including but not limited to:

71

a.   the actual name of the particular patient;
b.   the description of the facts and circumstances of the accident at issue;
c.   the parts of the body complained of by the patient;
d.   the objective injuries allegedly sustained by the patient;
e.   the permanency of any injuries allegedly sustained in the accident at issue;
f.   the results of radiological studies and diagnostic tests allegedly performed;
g.   the patient's diagnoses;
h.   the patient's past medical history;
i.   a disability statement regarding the patient's inability to work;
j.   recommendations of future treatment, and diagnostic testing;
k.   the patient's prognosis and alleged need for future medical care;
l.   the identity of the actual provider of medical services;
m.   a statement alleging that all of the billed services rendered were medically necessary and reasonable;
n.   standard findings of causation alleging that the diagnosed injuries were proximately caused by the accident at issue in the particular claim, regardless of whether the patient had a significant pre-existing condition to the exact same part(s) of the body allegedly "injured" in the accident at issue.

**ANSWER:**   Defendants deny the allegations in Paragraph 135.

136.   The following cases illustrate specific examples of defendants' use of "form" medical reports containing false, misleading, deceptive and/or wholly inaccurate findings relating to various aspects of the insurance claims at issue:

In *Taylor vs. Cook, 05M1304357 (Allstate claim# 2705678296),* the patient's final report incorrectly referred to Ms. Taylor as a "*Mrs. Bailie*". D'Souza admitted that the information was apparently not changed on the "form" medical report that is utilized by the defendants. In addition, the report in Ms. Taylor's case further mistakenly referred to her as the *driver* of the motor vehicle that was involved in an accident, when Ms. Taylor was actually the *passenger.* Ms Taylor also testified that she only injured her low back, neck, and left knee, yet a number of defendants' records also alleged injuries to the left shoulder, with radiating complaints to the arms and legs, as well as a left ankle injury, all of which were specifically denied by the Ms. Taylor at her deposition. Defendants' "form" final report also contended that Ms. Taylor sustained *permanent* injuries in the accident at issue and was only 85% improved by the last visit, yet Ms. Taylor testified that she was fine at the time of her discharge .

In *Reynolds vs. Green, 05L2838 (Allstate claim# 2705729594)*

Defendants' "form" final report also incorrectly referred to Ms. Reynolds as a "*Mrs. Bailie*". D'Souza admitted that the information was apparently not changed on the "form" medical report that is utilized by defendants. In addition, the report in Ms. Reynolds' case further mistakenly referred to her as a *driver* of the motor vehicle that was in a *rear end* accident, when Ms. Reynolds was actually the *passenger* in a car that was involved in a *left turn* accident. The initial report also indicated that Ms. Reynolds did not receive any emergency medical care before coming to defendants' clinic, yet in reality, Ms. Reynolds received an extensive medical and diagnostic work up at Christ Hospital in which she received over $7,000 in medical and diagnostic care. Defendants also allegedly re-took various x-rays and diagnostic tests on Ms. Reynolds that had already been performed at the Hospital and reported as negative/normal, yet defendants alleged studies reported certain positive findings, when they were conducted weeks after the accident at issue. The reports in Ms. Reynolds case also contain inaccuracies regarding the parts of her body were allegedly injured in the accident, when compared to her deposition testimony.

*In Ciara Hines and Alice Gray vs. Allstate (Allstate claim# 2705997997),* not only did Ciara Hines deny ever treating at defendants' clinic, defendants' records even purported to diagnose her with injuries to parts of body that she denied even injuring. In addition, defendants' medical records "incorrectly" described Ciara as being six (6) foot, three (3) inches tall, when at her deposition, Ciara testified that she was actually five (5) foot, six (6) inches tall. Also, Ciara's mother, Alice Gray, who testified that she actually did treat with defendants' clinic, admitted that she was 100% better at the end of her treatment, yet the defendants' "form" final report noted that she sustained *permanent* and *chronic* soft tissue type injuries in the accident at issue and was only 85% better at the time of discharge.

In a number of cases, including, but not limited to: Smith vs. Barr 03M1302281 (Allstate claim# 2704848833), Saldivar vs. Tomecki, 03L12096 (Allstate claim# 2705011019), Fenton vs. Breton, 03M1303838 (Allstate claim# 1016073130), and Wilson vs. Pickens, 03L192 (Allstate claim # 2214125938), the same "mistake" appeared in the "form" reports that were generated in each patient's case, indicating that the patient was "**wearing airbags**" in the accident. D'Souza admitted in various discovery depositions that the reference to the patient "wearing airbags" was a "typo" that was contained in one of the standard paragraphs on defendants' "form" medical report that was used for all of defendants' patients. On this same issue, *Dr. Zaveleta, D.C.,* admitted in the case of *Zamorano vs. Munoz, 05M1301 000 (Allstate claim# 2705827760),* that D'Souza gave him software containing defendants "form" medical reports, and that there were in fact certain hardcoded paragraphs that Zaveleta could not alter, including the section mentioned above the that patient was

73

"wearing airbags" in the accident. *Zaveleta* also admitted to "form" paragraphs pertaining to causation, prognosis and need for future medical care, that he could not alter as well.

In *Saldivar vs. Tomecki, 03L12096 (Allstate claim# 2705011019),* the final "form" report noted that Ms. Saldivar was still allegedly complaining about a right ankle injury that Ms. Saldivar denied ever sustaining in the accident at issue. Defendants' records also diagnosed various other injuries allegedly sustained by Ms. Saldivar to her left shoulder, right triceps, right forearm, right hip, right thigh, and right knee, that Ms. Saldivar also denied injuring in the accident at issue.

In *Santiago vs. Diaz,04M1302947 (Allstate claim# 1376180681),* Ms. Santiago admitted that she was better at the end of the treatments at defendants' clinic, yet defendants' "form" report indicated she sustained *permanent* and *chronic* injuries in the accident. Defendants' records failed to even note injuries that Ms. Santiago had sustained in a prior worker's compensation accident. Ms. Santiago testified to complaining about her back and neck, but defendants' records also noted that they allegedly treated injuries to her knees, shoulders and legs. Ms. Santiago actually testified that while she *did* injure her knees in the accident issue, that injury had resolved by the time she started treating with D'Souza approximately 2 weeks after the accident.

In *Wilson vs. Pickens, 03L192 (Allstate claim # 2214125938),* defendants' initial "form" report noted that the patient had "torn ligaments" even before a single diagnostic study had been performed. Defendants' "form" final report also contended that the patient's final diagnosis was *cervical disc displacement-herniation,* when the patient never even received a CT scan, MRI and/or any other diagnostic test to confirm such a diagnosis. Defendants' records and D'Souza's testimony in the case contended that the patient struck his *left* shoulder on the driver's door, yet the patient testified in his deposition that he was actually thrown to the *right* in the accident and injured his *right* shoulder.

In *Smith vs. Barr 03M1302281 (Allstate claim# 2704848833),* D'Souza admitted that he "*forgot*" to type in case specific information on the "form" final report which still contained the phrase: "*need verbiage*". D'Souza further admitted that the reports utilized by defendants contained "form" paragraphs noting the alleged injuries were *permanent* and *chronic* and *causally connected* to the accident at issue in the case.

In *Soto vs. Ramos, 05M1304199 (Allstate claim # 2705668909),* defendants' initial and final "form" reports noted that Mr. Soto sustained lumbar and thoracic spine injuries causing him to have *weakness* in both of his legs, and D'Souza suspected that Mr. Soto had sustained a *herniated*

*disc,* yet Mr. Soto testified that he was fine on his last visit to defendants' clinic, and further *denied* that he ever complained about *any weakness* in his lower extremities at all.

In *Webb vs. Stoval, 03M1303552 (Allstate claim# 2704918008)* the patient testified to *only* receiving a ***low back*** injury, yet defendants' records purported to diagnose and treat *cervical* and *thoracic* spine injuries, and even reported that the patient sustained *cervical disc displacement/herniation.* The "form" medical reports further noted that the patient's *cervical* spine injury was *permanent* and *chronic* and *casually related* to the accident at issue. Also the "disability" section of the "form" report noted that the patient related: "I can *drive* my car as long as I want with moderate *neck* pain". However, not only did this patient deny that he had a neck injury, the patient further testified that he did not even have a driver's license, and he was passenger in the car accident at issue.

In *Jones vs. Allstate (Allstate claim# 2704781117),* Mr. Jones testified that he sustained an injury to his ***low back*** as he was attempting to get into his parked car, when he was struck in the ***low back*** by the side mirror of another car that was backing out of an adjacent parking space. Mr. Jones repeatedly testified that the only injury he sustained was to his low back. Mr. Jones also admitted to at least a 7 year history of a prior low back injury in which he had been diagnosed with a herniated disc, for which surgery had actually been recommended. Mr. Jones also admitted to a prior history of knee surgery. On defendants "form" medical reports and records, D'Souza opined that Mr. Jones ***low back*** injury was solely caused by the car accident, and failed to even mention the patient's pre-existing low back condition. More importantly, other medical records obtained in the case from other doctors indicated that Mr. Jones had treated for his low back condition literally days before the alleged car accident. Defendants' "form" report also purported to diagnose and treat Mr. Jones for a *knee* injury and an *ankle* sprain, that Mr. Jones denied sustaining in the car accident. In D'Souza's deposition in the case he actually attempted to opine how Mr. Jones allegedly sustained a "*contusion*" to his ***knee,*** as well as *patellar tendonitis,* when Mr. Jones allegedly twisted his ***knee*** and apparently hit it against the side of the car in the accident.

In *Goodwin vs. Martin, 05M1301867 (Allstate claim# 2705860753),* Mr. Goodwin was actually under the care of D'Souza for a *low back injury* that he had sustained in a work related accident, when he was involved in a subsequent car accident. Thereafter, Mr. Goodwin continued to treat with D'Souza for both accidents. Defendants maintained two separate and distinct files for the work accident and the car accident. The work accident file *only* reported complaints "*low back*", and the car accident file *only* reported complaints to the "*mid back* and *neck*". Each file also never mentioned the other accident/injuries. After the date of the car accident

defendants issued two separate and distinct bills for services allegedly rendered to Mr. Goodwin for the *exact same dates of treatments*. Mr. Goodwin testified at his deposition that the car accident allegedly caused him to injure and/or aggravate his "low back" injury, for which he continued to receive treatments at defendants' clinic. Mr. Goodwin even testified that D'Souza allegedly told him that the car accident "aggravated" his pre-existing low back condition, yet none of this was ever recorded in any of the patient's medical records, which purport to note completely different injuries being sustained in each accident.

**ANSWER:**  Answering the language in the first sentence of Paragraph 136, beginning with the start of the sentence and ending with the colon, Defendants deny any and all allegations contained therein, and Defendants expressly deny that they have issued "bogus" form medical reports that are false, misleading, deceptive, or wholly inaccurate, deny that they have misrepresented the severity, permanency or chronic nature of the patients' injuries, deny that they ever provided care and treatment or diagnostic services to a patient where it was not medically necessary and reasonable to do so, deny that the Defendants ever fabricated the complaints of patients, deny that they gave false diagnoses of patients, deny that Defendants reported false test results, deny that they have misrepresented any other aspect of the care and treatment or diagnosis of their patients, and deny that they have engaged in fraudulent or otherwise inappropriate billings. With respect to the balance of Paragraph 136, consisting of the indented subparagraphs following the colon and setting forth averments as to purported testimony and other evidential matter from a series of other lawsuits, Defendants state that by answering they do not waive their position that such matter is improper and in violation of Fed.R.Civ.P. 8(a)(2) and 8(d) and interferes with and obstructs the ability of Defendants to answer for the reasons stated hereinabove on pages 23 and 24 in Defendants' response to Paragraph 52, and Defendants also state that by answering they do not waive their position that Plaintiffs' allegations rely on improper evidentiary material consisting of hearsay that is not

properly admitted into evidence in the instant action for the reasons stated hereinabove on page 24 in Defendants' response to Paragraph 52. Further answering the indented subparagraphs of Paragraph 136, and without waiving their position that the referenced purported testimony from other lawsuits is improper evidentiary material that is not admissible in this action, Defendants state as follows:

Answering the first subparagraph of Paragraph 136 regarding *Taylor v. Cook*, Defendants deny any and all allegations of wrongdoing contained therein, and Defendants expressly deny that they issued "bogus" form medical reports that are false, misleading, deceptive, or wholly inaccurate, deny that they have misrepresented the severity, permanency or chronic nature of injuries, deny that they provided care and treatment or diagnostic services where it was not medically necessary and reasonable to do so, deny that they fabricated the complaints made by a patient, deny that they gave false diagnoses, deny that they reported false test results, deny that they misrepresented any other aspect of the care and treatment provided, and deny that they have engaged in fraudulent or otherwise inappropriate billings. Further answering the subparagraph, and specifically in response to the first three sentences of the subparagraph, Defendants admit only that the clerical errors of the inclusion of the words "Mrs. Battie" and "driver" occurred in a report, but deny that said clerical errors in a medical report demonstrate that it is a "bogus" form medical report or evidence of fraudulent medical treatment or billings. Further answering the subparagraph, and specifically in response to the fourth sentence of the subparagraph, Defendants expressly deny the characterization of the testimony of Arlangia

Taylor in that she stated at a deposition in the cited case that she had other injuries beyond the injuries to the neck, low back and left knee alleged by Plaintiffs, including pain shooting down one of her legs from her tailbone area, pain shooting from the knee down, both of which persisted for approximately eight weeks, episodic pain in the hip, an inability to turn from right to left without having a problem, and a feeling of a "pulling" sensation radiating from her neck area, and when asked by Allstate's counsel whether she had complained about her foot at Defendants' clinic, she responded by stating: "My ankle maybe." Further answering the subparagraph, and specifically in response to the fifth sentence of the subparagraph, Defendants expressly deny the characterization of the testimony of Ms. Taylor in that while she stated she was feeling much better at the conclusion of her therapy at Defendants' clinic, she did not deny the permanency of her injuries, but instead explicitly described the ongoing and persistent nature of her injuries, including "serious throbbing and pain in my back and in my knee," and expressly stated that she was still suffering from those injuries as of the day of her deposition.

Answering the second subparagraph of Paragraph 136 regarding *Reynolds v. Green*, Defendants deny any and all allegations of wrongdoing contained therein, and Defendants expressly deny that they issued "bogus" form medical reports that are false, misleading, deceptive, or wholly inaccurate, deny that they have misrepresented the severity, permanency or chronic nature of injuries, deny that they provided care and treatment or diagnostic services where it was not medically necessary and reasonable to do so, deny that they fabricated the

complaints made by a patient, deny that they gave false diagnoses, deny that they reported false test results, deny that they misrepresented any other aspect of the care and treatment provided, and deny that they have engaged in fraudulent or otherwise inappropriate billings. Further answering the subparagraph, and specifically in response to the first three sentences of the subparagraph, Defendants admit only that the clerical errors of the inclusion of the words "Mrs. Battie" and "driver" occurred in the reports, but deny that said clerical errors in a medical report demonstrate that it is a "bogus" form medical report or evidence of fraudulent medical treatment or billings, and Defendants deny the remaining allegations in the first three sentences. Further answering the subparagraph, and specifically in response to the fourth sentence of the subparagraph, Defendants deny the Plaintiffs' characterization of the evidence in that there was no explicit denial of "emergency medical care" in a report, and Defendants further state that apparently as of the first visit Consuela Reynolds filled out a form at the Defendants' clinic to enable Defendants to have the necessary legal authority to request and secure her medical records from Christ Hospital. Further answering the subparagraph, and specifically in response to the balance of the subparagraph, Defendants admit only that they took x-rays of the patient and used same to diagnose the patient's condition but deny the remaining allegations in the balance of the subparagraph.

Answering the third subparagraph of Paragraph 136 regarding *Hines and Gray v. Allstate*, Defendants deny any and all allegations of wrongdoing contained therein, and Defendants expressly deny that they issued "bogus" form medical

reports that are false, misleading, deceptive, or wholly inaccurate, deny that they have misrepresented the severity, permanency or chronic nature of injuries, deny that they provided care and treatment or diagnostic services where it was not medically necessary and reasonable to do so, deny that they fabricated the complaints made by a patient, deny that they gave false diagnoses, deny that they reported false test results, deny that they misrepresented any other aspect of the care and treatment provided, and deny that they have engaged in fraudulent or otherwise inappropriate billings. Further answering the subparagraph, and specifically in response to the first sentence of the subparagraph, Defendants deny the allegations contained therein and further state that Ciara Hines explicitly stated at an arbitration hearing in the cited case that she did in fact receive treatments at Defendants' clinic. Further answering the subparagraph, and specifically in response to the second sentence of the subparagraph, Defendants admit that a six foot three note was put down in a report concerning Ms. Hines, but deny any wrongdoing in connection therewith and further state that it appears to have been a mistake in taking information from a notation put into the "Patient Information" sheet by Ms. Hines' mother who used the numerals "63" to express the child's height. Further answering the subparagraph, and specifically in response to the final sentence of the subparagraph, Defendants admit that Alice Gray at one point in a deposition in the cited case answered affirmatively to the question of whether she was "100 percent better" at the end of her treatment, but Defendants deny the balance of the allegations of the final sentence, and Defendants further state that immediately before said question Ms. Gray made

clear that she really could not remember by what percentage she had improved: "I don't recall exactly what it was."

Answering the fourth subparagraph of Paragraph 136, Defendants deny any and all allegations of wrongdoing contained therein, and Defendants expressly deny that they issued "bogus" form medical reports that are false, misleading, deceptive, or wholly inaccurate, deny that they have misrepresented the severity, permanency or chronic nature of injuries, deny that they provided care and treatment or diagnostic services where it was not medically necessary and reasonable to do so, deny that they fabricated the complaints made by a patient, deny that they gave false diagnoses, deny that they reported false test results, deny that they misrepresented any other aspect of the care and treatment provided, and deny that they have engaged in fraudulent or otherwise inappropriate billings. Further answering the subparagraph, and specifically in response to the first and second sentences of the subparagraph, Defendants admit that the phrase "wearing airbags" appeared in certain medical reports and that this was a simple clerical error or "typo," but Defendants deny the remaining allegations in the first and second sentences. Further answering the subparagraph, and specifically in response to the balance of the subparagraph, Defendants admit only that Dr. Raul Zavaleta stated in a deposition in the cited case that he was given report writing software to use in preparing reports on patients, and that the words "wearing airbags" appeared in a report, but Defendants deny the remaining allegations and they deny the rest of the Plaintiffs' characterization of the testimony of Dr. Zavaleta, and Defendants further state that at the deposition in the case cited by

81

Plaintiffs Dr. Zavaleta emphasized that certain patient history information "needs to be typed completely in my own words," that in using the software he had "the choice to modify" text generated by the report writing software, that he always had the discretion to change, delete, or otherwise modify certain computer-generated paragraphs in the report, and that he attributed his failure to correct the "wearing airbags" language to a simple mistake, while noting that for him "[e]nglish is a second language."

Answering the fifth subparagraph of Paragraph 136 regarding *Saldivar v. Tomecki*, Defendants deny any and all allegations of wrongdoing contained therein, and Defendants expressly deny that they issued "bogus" form medical reports that are false, misleading, deceptive, or wholly inaccurate, deny that they have misrepresented the severity, permanency or chronic nature of injuries, deny that they provided care and treatment or diagnostic services where it was not medically necessary and reasonable to do so, deny that they fabricated the complaints made by a patient, deny that they gave false diagnoses, deny that they reported false test results, deny that they misrepresented any other aspect of the care and treatment provided, and deny that they have engaged in fraudulent or otherwise inappropriate billings. Further answering the subparagraph, Defendants admit that they diagnosed Adela Saldivar as having the injuries specified in her medical records, but Defendants deny the remaining allegations in said subparagraph, and Defendants further answer by stating that Plaintiffs have mischaracterized the purported testimony from the cited case in that Ms. Saldivar in a deposition taken in that case described her injuries as including *inter alia*

weakness in "all" of her body, pain throughout all her arm and shoulder, pain throughout her waist area, pain and bruises in her chest which had hit the steering wheel in the subject accident, and pain going from her back down both her legs, which became more noticeable when she walked or did certain movements.

Answering the sixth subparagraph of Paragraph 136 regarding *Santiago v. Diaz*, Defendants deny any and all allegations of wrongdoing contained therein, and Defendants expressly deny that they issued "bogus" form medical reports that are false, misleading, deceptive, or wholly inaccurate, deny that they have misrepresented the severity, permanency or chronic nature of injuries, deny that they provided care and treatment or diagnostic services where it was not medically necessary and reasonable to do so, deny that they fabricated the complaints made by a patient, deny that they gave false diagnoses, deny that they reported false test results, deny that they misrepresented any other aspect of the care and treatment provided, and deny that they have engaged in fraudulent or otherwise inappropriate billings. Further answering the subparagraph, Defendants admit only that Dawn Santiago stated that her treatment at Defendants' clinic improved her condition and that Defendant D'Souza correctly noted on a report that her injuries sustained in the automobile accident would have a permanent impact on the use of her spine, but Defendants deny the remaining allegations in said subparagraph. Defendants further answer by stating that Plaintiffs have distorted the significance of the injuries from a "prior worker's compensation accident" in that said workplace injuries occurred nine years before the subject auto accident and involved "carpal tunnel" type injuries to Ms. Santiago's two

wrists, having absolutely no relation or relevance to the injuries to the spine and other injuries Defendants were treating her for nine years later.  Defendants further answer by stating that Plaintiffs have mischaracterized the purported testimony from the cited case in that Ms. Santiago could not remember ever telling Defendants about her workplace-related wrist injuries from nine years before, and in that Plaintiffs omitted to take account of the fact that the patient repeatedly stated at a deposition that she could not remember what exactly she said or what exactly had occurred during her treatment at Dr. D'Souza's office that took place four years before the date that her deposition was taken, such as her comment: "I'm very short on remembering stuff."

Answering the seventh subparagraph of Paragraph 136 regarding *Wilson v. Pickens*, Defendants deny any and all allegations of wrongdoing contained therein, and Defendants expressly deny that they issued "bogus" form medical reports that are false, misleading, deceptive, or wholly inaccurate, deny that they have misrepresented the severity, permanency or chronic nature of injuries, deny that they provided care and treatment or diagnostic services where it was not medically necessary and reasonable to do so, deny that they fabricated the complaints made by a patient, deny that they gave false diagnoses, deny that they reported false test results, deny that they misrepresented any other aspect of the care and treatment provided, and deny that they have engaged in fraudulent or otherwise inappropriate billings.  Further answering the subparagraph, Defendants admit that they diagnosed Peter Wilson with cervical disc displacement-herniation, among other things, but Defendants deny the remaining allegations in

said subparagraph, and Defendants further answer by stating that (1) they performed diagnostic tests, including plain film radiographs and videofluoroscopic x-rays, that provided confirmation of their diagnoses of the patients, and (2) Plaintiffs have mischaracterized the purported testimony from the cited case in that Mr. Wilson explicitly answered "That's correct" in response to a question from Allstate's counsel as to whether or not his "left arm and shoulder made contact with the driver's side door."

Answering the eighth subparagraph of Paragraph 136 regarding *Smith v. Barr*, Defendants deny any and all allegations of wrongdoing contained therein, and Defendants expressly deny that they issued "bogus" form medical reports that are false, misleading, deceptive, or wholly inaccurate, deny that they have misrepresented the severity, permanency or chronic nature of injuries, deny that they provided care and treatment or diagnostic services where it was not medically necessary and reasonable to do so, deny that they fabricated the complaints made by a patient, deny that they gave false diagnoses, deny that they reported false test results, deny that they misrepresented any other aspect of the care and treatment provided, and deny that they have engaged in fraudulent or otherwise inappropriate billings. Further answering the subparagraph, Defendants admit that Dr. D'Souza acknowledged a clerical omission in a report, but Defendants deny the remaining allegations in said subparagraph.

Answering the ninth subparagraph of Paragraph 136 regarding *Soto v. Ramos*, Defendants deny any and all allegations of wrongdoing contained therein, and

Defendants expressly deny that they issued "bogus" form medical reports that are false, misleading, deceptive, or wholly inaccurate, deny that they have misrepresented the severity, permanency or chronic nature of injuries, deny that they provided care and treatment or diagnostic services where it was not medically necessary and reasonable to do so, deny that they fabricated the complaints made by a patient, deny that they gave false diagnoses, deny that they reported false test results, deny that they misrepresented any other aspect of the care and treatment provided, and deny that they have engaged in fraudulent or otherwise inappropriate billings. Further answering the subparagraph, Defendants admit that Juvenal Soto stated in a deposition in the cited case that he had no weakness in his legs during treatment, that Dr. D'Souza suspected the patient's having a disc injury, that reports noted leg weakness in the patient, and that the patient stated he was fine at the conclusion of therapy.

Answering the tenth subparagraph of Paragraph 136 regarding *Webb v. Stoval*, Defendants deny any and all allegations of wrongdoing contained therein, and Defendants expressly deny that they issued "bogus" form medical reports that are false, misleading, deceptive, or wholly inaccurate, deny that they have misrepresented the severity, permanency or chronic nature of injuries, deny that they provided care and treatment or diagnostic services where it was not medically necessary and reasonable to do so, deny that they fabricated the complaints made by a patient, deny that they gave false diagnoses, deny that they reported false test results, deny that they misrepresented any other aspect of the care and treatment provided, and deny that they have engaged in fraudulent or

otherwise inappropriate billings. Further answering the subparagraph, and specifically in response to the first sentence thereof, Defendants admit that Gregory Webb was diagnosed and treated for cervical and thoracic spine injuries, among other things, but Defendants deny the remaining allegations of that sentence, and Defendants further state that Plaintiffs have mischaracterized the testimony of Mr. Webb that was given in a deposition in the case in that Mr. Webb did not limit his complaints of injury solely to the low back, but instead stated that as a consequence of the automobile accident he sustained injuries to his "[l]ower back, neck and shoulders." Further answering the subparagraph, and specifically in response to the second sentence thereof, Defendants admit that they diagnosed Mr. Webb with cervical as well as lumbar injuries, which were causally related to the accident, but deny the remaining allegations of the sentence. Further answering the subparagraph, and specifically in response to the third sentence thereof, Defendants admit that the quoted language is found in the "Neck Pain and Disability Index" in the initial report, but Defendants deny the remaining allegations in said sentence. Further answering the subparagraph, and specifically in response to the fourth sentence thereof, Defendants deny the allegations in that sentence, and Defendants further state Plaintiffs' have mischaracterized Mr. Webb's statements made at a deposition in the cited case in that Mr. Webb did not deny having a neck injury but instead stated that as a consequence of the automobile accident he sustained injuries to his "[l]ower back, neck and shoulders."

Answering the eleventh subparagraph of Paragraph 136 regarding *Jones v.*

*Allstate*, Defendants deny any and all allegations of wrongdoing contained therein, and Defendants expressly deny that they issued "bogus" form medical reports that are false, misleading, deceptive, or wholly inaccurate, deny that they have misrepresented the severity, permanency or chronic nature of injuries, deny that they provided care and treatment or diagnostic services where it was not medically necessary and reasonable to do so, deny that they fabricated the complaints made by a patient, deny that they gave false diagnoses, deny that they reported false test results, deny that they misrepresented any other aspect of the care and treatment provided, and deny that they have engaged in fraudulent or otherwise inappropriate billings. Further answering the subparagraph, and specifically in response to the first through third sentences thereof, Defendants admit only that William Jones stated at a deposition in the cited case that he had experienced "aches and pains" in his lower back for a couple of years before the subject automobile accident, but Defendants deny the remainder of the allegations contained in said sentences, and Defendants further state that while Mr. Webb stated he had aches and pains in the "lower portion of my back" prior to the accident, he did not insist that his accident-related injury was confined to the low back, but instead used the word "back" to describe the locus of his accident-related injury that was at issue in the cited case. Further answering the subparagraph, and specifically in response to the fourth sentence thereof, Defendants are without knowledge or information sufficient to form a belief as to what Plaintiffs are referring to exactly or are attempting to allege, and thus Defendants are unable to form a belief as to the truth or falsity of the allegations.

To the extent any allegations of wrongdoing, by inference or otherwise, are directed toward Defendants in said fourth sentence, Defendants expressly deny any and all allegations of wrongdoing. Further answering the subparagraph, and specifically in response to the fifth sentence thereof, Defendants admit that Dr. D'Souza diagnosed the patient's back injury as being caused by the auto accident, but Defendants deny the remaining allegations in said sentence, and Defendants further state that Plaintiffs have distorted the purported evidentiary record in the cited case by falsely insisting that the post-accident back injury was of the same quality as the pre-accident aches and pains when in fact it was not, as was made clear by the statements of Mr. Jones that his pre-accident back pain did not curtail his daily activities, whereas his accident-related back symptoms prohibited his engaging in such activities as taking extended walks. Further answering the subparagraph, and specifically in response to the sixth and seventh sentences thereof, Defendants are without knowledge or information sufficient to form a belief as to what Plaintiffs are referring to exactly or are attempting to allege, and thus Defendants are unable to form a belief as to the truth or falsity of the allegations. To the extent any allegations of wrongdoing, by inference or otherwise, are directed toward Defendants in said fourth sentence, Defendants expressly deny any and all allegations of wrongdoing. Further answering the subparagraph, and specifically in response to the eighth and final sentence, Defendants admit that Dr. D'Souza believed that Mr. Jones sustained a contusion and other injuries to the knee that Mr. Jones said he hurt in the accident, and Defendants deny any remaining allegations of wrongdoing that may exist in said

final sentence.

Answering the twelfth subparagraph of Paragraph 136 regarding *Goodwin v. Martin*, Defendants deny any and all allegations of wrongdoing contained therein, and Defendants expressly deny that they issued "bogus" form medical reports that are false, misleading, deceptive, or wholly inaccurate, deny that they have misrepresented the severity, permanency or chronic nature of injuries, deny that they provided care and treatment or diagnostic services where it was not medically necessary and reasonable to do so, deny that they fabricated the complaints made by a patient, deny that they gave false diagnoses, deny that they reported false test results, deny that they misrepresented any other aspect of the care and treatment provided, and deny that they have engaged in fraudulent or otherwise inappropriate billings. Further answering the subparagraph, Defendants admit only that Charles Goodwin sought treatment from Defendants for injuries sustained at his workplace, that he completed said treatment, that approximately two months later he was in a motor vehicle accident, that he sustained thoracic and cervical spine injuries, shoulder injuries, myalgia and myositis, and diffuse cervicobrachial syndrome, together with other injuries, as a consequence of said accident, that he sought care and treatment from Defendants for such injuries, that he was treated from April 19, 2004 through June 23, 2004, that Mr. Goodwin stated in a deposition that he suffered from, among other injuries, pain from his lower back to his legs at the time of the treatment, that he stated he received treatment for his injuries to his neck, shoulder and back, as well as lower back, at Defendants' clinic, and that there is a duplicate bill in Defendants' accident

90

medical file for this patient but both bills clearly state that they are for a "MVA" meaning motor vehicle accident that occurred on April 15, 2004. Further answering the subparagraph, Defendants deny the remaining allegations of the subparagraph, and Defendants further state that Mr. Goodwin stated at his deposition that his bills from Defendants' clinic relating to his auto accident-related injuries did not have anything to do with his worker's compensation injury, and Defendants further state that Mr. Goodwin specifically stated that his accident-related bills were not sent to his worker's compensation carrier.

137.     In certain instances D'Souza generates and submits to the Plaintiffs through the U.S. Mail, "form" narrative medical reports for patients that allegedly treat with other medical providers at the defendants' Satellite clinics. In certain situations D'Souza electronically affixes the other physician's name to the report, and prepares the report without ever consulting with this other medical provider.

**ANSWER:**     Defendants deny the allegations in Paragraph 137.

138.     The physician from the Satellite clinic for whom D'Souza purportedly prepares medical reports is not shown the final report to review for accuracy and/or representations made therein, and these reports contain false, misleading, and exaggerated findings that were not contained in the physician's medical records who actually treated the particular patient, and in some instances said reports contain "errors" regarding medical opinions, conclusions, and alleged diagnoses of injuries to parts of the body that the particular patient did not even complain about injuring in the accident at issue.

**ANSWER:**     Defendants deny the allegations in Paragraph 138.

139.     In the case of *Taylor vs. Cook, 05M1304357 (Allstate claim# 2705678296)*, D'Souza admitted that he generated medical reports for ***Dr. R. Rawoof M.D.,*** who treated patients at defendants' 63rd Street Clinic, because ***Rawoof was*** not too computer literate and/or that she did not like to type. ***Rawoof*** admitted in her deposition in the *Taylor* case that when she treats patients in her own private practice (in which she spends 80% of her time) she actually uses her own computer to type up her own records and reports.

**ANSWER:**     With respect to Paragraph 139, which contains averments aimed at characterizing

alleged testimony and evidentiary matter in another case, Defendants do not waive their objections to same previously stated hereinabove on pages 23-24 in Defendants' response to Paragraph. Further answering Paragraph 139, Defendants admit only that partly on the basis of the information contained in the medical file, including data in the patient registration form, the patient history information form or questionaire, the physical, orthopedic and neurological examination form, examination notes from Dr. Rawoof, and other such documents which Dr. Rawoof transmitted to Dr. D'Souza's main office, Dr. D'Souza prepared the one-page initial evaluation report in the medical file, and that Dr. Rawoof spent 20 percent of her time working for Dr. D'Souza and 80 percent of her time working in her own practice, but Defendants deny the remaining allegations in Paragraph 139.

140.    In *Taylor vs. Cook*, **Rawoof** *further* admitted that she had no involvement in the preparation of the "final report" generated by D'Souza regarding her alleged care and treatment of Ms. Taylor, and therefore, had no idea how the reported findings that the patient was "85% better" and/or how D'Souza determined the that patient's condition was "permanent and chronic", when none of this information was contained anywhere in Rawoof's medical chart for that patient. Rawoof could also not explain how and/or why in a certain paragraph Ms. Taylor was mistakenly referred to as "***Mrs. Battie***", as again, Rawoof testified that she had nothing to do with the generation of the report and never reviewed the report for accuracy.

**ANSWER:**    With respect to Paragraph 140, which contains averments aimed at characterizing alleged testimony and evidentiary matter in another case, Defendants do not waive their objections to same previously stated hereinabove on pages 23-24 in Defendants' response to Paragraph. Further answering Paragraph 140, Defendants admit that Dr. Rawoof stated in a deposition in the cited case that she did not know the basis for the inclusion in the final report of the "85% better" assessment, that she did not know who typed in the words, "Mrs. Battie," which she described as "a typographical error," and that she did not review the report, but Defendants deny the remaining allegations contained in Paragraph 140, and Defendants further stated that

Dr. Rawoof explained at her deposition that the one-page final evaluation report was typed up on the basis of her examination notes made by her on the last day of treatment and transmitted to Defendants' main office.

141. Defendants have actual knowledge that all of the false, misleading, and deceptive form medical reports that are submitted to Plaintiffs through the U.S. Mail will also be utilized by personal injury attorneys and/or will be otherwise relied upon in support of the patient's claims for injuries made to insurance companies, such as the Plaintiffs.

**ANSWER:** Defendants deny the allegations in Paragraph 141.

142. In a deliberate and calculated attempt to collect on their false and/otherwise fraudulent billing statements, defendants intend for Plaintiffs to rely on the above-mentioned material misrepresentations contained in the false, misleading and deceptive documents submitted by defendants, and for Plaintiffs to accordingly pay large sums of money in settlement of personal injury and/or insurance claims based in whole or part upon defendants' submitted documentation.

**ANSWER:** Defendants deny the allegations in Paragraph 142.

## COUNT I

### MAIL FRAUD RACKETEERING ACTIVITY,
### 18 U.S.C. section 1961 *et seq.* (RICO)

143. Plaintiffs incorporate, as though fully set forth herein, each and every allegation contained in the preceding paragraphs 1 through 142, as if fully set forth herein.

**ANSWER:** Defendants incorporate herein and reallege their answers to Paragraphs 1 through 142, as though fully set forth herein.

144. The acts and conduct of the defendants as fully alleged above were in violation of Federal law, namely, *18 U.S.C. section 1962*, which provides in pertinent part as follows:

> *(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any*

> *interest in, or the establishment or operation of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce; (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce; (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity or collection of unlawful debt.*

**ANSWER:**     Defendants admit that the statute contains the language quoted, but Defendants deny the remaining allegations contained in Paragraph 144.

145.    Defendants were and are engaged in the affairs of an ongoing enterprise, as defined in 18 U.S.C. section 1961, by operating various chiropractic clinics in the Chicagoland area for the purpose of illicitly and illegally enriching themselves at the expense of the Plaintiffs, by systematically and deliberately submitting through the U.S. Mail, false, misleading and deceptive medical reports, records, billing statements, and physicians liens, for services allegedly rendered to patients pursuing personal injury insurance claims against Plaintiffs.

**ANSWER:**     Defendants deny the allegations in Paragraph 145.

146.    Defendants' enterprise engages in and its activities affect and involve interstate commerce, as defendants' pattern of racketeering activity has consistently and repeatedly relied upon the regular use of the U.S. Mail to accomplish and achieve its purpose of defrauding the Plaintiffs in to paying out substantial sums of money based upon the above-mentioned racketeering activities of the defendants.

**ANSWER:**     Defendants deny the allegations in Paragraph 146.

147.    Defendants have made false, misleading, deceptive, and fraudulent representations of fact by submitting to the Plaintiffs through the U.S. Mail, various documents containing the following material misrepresentations, including, but not limited to:

a.    false and misleading statements in regard to the rendition, reasonableness and necessity of chiropractic examinations, treatments and diagnostic testing.

b.    false and misleading statements in regard to the necessity, duration, and nature of chiropractic examinations, treatments, and

diagnostic testing which are billed by defendants at specific CPT code levels.

c.    false and misleading statements in regard to the alleged existence of severe, permanent and/or chronic injuries allegedly sustained in the accidents at issue;

e.    false and misleading statements in regard to the qualifications and identity of the individuals actually performing the examinations, treatments and diagnostic studies allegedly rendered at defendants' clinics;

f.    false and misleading statements in regard to the reasonableness, necessity and medical value of DMX studies allegedly rendered on defendants' patients;

g.    false and misleading statements in regard to the reasonableness, necessity and medical value of computerized range of motion and strength studies allegedly rendered on defendants' patients;

h.    false and misleading statements in regard to the reasonableness and necessity of re-taking x-rays to parts of the body previously x-rayed at medical facilities immediately before coming to defendants' facilities, and/or otherwise unnecessarily taking of x-rays on patients;

i.    false and misleading statements that future medical care, diagnostic testing, or future medical care will be required to treat the alleged severe, permanent and chronic injuries allegedly sustained in the accidents at issue;

j.    false and misleading statements submitted to substantiate that defendants bills for various examinations, treatments, and diagnostic tests were reasonable and customary and/or medically necessary to treat injuries proximately caused by the accident at issue.

**ANSWER:**    Defendants deny the allegations in Paragraph 147.

148.    As a direct and proximate result of, and in reasonable reliance upon defendants' false and misleading misrepresentations, at least since January 1, 2000, and continuing through the date of this complaint, Plaintiffs were caused to and did issue substantial payments in settlement and/or other resolution of the above mentioned claims that they would not have otherwise done if the defendants' insurance scheme had not been fraudulently concealed to them.

**ANSWER:**     Defendants deny the allegations in Paragraph 148.

149.     As described above, defendants engaged in a near universal pattern of self-referring various accident patients for various unnecessary, unwarranted, and costly, diagnostic testing, and treatments, regardless of the patients' symptoms or apparent injuries. The referrals for diagnostic testing such as x-rays, DMX, and computerized range of motion studies, were made among the various satellite clinics to be performed by **D'Souza** at the defendants' Bridgeport clinic.

**ANSWER:**     Defendants deny the allegations in Paragraph 149.

150.     Bogus "form" medical narrative reports often containing false, misleading, deceptive, and unsupported findings of severe, permanent and chronic injuries, and need for future medical/chiropractic care, and opining that all of the diagnosed injuries listed, were proximately caused by the accidents at issue in the particular claim were regularly submitted to the Plaintiffs by the defendants through the U.S. Mail.

**ANSWER:**     Defendants deny the allegations in Paragraph 150.

151.     The treatments, diagnostic testing, and other alleged services rendered were riot based on reasonable medical necessity in caring for the patient, but were rendered and/or allegedly rendered as part of an elaborate insurance scheme designed to maximize defendants' profits, by providing false and bogus medical records and billing statements geared towards increasing the potential settlement value and/or potential verdict on the patient's claim, which in turn would allow the defendants to collect on their fraudulent medical bills through the physicians liens that they served upon the Plaintiffs through the U.S. Mail.

**ANSWER:**     Defendants deny the allegations in Paragraph 151.

152.     The misrepresentations made by defendants to Plaintiffs were material in that Plaintiffs relied on such representations to determine the settlement value of claims made against them and their insureds.

**ANSWER:**     Defendants deny the allegations in Paragraph 152.

153.     The misrepresentations made by the defendants were also material in that defendants knew that the such representations would be utilized by plaintiff personal injury attorneys, and considered by judges and/or juries in determining the compensable damages to be awarded to the patient in a third party action filed against Plaintiffs' insureds.

**ANSWER:**     Defendants deny the allegations in Paragraph 153.

154.     When defendants made such false and fraudulent misrepresentations they were

aware of the falsity of such misrepresentations.

**ANSWER:**     Defendants deny the allegations in Paragraph 154.

155.     Defendants made the misrepresentations with the deliberate intent to deceive Plaintiffs into paying large sums of money in settlement of the fraudulent claims at issue.

**ANSWER:**     Defendants deny the allegations in Paragraph 155.

156.     Defendants also intentionally concealed and failed to disclose material facts within their knowledge, knowing that Plaintiffs were ignorant of those facts; specifically, that chiropractic, and other medical bills and related records reflected services that were not reasonable or necessary, and/or were not rendered at all, and/or rendered to the extent misrepresented in defendants' medical records and billing statements.

**ANSWER:**     Defendants deny the allegations in Paragraph 156.

157.     D'Souza has repeatedly made false and misleading statements in depositions in Illinois state court cases in a deliberate attempt to fraudulently conceal the defendants activities from being discovered by the Plaintiffs.

**ANSWER:**     Defendants deny the allegations in Paragraph 157.

158.     The object of the fraud was to enrich the defendants at the expense of Plaintiffs and other insurers.  D'Souza played a specific role in the overall fraudulent insurance scheme, and upon information and belief, D'Souza personally received all monies and profits from the alleged scheme, individually, and through the fraudulent operations of St. Anthony's.

**ANSWER:**     Defendants deny the allegations in Paragraph 158.

159.     As a direct and proximate result of the defendants' pattern of racketeeing activity consisting of repeated violations of Federal mail fraud, Plaintiffs were injured in its business and property in that since at least January of 2000, and continuing through the date of this complaint, it has paid out in excess of *$1,800,000* (One Million, Eight Hundred Thousand Dollars) in collection with insurance claims submitted through defendants' fraudulent enterprise, and Plaintiffs have further incurred other substantial consequential damages such as investigative and litigation expenses, in responding to and otherwise defending such fraudulent claims.

**ANSWER:**     Defendants deny the allegations in Paragraph 159.

160. Because of the elaborate nature of the defendants' fraudulent enterprise, plaintiffs were precluded from discovering the defendants' fraudulent activities and the resultant injuries to the Plaintiffs. Therefore, the matters raised in this complaint are timely based upon when the Plaintiffs actually discovered defendants' fraudulent activities and the resultant injuries to the Plaintiffs.

**ANSWER:** Defendants deny the allegations in Paragraph 160.

Wherefore, Plaintiffs respectfully pray that: (1) the court enter judgment in favor of the Plaintiffs and against the defendants on Count I of Plaintiffs' complaint; (2) Plaintiffs be awarded actual and consequential damages to be established at trial; (3) Plaintiffs be awarded treble damages pursuant to 18 U.S.C. section 1964, plus costs of this lawsuit, as well as reasonable attorneys fees; (4) Plaintiffs be granted such other relief that this Honorable Court deems appropriate under the circumstances.

**ANSWER:** Wherefore, Defendants deny the allegations of Count I, further deny that Plaintiffs are entitled to any relief whatsoever, and request that Count I be dismissed with prejudice and that Defendants be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just.

## COUNT II
## STATE INSURANCE FRAUD (ILLINOIS) 720 ILCS 5/46-5

161. Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the preceding paragraphs 1 through 160, as if fully set forth herein.

**ANSWER:** Defendants incorporate herein and reallege their answers to Paragraphs 1 through 160, as though fully set forth herein.

162. The acts and conduct of the defendants as fully alleged above were in violation of Illinois law, namely, *720 ILCS 5/46-5*, which provides in pertinent part as follows:

*A person who knowingly obtains, attempts to obtain, or causes to be obtained by deception, control over the property of any insurance company by the making of a false claim or by causing a false claim to be made on a policy of insurance issued by an insurance company, intending to deprive an insurance company*

> *permanently of the use and benefit of that property, shall be civilly liable to the insurance company that paid the claim or against whom the claim was made, in an amount equal to either three (3) times the value of the property wrongfully obtained, or if no property was wrongfully obtained, twice the value of the property attempted to be obtained, which ever amount is greater, plus reasonable attorney fees.*

**ANSWER:** Defendants admit that the statute contains the language quoted, but Defendants deny the remaining allegations contained in Paragraph 162.

163. As a direct and proximate result of defendants' conduct in violation of Illinois law, namely, *720 ILCS 5/46-5*, the Plaintiffs have been fraudulently caused to incur damages by having to permanently pay significant sums of money to settle and/or otherwise resolve fraudulent insurance claims based in whole or part upon defendants' illicit and illegal insurance fraud scheme, through which defendants have fraudulently obtained signifcant sums of money from Plaintiffs as a result of proceeds paid in the resolution of such fraudulent insurance claims.

**ANSWER:** Defendants deny the allegations in Paragraph 163.

164. As a direct and proximate result of the defendants' violation of Illinois law, namely, *720 ILCS 5/46-5*, Plaintiffs were injured in its business and property in that since at least January of 2000, and continuing through the date of this complaint, it has paid out in excess of *$1,800,000* (One Million, Eight Hundred Thousand Dollars) in connection with insurance claims submitted through defendants fraudulent enterprise, and Plaintiffs have further incurred other substantial consequential damages such as investigative and litigation expenses, in responding to such fraudulent claims, in an amount to be determined at trial.

**ANSWER:** Defendants deny the allegations in Paragraph 164.

165. Because of the elaborate nature of the defendants' fraudulent enterprise, plaintiffs were precluded from discovering the defendants' fraudulent activities and the resultant injuries to the Plaintiffs. Therefore, the matters raised in this complaint are timely based upon when the Plaintiffs actually discovered defendants' fraudulent activities and the resultant injuries to the Plaintiffs.

**ANSWER:** Defendants deny the allegations in Paragraph 165.

Wherefore, Plaintiffs respectfully pray that: (1) the court enter judgment in favor of the Plaintiffs and against the defendants on Count II of Plaintiffs' complaint; (2) Plaintiffs be awarded actual and consequential damages to be established at trial; (3) Plaintiffs be awarded treble damages pursuant to *720 ILCS 5/46-5*, for

any and all amounts wrongfully obtained by defendants, plus costs of this lawsuit, as well as reasonable attorneys fees; (4) Plaintiffs be awarded twice the value of property attempted to be obtained by defendants, plus costs of this lawsuit and reasonable attorney fees; (5) Plaintiffs be granted such other relief that this Honorable Court deems appropriate under the circumstances.

**ANSWER:** Wherefore, Defendants deny the allegations of Count II, further deny that Plaintiffs are entitled to any relief whatsoever, and request that Count II be dismissed with prejudice and that Defendants be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just.

## COUNT III
## INSURANCE CLAIMS FRAUD PREVENTION ACT (ILLINOIS) 740 ILCS92/5

166. Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the preceding paragraphs 1 through 165, as if fully set forth herein.

**ANSWER:** Defendants incorporate herein and reallege their answers to Paragraphs 1 through 165, as though fully set forth herein.

167. The acts and conduct of the defendants as fully alleged above were in violation of Illinois law, namely, *740 ILCS 92/5*, which provides in pertinent part as follows:

*it is unlawful to knowingly offer or pay any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer.*

**ANSWER:** Defendants admit that the statute contains the language quoted, but Defendants deny the remaining allegations contained in Paragraph 167.

168. Through the conduct of the defendants, as fully set forth above, defendants have submitted to Plaintiffs, false, and misleading medical bills for services allegedly rendered, and/or were not medically necessary and/or warranted to treat the injuries allegedly sustained by their patients.

**ANSWER:** Defendants deny the allegations in Paragraph 168.

100

169. Defendants also engaged in a practice to solicit potential patients, and personal injury attorneys by falsely advertising and misrepresenting in various literature, and on various web sites that they can use certain diagnostic tests, namely DMX, to "*find*" alleged severe and permanent injuries that "*could never be seen before*", and use DMX to "*provide demonstrable evidence of permanent soft tissue damage resulting from automobile accidents*".

**ANSWER:**     Defendants deny the allegations in Paragraph 169.

170. Defendants' websites further misrepresent to potential patients that by utilizing DMX they can "*settle*" their cases for a much higher amount, even "*policy limits*" in certain situations, because the DMX will be used to "*show proof to the doctor, **insurance company,** and attorney that your are not crazy like many accuse. This is objective information which cannot be disputed*".

**ANSWER:**     Defendants deny the allegations in Paragraph 170.

171. Defendants' website further attempts to solicit and/or target plaintiff personal injury attorneys, under a section entitled "DMX and the Attorney" in which defendants further misrepresent that through the use of DMX the defendants can ***increase potential settlement*** values, by expressly stating: "*why settle for less!*"; "*stop letting 80% of your practice potential go out the door*"; "*since we have been in practice many attorneys have come up to me and have told me that before utilizing DMX for their clients, typically they would have **settled** for a much lesser amount, as soft tissue injury(sp) were hard to show proof*".

**ANSWER:**     Defendants deny the allegations in Paragraph 171.

172. Through defendants various solicitations set forth above, defendants have knowingly offered to directly and/or indirectly assist potential claimants in attempting to obtain benefits under policies of insurance, in which defendants offer to assist the potential claimant, and/or their attorney, by misrepresenting that defendants can increase the potential value of their potential "settlements" by purporting to indicate that defendants can provide "*proof*" of injuries that "could never be seen before".

**ANSWER:**     Defendants deny the allegations in Paragraph 172.

173. At the time that defendants made the above-mentioned solicitations, offers, and misrepresentations on their web sites, defendants knew that the DMX studies studies had no legitimate diagnostic value, that such tests were not reasonable and/or medically necessary to diagnose and/or treat soft tissue injuries that were allegedly sustained in the accidents at issue, and that the DMX studies could not be utilized to "*find injuries that could never be seen before*", and that DMX could not objectively show proof of "*permanent soft tissue injuries*".

**ANSWER:**     Defendants deny the allegations in Paragraph 173.

174.    In addition to purporting to represent to potential patients, and their attorneys that defendants would be able to increase the potential settlement values of their claims, the defendants, inappropriately paid "kick backs" and/or "referral fees" to independent contractor chiropractors working at their Satellite clinics, such as *Julie Knell, D.C.,* for the referral of patients to the defendants for the taking of unnecessary, and unwarranted DMX studies by D'Souza at the main Bridgeport clinic. *(Evans vs. Romano, 03M1303894 (Allstate claim#2704919527)* addressed above).

**ANSWER:**     Defendants deny the allegations in Paragraph 174.

175.    As a direct and proximate result of the defendants' violation of Illinois law, namely, *740 ILCS* 92/5, Plaintiffs were injured in its business and property in that since at least January of 2000 and continuing through the date of this complaint, it has paid out in excess of *$1,800,000* (One Million, Eight Hundred Thousand Dollars) in connection with insurance claims submitted through defendants fraudulent enterprise, and Plaintiffs have further incurred other substantial consequential damages such as investigative and litigation expenses, in responding to and otherwise defending such fraudulent claims, in an amount to be determined at trial.

**ANSWER:**     Defendants deny the allegations in Paragraph 175.

176.    Because of the elaborate nature of the defendants' fraudulent enterprise, plaintiffs were precluded from discovering the defendants' fraudulent activities and the resultant injuries to the Plaintiffs. Therefore, the matters raised in this complaint are timely based upon when the Plaintiffs actually discovered defendants' fraudulent activities and the resultant injuries to the Plaintiffs.

**ANSWER:**     Defendants deny the allegations in Paragraph 176.

Wherefore, Plaintiffs respectfully pray that: (1) the court enter judgment in favor of the Plaintiffs arid against the defendants on Count III of Plaintiffs' complaint; (2) Plaintiffs be awarded actual and consequential damages to be established at trial; (3) Plaintiffs be awarded treble damages pursuant to *740 ILCS 92/5,* for any and all amounts wrongfully sought by defendants under Plaintiffs' contracts of insurance, plus costs of this lawsuit, as well as reasonable attorneys fees; (4) Plaintiffs be granted such other relief that this Honorable Court deems appropriate under the circumstances, including, but not limited to the granting of other equitable relief, including temporary injunctive relief, as this court deems necessary to prevent the transfer, concealment, or dissipation of illegal proceeds, or to protect the public.

**ANSWER:**     Wherefore, Defendants deny the allegations of Count III, further deny that Plaintiffs are entitled to any relief whatsoever, and request that Count III be dismissed with prejudice and that Defendants be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just.

## COUNT IV
## COMMON LAW FRAUD & MISREPRESENTATION

177.     Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the preceding paragraphs 1 through 176, as if fully set forth herein.

**ANSWER:**     Defendants incorporate herein and reallege their answers to Paragraphs 1 through 176, as though fully set forth herein.

178.     The defendants' scheme to defraud the Plaintiffs was based upon material misrepresentations of fact made in submissions of various false, misleading, and deceptive medical reports, records, billing statements, and physicians liens, and other medical related documents sent to the Plaintiffs by the defendants, intentionally, and in furtherance of their scheme to defraud Plaintiffs into making payments on claims for insurance benefits.

**ANSWER:**     Defendants deny the allegations in Paragraph 178.

179.     The defendants made representations which were false, and/or required disclosure of additional facts to render the submitted information not misleading to Plaintiffs. The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Plaintiffs by submitting false and misleading claims for medical services based upon bodily injury claims pursued by their patients, for which defendants asserted rights to attach to settlement proceeds through physicians liens submitted to the Plaintiffs through the U.S. Mail.

**ANSWER:**     Defendants deny the allegations in Paragraph 179.

180.     The material misrepresentations were known to be false by the defendants and were made for the purpose of inducing Plaintiffs to make substantial payments on various fraudulent insurance claims.

**ANSWER:**     Defendants deny the allegations in Paragraph 180.

181.    Plaintiffs reasonably relied upon such material misrepresentations to its detriment in paying numerous, unreasonable, unnecessary, inappropriate, bills for medical expenses generated by the defendants on behalf of their patients, and submitted to the Plaintiffs for payment, and Plaintiffs were also caused to pay inflated settlements and verdicts which were based in whole or part on defendants' material misrepresentations.

**ANSWER:**     Defendants deny the allegations in Paragraph 181.

182.    As a direct and proximate result of defendants' fraudulent conduct, Plaintiffs were injured in its business and property in that since at least January of 2000 and continuing through the date of this complaint, it has paid out in excess of *$1,800,000* (One Million, Eight Hundred Thousand Dollars) since at least January of 2000 and continuing through the date of this complaint, in connection with fraudulent insurance and/or personal injury claims submitted by patients of defendants' clinics, which have been based in whole or part on defendants' fraudulent conduct, and Plaintiffs have incurred other consequential damages such as investigative and litigation expenses, in an amount to be determined at trial.

**ANSWER:**     Defendants deny the allegations in Paragraph 182.

183.    Because of the elaborate nature of the defendants' fraudulent enterprise, plaintiffs were precluded from discovering the defendants' fraudulent activities and the resultant injuries to the Plaintiffs. Therefore, the matters raised in this complaint are timely based upon when the Plaintiffs actually discovered defendants' fraudulent activities and the resultant injuries to the Plaintiffs.

**ANSWER:**     Defendants deny the allegations in Paragraph 183.

Wherefore, Plaintiffs respectfully pray that: (1) the court enter judgment in favor of the Plaintiffs and against the defendants on Count IV of Plaintiffs' complaint; (2) Plaintiffs be awarded actual and consequential damages to be established at trial; (3) Plaintiffs be awarded Punitive damages; (4) Plaintiffs be granted such other relief that this Honorable Court deems appropriate under the circumstances.

**ANSWER:**     Wherefore, Defendants deny the allegations of Count IV, further deny that

Plaintiffs are entitled to any relief whatsoever, and request that Count IV be dismissed with

prejudice and that Defendants be awarded attorney's fees and costs and such other and further

relief as the Court may deem appropriate and just.

## COUNT V
## UNJUST ENRICHMENT

184. Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the preceding paragraphs 1 through 183, as if fully set forth herein.

**ANSWER:** Defendants incorporate herein and reallege their answers to Paragraphs 1 through 184, as though fully set forth herein.

185. As described above, defendants have made false and fraudulent representations of fact to Plaintiffs in regard to the existence, nature, and severity of purported soft tissue injuries allegedly attributable to accidents at issue to defraud Plaintiffs, in violation of both Federal and State Statutes pertaining to their fraudulent insurance scheme.

**ANSWER:** Defendants deny the allegations in Paragraph 185.

186. Defendants have obtained a benefit from Plaintiffs, namely the payment for chiropractic, diagnostic, and other alleged medical expenses that were non-existent, unreasonable and unnecessary, and designed to enrich defendants at Plaintiffs' detriment. Not only was the benefit gained by fraud, but it was gained through the willful violations of both Illinois and Federal laws. As a direct and proximate result of defendants' conduct, Plaintiffs have paid sums, and defendants have been benefited from those payments, in connection with their insurance fraud activities.

**ANSWER:** Defendants deny the allegations in Paragraph 186.

187. By receiving payments in connection with said fraudulent insurance scheme the defendants have clearly unjustly received a benefit to the Plaintiffs' detriment, and that the defendants' retention of such benefit violates the fundamental principals of justice, equity and good conscience.

**ANSWER:** Defendants deny the allegations in Paragraph 187.

188. As a direct and proximate result of defendants' fraudulent conduct, Plaintiffs were injured in its business and property in that since at least January of 2000 and continuing through the date of this complaint, it has paid out in excess of *$1,800,000* (One Million, Eight Hundred Thousand Dollars) since at least January of 2000 and continuing through the date of this complaint, in connection with

fraudulent insurance and/or personal injury claims submitted by patients of defendants' clinics, which have been based in whole or part on defendants' fraudulent conduct, and Plaintiffs have incurred other consequential damages such as investigative and litigation expenses, in an amount to be determined at trial.

**ANSWER:** Defendants deny the allegations in Paragraph 188.

189. Because of the elaborate nature of the defendants' fraudulent enterprise, plaintiffs were precluded from discovering the defendants' fraudulent activities and the resultant injuries to the Plaintiffs. Therefore, the matters raised in this complaint are timely based upon when the Plaintiffs actually discovered defendants' fraudulent activities and the resultant injuries to the Plaintiffs.

**ANSWER:** Defendants deny the allegations in Paragraph 189.

Wherefore, Plaintiffs respectfully pray that: (1) the court enter judgment in favor of the Plaintiffs and against the defendants on Count V of Plaintiffs' complaint; (2) Plaintiffs be awarded actual and consequential damages to be established at trial; (3) Plaintiffs be awarded Punitive damages; (4) Plaintiffs be granted such other relief that this Honorable Court deems appropriate under the circumstances.

**ANSWER:** Wherefore, Defendants deny the allegations of Count V, further deny that Plaintiffs are entitled to any relief whatsoever, and request that Count V be dismissed with prejudice and that Defendants be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just.

## COUNT VI
## NEGLIGENT SPOLIATION OF EVIDENCE REGARDING
## "LOST" X-RAY AND DMX STUDIES

190. Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the preceding paragraphs 1 through 189, as if fully set forth herein.

**ANSWER:** Defendants incorporate herein and reallege their answers to Paragraphs 1 through 189, as though fully set forth herein.

191. In response to numerous subpoenas issued in Illinois state court cases upon defendants to produce reproductions of x-rays and DMX studies allegedly taken

on various patients, defendants have responded to subpoenas contending that the requested studies were ***permanently destroyed*** in two separate computer hard drive crashes that allegedly occurred at the Bridgeport clinic where the studies were allegedly stored.

**ANSWER:**     Defendants admit that in some Illinois state court cases they have been unable to respond to Plaintiffs' requests for information, including subpoenas, aimed at securing reproductions of digital x-rays and DMX studies because, as Defendants have truthfully reported, said computerized data was not subject to retrieval due to computer hard drive crashes, and Defendants further admit that the computers in which such hard drive crashes occurred were located in the clinic at 804 West 31st Street, Chicago, Illinois. Defendants deny the remaining allegations contained in Paragraph 191.

192.     In addition, D'Souza has provided sworn deposition testimony in the Illinois state court case of *Soto vs. Ramos, 05M1304199 (Allstate claim #2705668909)* admitting that defendants are not able to produce any of defendants' digital x-rays and DMX studies that were allegedly taken of defendants' patients on or before ***November of 2005,*** as such studies were ***permanently destroyed*** in two separate hard drive crashes in which defendants had no viable back up system in place.

**ANSWER:**     Answering Paragraph 192, Defendants admit state that they have not been able to produce in some Illinois state court cases digital x-rays and DMX studies that were taken of patients in or before November 2005 because said computerized data was not subject to retrieval due to computer hard drive crashes, but Defendants deny the remaining allegations of Paragraph 192.

193.     Defendants, as treating physicians of patients pursuing first party and third party insurance claims for alleged injuries, knew, or in the exercise of reasonable and ordinary care, should have known, that the actual x-ray and DMX studies allegedly conducted on their patients, were material to any potential civil actions and/or insurance claim, for alleged personal injuries sustained by their patients.

**ANSWER:**     Defendants deny the allegations in Paragraph 193.

194.     After the x-rays and DMX studies were allegedly conducted by the defendants, the defendants allegedly maintained possession of the studies on a computer

system located at the Bridgeport facility.

**ANSWER:** Defendants admit the allegations in Paragraph 194, except that x-rays and DMX studies were in fact, and not "allegedly," conducted by Defendants and that after said studies were performed, they were in fact, and not "allegedly," maintained on a computer system located at the clinic at 804 West 31st Street, Chicago, Illinois.

195. Defendants, as the treating physicians at issue in each of the particular insurance claims submitted to the Plaintiffs, had a duty to exercise ordinary and reasonable care to ensure that any and all of the x-rays and DMX studies allegedly taken to diagnose and/or care for their patients, were reasonably stored and maintained in a manner that would allow for such studies to be capable of being subsequently retrieved for future reproduction, review, and/or inspection.

**ANSWER:** Defendants deny the allegations in Paragraph 195.

196. Defendants breached their aforementioned duty to reasonably and properly maintain and store their x-rays and DMX studies, and were careless and negligent in one or more of the following acts and/or omissions:

(a) failed to have any back up system in place in the event of a computer hard drive crash;

(b) failed to have any guidelines and/or office policy and/or procedure in place regarding the storage and/or maintenance of the x-rays and DMX allegedly taken and kept at the defendants' Bridgeport clinic;

(c) failed to have a reliable system in place for the retrieval of data from any x-ray and DMX studies maintained on defendants' computer system at the Bridgeport facility;

(d) failed to properly ensure that any personnel involved in the maintenance and/or storage of defendants' x-ray and DMX studies at the Bridgeport clinic had the proper qualifications and/or working knowledge of the procedures necessary to ensure said studies were properly stored and maintained;

(e) failed to utilize proper and sufficient computer equipment necessary for the storing of the x-ray and DMX studies; and

(f) failed to take any of the above-mentioned actions even after the defendants' allegedly sustained their first alleged computer hard drive crash.

108

**ANSWER:**     Defendants deny the allegations in Paragraph 196.

197.     As a direct and proximate result of one or more of the defendants' negligent acts and/or omissions, the defendants allegedly lost the ability to retrieve and produce for inspection, any and all digital x-ray and DMX studies that were allegedly taken and stored on their computer systems at the Bridgeport facility for any such study allegedly conducted by defendants prior to *November of 2005.*

**ANSWER:**     Defendants deny the allegations in Paragraph 197.

198.     As a direct and proximate result of defendants' negligent spoliation of the above mentioned evidence, the Plaintiffs have been extremely prejudiced and damaged in their abilities to investigate and/or otherwise defend personal injury claims submitted by patients of the defendants' clinics, in that Plaintiffs are simply precluded from having any such studies independently reviewed by any retained expert to analyze the content of the studies and to render legitimate medical opinions that could potentially be used in the defense of personal injury and insurance claims submitted by defendants' patients.

**ANSWER:**     Defendants deny the allegations in Paragraph 198.

199.     Even though defendants continue to maintain that they cannot produce the actual x-ray and DMX studies for review, defendants continue to produce typed written reports that were allegedly prepared by chiropractic radiologists regarding their review of the alleged studies, and such reports are now completely incapable of being confirmed, contradicted and/or otherwise refuted by any expert retained in defense of such personal injury or insurance claims.

**ANSWER:**     Defendants deny the allegations in Paragraph 199.

200.     Plaintiffs are further prejudiced and damaged by defendants' negligent spoliation of evidence in that defendants still continue to issue billing statements and physicians liens to the Plaintiffs for the fees sought by the defendants' for the alleged of x-ray and DMX studies that can longer be reviewed and/or substantiated. In such instances the Plaintiffs have simply been deprived of the ability to compare the veracity of any written reports with the actual x-ray and DMX studies allegedly performed by defendants.

**ANSWER:**     Answering the first sentence of Paragraph 200, Defendants deny the allegations contained in the first sentence.  Answering the second sentence of Paragraph 200, Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the averments, and on that basis Defendants deny the allegations contained in the second sentence of

Paragraph 200.

201.     As a direct and proximate result of the defendants' conduct set forth above, Plaintiffs were injured in its business and property in that since January of 2000 and continuing through the date of this complaint, it has paid out in excess of *$1,800,000* (One Million, Eight Hundred Thousand Dollars) in connection with insurance claims based in whole or part on x-ray and DMX studies that are now allegedly permanently destroyed due to defendants' negligent spoliation of evidence.

**ANSWER:**     Defendants deny the allegations in Paragraph 201.

202.     Because of the elaborate nature of the defendants' fraudulent enterprise, plaintiffs were precluded from discovering the defendants' fraudulent activities and the resultant injuries to the Plaintiffs. Therefore, the matters raised in this complaint are timely based upon when the Plaintiffs actually discovered defendants' fraudulent activities and the resultant injuries to the Plaintiffs.

**ANSWER:**     Defendants deny the allegations in Paragraph 202.


Wherefore, Plaintiffs respectfully pray that: (1) the court enter judgment in favor of the Plaintiffs and against the defendants on Count VI of Plaintiffs' complaint; (2) Plaintiffs be awarded actual and consequential damages to be established at trial; (3) Plaintiffs be awarded Punitive damages; (4) Plaintiffs be granted such other relief that this Honorable Court deems appropriate under the circumstances.

**ANSWER:**     Wherefore, Defendants deny the allegations of Count VI, further deny that

Plaintiffs are entitled to any relief whatsoever, and request that Count VI be dismissed with

prejudice and that Defendants be awarded attorney's fees and costs and such other and further

relief as the Court may deem appropriate and just.


## COUNT VII
## NEGLIGENT SPOLIATION OF EVIDENCE REGARDING DESTRUCTION OF "ORIGINAL" X-RAY AND DMX REPORTS

203.     Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the preceding paragraphs 1 through 202, as if fully set forth herein.

**ANSWER:**     Defendants incorporate herein and reallege their answers to Paragraphs 1 through

202, as though fully set forth herein.

208. Defendants engage in a practice of allegedly sending out their x-ray and DMX studies to out of state independent contractors to review and report their findings.

**ANSWER:** Defendants admit only that they have sent x-ray and DMX studies to chiropractic radiologists whose offices are located outside the State of Illinois to review same and report their findings, but Defendants deny the remaining allegations in Paragraph 204.

205. After the out of state chiropractic radiologists allegedly review the x-ray and DMX studies they allegedly prepare and generate "original" reports which are sent to D'Souza at the defendants' Bridgeport clinic.

**ANSWER:** Defendants admit only that after chiropractic radiologists whose offices are located outside the State of Illinois have reviewed x-ray and DMX studies they have prepared reports that are sent to D'Souza, but Defendants deny the remaining allegations in Paragraph 205.

206. The "original" report that is prepared by the chiropractic radiologist hired by the defendants is not generated on the defendants' clinics letterhead/stationary.

**ANSWER:** Defendants admit only that reports on x-ray and DMX studies prepared by chiropractic radiologists whose offices are located outside the State of Illinois have typically in more recent years been e-mailed to D'Souza who then prints out a physical document that sets forth the chiropractic radiologist's report while identifying the chiropractic radiologist who prepared the report, and further admit that said print-out typically bears the name of Defendants' medical practice, but Defendants deny the remaining allegations in Paragraph 206.

207. Upon receipt of the "original" report from the chiropractic radiologist, D'Souza allegedly changes/alters the "original" report by thereafter "cutting and pasting" it onto defendants' letterhead/stationary containing the Bridgeport clinic address of 804 W. 31st Street, Chicago, Illinois.

**ANSWER:** Defendants deny the allegations in Paragraph 207.

208. In addition to simply cutting/pasting the "original" report on to defendants'

letterhead/stationary, D'Souza also adds additional language to the "original" report, that he allegedly personally "agrees" with the reported findings of the radiologist. D'Souza also affixes his electronic signature and the electronic signature of the alleged out of state chiropractic radiologist to the changed/altered report.

**ANSWER:** Defendants deny the allegations in Paragraph 208.

209. The "original" report that was initially generated and submitted by the chiropractic radiologist is never kept in the defendants' patient's medical chart, and likewise, that "original" x-ray and DMX report is never submitted to the Plaintiffs for inspection/review in any of the insurance claims at issue in this case. D'Souza has testified in Illinois state court cases, including, but not limited to, *Moss vs. Oparka, 04M1302263 (Allstate claim #2705593891)*, that the "original/unaltered" report generated by the chiropractic radiologist is never kept by the defendants.

**ANSWER:** Defendants deny the allegations in Paragraph 209, and Defendants further state that when original reports have been mailed they are typically kept in the medical files, and when original reports have been e-mailed they are typically printed out on stationary at the Bridgeport clinic and kept in the medical files.

210. Defendants, as treating physicians of patients pursuing first party and third party insurance claims for alleged personal injuries, knew, or in the exercise of reasonable and ordinary care, should have known, that the "original" x-ray and DMX reports were material to potential civil actions for alleged personal injuries and insurance claims pursued by their patients.

**ANSWER:** Defendants deny the allegations in Paragraph 210.

211. Defendants, as the treating physicians at issue in each of the particular insurance claims submitted to the Plaintiffs, had a duty to exercise ordinary and reasonable care to ensure that the "original" x-ray and DMX reports initially prepared and generated by the out of state chiropractic radiologists were reasonably preserved and maintained in a manner that allowed for such reports to be capable of being later produced for future reproduction, review, and/or inspection.

**ANSWER:** Defendants deny the allegations in Paragraph 211.

212. Defendants breached their aforementioned duty to reasonably and properly preserve, maintain, and store the "original" x-rays and DMX reports, and defendants were careless and negligent in one or more of the following acts and/or omissions:

    (a)    failed to simply keep and maintain the "original" unaltered x-ray and DMX reports that were provided to them by the various radiologists in the particular patient's file;

    (b)    failed to have any guidelines and/or office policy and/or procedure in place regarding the storage and/or maintenance of the "original" x-rays and DMX reports at the Bridgeport clinic;

    (c)    failed to properly ensure that any personnel involved in the maintenance and/or storage of the "original" x-ray and DMX reports at the Bridgeport clinic had the proper qualifications and/or working knowledge of the procedures necessary to ensure said "original" reports were properly stored and maintained and;

    (d)    were otherwise careless and negligent in failing to preserve and maintain "original" patient medical records in their possession.

**ANSWER:**    Defendants deny the allegations in Paragraph 212.

213.    As a direct and proximate result of the defendants' negligent acts and/or omissions, the defendants allegedly destroyed and/or otherwise discarded the "original" unaltered x-ray and DMX reports that were allegedly initially provided to them from the independent contractor chiropractic radiologists.

**ANSWER:**    Defendants deny the allegations in Paragraph 213.

214.    As a direct and proximate result of defendants' negligent spoliation of the above mentioned evidence, the Plaintiffs have been extremely prejudiced and damaged in their abilities to investigate and/or otherwise defend personal injury and insurance claims submitted by patients of; the defendants' clinics, in that Plaintiffs are simply precluded from having the ability to review the "original" unaltered radiological reports that were initially generated by the defendants' purported independent chiropractic radiologists, and therefore, Plaintiffs have been precluded from having such "original" reports independently reviewed by any retained expert to analyze the content of the "original" reports, and to render any necessary medical opinions that could have potentially been used in the defense of personal injury and insurance claims submitted by defendants' patients.

**ANSWER:**    Defendants deny the allegations in Paragraph 214.

215.    As defendants continue to maintain that they do not keep and/or otherwise maintain the "original" unaltered x-ray and DMX reports, Plaintiffs are virtually precluded from being able to verify whether any of the "original" reported findings have been changed and/or altered by the defendants. Plaintiffs are

further prejudiced and damaged by defendants' negligent spoliation of evidence in that defendants still continue to issue and generate changed/altered x-ray and DMX reports to the Plaintiffs, and said changed/altered reports are still being submitted by defendants to substantiate the patient's alleged diagnoses and the medical necessity to continue with alleged courses of chiropractic treatments for patients, and said changed/altered x-ray and DMX reports are submitted by the defendants to the Plaintiffs to substantiate and/or support the billing statements and physicians liens generated regarding the alleged x-ray and DMX studies conducted on defendants' patients.

**ANSWER:** Defendants deny the allegations in Paragraph 215.

216. As a direct and proximate result of the defendants' conduct set forth above, Plaintiffs were injured in its business and property in that it has paid out in excess of *$1,800,000* (One Million, Eight Hundred Thousand Dollars) since at least 2000 and continuing through the date of this complaint, in connection with insurance claims based in whole or part on x-ray and DMX reports, of which the "original/unaltered" reports are now allegedly permanently destroyed due to defendants' negligent spoliation of evidence.

**ANSWER:** Defendants deny the allegations in Paragraph 216.

217. Because of the elaborate nature of the defendants' fraudulent enterprise, plaintiffs were precluded from discovering the defendants' fraudulent activities and the resultant injuries to the Plaintiffs. Therefore, the matters raised in this complaint are timely based upon when the Plaintiffs actually discovered defendants' fraudulent activities and the resultant injuries to the Plaintiffs.

**ANSWER:** Defendants deny the allegations in Paragraph 217.


Wherefore, Plaintiffs respectfully pray that: (1) the court enter judgment in favor of the Plaintiffs and against the defendants on Count VII of Plaintiffs' complaint; (2) Plaintiffs be awarded actual and consequential damages to be established at trial; (3) Plaintiffs be awarded Punitive damages; (4) Plaintiffs be granted such other relief that this Honorable Court deems appropriate under the circumstances.

**ANSWER:** Wherefore, Defendants deny the allegations of Count VII, further deny that Plaintiffs are entitled to any relief whatsoever, and request that Count VII be dismissed with prejudice and that Defendants be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just.

## COUNT VIII
## UNIFORM FRAUDULENT TRANSFER ACT (ILLINOIS)
## 740 ILCS 160/1 et seq.

218.     Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained in the preceding paragraphs 1 through 217, as if fully set forth herein.

**ANSWER:**     Defendants incorporate herein and reallege their answers to Paragraphs 1 through

217, as though fully set forth herein.

219.     Supplemental jurisdiction over this Illinois state law claim is properly before this Court in accordance with 28 U.S.C. section 1367.

**ANSWER:**     Without waiving their position that federal jurisdiction does not exist under Title

18 of the United States Code, as stated hereinabove in Defendants' response to Paragraph 12,

Defendants admit that if federal jurisdiction is assumed to exist, then this Court would have

supplemental jurisdiction of the state law claim.

220.     Upon information and belief, the wrongful acts and omissions alleged in Count VIII were carried our by the defendants with this District, in the City of Chicago, State of Illinois; and therefore, venue is properly before this Honorable Court pursuant to 28 U.S.C. section 1391(c).

**ANSWER:**     Defendants deny that they have engaged in or carried out any wrongful acts or

omissions, but Defendants otherwise admit the allegations in Paragraph 220.

221.     At all times relevant, Defendant MELVIN D'SOUZA is a citizen and resident of the State of Illinois, and currently practices as a Chiropractic Physician at his principal place of business, 804 W. 31st Street, Chicago, Illinois.

**ANSWER:**     Admitted.

222.     At all times relevant, Defendant FIDENCIO CHAIDEZ is a citizen and resident of the State of Illinois. Based upon representations made by Defendant MELVIN D'SOUZA's counsel in this matter, Defendant FIDENCIO CHAIDEZ is the brother-in-law of Defendant MELVIN D'SOUZA.

**ANSWER:**     Admitted.

223.     At all times relevant, Defendant JOHN D'SOUZA is a citizen and resident of the

State of Illinois. Upon information and belief, Defendant JOHN D'SOUZA is a relative of Defendant MELVIN D'SOUZA.

**ANSWER:**     Admitted.

224.   At all times relevant, Defendant BERNADINE D'SOUZA is a citizen and resident of the State of Illinois. Upon information and belief, Defendant BERNADINE D'SOUZA is a relative of Defendant MELVIN D'SOUZA.

**ANSWER:**     Admitted.

225.   Upon information and belief, at the time of filing this lawsuit, Defendant MELVIN D'SOUZA owned valuable assets in the form of property deeds for the following properties in and around the Chicagoland area:

a.   3055 South Poplar Avenue, Chicago, IL 60608

b.   804 West 31st Street, Chicago, IL 60608

c.   8400 West Roseview Drive, Niles, IL 60714

d.   1255-57 West 127th Street, Calumet Park, IL 60827

**ANSWER:**     Defendants admit that Dr. D'Souza had an ownership interest in the four cited

properties as of December 19, 2006, the date the lawsuit was originally filed, but in so admitting

Defendants do not represent that Dr. D'Souza was the sole owner of the properties.

226.   On March 31, 2008, Defendant MELVIN D'SOUZA and Defendant FIDENCIO CHAIDEZ executed a warranty deed transferring ownership of the property located at 3055 South Poplar Avenue, Chicago, IL 60608 to Defendant CHAIDEZ for the reasonable equivalent value of the property.

**ANSWER:**     Admitted.

227.   On October 22, 2008, Defendant MELVIN D'SOUZA and Defendant FIDENCIO CHAIDEZ executed a warranty deed transferring ownership of the property located at 804 West 31st Street, Chicago, 1L 60608 to Defendant CHAIDEZ for the reasonable equivalent value of the property.

**ANSWER:**     Admitted.

228.   On September 17, 2008, Defendant MELVIN D'SOUZA and Defendants JOHN and BERNADINE D'SOUZA executed a quit claim deed transferring ownership of the property located at 8400 West Roseview Drive, Niles, IL 60714 to

116

Defendants JOHN and BERNADINE D'SOUZA for little or no consideration.

**ANSWER:** Defendants deny the allegations in Paragraph 228 as to the September 17, 2008 date that is stated in the Paragraph, but Defendants admit that on or about August 20, 2008 Dr. D'Souza and his wife executed a quit claim deed transferring their ownership interest in the West Roseview property to John and Bernadine D'Souza. Further answering Paragraph 228, Defendants deny the remaining allegations in that paragraph.

229. On January 7, 2010, Defendant MELVIN D'SOUZA and Defendant FIDENCIO CHAIDEZ executed a quit claim deed transferring ownership of the property located at 1255-57 West l27th Street, Calumet Park, 11 60827 to Defendant CHAIDEZ for little or no consideration.

**ANSWER:** Defendants admit the allegations in Paragraph 229 with the exception of the allegation advanced in the last five words of the Paragraph, which allegation is denied by the Defendants.

230. On February 10, 2010, this Court denied the majority of the RICO defendants' Motion of Summary Judgment stating that Plaintiffs had established a genuine issue of material fact as to all counts alleged in the preceding paragraphs 1 through 217.

**ANSWER:** Defendants admit that on February 10, 2010, this Court denied the Defendants' motion for summary judgment as to the first, second, fourth, fifth, sixth, and seventh causes of action stated in the original complaint, but Defendants deny the remaining allegations of Paragraph 230.

231. In response to an order by Magistrate Judge Morton Denlow, Defendant MELVIN D'SOUZA has indicated to Plaintiffs and the Court his inability to pay a substantial settlement in resolution of these allegations set forth in the preceding paragraphs 1 through 217.

**ANSWER:** Defendants deny the allegations in Paragraph 231.

232. Upon information and belief, at all times relevant to Count VIII to this Amended Complaint, Defendant MELVIN D'SOUZA is generally not paying his debts as they become due.

117

**ANSWER:** Defendants deny the allegations in Paragraph 232. Further answering Paragraph

232, Defendants state that Dr. D'Souza was at all relevant times financially solvent.

233. At the time of filing this complaint, Plaintiffs became a "creditor" by acquiring a "claim" against Defendant MELVIN D'SOUZA as defined in the Uniform Fraudulent Transfer Act, namely, 740 IICS ] 60/2(c) and (d), which provides in pertinent part as follows:

(c) "Claim" means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, ftxed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured

(d)"Creditor" means a person who has a claim, including a claim for past-due child support

**ANSWER:** Defendants deny that Plaintiffs have a right to payment or other compensation or

damages from Defendants, but Defendants otherwise admit the allegations of Paragraph 233.

234. At the time Defendant MELVIN D'SOUZA was served with this complaint, he became a "debtor" to the Plaintiffs as defined in the Uniform Fraudulent Transfer Act, namely, 740 IICS 160/2(f), which provides in pertinent part as follows:

(f) "Debtor" means a person who is liable on a claim

**ANSWER:** Defendants deny that Dr. D'Souza is liable on any claim advanced by the

Plaintiffs, but Defendants otherwise admit the allegations of Paragraph 234.

235. The acts and conduct of Defendants MELVIN D'SOUZA and FIDENCIO CHAIDEZ with regard to the properties at 804 West 31st Street, Chicago, IL and 3055 South Poplar Avenue, Chicago, IL were in violation of Illinois state law, namely, 740 IICS 160/5, which provides in pertinent part as follows:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation (1) with actual intent to hinder, delay, or defraud any creditor of the debtor

**ANSWER:** Defendants deny the allegations of Paragraph 235.

236. With regard the aforementioned properties, Defendant MELVIN D'SOUZA acted with actual intent to hinder, delay or defraud the Plaintiffs' claim in violation of Illinois state law, namely, 740 ILCS 160/5(b )(1-11), by transferring the

properties to an insider, namely his brother-in-law Defendant CHAIDEZ, for the reasonable equivalent value of the asset after Defendant MELVIN D'SOUZA had been sued by the Plaintiffs. As a result of the fraudulent transactions, Defendant D'SOUZA became or claims to have become insolvent.

**ANSWER:** Defendants admit only that Dr. D'Souza transferred the properties to his brother-in-law Fidencio Chaidez in exchange for their reasonable equivalent value and that the property transactions occurred after this lawsuit was filed, but Defendants deny all remaining allegations of Paragraph 236 and expressly state that the property transfers were not fraudulent, were not in violation of Illinois state law, did not render Dr. D'Souza insolvent, and were not intended to hinder, delay or defraud any creditor or the Plaintiffs' claim.

237. The acts and conduct of Defendants MELVIN D'SOUZA, FIDENCIO CHAIDEZ, JOHN D'SOUZA and BERNADINE D'SOUZA with regard to the properties at 8400 West Roseview Drive, Niles, IL and 1255-57 West 127th Street, Calumet Park, IL were in violation of Illinois state law, namely, 740 ILCS 160/6(a), which provides in pertinent part as follows:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the debtor the transfer was made or the obligation incurred if the debtor made the transfer or incurred the obligation without receiving reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or became insolvent as a result of the transfer or obligation

**ANSWER:** Defendants deny the allegations of Paragraph 237.

238. With regard to the property located at 8400 West Roseview, Niles, IL, Defendant MELVIN D'SOUZA transferred ownership of the property to his relatives, Defendants JOHN and BERNADINE D'SOUZA on September 17,2008 for little or not consideration. As a result of the transfer, Defendant MELVIN D'SOUZA became or claims to have become insolvent.

**ANSWER:** Defendants admit only that Dr. D'Souza transferred his interest in the West Roseview property to his father John D'Souza and his mother Bernadine D'Souza on or about August 20, 2008, but Defendants deny all remaining allegations of Paragraph 238 and expressly state that the property transfer was not fraudulent, was not in violation of Illinois state law, did

not render Dr. D'Souza insolvent, and was not intended to hinder, delay or defraud any creditor or the Plaintiffs' claim.

> 239. With regard to the property located 1255-57 West 127th Street, Calumet Park, IL, Defendant MELVIN D'SOUZA transferred ownership to his brother-in-law, Defendant CHAIDEZ on January 7, 2010 for little or no consideration. As a result of the transfer, Defendant MELVIN D'SOUZA became or claims to have become insolvent.

**ANSWER:** Defendants admit only that Dr. D'Souza transferred his interest in the West 127th Street property to his brother-in-law Fidencio Chaidez, but Defendants deny all remaining allegations of Paragraph 239 and expressly state that the property transfer was not fraudulent, was not in violation of Illinois state law, did not render Dr. D'Souza insolvent, and was not intended to hinder, delay or defraud any creditor or the Plaintiffs' claim.

> 240. As a result of the aforementioned fraudulent transfers, Defendant MELVIN D'SOUZA will not be able to satisfy any judgment entered against him regarding the allegations of insurance fraud alleged in the preceding paragraphs 1-217.

**ANSWER:** Defendants deny the allegations of Paragraph 240.

> Wherefore, Plaintiffs respectfully pray that this Honorable Court enter an order in its favor and against Defendants MELVIN D'SOUZA, FIDENCIO CHAIDEZ, JOHN D'SOUZA, and BERNADINE D'SOUZA (1) avoiding the transfers of properties located at 3055 South Poplar Avenue, Chicago, IL 60608, 804 West 31st Street, Chicago, IL 60608, 8400 West Roseview Drive, Niles, IL 60714 and 1255-57 West 127th Street, Calumet Park, IL 60827 to the extent necessary to satisfy any future judgment obtained by Plaintiffs, (2) permitting an attachment or other provisional remedy, (3) granting temporary injunctive relief against Defendants MELVIN D'SOUZA, FIDENCIO CHAIDEZ, JOHN D'SOUZA and BERNADINE D'SOUZA preventing further disposition of the aforementioned properties and any other assets for which Plaintiffs may have a claim, (4) appointing a receiver to take charge of the aforementioned properties and (5) any other relief that this Honorable Court deems appropriate under the circumstances.

**ANSWER:** Wherefore, Defendants deny the allegations of Count VIII, further deny that Plaintiffs are entitled to any relief whatsoever, and request that Count VIII be dismissed with prejudice and that Defendants be awarded costs of suit and such other and further relief as the

Court may deem appropriate and just.

## FURTHER DENIAL

With respect to the table of contents and the headings appearing in the First Amended Complaint, and to the extent that any such matter might be deemed to advance an allegation of wrongdoing against Defendants, Defendants hereby expressly deny any and all such allegations of wrongdoing.

## JURY TRIAL DEMAND

Defendants, Melvin D'Souza, D.C., and St. Anthony's Spine & Joint Institute, P.C., hereby demand a trial by jury on all issues in this matter that are appropriately tried to a jury.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

#### Statute of Limitations
#### (RICO)

1.      While improperly omitting to specify the precise subsection or subsections of the statute they are attempting to proceed under, in Count I of the First Amended Complaint Plaintiffs purport to advance claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO").

2.      All such RICO claims are time-barred by the applicable statute of limitations or statutes of repose, including the statute of limitations properly applied to RICO civil actions as adopted in *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 150-154 (1987) because Plaintiffs knew or should have known of the injury underlying their purported cause of action more than four years prior to the time the instant lawsuit was commenced.

3.      Defendants expressly deny Plaintiffs' conclusory allegation in Paragraph 160 of the First Amended Complaint that they were somehow "precluded from discovering" their purported claims, and Defendants further aver that Plaintiffs knew, or in the exercise of reasonable diligence could have known, of the purported facts that would have put them on actual or inquiry notice of their alleged claims such that Plaintiffs are not entitled to toll the statute of limitations for any period of time.

4.      Accordingly, Plaintiffs' RICO claims in the instant litigation are barred by the statute of limitations applicable to RICO civil actions, and any and all such claims that purport to arise under the RICO statute should be dismissed with prejudice, and Defendants should be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just.

## SECOND AFFIRMATIVE DEFENSE

### Statute of Limitations
### (720 ILCS 5/46-5)

1.      Plaintiffs purport to advance a claim for civil damages under 720 ILCS 5/46-5 in Count II of the First Amended Complaint.

2.      Plaintiffs' claims in Count II are barred under the statute of limitations or statute of repose applicable to civil actions for damages brought under 720 ILCS 5/46-5, including but not limited to Section 13-205 of the Code of Civil Procedure, 735 ILCS 5/13-205, which provides for a general five-year statute of limitations for all civil actions not otherwise provided for by statute, because Plaintiffs' purported cause of action accrued more than five years prior to the time the instant lawsuit was commenced.

3.      Defendants expressly deny Plaintiffs' conclusory allegation in Paragraph 165 of

the First Amended Complaint that they were somehow "precluded from discovering" their purported claims, and Defendants further aver that Plaintiffs knew, or in the exercise of reasonable diligence should have known, of the purported facts that would have put them on actual or inquiry notice of their alleged claims such that Plaintiffs are not entitled to toll the statute of limitations for any period of time.

4.  Accordingly, Plaintiffs' claims that purport to be based on the provision for civil actions in 720 ILCS 5/46-5 are time-barred and should be dismissed with prejudice, and Defendants should be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just.

### THIRD AFFIRMATIVE DEFENSE

**Statute of Limitations**
**(Illinois Claims Fraud Prevention Act)**

1.  Notwithstanding the fact that Plaintiffs are neither the Attorney General nor the State's Attorney, and notwithstanding the fact that Plaintiffs are not bringing a *qui tam* action on behalf of the State of Illinois pursuant to the provisions of Section 15 of the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/15, Plaintiffs, in violation of Fed.R.Civ.P. 11, purport to advance on behalf of themselves a claim for civil damages under the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq.*, in Count III of the First Amended Complaint.

2.  Though Plaintiffs lack standing to assert claims under the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq.*, and though it is Defendants' position that no claim is or can be advanced by the Plaintiffs against the Defendants under said statute (*see* Seventh Affirmative Defense *infra*), if solely for hypothetical purposes one were to assume

otherwise, then Plaintiffs claims in Count III are barred under what might hypothetically be deemed the statute of limitations or statute of repose applicable to such a purported hypothetical, but in fact nonexistent, civil action for damages brought under the Illinois Insurance Claims Fraud Prevention Act, including but not limited to Section 13-205 of the Code of Civil Procedure, 735 ILCS 5/13-205, which provides for a general five-year statute of limitations for all civil actions not otherwise provided for by statute, because Plaintiffs' purported cause of action accrued more than five years prior to the time the instant lawsuit was commenced.

3.      Defendants expressly deny Plaintiffs' conclusory allegation in Paragraph 176 of the First Amended Complaint that they were somehow "precluded from discovering" their purported claims, and Defendants further aver that Plaintiffs knew, or in the exercise of reasonable diligence should  have known, of the purported facts that would have put them on actual or inquiry notice of their alleged claims such that Plaintiffs are not entitled to toll the statute of limitations for any period of time.

4.      Accordingly, Plaintiffs' claims that purport to be based on the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq.*, are time-barred and should be dismissed with prejudice, and Defendants should be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just.

### FOURTH AFFIRMATIVE DEFENSE

### Statute of Limitations
### (Common Law Fraud)

1.      Plaintiffs purport to advance a claim for common law fraud in Count IV of the First Amended Complaint.

2.      Plaintiffs claims in Count IV are barred under the statute of limitations or statute

124

of repose applicable to civil actions for common law fraud, including but not limited to Section 13-205 of the Code of Civil Procedure, 735 ILCS 5/13-205, which provides for a general five-year statute of limitations for all civil actions not otherwise provided for by statute, because Plaintiffs' purported cause of action accrued more than five years prior to the time the instant lawsuit was commenced.

3.     Defendants expressly deny Plaintiffs' conclusory allegation in Paragraph 183 of the First Amended Complaint that they were somehow "precluded from discovering" their purported claims, and Defendants further aver that Plaintiffs knew, or in the exercise of reasonable diligence should have known, of the purported facts that would have put them on actual or inquiry notice of their alleged claims such that Plaintiffs are not entitled to toll the statute of limitations for any period of time.

4.     Accordingly, Plaintiffs' claims that purport to be for common law fraud are time-barred and should be dismissed with prejudice, and Defendants should be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just.

## FIFTH AFFIRMATIVE DEFENSE

### Laches
### (Unjust Enrichment)

1.     Plaintiffs purport to advance a claim for unjust enrichment in Count V of the First Amended Complaint.

2.     Defendants maintain that the principles of equity govern the right to recover in an action for unjust enrichment, and that the statute of limitations is neither conclusive or binding, but that the equitable doctrine of laches applies to determine the time within which the claim must be brought.

3.     Plaintiffs have shown an extraordinary lack of diligence and a lack of vigilance in bringing the instant action, when according to Plaintiffs' false allegations set forth in the First Amended Complaint, they have viewed Defendants' actions as purportedly fraudulent or otherwise highly improper for more than half a decade.

4.     Defendants specifically incorporate by reference herein, as though fully alleged herein, their allegations set forth in the Eleventh Affirmative Defense *infra*. Defendants have in bad faith and for improper purpose, including but not limited to the improper purpose of delaying for years in an attempt to undermine or otherwise severely hinder Defendants' ability to secure a full and fair hearing on all of the allegations set forth in the First Amended Complaint, refrained from filing this action within an appropriate period of time, and, accordingly, it would be inequitable and unjust to permit Plaintiffs to pursue any of their claims.

5.     In the alternative, should the Court find that the claims in Count V should be treated as an action at law, such that a statute of limitations should be applied, then Plaintiffs' claims are barred under the statute of limitations or statute of repose arguably applicable to civil actions advancing a claim for unjust enrichment, including but not limited to Section 13-205 of the Code of Civil Procedure, 735 ILCS 5/13-205, which provides for a general five-year statute of limitations for all civil actions not otherwise provided for by statute, because Plaintiffs' purported cause of action accrued more than five years prior to the time the instant lawsuit was commenced.

6.     Defendants expressly deny Plaintiffs' conclusory allegation in Paragraph 189 of the First Amended Complaint that they were somehow "precluded from discovering" their purported claims, and Defendants further aver that Plaintiffs knew, or in the exercise of reasonable diligence should have known, of the purported facts that would have put them on

actual or inquiry notice of their alleged claims such that Plaintiffs are not entitled to toll the statute of limitations for any period of time.

7.      Accordingly, Plaintiffs' purported claims for unjust enrichment are time-barred under the doctrine of laches, or, arguing in the alternative, under the applicable statute of limitations or repose and should be dismissed with prejudice, and Defendants should be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just.

## SIXTH AFFIRMATIVE DEFENSE

### Statute of Limitations
### (Negligence/Spoliation)

1.      Plaintiffs purport to advance claims for negligence (which they denominate as "spoliation" claims) in Counts VI and VII of the First Amended Complaint.

2.      Plaintiffs' claims in Counts VI and VII are barred under the statute of limitations or statute of repose applicable to negligence actions for spoliation of evidence, including but not limited to Section 13-205 of the Code of Civil Procedure, 735 ILCS 5/13-205, which provides for a general five-year statute of limitations for all civil actions not otherwise provided for by statute, because Plaintiffs' purported cause of action accrued more than five years prior to the time the instant lawsuit was commenced.

3.      Defendants expressly deny Plaintiffs' conclusory allegations in Paragraphs 202 and 217 of the First Amended Complaint that they were somehow "precluded from discovering" their purported claims, and Defendants further aver that Plaintiffs knew, or in the exercise of reasonable diligence should have known, of the purported facts that would have put them on actual or inquiry notice of their alleged claims such that Plaintiffs are not entitled to toll the

statute of limitations for any period of time.

4.     Accordingly, Plaintiffs' claims that purport to be for negligence on the grounds of spoliation of evidence in Counts VI and VII are time-barred and should be dismissed with prejudice, and Defendants should be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just.

## SEVENTH AFFIRMATIVE DEFENSE

### Lack of Standing
### (Illinois Claims Fraud Prevention Act)

1.     Plaintiffs purport to advance on behalf of themselves a claim for civil damages under the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq.*, in Count III of the First Amended Complaint.

2.     Plaintiffs lack standing to bring such an action since they are neither the Attorney General nor the State's Attorney, and since they are not bringing a *qui tam* action on behalf of the State of Illinois pursuant to the provisions of Section 15 of the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/15.  The statute does not provide for private enforcement actions where the party allegedly injured is a private party.

4.     Accordingly, Plaintiffs' claims that purport to be based on the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq.*, should be dismissed with prejudice, and Defendants should be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just, including but not limited to sanctions against Plaintiffs and their counsel under Fed.R.Civ.P. 11.

## EIGHTH AFFIRMATIVE DEFENSE

### Exception in 740 ILCS 92/5(a)
### (Illinois Claims Fraud Prevention Act)

1.      Plaintiffs purport to advance on behalf of themselves a claim for civil damages under the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq.*, in Count III of the First Amended Complaint.

2.      Although said cause of action is fatally flawed for the reasons stated in the Seventh Affirmative Defense, and this is an argument in the alternative, Defendants state that the exception stated in the second sentence of 740 ILCS 92/5(a) also bars some or all of Plaintiffs' claims brought under the statute.

3.      Accordingly, Plaintiffs' claims that purport to be based on the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq.*, should be dismissed with prejudice, and Defendants should be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just.

## NINTH AFFIRMATIVE DEFENSE

### Waiver

1.      Plaintiffs' claims purport to be predicated on payments made by Plaintiffs to Defendants, including but not limited to payments made in the context of personal injury claims of third parties and also including but not limited to "direct payments" that Plaintiffs allegedly made to Defendants "on first party claims submitted by Plaintiffs' own insureds pursuing medical payment claims, and uninsured and underinsured motorist claims." First Amended Complaint at ¶ 2.

2.      With respect to any and all such claims, Plaintiffs by their actions in reviewing or otherwise responding to the requests for payments, and/or in making the payments directly or indirectly to the Defendants, and possessed of actual or constructive knowledge of the purported

facts upon which Plaintiffs now seek to base their First Amended Complaint, voluntarily, knowingly and intentionally abandoned or relinquished any and all rights to challenge the said payments, and Defendants have thereby waived all such claims that they seek to advance in the instant litigation.

3.     Accordingly, Plaintiffs' claims in the instant litigation are barred by the doctrine of waiver, and any and all claims that purport to be based on payments made directly or indirectly to Defendants should be dismissed with prejudice, and Defendants should be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just.

## TENTH AFFIRMATIVE DEFENSE

### Ratification

1.     Plaintiffs' claims purport to be predicated on payments of medical bills made by Plaintiffs to Defendants, including but not limited to payments made in the context of personal injury claims of third parties and also including but not limited to "direct payments" that Plaintiffs allegedly made to Defendants "on first party claims submitted by Plaintiffs' own insureds pursuing medical payment claims, and uninsured and underinsured motorist claims." First Amended Complaint at ¶ 2.

2.     In paying the medical bills that Plaintiffs seek to put at issue in the instant litigation, Plaintiffs were acting as insurance companies and were purporting to conduct themselves pursuant to insurance policies or contracts of insurance.

3.     On information and belief, in the case of each payment of a medical bill, Plaintiffs were under a legal obligation (derived in part but not exclusively from the insuring clauses of relevant insurance policies or contracts of insurance) to pay the medical bills where they were

properly incurred by an insured or a claimant pursuing a claim against an insured.

4.      By paying the medical bills, Plaintiffs ratified the conduct of the Defendants in connection with the medical bills, and ratified the propriety of the bills themselves.

5.      Accordingly, Plaintiffs' claims in the instant litigation are barred by the doctrine of ratification, and any and all claims that purport to be based on payments made directly or indirectly to Defendants should be dismissed with prejudice, and Defendants should be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just.

**ELEVENTH AFFIRMATIVE DEFENSE**

**Equitable Estoppel**
**(Intentional Concealment and False Representations by**
**Conduct to the Detriment of Defendants)**

1.      Plaintiffs' claims purport to be predicated on past medical billing by the Defendants where Plaintiffs allege that they paid said billing and/or where Plaintiffs allege they otherwise took actions in respect of said billing.

2.      The medical bills date back many months and in many cases they are several years old.  The treatments upon which the bills are based also date back many months and in many cases the treatments occurred years ago.

3.      With respect such claims based on medical bills dating back many months or several years, Plaintiffs by their actions in connection with such medical bills at the time they were tendered, reviewed, otherwise responded to, or paid, and by their actions in waiting many months or several years after said time without raising charges of wrongdoing of the type advanced in this case as to such medical bills, engaged in conduct upon which Defendants reasonably relied in assuming that the circumstances surrounding such bills and the bills

themselves would not be challenged by the Plaintiffs.

4.      It is alleged on information and belief that such conduct by the Plaintiffs was done intentionally and knowingly and with improper motive, and that such conduct was for the purpose of concealing from Defendants an intent to later bring charges at a time when Defendants' ability to defend would be compromised through the passage of time.

5.      It is further alleged on information and belief that Plaintiffs had actual or constructive knowledge of the purported facts upon which they now seek to base their false charges of improper medical treatments and billing.

6.      Defendants reasonably believed that Plaintiffs' responses to such bills at the time they were first tendered, reviewed, otherwise responded to, or paid, did not entail any motive to later bring charges about the bills against Defendants of the type seen in the instant litigation, which charges in every particular are false, many months or several years after said bills were tendered, reviewed, otherwise responded to, or paid.

7.      Based upon reasonable and good faith belief predicated upon and caused by the aforementioned conduct of the Plaintiffs, Defendants refrained from taking actions, including actions to ensure the retention or securing of information useful in defending against such future false charges.

8.      By their conduct in the instant litigation, in attempting to impute wrongdoing to Defendants regarding medical bills from many months and in many cases several years after the time said medical bills were tendered and received by Plaintiffs, Plaintiffs have succeeded in prejudicing Defendants because the Defendants' ability to defend against each and every such imputation of wrongdoing is compromised by the passage of a long period of time since the time of the tendering of the bills and the time of the medical services that formed a basis for the bills.

On information and belief, Plaintiffs knowingly and intentionally brought about and desired this result.

9.      Accordingly, Plaintiffs' claims in the instant litigation are barred by the doctrine of equitable estoppel, and Plaintiffs are estopped from now pursuing any and all claims that purport to be based on payments, expenditures, or other actions of any kind taken in respect of the medical bills or associated medical treatments from many months or several years ago.  Any and all such claims should be dismissed with prejudice, and Defendants should be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just.

## TWELFTH AFFIRMATIVE DEFENSE

### Equitable Estoppel
### (Acquiescence)

1.      Plaintiffs' claims purport to arise out of Defendants' provision of medical treatments to insureds of the Plaintiffs or claimants pursuing a claim against insureds of the Plaintiffs.

2.      On information and belief, Plaintiffs were made aware that their insureds or third parties subject to insurance provided by Plaintiffs sought medical treatment from Defendants. Among other things, Defendants frequently directly notified Plaintiffs that they were treating such persons as of the time the treatments were taking place.  Plaintiffs also received said information at the time the treatments were taking place by others such as attorneys representing the injury claimants.

3.      Plaintiffs acquiesced in the provision of medical care to their insureds or third parties subject to insurance provided by Plaintiffs, and further Plaintiffs did so with actual or

constructive knowledge of the of the purported facts upon which they now seek to base their false charges of improper medical treatments and billing.

4.      Accordingly, Plaintiffs' claims in the instant litigation are barred by the doctrine of equitable estoppel, and any and all claims that purport to be based on payments made directly or indirectly to Defendants should be dismissed with prejudice, and Defendants should be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just.

## THIRTEENTH AFFIRMATIVE DEFENSE

### Release

1.      Plaintiffs' claims purport to be predicated on payments of medical bills made by Plaintiffs to Defendants, including but not limited to payments made in the context of personal injury claims of third parties and also including but not limited to "direct payments" that Plaintiffs allegedly made to Defendants "on first party claims submitted by Plaintiffs' own insureds pursuing medical payment claims, and uninsured and underinsured motorist claims." First Amended Complaint at ¶ 2.

2.      In paying the medical bills that Plaintiffs seek to put at issue in the instant litigation, Plaintiffs were acting as insurance companies and were purporting to conduct themselves pursuant to insurance policies or contracts of insurance.

3.      On information and belief, when Plaintiffs paid medical bills, in connection with first party claims or third party claims, they entered into releases that foreclose the effort by Plaintiffs in this case from seeking a return of monies paid in medical bills to the treatment providers of the injured insureds or the third parties who claimed to have been injured by one of Plaintiffs' insureds.

4.      Accordingly, Plaintiffs' claims in the instant litigation are barred by the doctrine of release, and any and all claims that purport to be based on payments of medical bills made directly or indirectly to Defendants should be dismissed with prejudice, and Defendants should be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just.

## FOURTEENTH AFFIRMATIVE DEFENSE

### Failure to State a Claim

1.      With respect to each of the counts of the First Amended Complaint, Plaintiffs have failed to state claims upon which relief may be granted.

## FIFTEENTH AFFIRMATIVE DEFENSE

### Collateral Estoppel
### (Issue Preclusion)

1.      Plaintiffs have attempted to assert claims that purport to be predicated upon payments made either directly or indirectly to Defendants where such payments were for medical bills of persons who commenced personal injury lawsuits against the insureds of the Plaintiffs (also referred to herein as "Allstate") contending that they were injured by an insured of one of the Plaintiffs, and/or where such payments were for medical bills of persons who commenced first party claims against Allstate.

2.      Plaintiffs in the instant litigation seek to assert allegations of wrongdoing, including fraud, with respect to said medical bills.

3.      On information and belief, the reasonableness and necessity of said medical bills may have been adjudicated in some or all of the prior personal injury lawsuits, or first party claims that resulted in lawsuits, so as to have established as regards Plaintiffs that the bills were

in fact reasonable and necessary.

4.     Further alleging on information and belief, Allstate in some or all of said prior personal injury lawsuits, or first party claims that resulted in lawsuits, may have had a full and fair opportunity to litigate the threshold reasonableness and necessity of the medical bills, said issues may have been actually litigated and decided, and said issues may have been necessary to support final judgments or awards in the personal injury lawsuits, or first party claims that resulted in lawsuits, or proceedings ancillary to all such aforesaid lawsuits (such as arbitration proceedings).

5.     If it was adjudicated that the bills were reasonable and necessary, then, depending on the nature of the prior proceedings and the relationship of Allstate to those proceedings, Allstate cannot be permitted to assert in the instant litigation that the medical bills were not reasonable or necessary, and Allstate, without making a showing as a threshold matter that the bills were not reasonable or necessarily incurred, cannot make the further contention that they somehow constituted an actionable fraud or other form of wrongdoing under any of the causes of action Allstate seeks to advance here.

6.     Accordingly, and to the extent that the allegations in Paragraphs 3 and 4 are correct, and depending upon the nature of the prior proceedings and Allstate's relationship to them, then Plaintiffs' claims as to the medical bills in the instant litigation are barred by the doctrine of collateral estoppel (or issue preclusion) from being re-litigated here, and any and all claims that purport to be based on medical bills at issue in the personal injury lawsuits or first party claims that resulted in lawsuits, where it was adjudicated that said medical bills were reasonable and necessary, should be dismissed with prejudice, and Defendants should be awarded attorney's fees and costs and such other and further relief as the Court may deem

appropriate and just.

## SIXTEENTH AFFIRMATIVE DEFENSE

### Res Judicata
### (Claim Preclusion)

1.      Plaintiffs have attempted to assert claims that purport to be predicated upon payments made either directly or indirectly to Defendants where such payments were for medical bills of persons who commenced personal injury lawsuits against the insureds of the Plaintiffs (also referred to herein as "Allstate") contending that they were injured by an insured of one of the Plaintiffs, and/or where such payments were for medical bills of persons who commenced first party claims against Allstate.

2.      Plaintiffs in the instant litigation seek to assert allegations of wrongdoing, including fraud, with respect to said medical bills.

3.      On information and belief, issues raised in the instant litigation regarding whether medical bills were reasonable and necessary may have been decided against Allstate, and to the extent that same is true, then, depending upon the nature of the prior proceedings and Allstate's relationship to them, Allstate is barred under the doctrine of *res judicata* from re-litigating such matters, Plaintiffs' claims should be dismissed with prejudice on that ground, and Defendants should be awarded attorney's fees and costs and such other and further relief as the Court may deem appropriate and just.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### Contributory Negligence

1.      Plaintiffs are barred from pursuing their claims for negligence by their own contributory and/or comparative negligence, including but not limited to their own contributory

and/or comparative negligence in failing to act with reasonable diligence to take in a timely manner those steps needed to secure any information the alleged loss of which is a predicate for Counts VI and VII, including but not limited to the alleged loss of x-ray and DMX studies.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### Failure to Mitigate Damages

1.      To the extent Plaintiffs may have in fact sustained any damages, which is expressly denied, and to the extent that said damages may be deemed to be properly sought in the instant litigation, which is also expressly denied, Plaintiffs have failed to take those steps necessary to mitigate damages.

## NINETEENTH AFFIRMATIVE DEFENSE

### Unclean Hands

1.      Plaintiffs are barred from recovering anything in the instant suit because they have come before the Court with unclean hands.  Defendants incorporate herein by reference as though fully set forth their allegations in Paragraphs 3, 4 and 5 of the Twentieth Affirmative Defense *infra*.  Defendants further allege that this suit against D'Souza is part of an overall pattern of bad faith conduct aimed at denying legitimate insurance claims.  Said overall pattern of bad faith conduct includes, but is not limited to, the use of false and misleading Allstate claims adjuster training videos, including videos that falsely misstate the injury probability in certain types of automobile accidents, for the purpose of training adjusters and other agents of Allstate to systematically deny, negate, or refuse insurance coverage where the denial, negation, or refusal is unjustified, and to systematically deny, negate, or refuse to recognize the propriety of medical treatments for persons who have been injured.

## TWENTIETH AFFIRMATIVE DEFENSE
### [Converted to Defendants' First Counterclaim]

### Bad Faith Insurer Conduct
### (720 ILCS 5/46-5)

1.      Plaintiffs have purported to bring an action under subsection (a) of 720 ILCS 5/46-5 in Count II of the First Amended Complaint.

2.      720 ILCS 5/46-5(b) provides in part that "[a]n insurance company … that brings an action against a person under subsection (a) of this Section in bad faith shall be liable to that person for twice the value of the property claimed, plus reasonable attorneys fees."

3.      Plaintiffs have brought this entire action, including their claim under 720 ILCS 5/46-5(a), in bad faith in that Plaintiffs have acted for the sole purpose of attempting to intimidate, harass, and burden Defendants, and specifically D'Souza.

4.      Defendants are attempting to use the machinery of this Court and an unmeritorious strike suit to destroy the reputation of, and otherwise harm the interests of, a man whose only purported "crime" is that he has treated many injured Allstate insureds or injured third persons entitled to Allstate insurance coverage.

5.      Allstate, in utmost bad faith and driven by an improper motive for pecuniary gain, seeks to harm and intimidate D'Souza through its instant strike suit so that he will refrain from treating Allstate patients, and so that Allstate will get to keep more of its money and not have to pay out its money to injured persons deserving of that money.

6.      Under the terms of 720 ILCS 5/46-5(b), provided bad faith by the insurance company is shown, then the party sued is entitled to "twice the value of the property claimed."

7.      In Paragraph 164 of Count II of the First Amended Complaint, Plaintiffs allege that they have been injured in their "business and property" by Defendants in the amount of One

Million Eight Hundred Thousand Dollars ($1,800,000).

8.     Accordingly, Defendants request that the Court adjudge Plaintiffs liable for bad faith within the meaning of 720 ILCS 5/46-5(b), and award to Defendants the sum of Three Million Six Hundred Thousand Dollars ($3,600,000), plus reasonable attorney's fees.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### Defense Of Good Faith Under Fraudulent Transfer Act
### (740 ILCS 160/9)

1.     Plaintiffs have purported to bring an action under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.*, in Count VIII of the First Amended Complaint.

2.     The four property transfers at issue in Count VIII are not voidable because the persons who received the property interests took them in good faith and for a reasonably equivalent value.

3.     In addition, Defendant Melvin D'Souza at all times acted in good faith in connection with the property transfers and at no time acted for the purpose of hindering or thwarting his creditors or potential creditors, including the Plaintiffs in this action.

4.     Accordingly, Plaintiffs' claims seeking to void the four property transfers that are the subject of Count VIII are barred by the provisions of the Illinois Uniform Fraudulent Transfer Act, including but not limited to Section 9(a) thereunder, 740 ILCS 160/9(a), and such claims should be dismissed with prejudice, and Defendants should be awarded costs and such other and further relief as the Court may deem appropriate and just.

Respectfully submitted,

**MELVIN D'SOUZA, D.C., ST. ANTHONY'S SPINE & JOINT INSTITUTE, P.C.**


**s/ Andrew P. Lamis**

_____
Andrew P. Lamis
*As Attorney for Defendants Melvin D'Souza, D.C., and St. Anthony's Spine & Joint Institute, P.C.*

Andrew P. Lamis
Law Offices of Andrew P. Lamis
525 S. Dearborn Street, Suite 707
Chicago, Ill. 60605
(312) 551-0780

## CERTIFICATE OF SERVICE

I, Andrew P. Lamis, attorney for Defendants Melvin D'Souza, D.C., and St. Anthony's Spine & Joint Institute, P.C., certify that on September 14, 2010, I served a true and correct copy of the attached **ANSWER TO PLAINTIFFS' FIRST AMENDED COMPLAINT FOR MONETARY DAMAGES AND EQUITABLE RELIEF** on the Plaintiffs by causing same to be served electronically through the Electronic Case Filing System on their counsel of record listed below, all of whom are Filing Users.

Mark A. LaRose
David Koppelman
Andrew Sperry
LaRose & Bosco, Ltd.
200 N. LaSalle Street, Suite 2810
Chicago, Illinois 60601

**s/ Andrew P. Lamis**
_____
Andrew P. Lamis