**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 06-cv-7010 |
| v. ) | |
| ) | |
| ST. ANTHONY'S SPINE & JOINT INSTITUTE, ) | |
| P.C., MELVIN D'SOUZA, D.C., et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Before the Court is Plaintiffs Allstate Insurance Company, Allstate Indemnity Company

and Allstate Property & Casualty Insurance Company's (collectively, "Plaintiffs") motion for a

new trial pursuant to Federal Rule of Civil Procedure ("Rule") 59(a). For the following reasons,

the Court denies Plaintiffs' motion.

**BACKGROUND[1]**

This case arises from what Plaintiffs have alleged is an "elaborate scheme to defraud"

Plaintiffs through the creation and submission of false and misleading medical reports, records,

and billing statements for chiropractic and diagnostic services. (R. 230, Am. Compl. at ¶ 1.)

Specifically, Plaintiffs claimed that Defendant Melvin D'Souza, a chiropractic physician,

routinely ordered "unnecessary and unwarranted diagnostic testing" such as digital motion x-

rays ("DMX"), which he conducted in a mobile x-ray van shared by Defendants' multiple

---

[1] The Court assumes familiarity with the factual background of this case, a summary of
which can be found in the Court's summary judgment memorandum opinion and order. *See
Allstate Ins. Co. v. St. Anthony's Spine & Joint Inst., P.C.*, 691 F. Supp.2d 772 (N.D. Ill. 2010).

chiropractic clinics.[2]  (*Id.* ¶¶ 96, 99.)  Plaintiffs also alleged that Defendant D'Souza's multiple

websites falsely represented the ability of DMX to "find injuries that could never be seen before"

and provide "objective information that cannot be disputed" regarding "permanent soft tissue

damage resulting from automobile accidents."  (*Id.* ¶ 129.)  According to Plaintiffs, they suffered

harm by making "direct payments to Defendants on first party claims submitted by [Plaintiffs']

own insureds pursuing medical payments claims, and uninsured and under-insured motorist

claims" based on Defendants' alleged fraudulent bills.  (*Id.* at ¶ 2.)  In other instances, Plaintiffs

made "substantial payments based upon settlements and verdicts obtained against Plaintiffs'

insureds in [their] third party personal injury claims and lawsuits" in which Defendants

"submitted physicians liens through the U.S. mail to Plaintiffs purporting to assert their alleged

right to attached towards any potential settlement and/or resolution reached in each particular

case."  (*Id.*)

Plaintiffs asserted the following claims 1) violation of the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964 (Defendant D'Souza only); 2) insurance

fraud in violation of 720 ILCS 5/46-5;[3] 3) common law fraud under Illinois law; 4) negligent

spoliation regarding DMX and x-ray studies (Defendant D'Souza only); and 5) negligent

spoliation with respect to DMX and x-ray reports (Defendant D'Souza only).[4]  Defendants

denied liability for all claims and maintained throughout trial that they neither falsified medical

---

[2]  Defendant D'Souza is the sole shareholder of Defendant St. Anthony's Spine & Joint Institute, P.C.  The Court refers to both defendants collectively as "Defendants" in this Order.

[3]  Effective July 1, 2011, the relevant portion of 720 ILCS 5/46-5 is located at 720 ILCS 5/17-10.5(e).  *See* P.A. 96-1551, Art. 5, § 5-6, eff. July 1, 2011.

[4]  Plaintiffs also brought an unjust enrichment claim, which they voluntarily dismissed before the close of trial.  *See* R. 298.

2

documents nor submitted falsified documents to Plaintiffs. Further, Defendants argued that all of the procedures they ordered for their patients were medically necessary. After a nine-day jury trial in October 2011, the jury deliberated for a day and a half and rendered a verdict for Defendants on all claims. (R. 303.) The Court entered judgment against Plaintiffs on October 31, 2011. (R. 304.)

According to Plaintiffs, all of the jury's verdicts were against the manifest weight of the evidence. Plaintiffs further contend that a new trial is warranted because Defendants' counsel's repeated leading questions tainted the evidence. Pursuant to Rule 59(a), they ask the Court to grant their motion to vacate the judgment and grant a new trial.

## LEGAL STANDARD

Plaintiffs face a heavy burden under Rule 59(a). *See Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995) ("[N]ew trials granted because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the court's] conscience.") (citation omitted). In deciding a motion for a new trial under Rule 59(a), the "district court must determine whether the verdict was against the manifest weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *Frizzell v. Szabo*, 647 F.3d 698, 702 (7th Cir. 2011); *Westchester Fire Ins. Co. v. Gen. Star Indem. Co.*, 183 F.3d 578, 582 (7th Cir. 1999). A verdict will be set aside as contrary to the manifest weight of the evidence only if "no rational jury" could have rendered the verdict. *Moore ex rel. Estate of Grady v. Tuelja*, 546 F.3d 423, 427 (7th Cir. 2008) (citing *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006)); *see also Westchester Fire*, 183 F.3d at 582 (a

3

court "will not overturn a jury's verdict as long as there is a reasonable basis in the record to support it").[5]

In determining whether the jury's verdict was against the manifest weight of the evidence, a court "may consider the credibility of witnesses, the weight of the evidence, and anything else which justice requires." *Bob Willow Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788, 798 (7th Cir. 1989); *see also Mejia v. Cook County, Ill.*, 650 F.3d 631, 633 (7th Cir. 2011) ("in passing on a motion for a new trial, the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial."). In doing so, it is "bound to the same evidence the jury considered, and can strike a piece of evidence from its weighing process only if reasonable persons could not believe it because it contradicts indisputable facts or laws." *Mejia,* 650 F.3d at 633 (citing *Latino*, 58 F.3d at 315).

Seventh Circuit precedent instructs that courts are to view the evidence in the light most favorable to the non-moving party on a Rule 59(a) motion. *See, e.g., Wipf v. Kowalski*, 519 F.3d

---

[5] Plaintiffs incorrectly assert that the Seventh Circuit's decision in *Mejia v. Cook County, Ill.*, 650 F.3d 631, 633 (7th Cir. 2011) altered the "no rational jury" standard. Indeed, less than one month before authoring the *Mejia* opinion, the Seventh Circuit issued another Rule 59(a) opinion in which it clearly affirmed that movants "bear a particularly heavy burden because a court will set aside a verdict as contrary to the manifest weight of the evidence only if no rational jury could have rendered the verdict." *See Marcus & Millichap Inv. Servs. of Chicago, Inc. v. Sekulovski*, 639 F.3d 301, 313-14 (7th Cir. 2011) (citing *Lewis v. City of Chicago*, 590 F.3d 427, 444 (7th Cir. 2009)); *see also United States v. One Ezonics Excam Model P35U1 USB Webcam*, No. 07-cv-3759, 2011 WL 3419372, at *1 (N.D. Ill. Aug. 2, 2011) (stating, post-*Mejia*, that "a verdict can only be set aside as contrary to the manifest weight of the evidence if 'no rational jury' could have rendered that verdict"); *Whitehead v. Bond*, 782 F. Supp.2d 685, 691 (N.D. Ill. 2011) (same); *Nelson v. Lis*, No. 09 C 883, 2011 WL 4460492, *7 (N.D. Ill. Sept. 27, 2011) (to succeed on a Rule 59(a) motion, the plaintiff "would have to demonstrate that no rational jury could have rendered a verdict against him").

4

380, 384 (7th Cir. 2008) (citing *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004));

*Carter v. Chicago Police Officers*, 165 F.3d 1071, 1079 (7th Cir. 1998) (citing *M.T. Bonk Co. v.*

*Milton Bradley Co.*, 945 F.2d 1404, 1407 (7th Cir. 1991)). At least one court in this District has

interpreted the Seventh Circuit's recent decision in *Mejia* as requiring courts to view the

evidence neutrally on a Rule 59(a) motion. *See Galvan v. Nordberg*, No. 04 C 4003, 2011 WL

1898237, at *6, n.4 (N.D. Ill. May 18, 2011) ("the evidence must be weighed neutrally, rather

than in a light favorable to the non-movant") (citing *Mejia*, 650 F.3d at 634)). Several district

courts in the Seventh Circuit, however, have continued to view the evidence in the light most

favorable to the prevailing party after *Mejia*. *See, e.g., Nelson*, 2011 WL 4460492 at *7; *Cook v.*

*Illinois Dept. of Corrs.*, No. 09-cv-133-DRH, 2011 WL 5520436, *2 (S.D. Ill. Nov. 14, 2011).

Regardless of whether the Court views the evidence in this case in a light most favorable to

Defendants or neutrally, the Court's decision is the same.

District courts have wide discretion in determining whether to grant a motion for a new

trial, *Mejia*, 650 F.3d at 634, but they must give deference to the jury's conclusions. *Id.* at 633,

n.1. "This deference is encompassed within the manifest weight standard, which balances 'a

decent respect for the collective wisdom of the jury' against a duty not to 'approve miscarriages

of justice.'" *Id.* (citing 11 Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, *Federal*

*Practice and Procedure* § 2806, at 74 (2d ed. 1995)). "In cases involving simple issues but

highly disputed facts . . . , greater deference should be afforded [to] the jury's verdict than in

cases involving complex issues with facts not highly disputed." *Latino*, 58 F.3d at 314 (citations

omitted); *see also Moore*, 546 F.3d at 427 (citing *Latino*). The Seventh Circuit has cautioned

that while the district court judge "has a responsibility for the result [of the trial] no less than the

5

jury, he should not set the verdict aside as against the weight of the evidence merely because, if

he had acted as trier of the fact, he would have reached a different result; and in that sense he

does not act as a 13th juror in approving or disapproving the verdict." *Latino*, 58 F.3d at 315.

## ANALYSIS

During the nine-day jury trial, Plaintiffs and Defendants presented several witnesses,

both lay and expert, in support of their respective theories. Defendant D'Souza testified

twice–once in Plaintiffs case-in-chief and again in Defendants' case-in-chief. Neither Plaintiffs

nor Defendants called any of Defendant D'Souza's patients to testify at trial.

The facts regarding Defendants' conduct were largely undisputed. Rather, the parties

disputed the reasons for that conduct and the inferences to be drawn from such conduct. *See* R.

342 ("Largely, the underlying facts are not in dispute . . . . What is complicated are defendant's

attempted explanations of the reasons why these actions were taken."); R. 348 at 2-3; R. 355 at

12 ("In this case, a central issue before the jury was a simple one, the Defendant's intent.").

Plaintiffs are correct that this case involved allegations of relatively complex healthcare fraud,

but Defendants are also correct in that much of what the jury decided rested on credibility

determinations of various witnesses. Accordingly, it is appropriate to give significant deference

to the jury's verdicts.[6]

---

[6] The Court rejects Plaintiffs' suggestion that the Court should afford the jury's verdicts "little or no deference." Plaintiffs' argument is contrary to well-established Seventh Circuit law. *See Latino*, 58 F.3d at 317 (after the jury gives its verdict, "the Seventh Amendment affords it very considerable deference"). Although courts in the Seventh Circuit have applied varying degrees of deference to a jury's verdict depending on whether the issues involved in the case are complex and whether the facts are disputed, *see id.* at 314, Plaintiffs point to no authority, nor is the Court aware of any, authorizing this Court to apply "little or no" deference to the jury's verdicts. *Cf. Maldonado v. Stinar*, No. 08-cv-1954, 2011 WL 2470124, at *4 (N.D. Ill. June 20, 2011) ("Normally, the court is required to give significant deference to the jury's verdict. Where

I.    **Claims Involving Fraud**

Because Plaintiffs' first three claims (RICO/mail fraud, Illinois insurance fraud and

Illinois common law fraud) all centered around the same alleged fraudulent scheme, the Court

addresses those claims together.  Plaintiffs argue that the overwhelming evidence at trial

indicated that Defendants perpetuated "a fraudulent scheme" consisting of the following

components:  (a) personal injury attorneys representing persons involved in minor auto accidents

referred 461 clients to Defendant D'Souza; (b) those persons had personal injury or direct "med-

pay" claims against Plaintiffs; (c) Defendant D'Souza filed a physician's lien on these claims;

(d) Defendant D'Souza mailed medical records, bills and health insurance claim forms to

Allstate for treatments to these patients; (e) Defendant D'Souza's bills increased the value of the

patients' insurance claims or lawsuits; (f) the cases settled or resolved; (g) Defendant D'Souza

got paid and wrote off the rest; and (h) Defendant D'Souza's bills were false, misleading and/or

inflated, and they exaggerated injuries and/or misrepresented unnecessary treatments or

treatments not rendered.  *See* R. 348 at 3-4.

A.    **Burdens of proof**

1.    **RICO/mail fraud**

To prevail on their RICO claim against Defendant D'Souza, Plaintiffs had to prove, by a

a preponderance of the evidence, that: 1) an enterprise existed; 2) the enterprise engaged in, or

had some effect upon, interstate or foreign commerce; 3) the defendant was employed by or

---

there are simple issues and highly disputed facts, even "greater deference should be afforded [to]
the jury's verdict.") (internal citations and quotation marks omitted).

associated with the alleged enterprise; 4) the defendant knowingly and willfully conducted or participated, directly or indirectly, in the conduct of the affairs of the alleged enterprise; and 5) the defendant did so knowingly and willfully through a pattern of racketeering activity. *See* R. 306 at 28-33; Fifth Circuit Pattern Jury Instr. 8.1 (2006); *see also DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011). Because Plaintiffs argued that Defendant D'Souza committed two or more predicate acts in violation of the mail fraud statute, Plaintiffs also had the burden of proving that Defendant D'Souza committed mail fraud. To do so, they had to prove, by a preponderance of the evidence, that he 1) willfully and knowingly devised a scheme or artifice to defraud, or a scheme for obtaining money or property by means of false pretenses, representations or promises, and 2) used the mail in furtherance of the scheme. *See* R. 306 at 31; 18 U.S.C. § 1341; *see also Williams v. Aztar Indiana Gaming Corp*., 351 F.3d 294, 298-99 (7th Cir. 2003).

### 2.  Illinois statutory insurance fraud under 720 ILCS 5/46-5

To succeed on their Illinois statutory insurance fraud claim, Plaintiffs had to prove, by clear and convincing evidence, that either one of the Defendants 1) knowingly obtained, attempted to obtain, or caused to be obtained by deception, control over the property of an insurance company; 2) made a false claim or caused a false claim to be made on any policy of insurance issued by an insurance company; and 3) intended to deprive an insurance company permanently of the use and benefit of that property. *See* R. 306 at 35; *see also Allstate*, 691 F. Supp.2d at 795.

### 3. Illinois common law fraud

Plaintiffs had to prove the following by clear and convincing evidence in order to succeed on their Illinois common law fraud claim: 1) Defendants made material representations of fact in the submission of false, misleading, and deceptive medical reports, records, billing statements, physician's liens, and other medical related documents, submitted on each of the insurance claims; 2) Defendants knew the statements were false or made the statements in reckless disregard of whether they were true or false; 3) Defendants made the statements with the intent to induce Plaintiffs to act by paying out on the insurance claims submitted to Plaintiffs for payment; 4) Plaintiffs reasonably believed the statements and paid out money on insurance claims in justifiable reliance on the truth of the statements; and 5) Plaintiffs sustained damages as the result of this reliance. *See* R. 306 at 42; *see also Allstate*, 691 F. Supp.2d at 794 (citing *D.S.A. Fin. Corp. v. County of Cook*, 345 Ill. App.3d 554, 560, 280 Ill, Dec. 130, 801 N.E.2d 1075 (Ill. Ct. App. 2003)).

### B. A rational jury could have rendered verdicts for Defendants on Plaintiffs' fraud-based claims

In their memorandum in support of their motion, Plaintiffs list eight categories of Defendants' purported fraudulent conduct, which they argue is clear-cut evidence of fraud that the jury disregarded. As an initial matter, it is noteworthy that, at trial, Plaintiffs only provided the jury with, at best, a few examples of each category of fraud and asked the jury to extrapolate, based on those examples, that Defendants engaged in a fraudulent scheme as to all 461 cases at issue. Additionally, Plaintiffs did not call any of Defendant D'Souza's patients to testify about his or her specific case. As explained more fully below, Defendants offered a credible explanation or justification as to each purported example of fraud. Moreover, although Plaintiffs

9

introduced a significant amount of expert testimony at trial, such testimony was not

uncontradicted as Defendants also presented credible expert opinions from several witnesses.

Simply put, and as explained in greater detail below, the jury did not err in weighing the entirety

of the evidence the parties presented at trial and determining, based on such evidence, that

Plaintiffs failed to meet their burden of proof as to their fraud-based claims.

### 1. Treatments rendered

First, Plaintiffs contend that "[t]he evidence was overwhelming that Defendant D'Souza

billed for treatments not rendered." (R. 348 at 5.) They point to 12 medical records, dated

between February 22-25, 2002 and July 14-18, 2003, in which Defendant D'Souza indicated that

he treated the patient or that he directly supervised someone else who treated the patient, when in

fact he attended seminars out-of-state on those days. (R. 348 at 5 (citing Trial Tr. 261:13-262:2;

272:1-14; 280:21-281:2; 292:1-18; Plaintiffs' Exhibits 186-197).) As Plaintiffs concede,

however, Defendant D'Souza offered several possible explanations to the jury as to these

medical records. Notably, he testified that when he was out of town, his normal practice was to

have another doctor cover for him at his office (Trial Tr. 275:11-23; 287:11-17; 287:24-288:4),

which reasonably supports the inference that another doctor covered for him on the days in

question. He further explained that he may not have had an option for the covering doctor(s) to

check their names on the SOAP note form,[7] so they may have checked his name as the treating

doctor. (*Id.* at 287:24-288:4.) When confronted with the fact that the handwriting on the forms

was his, Defendant D'Souza testified that he may have filled out the SOAP note form after he

---

[7] SOAP notes are a form of medical record that Defendant D'Souza used. "SOAP" stands for "Subjective," "Objective," "Assessment," and "Plan."

returned from his trip after talking to the doctor who had covered for him. (*Id*. at 288:7-289:22.) Plaintiffs claim that Defendant D'Souza is not credible because he offered multiple explanations and could not remember the specifics of who covered for him and under what circumstances he filled out the SOAP note forms. The jury, however, was entitled reach the conclusion it did based on the evidence, especially considering that almost ten years have expired since the period in question. *Cf. Galvan*, 2011 WL 1898237, at *8 (noting that the jury could permissibly set aside inconsistencies in testimony as "a product of the passage of time and the fading of memories").

In support of their argument that Defendants billed for unrendered treatments, Plaintiffs also rely on the testimony of their expert, Dr. Tari Reinke,[8] who testified that she found several instances where Defendants billed patients for treatments and diagnostic studies that do not appear in the patients' medical records. (Trial Tr. 1086:7-1088:5.) Defendants, however, put forth their own expert witness, Dr. Michael Freeman,[9] who rebutted Dr. Reinke's testimony. After reviewing all of the medical bills in the 461 cases at issue, he concluded that those bills

---

[8] Dr. Reinke is a chiropractic physician licensed in both Illinois and Wisconsin. She has practiced since 1987 and is currently a member of the clinical faculty of National University of Health Sciences, where she serves as a Senior Staff Clinician and Assistant Professor. Among her other experience, Dr. Reinke served for 13 years as an instructor on medical records and report writing for the American College of Chiropractic Consultants and has lectured and published on the topics of preparing and maintaining medical records.

[9] Dr. Freeman is a Clinical Associate Professor of Epidemiology at Oregon Health and Science University School of Medicine, where he teaches a course in forensic and trauma epidemiology. He holds a doctorate degree in epidemiology and a masters degree in public health with a focus in biostatistics and epidemiology, both from Oregon State University, and he obtained his license to practice chiropractic in Oregon in 1987. He has testified as an expert at least 148 times since 2004. Dr. Freeman describes his area of expertise as "the field of motor vehicle crash injuries, crash reconstruction, and injury biomechanics," and has published numerous articles in several peer-reviewed journals and a number of legal publications.

11

accurately reflect treatments that Dr. D'Souza and his colleagues rendered. *See* Trial Tr. 1561:19-1562:5 ("[O]ut of 461 cases, there was [sic] 7,007 visits to Dr. D'Souza's office; and, out of all of those, Dr. Reinke identified 11 visits in which Dr. D'Souza was not present, but his name was either checked or printed on the bottom of the SOAP note. . . . [W]e'd have to have evidence that the patient wasn't seen; didn't get the care; and, that there was billing to be able to find what she concluded. And we don't have that."). Dr. Freeman also testified that, in his opinion, "the most reasonable explanation is there was an associate who took care of the patient when he wasn't there for those 11 visits."[10] (Trial Tr. 1591:14-1592:9.)

Additionally, several other witnesses, including Defendant D'Souza's current and former colleagues, corroborated his testimony by testifying that Defendants did not report unrendered treatments. *See, e.g.*, Knell Dep. 264:1-14 (played at trial); Trial Tr. 1297:10-24 (Dr. Tricia Wells testified that patients were examined by a physician "every time" they came to Defendants' clinics).[11] The jury was entitled to determine what weight, if any, to give to the parties' lay and expert witness testimony. *See* R. 306 at 17 (instructing the jury that it was to "judge [expert] testimony in the same way that you judge the testimony of any other witness" and that "[t]he fact that [an expert witness] has given an opinion does not mean that you are

---

[10] The parties are inconsistent as to whether there are 11 or 12 medical records at issue. That discrepancy, however, does not affect the jury's verdicts or the Court's consideration of same.

[11] The jury did not err in refusing to believe Plaintiffs' adjusters' testimony that their investigations yielded evidence that Defendants billed patients for treatments they never received. (R. 348 at 7 (citing Trial Tr. 109:17-110:1; 719:12-21).) The adjusters' testimony on which Plaintiffs rely in their motion is vague and unspecific as to particular cases, and Plaintiffs did not call any of Defendants' patients to testify as to whether treatments they received treatments.

required to accept it. Give the testimony whatever weight to think it deserves, considering the reasons given for the opinion, the witness's qualifications, and all of the other evidence in the case."). In light of all of the evidence, there was a reasonable basis for the jury to conclude that Defendants did not commit fraud by billing for unrendered treatments.

Next, Plaintiffs argue that Defendant D'Souza committed fraud by allowing his patients to sign blank SOAP note forms, which contain statements that the patient must sign the form after therapy and that by signing, the patient attests that "I hereby confirm the above checked therapies I received today." Plaintiffs argue that Defendant D'Souza testified inconsistently by first stating that he never allowed his patients to sign blank SOAP notes, but later testifying, after Plaintiffs confronted him with signed blank SOAP note forms, that patients who spoke foreign languages sometimes got confused and signed blank forms. He also testified that he accidentally lost the file of one of his patients whom he treated at his home and thereafter asked the patient to sign blank SOAP note forms to prove that he had previously treated that patient. (Trial Tr. 491:2-492:13.) Although Defendant D'Souza's testimony arguably contained some inconsistencies, it was not so inconsistent as to be incredible, and the jury was entitled to believe him. *See Lowe v. Consol. Freightways of Delaware, Inc.*, 177 F.3d 640, 643 (7th Cir. 1999) ("It's the jury's job—not the district court's job or the job of a panel of appellate judges—to figure out who's telling the truth. The fact that [the losing party] presented evidence that is inconsistent with the jury's verdict does not mean that the verdict should be reversed."). Moreover, the handful of blank SOAP note forms was not the "bombshell" evidence Plaintiffs claim it was. Indeed, out of 25,000 pages of 461 patients' medical records, whom Defendant D'Souza treated over the span of a decade, Plaintiffs presented only two blank SOAP note forms

13

and one set of blank SOAP note forms for the patient whose file was misplaced. (Trial Tr. 395:2-406:25; .) This dearth of evidence hardly supports an inference of fraud or intent to defraud.

As the Court's review of the evidence makes clear, there was a reasonable basis for the jury to conclude that Defendants did not defraud Plaintiffs by billing for treatments not rendered. *See Westchester Fire*, 183 F.3d at 582 (a court "will not overturn a jury's verdict as long as there is a reasonable basis in the record to support it"). Notably, Plaintiffs did not call even one of Defendant D'Souza's patients to testify as to whether Defendant D'Souza or his colleagues treated the patient on the day(s) at issue or asked the patient to sign a blank SOAP note form. Asking the jury to infer a massive fraudulent scheme from a handful of inaccurate medical records over a span of several years is a difficult proposition, and it does not shock the Court's conscience that the jury found Plaintiffs' evidence lacking.

### 2.  Upcoding

It is undisputed that for the pre-2003 cases at issue, Defendant D'Souza coded all of his initial exams at a Level 5, which is the highest, most complex level, and that he charged $175.00 for a Level 5 exam. In 2003, however, Defendant D'Souza began coding his initial exams at a Level 3, and charging $150.00 per initial exam, after attending a conference where he learned that changes in the industry necessitated a coding change. (Trial Tr. 464:3-13; 465:21-469:6.) According to Plaintiffs, neither Defendant D'Souza nor any of the witnesses on his behalf explained what specifically was necessary in the decision-making and medical complexity of the cases to justify billing a Level 5 exam. Defendant D'Souza, however, offered testimony as to why he used a Level 5 code. In particular, he testified that he believed he was doing an

"extensive study, extensive history taking, and extensive examination" and that he engaged in what he described as "not a simple decision-making process." (*Id.* 465:11-20.) Although Plaintiffs are correct that their expert, Dr. Reinke, testified that none of Defendant D'Souza's patients' cases could have warranted a Level 5 examination, Defendants' expert, Dr. Freeman, corroborated Defendant D'Souza by testifying that he reviewed the cases at issue, found that they were complex, and determined that it was reasonable to code them as a Level 5. (*Id.* 1605:20-1607:11.)

Moreover, even if the jury concluded that Defendant D'Souza improperly coded his patients' examinations before 2003, the jury was nevertheless entitled to reach the conclusion that it did. First, Plaintiffs do not cite to any evidence showing that Defendant D'Souza intended to defraud Plaintiffs by upcoding bills. Additionally, Defendants' uncontradicted testimony showed that the rate Defendant D'Souza charged for a Level 5 exam ($175.00) was within the range of rates doctors in the relevant geographic area charge for Level 3 exams ($135.00 to $200.00). (Trial Tr. 468:20-469:6.) Therefore, the jury could have reasonably concluded that even if Defendant D'Souza mistakenly improperly coded his patients' exams, he did so without any fraudulent intent.

### 3.     DMX

One of the hotly contested issues at trial was Defendant D'Souza's use of DMX to detect ligamentous injuries. On the one hand, Plaintiffs argued that DMX is essentially a hoax and a tool for chiropractors to charge more money, while on the other hand, Defendants argued that DMX is ground-breaking technology that allows chiropractors to more accurately diagnose and treat patients.

15

At trial, Plaintiffs argued that Defendant D'Souza's use of DMX on his patients was not medically necessary and that billing Plaintiffs for DMX studies and reports was either fraud or an "attempt at fraud." *See* R. 348 at 10-11. Dr. Joel Meyer,[12] Plaintiffs' expert, testified that a DMX study cannot detect ligamentous injuries because DMX does not allow one to see ligaments. (Trial Tr. 539:1-21.) He further testified that none of the DMX studies he reviewed showed any ligamentous instability or other physical irregularities that Defendant D'Souza, or the radiologists working with him, reported. (*Id.* 558:4-20.) Such evidence, however, was not uncontradicted.

Dr. Louis Kastan,[13] Defendants' expert, testified that, contrary to Dr. Meyer's opinions, DMX could be used to diagnose musculoligamentous injuries of the spine and that, based on his 15 years of experience and several thousand examinations, a DMX study is the "best way" to evaluate instability of the spine. (*Id.* 1713:10-25.) He explained that although one cannot see ligaments through a DMX study, it can nevertheless detect a ligamentous injury because it shows the motion of the patient's cervical spine. (*Id.* 1726:8-1727:2 ("You don't see the ligament.

---

[12] Dr. Meyer is the Vice Chairman of Radiology and the Section Chief of Neuroradiology at NorthShore University Health Systems in Evanston, Illinois. He is also a clinical professor of radiology at the Pritzker School of Medicine at The University of Chicago. After obtaining his Doctor of Medicine degree from SUNY Health Science Center in Syracuse, New York, he completed a residency in diagnostic radiology at the University of Michigan Hospitals in Ann Arbor, Michigan and completed a two-year neuroradiology fellowship at the same location. Dr. Meyer is board certified in diagnostic radiology.

[13] Dr. Kastan is board certified in both diagnostic radiology and nuclear medicine. He graduated from the University of Louisville medical school in 1972 and also served his internship and two residencies at the University of Louisville affiliated hospitals. He is licensed in Kentucky, Illinois, Indiana, and Florida. Among his experience, he served as the Director of Radiology at Perry County Memorial Hospital in Tell City, Indiana from 1985 to 2004 and currently is a consulting member of the radiology staff of a number of hospitals in southern Florida.

You see whether it's doing its function. And that's the whole idea of the study."). Dr. Knell testified similarly: "by the bones moving, we're able to deduct that because bones are moving in an aberrant fashion or in an irregular or wrong fashion, that there is most likely something wrong with the ligamentous structure that supports the bones while the muscles are moving that joint." (Knell Dep. 238:23-240:2.)

Additionally, Defendants' expert, Dr. Zinser,[14] who has treated over 17,000 patients during the last 40 years and has extensive experience with DMX studies, testified that he reviewed the medical records of the 93 patients on whom Defendant D'Souza performed a DMX study and concluded that if those patients had been his, he would have conducted DMX studies for each one of them. (Trial Tr. 1651:23-1652:1; 1655:5-7; 1656:25-1657:3; 13-18.) Based on this evidence, the jury was well within its province to determine that Defendant D'Souza did not commit fraud by ordering and billing for DMX studies.[15]

### 4. Unnecessary conventional x-rays

Next, Plaintiffs argue that Defendant D'Souza routinely billed them for unnecessary conventional "Davis Series" x-rays. Plaintiffs' expert, Dr. Reinke, testified that in order to

---

[14] Dr. Zinser is a Doctor of Chiropractic who graduated from Palmer College of Chiropractic in Davenport, Iowa over 40 years ago. He operates two chiropractic clinics in Illinois. He is a member of the International Chiropractic Association and the American Chiropractic Association. He has lectured numerous times about chiropractic topics, and he has engaged in studies in orthopedic diagnostics and x-ray diagnostics.

[15] Plaintiffs make much of the fact that Defendant D'Souza stopped conducting DMX studies on his patients after Plaintiffs stopped paying for them. *See* R. 348 at 10. This fact is uncontested, but it does not require a finding that Defendant D'Souza defrauded Plaintiffs. Moreover, the fact that Defendant D'Souza performed a DMX on his computer expert has nothing to do with whether he defrauded Plaintiffs since Plaintiffs do not allege that Defendant D'Souza billed Plaintiffs for this study.

properly bill for x-rays, they must be necessary and the doctor must follow up with the patient if the x-ray reveals a potential medical issue. (Trial Tr. 1091:15-1096:5.) Based on this testimony, Plaintiffs contend that the x-rays Defendant D'Souza took were unnecessary because, in some cases, he did not perform the necessary follow up with his patients after taking the x-rays. In support of this contention, Plaintiffs identified two instances where the x-rays showed that the patients had "potential serious trauma," but Defendant D'Souza did not follow up with them. (R. 348 at 12.)

Again, however, Defendants' evidence contradicted Dr. Reinke's opinions, and the jury was entitled to weigh the parties' evidence and determine that Defendant D'Souza did not bill Plaintiffs for unnecessary conventional x-rays. *See Latino*, 58 F.3d at 317. Defendant D'Souza testified, for example, as to his reasons for taking conventional x-rays, citing an authoritative treatise written by Dr. Terry Yochum, *Essentials of Skeletal Radiology*, which recommends such x-rays as an "integral part of radiological examination" of whiplash cases. (Trial Tr. 1842:10-1843:7.) Moreover, Dr. Freeman explained why it is medically necessary for a chiropractic doctor to take Davies series x-rays. (*Id.* 1565:25-1569:12). Additionally, Dr. Slater and Dr. Knell, both of whom worked for Defendant, testified that they also believed that Davis Series x-rays often were medically necessary for the types of patients they saw while working for Defendant D'Souza. (*Id.* 1382:13-22; 1384:4-9, 15-18; 1385:16-1386:3; 1386:19-1387:12; Knell Dep. 234:2-235:11.) Even if the jury believed Dr. Reinke regarding the two cases in which Defendant D'Souza allegedly failed to follow up with his patients after taking the x-ray, such a finding does not necessarily indicate fraud as to those specific cases, let alone a fraudulent

18

scheme as to all 461 cases.[16]  The jury was entitled to, and indeed had to, weigh the witnesses'

testimony and determine whom to believe.  *See Latino*, 58 F.3d at 316 ("the credibility of

witnesses is peculiarly for the jury").  Based on the evidence, a rational jury could have reached

the same verdict.

### 5. Altering and manipulating medical records

Plaintiffs maintain that Defendant D'Souza manipulated medical records, citing as

examples Plaintiffs' Exhibits 203 and 204, in which Defendant D'Souza allegedly changed the

date of Dr. Yochum's x-ray reading to reflect that the reading took place soon after the patient

underwent the x-ray examination.  Contrary to Plaintiffs' argument, the testimony Plaintiffs cite

does not necessitate a conclusion that Defendant D'Souza intentionally altered those two medical

records, let alone altered them for the purpose of defrauding Plaintiffs.  Defendant D'Souza

admitted that the two dates were incorrect, but he specifically testified that he did not know how

the error happened.  (Trial Tr. 1916:8-15;1918:23-25.)  Plaintiffs asked the jury to infer that

Defendant D'Souza intentionally altered the dates on the x-ray reports for a nefarious purpose,

but the facts do not mandate such an inference.  Moreover, the fact that Plaintiffs could point to

only two instances out of 461 cases' worth of medical records where this error occurred works

against them in proving that Defendant D'Souza intentionally altered the dates as part of a

scheme to defraud Plaintiffs.  The jury was well within its discretion to conclude that Defendant

D'Souza did not manipulate medical records for the purpose of defrauding Plaintiffs.

---

[16]  Indeed, Dr. Freeman criticized Dr. Reinke's opinions for deciding, based on couple of
instances of alleged failure to follow up with patients, that the x-rays Defendant D'Souza took in
all of the cases at issue were unjustified.  (*Id.* 1568:23-1569:12.)

Similarly, the jury did not act irrationally in disbelieving Plaintiffs' argument that Defendant D'Souza committed fraud by typing Dr. Rawoof's medical reports. Defendant D'Souza explained that he typed Dr. Rawoof's reports and affixed her electronic signature to them because she asked him to do so as she was not very good with computers. Further, he testified that after having a conversation with Dr. Rawoof, sometimes oral and sometimes written, he typed the patient reports and gave the files back to her for review. (Trial Tr. 419:22-421:7.) Dr. Rawoof explained how she believed Defendant D'Souza interpreted her notes in order to determine what to include in the medical report. (*Id.* 655:4-661:4.) Even though Plaintiffs obviously do not believe Defendant D'Souza, it was the jury's prerogative, as the finder of fact, to weigh the testimony and determine that he did not commit fraud by typing Dr. Rawoof's reports. *See, e.g., Latino*, 58 F.3d at 317 (motion for new trial not warranted where "[b]oth sides put forth evidence on [the] issue and argued at length the inference which could be derived from it").

Plaintiffs also argue that the jury should have concluded that Defendant D'Souza committed fraud by transforming Dr. Marquart's, Dr. Sandman's, and Dr. Youchum's original records onto his letterhead and affixing facsimiles of those doctors' signatures. Nothing Plaintiffs point to suggests, let alone proves, that Defendant D'Souza did this with an intent to defraud Plaintiffs. Indeed, as Defendants point out, Plaintiffs offered no evidence at trial as to how Defendant D'Souza defrauded them by this conduct. Importantly, Plaintiffs do not contest that the doctors rendered the underlying studies. Accordingly, there was a reasonable basis for the jury to conclude that Defendant D'Souza did not engage in fraud by altering medical records.

### 6.     Improper use of assistants

Dr. Reinke testified that lay assistants could properly treat chiropractic patients.  She

further testified that in order for a doctor to properly bill a lay assistant's time as "incident to

physician service," the doctor must have documentation that the lay assistant is properly trained,

and the bill has to reflect the name of the doctor and the individual(s) who provided assistance.

(Trial Tr. 1069:3-1070:7.)  Based on such testimony, Plaintiffs argued at trial that Defendant

D'Souza improperly billed for lay assistants' time, pointing to the fact that the lay assistants

were not trained physical therapists or licensed chiropractors and that at least one of them, a

Spanish-speaker, could not have taken direction from Defendant D'Souza because he does not

speak Spanish.  (R. 348 at 14.)  Plaintiffs also claimed that Rafael Chazaro provided treatment to

patients and wrote SOAP notes in the patients' medical records.

The jury, however, did not have to accept as true Dr. Reinke's testimony.  *Lowe*, 177

F.3d at 642–43 ("The fact that [the defendant] presented evidence that is inconsistent with the

jury's verdict does not mean that the verdict should be reversed . . . .  The jury was there; it

weighed the witnesses' credibility, considered the evidence, and reached a supportable

conclusion.")); *see also* R. 306 at 17 (instructing the jury that "[t]he fact that [an expert witness]

has given an opinion does not mean that you are required to accept it.")  Moreover, Defendants

offered evidence, from both the assistants themselves and from doctors who worked with

Defendant D'Souza, that contradicted Plaintiffs' arguments about the lay assistants' training and

supervision.  *See* Trial Tr. 642:2-9; 1411:2-1415:6; 1423:2-1424:18; 1438:24-1440:9; 1447:1-5

and 13-16 (Defendant D'Souza's lay assistants received both formal and informal training) and

1427:3-21; 1428:24-1432:9; 1433:2-8 and 17-22; 1434:25-1435:12; 1224:25-1227:13 (assistants

were supervised). Defendants also offered evidence showing that Rafael Chazaro was a fully-licensed doctor of naprapathic medicine in the State of Illinois and was legally authorized to provide care to patients without supervision. (*Id.* 1199:17-1204:13.) Given this evidence, Plaintiffs are not entitled to a new trial.

### 7. Computerized range of motion tests

Plaintiffs next argue that they proved fraud by showing that Defendant D'Souza, "at some point," started billing for computerized range of motion and muscle strength tests as separate procedures rather than billing for them as a part of the "bundle" of the physical exam. (R. 348 at 16.) According to Plaintiffs, the timing of the change to this billing system was telling because it coincided with the point at which Defendant D'Souza stopped using the DMX.

Again, however, Defendant D'Souza offered a reasonable and factually supported explanation as to why he conducted computerized range-of-motion tests in addition to manual tests–namely, that the computerized printouts helped educate patients' on their progress. (R. 348 at 16.) Drs. Slater and Knell, both of whom are practicing chiropractors, corroborated Defendant D'Souza's explanation. *See* Trial Tr. 1403:21-23; 1404:16-18; Knell Dep. 254:18-256:21. Dr. Knell, who worked for Defendant D'Souza, further testified that she was not aware of any instance in which he performed a medically unnecessary computerized range-of-motion test. (Knell Dep. 258:1-5.) Additionally, Dr. Freeman opined that Defendant D'Souza properly billed for the procedures. (Trial Tr. 1564:6-1565:24.) That Plaintiffs find Defendant D'Souza's corroborated explanation incredible is of no moment because the jury was entitled to determine whom to believe. *See Nelson*, 2011 WL 4460492, at \*7, n.3 (Where the jury's determination

rests upon the credibility of witness testimony concerning straightforward claims, "substantial deference" to the jury is appropriate.).

### 8.    Kickbacks to Drs. Knell and Chazaro

Plaintiffs next argue that because Dr. Reinke testified that it was "unethical" for doctors to pay associates a referral fee for referring patients to their clinics for diagnostic testing, Defendant D'Souza committed fraud against Plaintiffs by doing so.  (R. 348 at 16.)  Defendants offered credible testimony from both doctors that Defendant D'Souza did not pay them referral fees.  (Knell Dep. 244:8-245:4; Trial Tr. 1231:3-9.)  Therefore, the jury's determination rested on which witness(es) to believe.  Because there was a reasonable basis for the jury to believe Drs. Knell and Chazaro, the jury's verdict was not against the manifest weight of the evidence.

### C.    A rational jury could have concluded that Plaintiffs failed to prove reliance and damages

Plaintiffs bore the burden at trial to prove damages resulting from Defendants' alleged conduct.  During the trial, Plaintiffs introduced a chart prepared by Allstate employee Catia Monforton-Farris, which for all cases lists, among other information: 1) the claim number; 2) the patient name; 3) the provider name; 4) the billed amount; 5) the covered amount; 6) the dates of treatment; and 7) the amount Plaintiffs paid on the claim.  *See* Plaintiffs' Exhibit 45A.  Ms. Monforton-Farris testified about the methodology she used to create the spreadsheet.  On the basis of this evidence, Plaintiffs asked the jury to award them at least $814,938.13 on their fraud-based claims (and treble damages for their RICO claim).  Over Defendants' objection, the Court allowed Plaintiffs to admit the chart into evidence, determining that counsel's arguments were relevant to the weight, but not the admissibility, of the chart.  By introducing the chart with summary information for hundreds of cases, while not introducing any underlying medical bills,

23

Plaintiffs risked that the jury would find their damages evidence insufficient. Indeed, Defendants' counsel criticized Plaintiffs' damages theory during closing argument, citing the fact that Plaintiffs failed to introduce a single medical bill into evidence.[17] Given the totality of the evidence, the jury had a reasonable basis to conclude that Plaintiffs failed to meet their burden with respect to reliance and damages.

## II. Negligent Spoliation of Evidence

### A. Burden of proof

To establish their claims for negligent spoliation for destruction of original x-rays, DMX studies, x-ray reports and DMX reports, Plaintiffs had to prove the following elements by a preponderance of the evidence: 1) Defendant D'Souza was negligent in failing to keep and maintain the actual x-rays and DMX studies, as well as the "original" unaltered x-ray and DMX reports that were provided to him by the various radiologists; 2) Plaintiffs sustained damages; and 3) Defendant D'Souza's negligence was a proximate cause of Plaintiffs' alleged damages. *See* R. 306 at 53; *see also Allstate*, 691 F. Supp.2d at 796 (citing *Perez-Garcia v. Village of Mundelein*, 396 F. Supp.2d 907, 912 (N.D. Ill. 2005)).

### B. A rational jury could have found for Defendants on both of Plaintiffs' negligent spoliation claims

Plaintiffs argue that Defendant D'Souza acted negligently when he destroyed certain reports regarding x-rays and DMX that he received from Drs. Marquart, Sandman and Yochum after cutting and pasting the content of those reports onto his letterhead. (R. 341 at 17.) They

---

[17] Additionally, the fact that Defendants did not present rebuttal evidence with respect to Plaintiffs' damages argument is not dispositive, especially given that it is Plaintiffs' burden to prove damages (and not Defendants' burden to prove lack thereof).

further contend that he was negligent in storing original VHS tapes and CDs of DMX studies and original x-ray films in his basement, where they were inadvertently destroyed by mold and mildew.  As Defendants note, however, Defendant D'Souza offered rational explanations for his conduct, including that he stored files on his computer containing the content of the original documents Drs. Marquart, Sandman and Yochum sent to him, and that he digitized the DMX studies so that he could store them on his computer.  (Trial Tr. 478:24-480:2; 480:12-481:18; 1873:5-1875:4.)  Moreover, Defendants introduced a computer expert, Mr. Charles Fletcher, who testified in detail as to the computer crash that caused Defendant D'Souza to lose the DMX studies and other information that he stored in his computer.  (Trial Tr. 1455-1480.)  Based on this evidence, a rational jury could have inferred that Defendant D'Souza did not act negligently. Additionally, as Defendants point out, Plaintiffs did not introduce any evidence of damages caused by Defendant D'Souza's conduct.  After viewing the totality of the evidence, the jury was well within its province to find for Defendants on Plaintiffs' negligence claims.[18]

### III.    Defendants' Counsel's Leading Questions Do Not Warrant a New Trial

As this Court has held, "[i]n order to obtain a new trial on attorney misconduct grounds, the moving party must show both that the misconduct occurred and that it prejudiced their case." *Anderson v. City of Chicago*, No. 09 C 2311, 2011 WL 2292327, at *2 (N.D. Ill. June 9, 2011) (citing *Whiting v. Westray*, 294 F.3d 943, 944 (7th Cir. 2002)); *see also Edwards v. Staniec*, 389 Fed. Appx. 523, 526 (7th Cir. 2010) (refusing to set aside a verdict unless the moving party

---

[18]  As Defendants note, Plaintiffs do not point to any evidence indicating to what extent Defendant's conduct harmed Plaintiffs, which is significant given that damages are a necessary element of a negligence claim.

suffered prejudice from the asserted error) (citing *Happel v. Walmart Stores, Inc*., 602 F.3d 820, 826 (7th Cir. 2010)).

Although Defendants' counsel asked a significant amount of leading questions during his direct examination, such questioning did not rise to the level of misconduct that would warrant a new trial in this case. Plaintiffs had the opportunity to object to such questioning, and they admit that the Court repeatedly sustained their objections. *Cf. Shutler v. Lake Forest Country Day Sch*., No. 07 CV 6553, 2011 WL 4007340, at *5 (N.D. Ill. Sept. 9, 2011) (denying motion for a new trial based on allegedly improper leading questions where court *overruled* objections to leading questions). Moreover, even if Defendants' counsel's questioning constituted "misconduct," Plaintiffs nevertheless fall far short of their burden to demonstrate that such conduct prejudiced their case. Plaintiffs point to two specific instances where they argue Defendants' counsel's leading questions suggested to the witness what his answer to the question should be. Having reviewed those instances and having witnessed the entirety of counsel's conduct at trial, it is clear that he did not ask the questions for an improper purpose. In addition, Plaintiffs fail to identify any prejudice from these answers over the course of the nine-day trial.

This case is unlike *Dunlap v. King*, No. 3:08-0077, 2009 WL 2151311, at *3 (M.D. Tenn. July 15, 2009), on which Plaintiffs rely. During the course of the trial in *Dunlap*, "the Court repeatedly and expressly warned defense counsel that the Court was considering a mistrial, if his *contemptuous* conduct persisted." *Id.* (emphasis added). The Court gave no such warnings in this case, nor did it find, or even suggest, that Defendants' counsel's conduct was "contemptuous." Plaintiffs did not ask the Court to give such a warning, and the Court did not find that Defendants' counsel's conduct warranted it. Moreover, the court in *Dunlap* explained

26

that the "record does not capture defense counsel's disregard for the Court's rulings." *Id.* Here, the Court is not of the opinion that Defendants' counsel was intentionally disregarding the Court's rulings.[19]  In its discretion, the Court determines that Defendants' counsel's leading questions did not prejudice Plaintiffs' case. *See Whiting*, 294 F.3d at 944 (because of the district court's unique position to view the evidence and the course of the trial, the Seventh Circuit defers to the district court on questions of prejudice) (citing *Miksis v. Howard*, 106 F.3d 754, 757 (7th Cir. 1997)).

## IV.    A New Trial Is Not Necessary to "Prevent Injustice"

The Court is not convinced by Plaintiffs' argument that it must grant their motion for a new trial because, in their opinion, "Defendant lied throughout the trial." (R. 348 at 21.)  The members of the jury observed the Defendant as he testified two separate times (once in Plaintiffs' case-in-chief and again in Defendants' case-in-chief), and they observed Defendant D'Souza in the courtroom throughout the nine days of trial.  As the fact-finder, the jury was entitled to determine the credibility of each witness and how much weight to give his or her testimony. *Latino*, 58 F.3d at 316.  Likewise, the Court is unpersuaded by Plaintiffs argument that the jury verdicts in this case "will serve to empower this defendant to go on and continue to practice medicine in a fraudulent manner. . . ." (R. 398 at 321.)  As discussed throughout this opinion, the jury's findings that Defendant did not engage in fraud are not against the manifest weight of the evidence.  Therefore, the jury's verdicts will not cause injustice.

---

[19]  As the record reflects, Plaintiffs' counsel's conduct during the trial was not exactly exemplary, and it was the subject of Defendants' motion (and renewed motion) for a mistrial. *See* R. 300-302.  Indeed, the Court admonished Plaintiffs' counsel for his improper conduct.

**CONCLUSION**

After reviewing both parties' arguments and the evidence upon which each party relies,

the jury's verdicts were not against the manifest weight of the evidence.  Accordingly, the Court

denies Plaintiffs' motion for a new trial.

DATED:  February 29, 2012                                    ENTERED

                                                            _____
                                                            AMY J. ST. EVE
                                                            United States District Court Judge